UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------- X

PHILLIP J. BARKETT, JR.,

             Plaintiff,

      -against-

SOCIÉTÉ GÉNÉRALE, DANIEL
BOUTON, and ROBERT A. DAY,

          Defendants.

----------------------------------- X

**JUDGE LYNCH**

No. 08 CIV. _____ (   ) ECF case

**CLASS ACTION COMPLAINT FOR
VIOLATION OF THE
FEDERAL SECURITIES LAWS**

**DEMAND FOR JURY TRIAL**



MAR 1 2 2008

U.S.D.C. S.D. N.Y.
CASHIERS

This class action complaint for violations of federal securities laws is brought against Société Générale and its subsidiaries and affiliates ("Société Générale" or "SocGen" or the "Company") and certain of SocGen's officers and directors (collectively, "Defendants").  Plaintiff Phillip J. Barkett ("Barkett") brings this action individually and on behalf of all other purchasers of the American Depository Receipts ("ADR"s) of SocGen and all U.S. citizens who purchased SocGen securities on any exchange between August 1, 2005 and January 23, 2008, inclusive (the "Class Period" or "CP"). (Such purchasers, along with Plaintiff, are referred to collectively herein as the "Class.")   This complaint is alleged upon personal knowledge as to Plaintiff's own acts, and upon information and belief as to all other matters, based upon Plaintiff's counsel's investigation, which included counsel's review of SocGen's public filings, wire and press releases published by and regarding SocGen, securities analysts' reports and advisories about the Company, and information readily available in the media and on the Internet.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.      INTRODUCTION

1.      SocGen is a large financial services group, which employs over 120,000 employees worldwide in three key businesses: Retail Banking & Financial Services, Global Investment Management & Services, and Corporate & Investment Banking ("CIB").  SocGen is also France's second largest bank – and ranks among the leading banks worldwide in euro capital markets, derivatives and structured finance.  SocGen serves corporate and individual clients and financial institutions, has offices in some 5,300 locations worldwide in approximately 82 countries (at YE 2007), and has a significant presence in the United States.  SocGen has approximately 2,900 professionals working in 13 U.S. cities, including offices in New York and Los Angeles.  SocGen is the third largest non-American bank in the United States.

2.      During the CP, Defendants made false and misleading statements and concealed material adverse information regarding: (1) SocGen's exposure to subprime loans and collateralized debt obligations ("CDOs"), and (2) SocGen's internal controls.

3.      Throughout the Class Period, Defendants touted SocGen's conservative management,

risk control, and expertise in risk analysis and structured finance, including CDO vehicles.

4.      In addition, when the subprime crises affected the market as a whole, Defendants misleadingly emphasized to investors that SocGen had "very little exposure" to the subprime segment.

5.      Defendants thus gave investors no warning about the size of Société Générale's losses. On November 2007, SocGen announced €230 million ($334.6 million) in write-downs for 3Q2007 related to subprime exposure, while adding that the write-downs were based on a "worse-case [sic] forward-looking scenario" that losses from subprime mortgages in the market as a whole would reach $200 billion.

6.      Investors were even more shocked by subsequent revelations regarding the size of SocGen's subprime losses. On January 24, 2008, SocGen announced writedowns of €2.05 billion for the fourth quarter of 2007, including €1.1 billion in relation to US residential mortgage risk, €550 million from exposure to US monoline insurers, and €400 million in additional provision to the aforementioned exposures. Then, on February 11, 2008, Société Générale said it recorded writedowns and provisions from subprime exposure of €2.6 billion (U.S. $3.8 billion) in 2007 (which was greater than the cumulative total of €2.28 billion previously disclosed for the fourth and third quarters of 2007).

7.      In addition, throughout the Class Period, SocGen repeatedly touted its internal controls and risk management. Such controls and risk management are key attributes of critical importance to a financial services company. Among other things, Defendants misled investors regarding SocGen's lack of adequate internal controls by assuring the investing public that all risks were carefully monitored throughout the Company. For instance, SocGen's 2006 Registration Document, filed on March 9, 2006, and 2007 Registration Document, filed on March 6, 2007, each included a 10-page Report of the Chairman on Internal Control Procedures, which details "a set of specific procedures [that] has been compiled for each type of risk." SocGen claimed that it had implemented such procedures, for instance: "teams of risk controllers who are completely independent from the front-office staff, carry out **daily reviews of all positions and risks** taken in

the course of the Group's market activities," and "daily summaries of risk exposures are produced, **highlighting any cases where limits have been exceeded**." (Emphasis added.) The 2007 Registration Document also boasted that almost 2,000 staff members were "dedicated to reviewing and controlling risk exposure on a permanent basis," that compliance is monitored on a regular basis by the compliance department, legal and tax departments, that there is permanent supervision and day-to-day security, and a two-level control system including internal audit departments in every SocGen division, and a General Inspection Department. Defendants also assured investors that SocGen was "**ever loyal to its ethic of prudence**," and that SocGen has "been able to check that, even in extreme situations, the degree of risk remains acceptable for the Group."

8.     However, the reality at SocGen was quite different from the prudent, comprehensive internal controls and risk management situation which Defendants portrayed to investors. In reality, SocGen had a "culture of risk" in which risky trading was tacitly permitted. As a result of the actual inadequacy of SocGen's internal controls, a 31-year-old trader on SocGen's Delta One equity derivatives trading desk, Jerome Kerviel, engaged in unauthorized trades for over two years, from 2005 through January 18, 2008.

9.     On January 24, 2008, investors were stunned when Société Générale announced a "massive fraud" involving Kerviel's trades, which had cost SocGen €4.82 billion ($7.09 billion) to unwind. Criminal and other investigations of this matter are ongoing, and a number of employees were fired by SocGen.

10.     According to an interim report of three independent SocGen board members, issued on February 20, 2008, SocGen ignored or failed to act upon **seventy-five alerts** which should have alerted SocGen to Kerviel's massive trading activity from 2005 through early 2008. The interim investigative report also concluded that SocGen's "operating staff did not systematically carry out more detailed checks," and certain controls which might have identified the fraud were absent and not provided for. Furthermore, Kerviel and other sources have maintained that Kerviel's supervisors were aware of his trading activities.

11.     The fraud at SocGen appears to be the largest ever by a trader. SocGen's $7.09

billion of trading losses to unwind Kerviel's trades far exceeds the Nick Leeson trading scandal in 1995 that bankrupted British bank Barings. Barings collapsed after Leeson, the bank's Singapore general manager of futures trading, lost $1.38 billion on Asian futures markets, wiping out the bank's cash reserves.  Barings had been in business for more than 230 years.

12.    This case also involves enormous insider trading.  Just two weeks before the billions of dollars of SocGen's trading and subprime-related losses were revealed to the public, a top SocGen U.S. executive and board member, defendant Robert A. Day, and foundations related to Mr. Day, sold off millions of shares of their SocGen stock at artificially inflated prices, for proceeds of more than U.S. $140 million (€95 million).  These sales are now the subject of investigations by the U.S. Department of Justice, the U.S. Securities and Exchange Commission ("SEC"), and French market regulators.

13.    The revelation and materialization of the truth at the end of the CP caused the price of SocGen's ADRs and other securities to drop dramatically, damaging Plaintiff and the Class.

## II.    **JURISDICTION AND VENUE**

14.    Jurisdiction is conferred by §27 of the Securities Exchange Act of 1934 (the "1934 Act"), 15 U.S.C. §78aa, and 28 U.S.C. §§1331 and 1337.  The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and the rules and regulations promulgated thereunder, including Rule 10b-5, 17 C.F.R. §240.10b-5.  In connection with the acts alleged in this Complaint, defendants, directly and indirectly, used the means and instrumentalities of interstate commerce including, but not limited to, the United States mail and interstate telephone communications.

15.    Venue is proper in this District pursuant to §27 of the 1934 Act, 15 U.S.C. §78aa and 28 U.S.C. §§1391(b), (c) and (d), because offers and sales of SocGen securities at issue in this action occurred in this District.  In addition, many of the acts and practices made in furtherance of Defendants' scheme and complained of herein occurred in substantial part and/or had an effect in

this District. Further, as detailed in the "parties" section below, Defendants are, and were during the Class Period, located in, conduct (or conducted) substantial business in, and/or have (or had) substantial contacts within this District.

16.     In the United States, SocGen sold artificially inflated securities by means of false and misleading statements in financial reports, offering memoranda, and press releases. SocGen actively marketed and sold these securities in the United States despite its false reporting of its financial condition and internal controls as alleged herein.

17.     SocGen's ADR program has been active in the U.S. since July 1st, 1993. Five SocGen ADRs (Ticker symbol: SCGLY) represent one Société Générale share. Bank of New York, in New York City, serves as the depository bank for the program. SocGen's ADRs traded on the over-the-counter market in the United States throughout the Class Period.

18.     Throughout the Class Period, SocGen regularly filed and disseminated false and misleading reports, including quarterly and annual reports which were relied upon by investors in the United States in making investment decisions concerning SocGen securities. SocGen posted copies of these filings in English on SocGen's web site to ensure that United States investors would be able to review those documents. Also during the Class Period, false and misleading statements made outside the United States were disseminated, in English, into the United States and internationally through the means and instrumentalities of international and interstate commerce including, but not limited to, the mails, interstate telephone (and related Internet) communications, and other electronic media.

III.    **THE PARTIES**

19.     As set forth in the accompanying certification, **Plaintiff Barkett** purchased 389 ADRs on April 12, 2006 at $28.96 per share. Plaintiff lost approximately $3,100 on his CP purchases of artificially inflated SocGen ADR securities. Plaintiff is a resident of Missouri.

20.     **Defendant Société Générale** is a large financial services group, headquartered in France, which has a significant presence in the United States.

21.     Société Générale opened its first office in the United States in 1938. According to SocGen's website, today SocGen "is one of the largest foreign banking organizations in the United States with approximately 2,900 professionals working in 13 U.S. cities."

22.     SocGen Corporate and Investment Banking's subsidiaries, Société Générale America Securities LLC, Société Générale Constellation LLC, and Société Générale Energie (USA) Corp., all have their offices at SocGen's New York branch, located at 1221 Avenue of the Americas, New York, New York. In addition, Société Générale Asset Management has its headquarters in Los Angeles, and offices in New York at 200 Park Avenue, New York, NY 10166.

23.     Société Générale's website also sets forth the Company's extensive operations in the United States, as follows:

> The following Société Générale divisions **operate in the U.S. to provide Société Générale investor, corporate and governmental clients with a complete array of financial services.**
>
> Société Générale Corporate & Investment Banking offers:
>
> - Securities, investment banking and advisory services through **SG Americas Securities, LLC**
>
> - Corporate banking and fixed income services through the Société Générale branch
>
> The Société Générale Global Investment Management and Services division provides asset management; brokerage, clearing and execution; custody; and issuer services, among others.
>
> Société Générale's Specialized Financial Services division meets the financial and service needs of companies and individuals in France and abroad. For its corporate clientele in the U.S.:
>
> - Equipment finance is provided by **SG Equipment Finance USA Corp**.
>
> - Fleet management services are provided by **ALD Automotive USA** (through its 100% acquisition of ULTEA in 2006)
>
> - Boat finance brokerage services are provided by **Scott Financial Services** (through its 100% acquisition by Société Générale in 2006)
>
> SOCIÉTÉ GÉNÉRALE CORPORATE & INVESTMENT BANKING
>
> **Société Générale Corporate & Investment Banking in the U.S. integrates a sophisticated and well diversified product mix** - including the global SocGen CIB core product areas of Capital Markets, **Derivatives and Structured Finance** - with a focused industry approach to service some of the world's largest multinational and corporations and high growth clients.

6

**SG CIB in the U.S. delivers its array of financial services to targeted U.S. multinational, institutional and sector-based clients in industries where the firm has demonstrated expertise.** In addition to continuing to strengthen its client franchise across the Americas region, SG CIB is growing its capital markets and financing product platform in areas of excellence such as **structured finance** (e.g. real estate, leveraged and commodity finance), **securitization, equity derivatives,** foreign exchange and commodity trading.

**The U.S. operations regularly contribute around 1/3 of client revenues and before-tax operating income to the global results of SocGen CIB, one of the most profitable corporate and investment banks in the eurozone.**

Sectors of focus:

- Financial Institutions
- Infrastructure & Transportation Project Finance
- Energy & Natural Resources (Oil & Gas, Utilities, Soft Commodities)
- Financial Sponsors
- Media, Telecom & Sports
- Real Estate, Gaming & Lodging
- Large Multinationals

Product areas of focus:

- Capital Markets: **SG CIB in the U.S. helps clients to tap the U.S. and euro debt and equity markets and provides clients with expert distribution capabilities.**

- **Derivatives: SG CIB in the U.S is active in equity derivatives, commodities derivatives, foreign exchange derivatives, and credit and interest rate derivatives with a focused client base. SG CIB is additionally an innovator in the area of index-linked structured products. SG CIB purchased Bank of America's Hedge Fund-Linked Structured Products business which has been integrated into the firm's equity derivatives platform.**

- Structured Finance: SG CIB's U.S. structured finance business is instrumental in **consolidating our leading franchise in our global specialized finance areas such as securitization, project finance, and trade and export finance. In 2006, SG CIB created a U.S. RMBS group and also launched its U.S. leveraged finance business.**

SG CIB targets industries in which it can provide deep sector knowledge coupled with a product platform assembled to satisfy the demanding requirements of its clients.

(Emphasis added)

24.     In the U.S., SocGen also controls asset manager The TCW Group. (SocGen spun off

U.S. investment bank Cowen Group in 2006.)

25.     In addition, SocGen's Fimat subsidiary, which describes itself as "amongst the top

international brokers for derivatives and commodities," had divisions in the United States, including

7

Fimat USA, LLC located at 630 Fifth Avenue, Rockefeller Center, Suite 500, New York, NY 10111 (as well as offices in other U.S. cities), and Fimat Preferred LLC, located at 2 Rector Street, 9th Floor, New York, NY 10006 (as well as offices in other U.S. cities).

26.     In addition, significant SocGen funds invest substantial amounts within the U.S. For instance, in a press release dated April 23, 2007, SocGen, through Société Générale Asset Management ("SGAM"), noted that SGAM's Private Value Fund (€267 million target) "invests mainly in Europe and the United States in all the segments of private equity." As another example, a SocGen press release dated June 12, 2007 described a SocGen fund launched in September 2006, with three sub-funds providing access to certain U.S. equity strategies.  SocGen also touted its commitment to the Americas infrastructure market in a September 10, 2007 press release, including its lead role and distribution of over $1.7 billion in loans in North America during the previous 24 months, and the strengthening of its New York office in this area.  Furthermore, in an October 26, 2007 press release, SocGen announced the launch of SG Equipment Finance, USA.

27.     In addition, SocGen engages in direct marketing, increasingly targeted communication with customers.  In 2004, SocGen reported that an average of 2-3 personalized mailers are sent to each of its customers every year.

28.     The Individual Defendants listed below were directors and/or executive officers of SocGen, as follows:

29.     **Defendant Daniel Bouton ("Bouton")** is and has served as Chief Executive Officer of SocGen since 1993, and Chairman of SocGen since 1997.  Bouton initially joined SocGen in 1991, as its executive vice president.  Bouton is also head of the French banking association and a former adviser to the French government on corporate governance.   Bouton frequently communicated to SocGen's shareholders throughout the Class Period, including via quarterly and annual "letters to shareholders" posted on SocGen's website in English, press releases, and other statements.

30.     **Defendant Robert A. Day ("Day")** is a U.S. national who lists his professional address as Los Angeles, California.  Day was appointed to SocGen's board of directors in 2002; his

term will expire in 2010. Day is Chairman and an investment manager of SocGen's U.S. subsidiary, Trust Company of the West ("TCW"). As of Dec. 31, 2006, Day held 3,034,171 shares of SocGen stock.

31.     On January 9, 2008 – two weeks before SocGen's announcement of the fraud regarding Jerome Kerviel's trading, Day sold €85.75 million ($126.1 million) worth of SocGen shares. In addition, one day later, on January 10, 2008, two foundations linked to Day, the Robert A. Day Foundation and the Kelly Day Foundation, sold a total of €9.59 million ($14.1 million) worth of shares – bringing the total sold by Day and foundations connected to him, over this suspicious two-day period, to over $140 million.   The huge amounts and timing of these sales was highly suspicious. Insider Day's sales on January 9 and 10, 2008 were at over $28 per share (based on ADR share prices) – whereas the share price dropped to the $20 to $21 range (based on ADR share prices) when SocGen's news announcements regarding its huge subprime losses and Kerviel's fraud were issued only two weeks later, on January 24, 2008 and thereafter.

32.     The U.S. Department of Justice is looking into Day's stock sales shortly before SocGen announced billions of dollars in losses. The U.S. Attorney for the Eastern District of New York is taking the lead in the investigation of Day. The SEC and French market regulators are also probing the stock sales by Day and by the two foundations associated with him.

33.     The Individual Defendants held positions in which they possessed the power and authority to control the contents of SocGen's public filings and statements. Each Defendant was provided with copies of SocGen's reports and press releases prior to or shortly after their issuance and had the ability and opportunity to prevent or correct false or misleading statements therein.

34.     SocGen's top executives were involved with all aspects of SocGen's business.

35.     Defendants' positions and access to information made them aware that adverse facts were being concealed and positive public representations were materially false and misleading. Individual Defendants are also liable for "group-published" false statements. Moreover, Defendants' SocGen stock sales obligated Defendants to disclose adverse information that was not publicly available.

IV.   **DEFENDANTS' FALSE AND MISLEADING STATEMENTS REGARDING RISK MANAGEMENT, CDO AND SUBPRIME MORTGAGE EXPOSURE, AND INTERNAL CONTROLS**

36.     Prior to the Class Period, Defendants emphasized to SocGen's investors and prospective investors that SocGen was achieving excellent performance, reflecting its expertise, while engaging in "active risk management" and "conservative provisioning," and maintained an "ethic of prudence," and conditioned the market to expect these qualities in the future. For instance, the "key points of Chairman Daniel Bouton's message" at SocGen's May 9, 2005 shareholders' meeting (reported in SocGen's May 2005 newsletter, published on SocGen's website in English) included the following:

> **Quarter after quarter**, Société Générale's Corporate and Investment Banking arm **continues to excel in terms of its performance**, two thirds of which is client-driven. Moreover, SG CIB is currently **implementing an essentially organic growth plan which will allow it to further boost** its development.
>
> Global Investment Management & Services, Retail Banking Outside France and Specialised Financial Services now account for 37% of Group NBI and Société Générale intends to continue developing these buoyant activities through a combination of sustained organic growth and external growth of the sort highlighted in the successful integration of recent acquisitions.   Given our firm commitment to rigorous cost control and operational streamlining, **our development goes hand-in-hand with conservative provisioning, active risk management** and vigilance as regards acquisition opportunities. Lastly, we also remain committed to maintaining our generous and dynamic payout policy.

Emphasis added.

37.     Similarly, on or about August 1, 2005, the beginning of the Class Period, in a quarterly shareholder publication published in English on SocGen's website, Jean-Pierre Mustier (CEO of SG Corporate and Investment Banking and a member of SG's Board of Directors and Management Board), described the derivatives offered by SG CIB as "an innovative and effective investment product," stated that "SG CIB is a recognized global specialist in structured finance," and stated that SG CIB has been implementing "a profitable growth strategy aimed at boosting revenues as well as profits," and aimed to develop its businesses "using a selective, structured approach . . . while at the same time maintaining a **firm grip on** our costs and **risk exposure**." (Emphasis added.)

38.     In the same August 2005 SocGen shareholder publication, Mustier also discussed

how SocGen purportedly controls its risk exposure, at both the Board level and the level of each

individual SocGen agent. Mustier noted, among other things:

> One of the most important aspects of this business is controlling our exposure to the different types of risk (market risk, credit risk, etc.) in order to limit their impact on our profitability. Of course, all our risk management is conducted in close conjunction with, and under the permanent supervision of the Group Risk Division.

> The risk of adverse movements in the financial markets is **controlled at two levels**: Société Générale's **Board of Directors** first defines a series of global exposure limits that applies to the whole division. We then break this down into a series of more **specific limits for each business activity and agent**. At the same time, **we have invested in a number of highly sophisticated control systems which have already proved their worth in extreme situations**, notably in the aftermath of 9/11.

Emphasis added.

39.     The same themes of extensive, proven internal controls and prudent, active risk

management, as well as recognized expertise in key businesses, were disseminated by Defendants in

SocGen publications and statements throughout the Class Period. In SocGen's quarterly shareholder

publication (entitled Letter to Shareholders #57), published on SocGen's website in English in

February 2006, Defendants stated that SocGen's Corporate and Investment Banking division "posted

exceptional revenues in 2005, confirming the division's **recognized expertise** in its three key

businesses: - **in derivative products** . . .; in the euro capital markets, it earned the . . . No. 1 position

**in securitization**; [and] a global leader in structured finance. . . ."  (Emphasis added.)

40.     In the same February 2006 SocGen shareholder publication, Didier Haugel, Head of

Group Risk Management at Société Générale since the summer of 2000, discussed the role of

SocGen's Risk Management division, SocGen's "broad gamut of expertise" in risk management, and

the Company's "ethic of prudence." Haugel noted the importance of the risk management function,

acknowledging that it was "a key element in internal control," and reported directly to top

management, as follows:

> **Banking risk covers a broad spectrum** and can, for example, arise if a person defaults on a loan repayment or if there is a **drop in the market value of a given security**. That said, there is one important distinction: financial risks **materialize much faster** than industrial risk.

> Hence the **importance of risk management and the strict procedures** it entails. At Société Générale, the Risk Management Division is expected to contribute as much to the Group's development as it is to the company's bottom line. **A key element in internal**

**control**, its role can prove to be a source of tension amongst the operating divisions which is why, to ensure its complete impartiality, **it reports exclusively to the General management**. An inherently transverse function, its role is to both advise and audit. With a primary remit that extends to the definition of suitable methods for the analysis, measurement, approval and monitoring or risks, the division subsequently works alongside the Group's different business lines in defining commercial and product strategies. Thirdly, given its entirely impartial position, the Risk management Division is called upon to monitor and approve the transaction proposals put forward by the sales mangers and, lastly, centralizes all Group risk issues. In short, it is up to the risk Division to ensure that the Group is in a position to take informed decisions on the risks that it is prepared to assume in order to enhance its profitability.

Emphasis added.

41.     Haugel also explained that "operational risk, i.e. the risk of loss resulting from the inadequacies or failings of procedures, persons, internal systems or event external events such as natural catastrophe or fire," was one of SocGen's main three banking risks. Further, in response to a query about declining provisioning against risks, Haugel indicated that SocGen's provisioning was more than adequate and reassured investors regarding SocGen's "prudence." Haugel stated, among other things:

> **Ever loyal to its ethic of prudence**, Société Générale had accurately provisioned for the problematic cases seen at the start of the decade.

Emphasis added.

42.     Haugel also emphasized SocGen's supposed expertise in risk management in general as well as in the specific area of derivatives, in the same publication. With respect to SocGen's general risk management risk expertise, Haugel stated:

> **Risk management – a broad gamut of expertise**
>
> When faced with a variety of risks, you need a variety of profiles. Indeed, our credit and market risk specialists that are on hand to advise on transactions interact on a daily basis with the operational teams from which they often originate. Moreover, within the research department, our economists often brush shoulders with consultant engineers. With a background in industry, the latter are often in charge of assessing the quality of the industrial infra-structures of a given borrower.
>
> And last but certainly not least are the **IT teams, there to provide the ever-demanding task of recalculating the risk on market positions each day**. At the end of 2005, Société Générale Group's Risk division employed around 1,900 members of staff.

Emphasis in title in original; other emphasis added. With respect to SocGen's risk management expertise in derivatives, Haugel claimed:

And what about risk management in derivatives, a field in which Société Générale ranks as a global leader?

If we rank as a leader in this field it is undeniably because **we have looked to develop our expertise therein for over 20 years now**. That said, the growth of this activity has only been possible, and more importantly, acceptable, thanks to the **parallel development of a strong expertise in the management of risks linked to derivatives**.

At every step in its growth on these markets driven by the dynamism of the business line teams, **Société Générale has always been careful to uphold the principles of prudence and rigour that have long applied to traditional banking activities**. Furthermore, given the diversity of the risks at play, **we have developed a systematic approach and procedures based on the simulation of various market assumptions including extreme cases such as a stock market crash. We have thus been able to check that, even in extreme situations, the degree of risk remains acceptable for the Group. As such, risk management is an integral part of our derivatives activity.**

Emphasis added.

43.    In a press release dated February 16, 2006, SocGen announced that 2005 results were "up sharply." The release touted "Strong organic growth in revenues: +14.8%* vs. 2004," "Very low cost of risk: 16 bp," and a "Very strong fourth quarter 2005." The release also stated that against the backdrop of a favorable economic and financial environment, "the Group delivered excellent performance." The release further noted that the "net cost of risk declined sharply in 2005," and that this "decrease is attributable to the quality of the customer base, but also to the significant rise in the proportion of housing loans which carry a low cost of risk." The press release also touted SocGen's "recognised expertise" in three key businesses – derivative products, euro capital markets and structured finance. The press release also stated that the "credit risk environment remained favourable," enabling write-backs in provisions for this risk, and that "market risk was lower."

44.    On March 9, 2006, SocGen filed its 2006 Registration Document with the AMF (French securities regulator). Among other things, the 2006 Registration Document assured investors that SocGen engages in daily analysis "of the exposure and risks incurred by **all** the Group's market activities and comparison of these exposure [sic] and risks with the limits set," (emphasis added), "constant analysis of exposure and results," and "daily limit monitoring for each activity, and constant checking that appropriate limits have been set for each activity."

13

45.     The 2006 Registration Document also contained a "Report of the Chairman on Internal Control Procedures," at pp. 72-81, which noted, *inter alia*, that "internal control is part of a strict regulatory framework applicable to all banking establishments and Group staff," that risk management procedures were defined at SocGen's highest management level, and that 1,900 staff were dedicated to reviewing and controlling risk exposures on a permanent basis. The 2006 Registration Document also claimed that teams of independent risk controllers "carry out daily reviews of **all** positions and risks taken in the course of the Group's market activities," (emphasis added), that any cases where limits have been exceeded were highlighted, that market parameters used to calculate risks and results were verified each day, that precise methods have been defined for evaluating risks, and that controls were further reinforced through targeted action plans. Investors were also assured that compliance was regularly monitored by SocGen's compliance department and legal and tax departments, and that inspections were carried out by the Internal Audit Department and General Inspection Department.

46.     Bouton signed a "Certification of the Person Responsible for the Registration Document," stating that he certified that the information in the 2006 Registration Document was, "to the best of [his] knowledge, true and there are no omissions that could impair its meaning."

47.     On March 30, 2006, SocGen announced a unified advertising campaign emphasizing SocGen growth and strength, in a press release entitled, "Société Générale's corporate advertising campaign focuses on the Group's performance and the adoption of a single brand." The press release noted that the campaign would be launched in Europe, the United States and Asia in April, with advertisements in the economic and financial press, posters in international airports, the Internet and other new media. Growth performance would be emphasized with flowers blooming before one's eyes, and SocGen's teams' strength and power would be evoked by rugby teams.

48.     On May 18, 2006, Defendants touted SocGen's 1Q 2006 results, in a press release entitled, "Excellent first quarter 2006." The release reported "Strong organic growth: revenues up +18.2%* vs. Q1 05," "Very low cost of risk: 25 bp," "Group net income: EUR 1,471m (+20.0% vs. Q1 05)," and "Group ROE after tax: 30.2%." The release stated that against a backdrop of a very

favorable economic and environment in 1Q 2006, "the Group delivered an excellent performance."

49.     During the Class Period, Defendants continued to emphasize SocGen's claimed expertise in risk management (and profitability). For instance, in his quarterly letter to shareholders, published on SocGen's website in English in June 2006, Bouton stated:

> For the tenth quarter in a row, the Group's **risk expense remained very low** as a result of an ever-buoyant credit environment and the different measures taken by the Group: diversification of its portfolio of businesses and **improvement of its risk management** and hedging **techniques**.

Emphasis added.

50.     On August 3, 2006, Defendants touted another profitable quarter, in a press release entitled, "Excellent second quarter 2006." The release reported "Very strong organic growth: revenues up 26.6%* vs. Q2 05," "Cost of risk remains low: 21 bp," "Net income: EUR 1,320m (+37.9% vs. Q2 05)," "Group ROE after tax: 25.7%," and "First half results up sharply." The release stated that against a mixed but overall favorable financial and economic environment for SocGen's business, "the Group reported very good performances over the quarter, posting gross operating income of EUR 2,220 million, up 40.0%* on Q2 05, and net income of EUR 1,320 million, up by a substantial 37.9%."

51.     The August 3, 2006 release also stated that SocGen was using CDOs for **hedging**, and that risk provisions were reversed, as follows:

> The credit risk environment remained very favourable, enabling the division to make a net provision reversal of EUR 35 million in the quarter (provision reversal of EUR 54 million in H1 06). Few new loans required provisioning and the business was able to reverse some of its specific provisions thanks to an improvement in its counterparties' financial positions, or following the sale or repayment of the corresponding loans under the policy of active management of the credit portfolio. During the second quarter, the division actively continued its policy of using credit derivatives for hedging: over the first half, the CDO and CDS hedging portfolio increased by EUR 13.6 billion to EUR 22.1 billion at the end of June 2006.

52.     On November 9, 2006, Defendants issued SocGen's 3Q 2006 press release. The release touted: "Increase in revenues: +7.1%* vs. Q3 05," "Cost of risk remains low: 21 bp," "Net income: EUR 1,272 million (+12.4% vs. Q3 05)," and "Group ROE after tax: 23.6%." Against a backdrop of a mixed by overall favorable economic and financial environment, "the Group reported

higher levels of activity than in the third quarter of 2005, which was already a strong comparative base: gross operating income was EUR 2,049 million for the period, representing a rise of 8.7%* on Q3 05, while net income amounted to EUR 1,272 million, up 12.4% on the previous year."

53.     On February 14, 2007, Defendants issued a SocGen press release, entitled "2006: Sharp increase in results," touting SocGen's 2006 financial results.  The press release publicized: "Strong organic growth in revenues: +15.7%* vs. 2005," "Cost of risk low: 25 bp," "Group net income: EUR 5,221 M (+18.6% vs. 2005)," "Group ROE after tax: 25.8%," "Earnings per share EUR 12.33 (+15.2% vs. 2005)," and "Recommended dividend: EUR 5.20 (+16.3% vs. 2005)."  The press release noted that against a backdrop of a strong global and financial environment in 2006, "the Group delivered excellent performance."  The release also touted SocGen's "**improved risk management techniques and hedging of high-risk exposure.**" (Emphasis added.)

54.     The February 14, 2007 press release also boasted about SocGen's high quality CDO (collateralized debt obligations) offerings and capabilities, as follows:

> Société Générale Asset Management (SG AM) has a **complete, high quality offering and its innovative capability** is recognised by the market.  In 2006, SG AM confirmed its positioning:
> . . . .
> as the **leading player in the CDO market** with TCW (the number one player in cash CDOs) and SG AM A1 (number 2 worldwide in synthetic CDOs).

Emphasis added.

55.     In a March 2, 2007 press release, SocGen, through its Société Générale Asset Management ("SGAM") division, touted the SocGen's synthetic CDOs and the Company's "extensive expertise" and innovation through guaranteed structured products, structured credit products, securitization vehicles, and other financial instruments.

56.     On March 6, 2007, SocGen filed its 2007 Registration Document with the AMF.  At page 49 of the 2007 Registration Document, SocGen advised, "The Group will **continue its strict risk management policy**, in particular as regards exposure to emerging markets." (Emphasis added.)  In addition, pages 89 through 98 of SocGen's 2007 Registration Document contained a detailed "Report of the Chairman on Internal Control Procedures."  The report noted that "Internal

control is part of a strict regulatory framework applicable to all banking establishments and Group staff." The report described six divisions or departments involved in SocGen's internal control, and noted that risk management procedures are defined at SocGen's highest management level. Among other things, the report claimed that "the procedures for managing, preventing and evaluating risk are regularly analyzed in-depth by the Board of Directors and, in particular, its Audit Committee." The report further noted that: "Almost 2,000 staff [are] dedicated to reviewing and controlling [SocGen's] risk exposure on a permanent basis." The report further noted that SocGen's "General Management has adopted **a rigorous and coherent approach to reinforcing the management of [operational] risk throughout the businesses**" (emphasis added), and described the operational risk function reinforcement procedures.

57.     SocGen's March 6, 2007 report on Internal Control Procedures further described an Internal Audit Department and General Inspection Department control system, and reassured SocGen's investors regarding this control system's effectiveness:

> Given the risks at stake [from operations], each department is provided with the requisite resources, from both a qualitative and quantitative point of view, to carry out its functions effectively.

The report further noted that "a unified set of procedures, tools and methodologies has been implemented," and, after describing these tools, assured investors that "the Group's diverse entities are able to define and implement the necessary actions **to ensure that operational risk is maintained at or reduced to an acceptable level**." (Emphasis added.)

58.     SocGen's March 6, 2007 report on Internal Control Procedures also assured investors of internal control procedures designed to guarantee the quality of governing SocGen's accounting and financial information, including, among other things, to "ensure the transactions entered in the Group's accounts are exhaustive and accurate."

59.     Bouton signed a "Certification of the Person Responsible for the Registration Document," stating that he certified that the information in the 2007 Registration Document was, "to the best of [his] knowledge, true and there are no omissions that could impair its meaning."

60.     In a March 27, 2007 press release, SocGen, through its Société Générale Securities

Services division, again touted SocGen's "global reputation and expertise in complex derivative products."

61.     On May 10, 2007, SocGen issued a press release touting "solid performances" in first quarter 2007, which down-played exposure to subprime losses.  With respect to subprime, the quarterly release merely noted the following:

> In the first quarter of 2007, the economic environment remained generally favourable, albeit more uncertain in the United States, particularly in the real estate sector. . . . Events in the US real estate markets (defaults by some players in the subprime sector) led to a correction in the equities markets at the end of February.  However, the correction was limited and indices ended the quarter at a level similar to that at end-2006.
>
> . . . .
>
> The market environment remained favourable in Q1 07, with generally sustained activity in corporate and investment banking's different market segments, notably equity and bond markets which enjoyed higher volumes and abundant liquidity.  The crises in the debt and equity market segments at end-February was due primarily to the deterioration in credit quality of certain players in the US real estate market operating in the subprime segment (**SG CIB has very little exposure to this segment**).  It fueled a temporary increase in market volatility, which nevertheless returned to historically low levels at the end of the quarter.

Emphasis added.

62.     In his message to SocGen's annual shareholders' meeting on May 14, 2007, Chairman Bouton stated:

> Over the past 10 years, we have been among the European banks with the **strongest growth and profitability, without a major tie-up**.  In the coming years we can pursue this strategy: we have the right people, quality projects and shareholders' equity to finance them.  **All of our businesses are profitable and developing**. . . .

Emphasis added.  Bouton further stated: "Our strategy, combining organic growth and targeted acquisitions, can deliver long-term growth and profitability."

63.     In a press release dated June 11, 2007, SocGen reiterated Bouton's statements at the May 14, 2007 shareholders' meeting, as follows:

> With regard to its strategy, Société Générale reiterates the position communicated by Daniel Bouton, Chairman and CEO, during the General Meeting of Shareholders held on 14 May 2007: "a transforming operation is neither necessary nor urgent."

64.     On August 2, 2007, SocGen announced 2Q2007 net profit, excluding a one-off capital gain, increased 14.5% to €1.5 billion.  Defendants stressed that SocGen "has **low exposure to the**

**current credit market crisis.**" (Emphasis added.) Defendants also said that SocGen had no retail activities in the US and a limited presence in securitization and CDOs in the region (less than 1% of revenues). Defendants further noted that SocGen's corporate and investment banking division has low exposure to LBO financing, representing about 1% of revenues, and that SocGen's exposure to hedge fund counterparty risk from credit market activities represented about 1% of counterparty risk.

65. In addition, Bouton's August 2007 quarterly shareholder publication (Letter to Shareholders No. 63), published on SocGen's website in English, stated that SocGen had enjoyed a very good second quarter 2007 against the backdrop of the downturn in the U.S. mortgage sector. Bouton's letter stated in pertinent part:

> The second quarter of 2007 was marked by a favourable economic environment, notably in emerging countries but also in Europe. In the United States, the distinct slowdown in growth which began in 2006 has continued due to the **downturn in the mortgage sector as a whole.** Inflation remained under control, although the rebound in oil prices and higher agricultural commodity prices are delaying the end of cycle restrictive policy expectations of the US Central Bank, with the Fed funds rate kept unchanged at 5.25%. . . .

> **Against this backdrop, the Société Générale Group enjoyed a very good second quarter in 2007.** Net banking income for the quarter was up +11.1%*(a), driven by strong organic revenue growth in all the core businesses: the French Networks posted a significant increase in revenues as a result of the dynamic activity for individual and particularly business customers; Corporate and Investment Banking revenues were significantly higher, driven by the good performance of the equities businesses; as for the growth drivers (International Retail Banking, Financial Services, Global Investment Management and Services), they enjoyed very strong growth against the backdrop of an expanding customer base.

> Overall, and excluding exceptional items(a), the Group posted a significant increase in its results (net income +14.5%(a) vs. Q2 06), confirming its ability to deliver strong growth in all its core businesses and a high level of profitability (ROE after tax 29.0%).

Emphasis added.

66. In the same August 2007 shareholder publication, Defendants also touted SocGen's expertise regarding various financial products:

> Corporate and Investment Banking's performance confirms the success of its profitable growth strategy focusing on its three key **areas of expertise** (derivatives, structured products and euro capital markets) . . .

Emphasis added.

67. In the same August 2007 shareholder publication, in a section entitled "Questions for Daniel Bouton," Bouton assured investors:

> Over the last few years, our Group has demonstrated – and **will continue to demonstrate in the future** – its ability to foster strong growth combined with **high profitability**. It has the critical mass in its various businesses to be able to position itself vis-à-vis the competition.

Emphasis added.

68.    On September 3, 2007, SocGen again emphasized its control of risk when it published a press release announcing SocGen's adoption of the "Equator Principles" – guidelines for managing environmental and social issues in project finance. Defendants noted:

> Adopting the Equator Principles builds on the bank's **tradition of risk analysis and control applied to structured finance**, in particular in project finance where Société Générale is a global leader.

Emphasis added.

69.    On Friday, September 7, 2007, CEO Bouton told *Le Figaro* in an interview that SocGen has no new elements to reveal concerning its exposure to the US subprime loans crisis, since the comments made on August 2, 2007 when it published its first half 2007 results: "**Concerning our exposure to the subprime crises**, we made a statement at the beginning of **August . . . the facts have not changed**." (Emphasis added.)

70.    When asked by *Le Figaro* if the subprime crises will affect SocGen's results, Bouton stressed that only a small part of SocGen's investment banking business was affected: "Overall, our business model is solid and our strategy is fruitful." Bouton added that strong results in corporate and investment banking are allowing SocGen to diversify its revenues by expanding its foreign retail banking business and specialized financial services activities.

71.    On November 7, 2007, SocGen reported its first profit slide in five years, for 3Q2007. Profits decreased 11.5% from the same period (July through September) during the previous year. SocGen also announced asset write-downs of €404 million (US $587.7 million). SocGen disclosed that €230 million (US $334.6 million) of the write-down for its third quarter was directly attributable to U.S. subprime mortgage exposure.

72.    However, the Company's press release dated November 7, 2007 announcing its quarterly financial information downplayed the problems and touted "good results." The release touted "Good resilience of Q3 07 results," "Increase in revenues: +1.2% vs. Q3 06" (after certain

adjustments), "Low cost of risk: 26 bp" and Group ROE after tax of 18.0%.  The release further

stated:

> Daniel Bouton, the Chairman and Chief Executive Officer, has stated: "The third quarter saw very good results for retail banking in France and abroad, the continued expansion of Private Banking and Securities Services, very good commercial performances for the Corporate and Investment Banking businesses, and asset write-downs as a result of the crisis in the financial markets.  The Group's results demonstrate the quality of the businesses and the robustness of the portfolio of activities that has been built up in recent years."
>
> The third quarter was marked by the financial crisis caused by the deterioration in the US residential mortgage sector.  This resulted (as from August) in the illiquidity of financial instruments secured against subprime assets and strong tensions in credit markets and on interbank market liquidity.  Moreover, equities markets were impacted by this very deteriorated environment, with erratic fluctuations in indices and increasing volatility.  Although gradually improving, the market environment has not, at this stage, returned to normal.
>
> Retail banking in France and abroad, Financial Services, Private Banking and Securities Services produced very good results.  Conversely, the results for Corporate and Investment Banking and Asset management were significantly lower due to the financial crisis and the prudent write-down of some assets.  However, Corporate and Investment Banking achieved ROE after tax of 21.1% of Q3 07 thanks to the good commercial performance of its businesses and particularly its Equities activities.  Overall, the Group has benefited from the diversity of its portfolio of activities and generated operation income of EUR 1,775 million in Q3 07 (-7.8%* vs. Q3 06, -7.5% in absolute terms).

73.     As detailed below (*see* "The Truth Emerges" section of this Complaint), on January

24, 2008, SocGen announced huge writedowns of €2.05 billion for the fourth quarter of 2007,

including €1.1 billion in relation to US residential mortgage risk, €550 million from exposure to US

monoline insurers, and €400 million in additional provision to the aforementioned exposures.  In

addition, the billions of euros of losses pertaining to Kerviel's trading were revealed at the same

time.

74.     Furthermore, on February 11, 2008, Société Générale said it recorded writedowns and

provisions from subprime exposure of €2.6 billion (U.S. $3.8 billion) in 2007, above the cumulative

total of €2.28 billion previously disclosed for the fourth and third quarters.  Detailing its €2.6 billion

in subprime writedowns and provisions, SocGen said €1.250 billion was related to its portfolio of

non-hedged collaterised debt obligations (CDOs), €947 million from counterparty risk involving

monoline insurers, and €325 million on the trading portfolio of residential mortgage-backed

securities (RMBS).

75.     Société Générale also announced on February 11, 2008 that it planned to raise €5.5 billion by selling stock at a lower price than analysts estimated to replenish capital after its trading losses. SocGen announced it would sell shares in a rights offer at €47.50 each, a discount of 39% to the closing price on Friday, February 8, 2008. Analysts had expected a discount of as much as 30%. In the prospectus for its €5.5 billion capital increase published on February 11, 2008, SocGen also announced an estimated net profit of €947 mln for 2007, including both the subprime-related writedowns and a €4.9 billion loss from unauthorised trading. The Company also said estimated 2007 sales came to €21.923 billion, while operating profit excluding the net loss from unauthorised trading was €6.713 billion.

## V.     THE FALSITY OF THE FOREGOING STATEMENTS; DEFENDANTS' KNOWLEDGE OR RECKLESS DISREGARD OF RISKS, CDO AND SUBRIME MORTGAGE EXPOSURE, AND SEVERE INTERNAL CONTROL PROBLEMS

76.     Defendants' above-listed statements regarding SocGen's risks, CDO and subprime mortgage exposure, and internal controls were false and misleading for, *inter alia*, the reasons referenced below. SocGen's internal controls over its traders were in fact inadequate, and had a material negative effect on SocGen's ability to control risk. Moreover, SocGen's subprime-related exposure was more serious a risk than investors were led to believe from Defendants' statements.

77.     Internal controls at SocGen were insufficient even before the Class Period. In 2003, SG Cowen Securities Corp., then a unit of Société Générale, paid a $5 million penalty in a settlement with the SEC and the New York Stock Exchange, for inadequate procedures and failing to supervise a rogue stock broker, Frank Gruttadauria, who misappropriated millions of dollars from customer accounts.

78.     During the Class Period, the inadequacy of SocGen's internal controls had disastrous consequences. From 2005 through January 18, 2008, a trader on SocGen's Delta One equity derivatives trading desk, Jerome Kerviel, 31, built a virtual company within SocGen, according to bank officials. Kerviel was assigned to perform arbitrage trades, which involved taking advantage of differences in the valuation of correlated assets. Each financial instrument purchased is supposed to

be balanced against an offsetting or counterbalancing trade, involving a similar financial instrument with slightly different values, to benefit from small arbitrage spreads. Such trading involves very little market risk. However, Kerviel instead engaged in massive risky "directional" trading, way beyond his limits, and concealed these risky positions with fictitious counterbalancing trades. As Bouton said at a press conference on February 11, 2008 in Paris, Kerviel "was running two books simultaneously, one real and one false."

**Red Flags**

79.      According to an interim investigative report issued by three independent board members (further discussed below, *see* "The Truth Emerges"), SocGen management failed to follow up on 75 warnings over more than two years about Kerviel's trading, adding to questions about oversight at SocGen.

80.      Among other things, Société Générale received letters directly from Eurex at the end of 2007 raising questions about Kerviel. In a November 7, 2007 letter, Eurex alerted a compliance officer at SocGen that for seven months, Kerviel had engaged in "several transactions" that had raised red flags. The letter also asked whether Kerviel entered transactions automatically or manually. SocGen, taking its time, responded on November 20, 2007; a SocGen risk-control expert replied than nothing was irregular, and that recent market volatility explained a new need for after-hours trading. Eurex sent a second e-mail message to SocGen's compliance department on November 26, 2007, demanding more details and clarification of several suspicious trades by Kerviel. This was the second letter in less than three weeks questioning Kerviel's investment strategy. SocGen provided additional details on December 10, 2007, and then both SocGen's risk managers and Eurex let the Kerviel matter drop.

81.      Kerviel also built up a €1,000 per month cell-phone bill, despite working in an office with telephones. The unusually high cell-phone bills, which investigators are now examining, suggested that others could be involved, according to Jean Veil, a lawyer for SocGen.

**A Culture of Risk**

82.      The New York Times reported on February 5, 2008 that, in addition to failing to

sufficiently investigate after receipt of Eurex's warnings, other mis-steps by SocGen, and a "culture

of risk" at SocGen resulted in Kerviel's losses:

> Overlooking the warnings by Eurex about Mr. Kerviel was only one of a series of missteps by Société Générale that led to his staggering loss.
>
> The 144-year old bank **allowed a culture of risk to flourish, creating major flaws in operations that enabled the rogue trader's activities to go undetected**, according to bank officials, investigators and traders who worked with Kerviel.
>
> **Far from being discouraged from placing big bets, Société Générale traders were rewarded for making risky investments with the bank's money. It was not uncommon for traders to briefly exceed limits imposed on their trading before pulling back, despite controls meant to prohibit this.**
>
> . . . .
>
> While management depicts the 31-year-old Mr. Kerviel as a lone operator who spiraled out of control, interviews with current and former Société Générale employees suggest that he was also the product of an environment where risk taking was embraced, as long as it made money for the bank.
> . . . .
>
> The damage wrought by Mr. Kerviel comes in the wake of two trends that reshaped Société Générale: the explosive growth of its derivatives business and its use of its own money to make bets on the market, known as proprietary trading.
>
> Throughout Société Générale's sprawling derivatives business, said one current employee who used to work with Mr. Kerviel, **traders were encouraged to make proprietary bets, even on desks that specialized in what top executives called "plain vanilla products," like the team where Mr. Kerviel worked, Delta One.**
>
> "You must take positions, even if you are not a proprietary trader," said this employee, who insisted on anonymity because he was not authorized to talk to the press. "During appraisals by bosses, they made it clear you were judged by how well you did your basic job, as well as how much money you made on prop trades."
>
> Mr. Kerviel told French prosecutors as much. Asked if his superiors knew of his activities, he said, "at the beginning, just as at the end of my maneuvers, they didn't want to intervene," adding, "They know the machinery."

Emphasis added.

      83.    The same NY Times article noted that, according to analyst Pascal Decque, SocGen's

willingness to take risks also was reflected by SocGen's loss of over €2 billion stemming from

subprime-related investments, twice the size of the losses of BNP Paribus, even though BNP is a

larger bank than SocGen.

**Internal Knowledge of Kerviel's Trading**

84.     Kerviel's trading appears to have been known within SocGen, which recklessly turned a "blind eye" to the unauthorized trading, contrary to Defendants' representations to investors throughout the Class Period regarding SocGen's strict controls on risk and daily-implementation of internal controls on all trading positions.

85.     On February 15, 2008, the New York Times reported that a confidential source who was well-acquainted with the trading controls at SocGen said that it was "inconceivable" that Kerviel's immediate supervisors were not alerted after his trades set off alarm bells at Eurex (the derivatives exchange based in Frankfurt).  The source reported that on a least one occasion in late 2006 or early 2007, Kerviel made a €500,000 profit on a one-way bet.  As Kerviel's role was not to speculate with SocGen's money, Kerviel was reprimanded by his bosses, who said his profit would not be included in the tally used to calculate year-end bonuses.  According to the source, this incident would have been sufficient grounds to fire Kerviel, and Kerviel would normally have been watched closely afterward, and not allowed to take additional risks.  The source's report lent credence to Kerviel's claims, during Kerviel's interrogation by the French financial police in late January 2008, that his superiors, who were experienced foreign traders, received clear and repeated warnings that Kerviel was trading beyond his limits.

86.     Kerviel also told police that his supervisors in the Delta One derivative trading office, Martial Rouyère (head of Delta One) and Éric Cordelle (Royère's debuty), were familiar with his overreaching limits since April 2007.  Further, Moussa Bakir, a broker at SocGen's futures brokerage, Newedge, told police when he was questioned that he knew that Kerviel had a problem with his bosses. An AP article (on January 29, 2008), reported the following: A judicial official said that Kerviel told investigators that he believes that his bosses at SocGen were aware of his massive risk-taking but turned a blind eye as long as he earned money.  According to excerpts of Kerviel's testimony published in *Le Monde* newspaper, Kerviel told investigators: "I can't believe that my superiors were not aware of the amounts that I was committing, it is impossible to generate such profits with small positions."   Kerviel's remarks were confirmed by Isabelle Montagne, a spokeswoman for the Paris prosecutor's office.

87.     Kerviel told police that other traders and managers hid gains and losses to smooth over earnings, and that his superiors must have been aware of what he was doing. He said his managers went along because they too would have been fired had his unauthorized trading been exposed.

88.     In an interview by Maria Baritiromo published in Business Week on February 11, 2008, French Finance Minister Christine LaGarde also acknowledged SocGen's awareness of irregular trades early on:

> Q (Baritoromo):  It has been reported that, according to prosecutors, SocGen was made aware of irregular trades in 2005.  And then in November of last year [2007], they were again made aware of questionable trades by this very same trader.
>
> A (LaGarde):  It's certainly going to be part of our investigation, and I have my people working on that at the moment.  I'm going to see what the governor of the central bank and the president of the AMF, which is the equivalent of the SEC, have to say about why they did not disclose earlier.

## Lack of Functional Controls and Risk Management

89.     French Finance Minister Christine Lagarde's 11-page report, submitted to the French prime minister on the SocGen trading scandal on Monday, February 4, 2008, noted that SocGen took too long to report the suspicious activity to government officials.

90.     Lagarde's harshest comments concerned SocGen's controls.  Lagarde told reporters after submitting her report, "Very clearly, certain mechanisms of internal controls of Société Générale did not function, and those that functioned were not always followed by appropriate modifications."  Among problems the report cited at Société Générale  were cracks in the wall separating the trading floor and the offices where trades are controlled; problems with computer passwords and other security measures; and "atypical behavior" such as Kerviel not taking vacation days that went unnoticed.

91.     During her Business Week interview on February 11, 2008, in response to a question as to what could be done to avoid future SocGen-type situations, French Finance Minister LaGarde discussed the need for three types of transparency: transparency of financial instruments (LaGarde noted that this "addresses the subprime issue"), transparency of the entire reality of financial

institutions' balance sheets and accounts, and transparency of relationships within trading rooms and between trading rooms and control areas.

92.    Various experts also criticized SocGen's risk management procedures, in light of SocGen's trading loss pertaining to Kerviel.  Joseph Mason, a risk-management researcher and professor of finance at Drexel University in Philadelphia, stated "I find it really improbable that this trader was not abetted by at the very least incompetence, if not assistance from others.  Ultimately, we're talking about a breakdown of fundamental operational controls."  According to Francis Hounnongandji, a corporate governance expert who is also president of the French chapter of the Association of Certified Fraud Examiners, given that Mr. Kerviel was able to exceed trading limits and evade detection for so long, as well as Société Générale's handling of Eurex's November warnings, "we can easily infer that the internal controls were either inadequately designed or have not been operating effectively and efficiently."  David Moss, a fund manager at F&C Asset Management in London, said "the systems controls didn't function."

**Indications That Kerviel Did Not Act Alone**

93.    News reports in mid-February indicated that police investigating the trading scandal at Société Générale were leaning towards a theory that Kerviel, whom the bank blamed for losing nearly US $7.2 billion, might not have acted alone, as he and the bank have claimed.  The police had been sifting through nearly 2000 pages of instant message traffic that Jerome Kerviel had sent.  The police believed that Kerviel may have been trying to protect a friend who appeared to have helped him cover his tracks.

94.    The instant message exchange added to doubts about Société Générale's explanation that Kerviel had engaged in the trades alone.

95.    Investigators suspected that Moussa Bakir, 32, a broker at the futures brokerage Newedge, a Société Générale subsidiary, sent Mr. Kerviel a forged email message from Deutsche Bank, purporting to confirm a sizeable trade in German DAX index futures that did not exist.

96.    Late on the afternoon of January 18, 2008, the day Société Générale said it uncovered roughly US $74 billion worth of fictitious trades by Kerviel, Mr. Bakir indicated in a message

exchange over the Reuters terminal system that he would send Kerviel documentation for an unspecified transaction. "I'm sending you the conf," Bakir wrote, using the shorthand for the confirmation of a trade.

97.     Kerviel and Bakir's messages – which indicated that they continued many of their conversations on mobile phones – suggested that Bakir had an intimate knowledge of Kerviel's surreptitious trading.

## VI.     THE TRUTH EMERGES, AND END-OF-CLASS-PERIOD AND POST-CLASS-PERIOD EVENTS FURTHER DEMONSTRATE DEFENDANTS' FRAUD

### SocGen's Announcements Of Discovery Of The Fraud, Subprime-Related Losses, and The Need For New Capital; Charges Against Kerviel

98.     After repeatedly assuring investors during the Class Period that SocGen's subprime exposure was minimal, and that SocGen had comprehensive internal controls and risk management procedures, involving carefully and prudently monitoring of all trades, investors were shocked on January 23, 2008 (the last day of the CP), when market rumors indicated that SocGen had significant exposure to subprime CDOs and RMBS which would require substantial additional writedowns.

99.     Investors were further shocked by SocGen's announcement at 2:00 a.m. E.S.T. on Thursday, January 24, 2008 (before the markets opened) of €4.9 billion of losses due to Kerviel's trading and €2.05 billion of writedowns related to (subprime) "credit market turbulence." As a result, SocGen's ADRs fell $1.95, from a close of $24.25 on January 23 to close at $22.30 on January 24, 2008 (and continued to drop over the next 2 trading days to $21.50), on extremely heavy trading volume.

100.     After two years of unauthorized trading by Kerviel, according to SocGen, on Friday, January 18, 2008, a routine check found a trade that exceeded the bank's limits. A call to the other party in the trade found the transaction didn't exist. Kerviel had built up €50 billion of positions – which was more than the entire market capitalization of the Company – in European stock index futures and disguised them with fake hedges.

101.    SocGen quickly unwound Kerviel's positions on January 21, 22 and 23, 2008, and then announced on January 24, 2008 that it uncovered a $7.14 billion fraud – one of history's biggest – as well as additional subprime losses.

102.    SocGen stated that it lost €4.82 billion ($7.09 billion) in cleaning up unauthorized transactions by Kerviel.  The trading loss, and losses from the crisis in U.S. subprime mortgage loans, wiped out the bulk of SocGen's net profit for 2007.  SocGen said it would be forced to seek $8.02 billion in new capital.

103.    SocGen also announced that Kerviel confessed to the fraud, and was being dismissed from his position at SocGen.   Kerviel's supervisors were also to leave SocGen.  Chief Executive Daniel Bouton offered his resignation, but the board rejected it. (SocGen made a number of personnel changes in its derivative business, and replaced its co-heads of fixed income, Marc Bruillout and Gregorie Varenne.)

104.    In a press release issued January 27, 2008, entitled "Explanatory note about the exceptional fraud," SocGen described Kerviel's methods, including fictitious operations which gave an appearance of offsets to the actual portfolio operated by Kerviel.

105.    SocGen's January 27, 2008 press release set forth a time line purporting to describe the conditions under which the fraud was uncovered, as follows:  Under the entry for January 18, 2008, SocGen admitted that "abnormal counterparty risk on a broker [was] detected several days earlier [several days prior to Friday January 18, 2008]."  The press release claimed that the team to start investigating the situation was created on January 18, 2008, and that on January 19, 2008, Kerviel acknowledged committing unauthorized acts and creating fictitious operations.  By Sunday January 20, 2008, Kerviel's positions, amounting to approximately €50 billion, were identified, and Bouton informed the Governor of the Banque de France.   An Audit Committee meeting was convened that afternoon to examine the results for 2007 and writedowns related to US residential mortgage assets (in particular CDOs).  At this meeting, Bouton informed the Audit Committee of the trader's position which had been uncovered.  Bouton then also informed the general secretary of the AMF.  From January 21 through 23, 2008, SocGen unwound Kerviel's positions in a measured

fashion, under unfavorable market conditions.

106.   SocGen's January 27, 2008 press release noted that before the markets opened on Thursday, January 24, 2008, the existence of the fraud was announced, and SocGen asked for trading in its shares to be suspended.  The press release also noted that investigations were under way by SocGen's General Inspection division and Banque de France.

107.   On Monday, January 28, 2008, investigating judges filed preliminary charges against Kerviel, after questioning Kerviel for 48 hours.  The preliminary charges were for breach of trust, "forgery and using forgeries" and unauthorized computer activity, which could bring Kerviel up to three years in prison and hefty fines.  Such preliminary charges allow the magistrates time to further investigate and to decide whether to send the case to trial.  The prosecutor said that in November 2007, Eurex "became concerned" by a position taken by Kerviel.  However, Kerviel was able to wiggle out, the prosecutor said.

108.   On or about January 29, 2008, the ADAM organization, which represents the interests of small shareholders, asked France's AMF financial markets regulator to investigate SocGen. ADAM President Colette Neuville said in a letter that she was surprised by the difference between a reassurance given over SocGen's subprime debt position in September 2007, and the €2.05 billion ($3.03 billion) in additional write-downs announced on January 24, 2008.  Ms. Neuville also asked AMF to look into possible insider dealing because the share price of SocGen started to fall from January 14, 2008, ten days before the announcements of the €4.9 billion in trading losses and additional subprime writedown, and planned capital increase.

109.   On Wednesday, January 30, 2008, a press statement was issued by SocGen director Jean-Martin Folz.  The press release explained that SocGen's Board of Directors met on January 30, 2008, and decided to form a special committee of independent directors, comprised of Jean Azema, Antoine Jeancourt-Galignani, and Jean-Martin Folz (who was appointed Chairman of the special committee) to launch an independent, thorough inquiry into the fraud.

110.   On February 8, 2008, a Paris court ordered that Kerviel be placed in pre-trial custody, reversing a ruling the previous week that Kerviel could remain free while his case was being

investigated.  Kerviel is being investigated on accusations of forgery, breach of trust and illegal computer use.

111.    On Saturday, February 9, 2008, after two days of questioning by the police, Moussa Bakir, a broker at FIMAT who exchanged emails with and executed trades for Kerviel, was released without charge.

112.    On February 11, 2008, Société Générale said it recorded writedowns and provisions from subprime exposure of €2.6 billion (U.S. $3.8 billion) in 2007, above the cumulative total of €2.28 billion previously disclosed for the fourth and third quarters of 2007.  Detailing its €2.6 billion in subprime writedowns and provisions, SocGen said €1.250 billion was related to its portfolio of non-hedged collaterised debt obligations (CDOs), €947 million from counterparty risk involving monoline insurers, and €325 million on the trading portfolio of residential mortgage-backed securities.

113.    Kerviel's trading losses, along with the writedowns and provisions linked to the U.S. subprime mortgage crash, forced Société Générale to raise €5.5 billion from shareholders in February 2008 to replenish capital.  In the prospectus for its €5.5 billion capital increase published on February 11, 2008, which announced the larger subprime writedowns and provisions, SocGen also announced an estimated net profit of €947 mln for 2007, including both the subprime-related writedowns and a €4.9 billion loss from unauthorised trading.  The Company also said estimated 2007 sales came to €21.923 billion, while operating profit excluding the net loss from unauthorised trading was €6.713 billion.

114.    Société Générale also announced on February 11, 2008 that it planned to raise €5.5 billion by selling stock at a lower price than analysts estimated, to replenish capital after its trading losses.  SocGen announced it would sell shares in a rights offer at €47.50 each, a discount of 39% to the closing price on Friday February 8, 2008.  Analysts had expected a discount of as much as 30%.

115.    On February 11, 2008, Société Générale also filed a lawsuit against "a 31-year-old person" for creating fraudulent documents, using forged documents and making attacks on an automated system, according to Clarisse Grillon, a spokeswoman for the Nanterre prosecutor.

116.    In February, 2008, a French magazine, *Le Nouvel Observateur*, printed nearly 2,000 pages of electronic messages which Bakir and Kerviel exchanged between early October 2007 and January 18, 2008, Kerviel's last day at SocGen.  According to reports, SocGen also provided the email messages to prosecutors.  In one message, sent on November 30, 2007, Bakir said that in his opinion, Kerviel's actions were not "illegal in terms of the law."

**The Interim Investigative Report**

117.    On Wednesday, February 20, 2008, an interim report from the inquiry by three independent SocGen board members, chaired by former Peugeot Citroen chief executive Jean-Martin Folz, was published.   The initial findings were reviewed by auditors at PricewaterhouseCoopers.  The investigative report stated that Kerviel began making unauthorized transactions beginning in 2005, almost immediately after Kerviel moved to SocGen's Delta One equity derivatives trading desk.  Lapses in the internal controls let the trades go undiscovered until January 2008.  According to the report, Kerviel initially bought options and warrants on individual stocks, including Allianz, Deutsche Bank and Porsche.  In 2007, Kerviel moved on to take large positions on stock index futures and forwards.  Beginning in March 2007, Kerviel built up a short position in index futures that reached a notional value of €28 billion by June 30, 2007.  That position was unwound in November, 2007, resulting in a profit of €1.5 billion.  In January 2008, Kerviel took €49 billion of long positions on index futures.  SocGen incurred €6.4 billion of losses unwinding these positions from January 21 to 23, 2008.  The report confirmed that SocGen's "global loss" from Kerviel's trading (apparently after netting gains against losses) was €4.9 billion.

118.    The investigative report catalogued 75 instances when Kerviel's trading raised alarm bells, and better systems might have prevented the alleged fraud.  The report said that SocGen management failed to follow up on 75 warnings over more than two years about Kerviel's trading, adding to questions about oversight at SocGen.  In some cases, the report said that "operating staff did not systematically carry out more detailed checks" of Kerviel's trades.  The report also found that "no initiative was taken to verify the truth of [Kerviel]'s assertions or to transmit the information to immediate supervisors."  The report also said that some work still needed to be done to confirm

that the entire impact of Kerviel's trading has been identified.

119.    Although the internal inquiry also found that Kerviel's allegedly unauthorized trading had not been detected because of Kerviel's sophisticated techniques, it also pointed the finger at internal audit and risk control failures.  The inquiry also highlighted that controllers did not "systematically carry out more detailed checks" and pointed to an absence of controls likely to identify fraud.  The report suggested the strengthening of three areas, namely, computer security, procedures to tip off the management of wrongdoing, and stronger human resources checks.

120.    The committee report also said there were 75 red flags between June 2006 and the beginning of 2008 that should have alerted managers to Kerviel's unauthorized trades.  The warning signs included a trade with a maturity date on a Saturday, trades with "pending" counterparties, and trades with missing broker names, according to the investigative report.  The report said that while procedures were respected and questions were asked, "no initiative was taken" to check Kerviel's assertions, "even when those lacked probability."  Moreover, "the next level of superiors failed to react when notified."

121.    The interim investigative report indicated that the independent committee would continue its work and present an update at SocGen's shareholders' meeting on May 27, 2008.

122.    On February 20, 2008, after issuance of the interim investigative report, Société Générale shares fell 10 cents, or 0.2 percent, to €66.50 euros at 1:05 p.m. in Paris trading.  SocGen ADRs fell from $22.30 on February 19, 2008, to $21.10 on February 20, 2008, and fell another 15 cents over the next two trading days.  SocGen's shares fell 28 percent during the first two months of 2008, compared with a 16 percent decline in the 60-member Bloomberg European Banks and Financial Services Index.  The decline exceeded the 19 percent slump in BNP Paribas SA, France's biggest bank, which reported a 42 percent drop in 4Q2007 profit to €1.01 billion on 2/20/08.

**SocGen's Announcement of 4Q 2007 and FY 2007 Results:**

123.    On February 21, 2008, SocGen announced in a press release that unauthorized trading and subprime-related writedowns led to a record €3.35 billion ($ 4.9 billion) fourth-quarter loss. This net loss compared with profit of €1.18 billion in 4Q2006.  For the full year of 2007, SocGen

announced that its net income fell to €947 million from €5.22 billion, matching preliminary results announced on February 11, 2008. SocGen blamed the reversal mostly on unauthorized trades by Kerviel, whose positions led to €4.9 billion of trading losses, and on the effects of the serious financial crisis on SocGen's Corporate and Investment Banking and Asset Management activities. Although SocGen claimed that it did not discover Kerviel's positions until January 18, 2008, Société Générale booked the losses in the fourth quarter of 2007.

124.    SocGen also said in its February 21, 2008 press release that it would cut its dividend to €0.90 a share from €5.20, maintaining a policy of paying out about 45 percent of profit.

125.    Frederic Oudea, SocGen's chief financial officer, said on the conference call that some further writedowns in money market funds may be necessary in the first quarter of 2008 if credit markets do not improve.


**VII.    INSIDER TRADING**

126.    French market regulators are looking into stock sales by Robert A. Day, a member of the Société Générale board. As set forth above, Day, an investment manager with U.S.-based Trust Company of the West, or TCW, and his family's trusts and foundations sold €140 million (U.S. $206 million) worth of SocGen shares on January 9 and 10, 2008, suspiciously timed just two weeks before SocGen announced €2.05 billion of write-downs related to subprime and €4.9 billion of losses due to Kerviel's trading.


**VIII.    LOSS CAUSATION**

127.    As a result of Defendants' false and misleading statements and omissions described herein, the price of SocGen's ADRs was artificially inflated during the CP, causing harm to Plaintiff and other Class members. Plaintiff and the Class suffered actual economic loss when the risk, subprime exposure and internal control problems and their adverse impact were disclosed to the market, causing the inflation to be removed from SocGen's ADR price.

128.    Investors were shocked on January 23, 2008 (the last day of the CP), when market

rumors indicated that SocGen had significant exposure to subprime CDOs and RMBS which would require substantial additional write-downs. SocGen further shocked investors by announcing, at 2:00 a.m. E.S.T. on January 24, 2008, €4.9 billion of losses due to Kerviel's trading and €2.05 billion of write-downs related to (subprime) "credit market turbulence." As a result, SocGen's ADRs fell $1.95, from a close of $24.25 on January 23 to close at $22.30 on January 24, 2008 (and continued to drop over the next 2 trading days to $21.50), on extremely heavy trading volume (over 2,500,000 ADR shares), removing the artificial inflation from the ADR stock price. As a direct result, Plaintiff and the Class suffered economic loss, *i.e.*, damages under the federal securities laws.

## IX.   CLASS ACTION ALLEGATIONS

129.   This class action is brought pursuant to Fed. R. Civ. P. Rule 23 on behalf of all persons who purchased SocGen ADRs during the CP (the "Class"), and all U.S. citizens who purchased SocGen securities on any exchange, excluding Defendants, SocGen's officers and directors, and their immediate families, legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest. Class members are so numerous that joinder is impracticable. SocGen reports 2.9 billion ADRs outstanding, owned by numerous persons. Average weekly trading volume of SocGen's ADRs during the Class Period was approximately 147,060 ADRs per week.

130.   Questions of law and fact common to the Class predominate over questions affecting individual Class members. Common questions include: (a) whether Defendants violated the 1934 Act; (b) whether Defendants omitted and/or misrepresented material facts; (c) whether Defendants knew or deliberately disregarded that their statements were false and misleading; (d) whether SocGen ADRs' price was artificially inflated; and (e) the extent and appropriate measure of damages.

131.   Plaintiff's claims are typical of those of the Class. Plaintiff and the Class sustained damages from Defendants' wrongful conduct. Plaintiff has no interests conflicting with the Class and will adequately protect the Class' interests. Plaintiff has retained experienced securities class

action counsel. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## FIRST CLAIM FOR RELIEF
### For Violation of §10(b) of the 1934 Act and Rule 10b-5 Against All Defendants

132.    Plaintiff incorporates the foregoing allegations by reference.

133.    During the CP, Defendants violated § 10(b) of the 1934 Act and Rule 10b-5 by: (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material facts or omitting material facts needed to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaging in acts, practices, and a course of business that operated as a fraud or deceit upon the Class. Defendants also failed to disclose material adverse information in connection with their insider sales of SocGen stock.

134.    The market for SocGen securities was open, well-developed and efficient at all relevant times. Defendants' materially false and misleading statements and omissions caused SocGen ADRs and other securities to trade at artificially-inflated prices during the CP. Plaintiff and the Class were damaged because they acquired SocGen ADRs and other securities relying upon the market's integrity, and would not have purchased at the prices they paid, or at all, if they had known that Defendants' misleading statements and omissions artificially inflated market prices, and because when the truth was revealed, SocGen's ADRs and other securities declined dramatically, directly causing investors' losses.

## SECOND CLAIM FOR RELIEF
### For Violation of §20(a) of the 1934 Act, Against Individual Defendants

135.    Plaintiff incorporates the foregoing allegations by reference.

136.    Individual Defendants acted as controlling persons of SocGen within the meaning of §20(a) of the 1934 Act and are liable thereunder. As officers and/or directors of SocGen, owners of SocGen stock, and "hands on" managers, Individual Defendants had the power and authority to cause SocGen to engage in the wrongful conduct complained of herein.

## PRAYER FOR RELIEF

representatives; and awarding Plaintiff and the Class compensatory damages; extraordinary, equitable or injunctive relief permitted by law or equity; pre- and post-judgment interest; reasonable attorneys' fees; expert fees; other costs; and such other relief as the Court may deem just and proper.

Dated: New York, New York
   March 12, 2008

        Respectfully submitted,

        **COHEN, MILSTEIN, HAUSFELD**
        **& TOLL, P.L.L.C.**

        Elizabeth A. Berney (EB-9781)
        150 East 52nd Street, 30th Floor
        New York, N.Y. 10022
        Telephone: (212) 838-7797
        Facsimile: (212) 838-7745
        eberney@cmht.com

        Steven J. Toll
        Daniel S. Sommers
        Matthew K. Handley
        1100 New York Avenue, N.W.
        West Tower, Suite 500
        Washington, D.C. 20005
        Telephone: (202) 408-4600
        Facsimile: (202) 408-4699
        stoll@cmht.com
        dsommers@cmht.com
        mhandley@cmht.com

        ***Counsel for Plaintiffs***

## CERTIFICATION OF PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

I, Phillip J. Barkett, Jr., ("Plaintiff") declare, as to the claims asserted under the federal securities laws, that:

1.      I have reviewed a class action complaint asserting securities claims against Societe General and wish to join as a plaintiff retaining Cohen, Milstein, Hausfeld & Toll, P.L.L.C. as my counsel.

2.      Plaintiff did not purchase the ADRs that are the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action.

3.      Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.      My transactions in Societe General were as follows:

| DATE | TRANSACTION (buy/sell) | NO. OF SHARES | PRICE PER SHARE |
|------|------------------------|---------------|-----------------|
| April 12, 2006 | Buy | 389 | $28.964 |

5.      During the three years prior to the date of this Certificate, Plaintiff has not sought to serve or served as a representative party for a class in any action under the federal securities laws except as follows: None.

6.      Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing true and correct.

Executed this ___5th___ Day of __March_____, 2008.

_____
Phillip J. Barkett, Jr.