UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------ x

In re SOCIÉTÉ GÉNÉRALE SECURITIES
LITIGATION

------------------------------------------------ x

No. 1:08-cv-02495-RMB

CLASS ACTION

SECOND AMENDED AND CONSOLIDATED COMPLAINT FOR
VIOLATION OF THE FEDERAL SECURITIES LAWS

# TABLE OF CONTENTS

**Page**

I.      Introduction .............................................................................................1

II.     Jurisdiction and Venue ..........................................................................13

III.    Parties .....................................................................................................13

        A.      Lead Plaintiff .............................................................................13

        B.      Foreign Plaintiff ........................................................................14

        C.      Additional Plaintiffs ..................................................................14

        D.      The Corporate Defendant ...........................................................14

        E.      The Individual Defendants ........................................................15

        F.      SocGen's Corporate Structure ...................................................20

        G.      SocGen Corporate and Investment Banking ..............................20

IV.     Confidential Sources .............................................................................23

V.      Control Person Allegations/Group Pleading .........................................28

VI.     Background ............................................................................................30

        A.      The Kerviel Fraud .....................................................................32

        B.      The Subprime Fraud ..................................................................35

VII.    Defendants' False and Misleading Statements ......................................39

        A.      Summary of False Statements ....................................................39

        B.      Defendants' False and Misleading Class Period Statements ................................41

VIII.   The Truth Begins to Come to Light .......................................................69

IX.     Defendants' Scienter .............................................................................90

        A.      According to Kerviel His Superiors at SocGen Not Only Knew of His Trading Activities, They Condoned Them ...........................................90

**Page**

B.  Defendants Knew of or Recklessly Disregarded Numerous Red Flags Indicating that Kerviel Was Engaging in Unhedged Directional Trades and that SocGen Lacked Adequate Risk Control Management Systems ..................92

C.  Defendants Knew of or Recklessly Disregarded Numerous Red Flags Indicating that SocGen's RMBS/CDO Portfolio Was Materially Overstated ....................................................................................................98

D.  Government Investigations, Pursued by U.S. and French Government Agencies, and SocGen's Internal Investigations Further Support Plaintiffs' Scienter Allegations ..................................................................................106

    1.  The French Finance Minister Investigation .............................................107

    2.  Testimony from the Governor of the Banque de France ........................108

    3.  The French Banking Commission Investigation.....................................108

    4.  The AMF Investigation..........................................................................111

    5.  The SEC Investigation ...........................................................................112

    6.  The U.S. Attorney Investigation .............................................................112

    7.  Mission Green Report .............................................................................113

    8.  Report of the Special Committee of the Board of Directors of Societe Generale ................................................................................116

    9.  PwC's Diagnostic Review .....................................................................117

E.  SocGen's Financial Restatement Further Evidences Defendants' Scienter ........117

F.  Defendants' Insider Sales Also Support Plaintiffs' Scienter Allegations............118

    1.  The Percentage, Amount and Timing of the Individual Defendants' Class Period Sales Are Suspicious..........................................................118

    2.  The Individual Defendants' Stock Sales Made Shortly After SocGen's Repurchasing of Company Stock Are Suspicious as Well......122

G.  The Termination, Resignation and Reassignment of Key Members of SocGen's Senior Management Team and Other Participants in the Fraud Is Further Evidence of Defendants' Scienter ..........................................................123

**Page**

H.    SocGen's Simultaneous Disclosure of Both Frauds Confirms Scienter ............126

I.    Defendants' Participation in a Scheme to Defraud Shareholders ......................126

X.    SocGen Violated International Financial Reporting Standards During the Class
Period ...............................................................................................................................129

A.    Applicable Accounting Standards........................................................................130

B.    Defendants' Violations of International Financial Reporting Standards
Related to the Kerviel Fraud ...............................................................................131

1.    SocGen's Restatement of Its 2007 Financial Statements ......................131

2.    IFRS Violations Related to the Kerviel Fraud .......................................135

C.    Defendants' Violations of International Financial Reporting Standards
Related to the Subprime Fraud ............................................................................136

1.    IFRS Required SocGen to Disclose the Risks Arising from Its
Subprime Exposure.................................................................................137

2.    SocGen's Class Period Financial Statements Failed to Disclose Its
Subprime Exposure in Violation of IFRS................................................139

3.    IFRS Required SocGen to Writedown Its Subprime-Backed Assets
to Fair Value ..........................................................................................141

4.    SocGen's Class Period Financial Statements Failed to Write Down
Its Subprime Assets in Violation of IFRS................................................143

5.    Defendants Knowingly Concealed the Risks and Losses Arising
from SocGen's Subprime Exposure.........................................................144

a.    SocGen's Exposure to Subprime and Other U.S.
Residential Mortgage-Backed Assets ..........................................145

(1)    Mezzanine and Unhedged CDOs.....................................146

(2)    CDOs and Other U.S. Mortgage-Backed Assets
Exposed to Monoline Insurers .........................................146

(3)    RMBS ..............................................................................148

(4)    PACE SIV ........................................................................148

- iii -

**Page**

        b.      SocGen Knew or Recklessly Disregarded the Early
Warning Signs of the U.S. Subprime Crisis ...............................149

        c.      Defendants Knew or Recklessly Disregarded Information
from SocGen's Subsidiary TCW About the Deterioration of
SocGen's Mortgage-Backed Assets............................................152

        d.      Defendants Knew or Recklessly Disregarded the ABX
Index .........................................................................................155

        e.      Defendants Knew or Recklessly Disregarded that SocGen's
Own Trading Experience Reflected the Increasing
Illiquidity in the Market ............................................................158

    D.      Defendants' Failure to Disclose the Internal Control and Risk
Management Deficiencies Relating to the Kerviel Fraud and the Subprime
Fraud Violated Financial Regulations AMF........................................160

XI.     Additional Jurisdiction Allegations .................................................................164

    A.      Defendants' False Statements Were Made, and Its Fraudulent Conduct
Occurred in the United States .............................................................164

    B.      SocGen's Additional U.S. Operations ................................................170

XII.    Applicability of Presumption of Reliance: The Fraud-on-the-Market Doctrine ............172

XIII.   Defendants' Insider Sales During the Class Period .......................................173

    A.      Defendants' Insider Trading Scheme.................................................173

    B.      SocGen's Stock Repurchase Program Was Timed to Boost Share Prices to
Support and Benefit Defendants' Sales .............................................176

    C.      Defendant Day's Insider Trading........................................................179

    D.      Defendant Bouton's Insider Trading ..................................................183

    E.      Defendant Mustier's Insider Trading.................................................186

    F.      Defendant Citerne's Insider Trading .................................................188

    G.      Defendant Alix's Insider Trading .....................................................191

XIV.   Loss Causation/Economic Loss ....................................................................193

**Page**

XV.    No Safe Harbor ....................................................................................................195

XVI.   Class Action Allegations.......................................................................................195

XVII.  First Claim for Relief............................................................................................197
       For Violation of §10(b) of the 1934 Act and Rule 10b-5 Against All Defendants

XVIII. Second Claim for Relief.........................................................................................199
       For Violations of §10(b) of the 1934 Act and Rule 10b-5 Against the Individual
       Defendants

XIX.   Third Claim for Relief ...........................................................................................201
       For Violation of §20(a) of the 1934 Act Against All Defendants

XX.    Fourth Claim for Relief..........................................................................................202
       For Violation of §20A of the 1934 Act Against the Individual Defendants Bouton,
       Day and Mustier

XXI.   Prayer .....................................................................................................................204

XXII.  Jury Demand ..........................................................................................................204

## I.    Introduction

1.      This is a federal securities class action on behalf of purchasers of Société Générale ("SocGen" or the "Company") securities during the period  August 1, 2005 to January 25, 2008 (the "Class Period") seeking to pursue remedies under the Securities Exchange Act of 1934 (the "1934 Act" or "Exchange Act") and Rule 10b-5.

2.      Defendant SocGen specializes in equity derivative securities, which includes arbitrage and trading futures on the world's largest options exchanges, such as the U.S.-based ISE, Eurex, Dax and FTSE.  Arbitrage involves engaging in offsetting trades and then capturing the difference in yield, which results in a small profit margin.  With proper risk control management systems in place, arbitrage activities should carry little risk.  The essential key to this type of trading, however, is risk control management.

3.      This case concerns the concealment of a massive trading scandal at the Company, the concealment of the extent and nature of the Company's exposure to the U.S. subprime mortgage market and the lack of adequate risk controls at a company that is in the business of managing risk. At the same time that SocGen was amassing billions in undisclosed losses due to a purported rogue trader, the Company was sitting on billions in undisclosed exposure and losses related to its investments in subprime Residential Mortgage-Backed Securities ("RMBS") and Collateralized Debt Obligations ("CDOs").  When the market learned the truth about the Company's trading losses, inadequate risk controls and subprime losses, the price of SocGen securities declined dramatically. Throughout the Class Period, insiders sold over €225,000,000 worth of their SocGen shares at ten-year stock price highs, and, literally days before the disclosure of the true facts, a SocGen director, Defendant Day, dumped more than €140,000,000 worth of his SocGen securities to the unsuspecting public – a sale of about 53% of his total holdings.  Now, SocGen is subject to numerous international

and U.S.-based regulatory and criminal investigations and the Company's reputation and credibility has been forever tarnished.

4.    SocGen's trading scandal has garnered international attention.  Commencing in at least August 2005,  SocGen trader Jerome Kerviel ("Kerviel") engaged in un-hedged, directional trades (bets on whether market will rise or fall) which exposed the Company to huge losses. Throughout 2006 and into 2007, Kerviel's trading positions continued to increase and SocGen's exposure to losses increased dramatically – at one point reaching €50 billion or more than $70 billion in market risk, which is and was more than SocGen's entire market capitalization. Kerviel's massive directional trades did not go unnoticed at SocGen.  SocGen's inadequate risk controls generated clear and unequivocal red flags and other reports which highlighted to SocGen managers and executives certain aspects of Kerviel's trading positions.  Yet, as SocGen was peppered with internal and external alerts – many identifying Kerviel specifically – nothing was done and the risk of loss to SocGen continued to mount, eventually reaching billions of euros.

5.    To be sure, over an extended period of time, Kerviel was the "subject of more than 70 'alert' warnings."  In March 2007, SocGen held internal discussions about Kerviel's use of fake transactions (which made it appear as though his trades were properly hedged), which had been discovered by one of the Company's internal accounting committees.  Such fictitious deals generated an €88 million charge to the Company's profit and loss account.  In an April 16, 2007 e-mail sent from the director of the "middle results" department to Kerviel's superiors, several financial controllers and the author's supervisor identified €94 million in fictitious transactions.  The recipients of the e-mail held an emergency meeting that day in which the fictitious transactions were confirmed.  Such deals continued, however, with the approval of the directors of SocGen's finance department, ***resulting in a €2.2 billion accounting gap by late June-early July 2007***.

6.     In addition, Kerviel's earnings from proprietary trades were grossly disproportionate to both his trading authority and the earnings of fellow traders on the "Delta One" arbitrage desk where he worked.  As Kerviel himself explained, "*I cannot believe my hierarchy was not aware of the sums I was placing, [a]s it is impossible to generate that kind of profit with small positions*."  Indeed, Kerviel's trades were made in the open, in the middle of a busy trading desk – everything was visible.  SocGen also knew that Kerviel had failed to take the required two-week continuous vacation time – a key requirement in any risk control management system on a trading desk and critical to allowing another trader to review and manage Kerviel's trades – but failed to take any action.  In other words, Kerviel's actions were either known to Defendants or Defendants were extremely reckless in not knowing about them – there is simply no way that SocGen could not have known unless it had engaged in grossly deficient risk management practices.  Indeed, the French Banking Commission, after a series of inspections, twice wrote to Defendant Bouton alerting him and SocGen about the need to reinforce SocGen's controls, particularly in the equity derivatives team where Mr. Kerviel worked.  The French Banking Commission concluded that SocGen clearly had inadequate risk control systems and imposed a €4 million fine – the largest ever in its history.

7.     While Kerviel was posting highly risky directional bets on the market, exposing the Company to billions in losses, internal red flags were being ignored and fictitious trades were being discussed internally but not disclosed.  Meanwhile, Defendants were publicly characterizing the Company's risk controls as, among other things, "highly sophisticated control systems which have already proved their worth in extreme situations."  Defendants also told investors that SocGen had "sound risk management" and that "risk is kept under control, under strong supervision and using our expertise."  Defendants' statements and characterizations of SocGen's risk management policies and controls were materially false and misleading as the Company lacked sufficient risk controls

necessary to prevent a rogue trader from exposing the Company to billions of euros in losses or that even if Kerviel were caught and identified, the Company's risk control procedures were not being implemented and followed as executives and the Company requested. Indeed, once the Kerviel Fraud was disclosed, the numerous deficiencies were apparent to each investigating entity. SocGen's risk controls and policies were insufficient in that they failed to identify, expose, prevent or correct obvious and repeated violations of the purported controls and policies. One internal report described SocGen as a chaotic workplace that fostered the flouting of rules and oversight. Investors would have considered the lack of sufficient risk controls at SocGen to be highly material information given the Company's purported risk control expertise and the importance of risk control to the Company's business, particularly its highly risky equity derivatives trading.

8.    The trading scandal also impacted SocGen's reported financial results, as the Company has now restated its financial statements for each quarter in FY 2007. The restatement is an admission that SocGen's reported financial results were materially false and misleading at the time that they were issued. The magnitude of the restatement is staggering. For example, SocGen was forced to restate €1.4 billion, an astounding 78% of the net income reportedly earned by the Company during the three-month period ended June 30, 2007. In addition, SocGen's CIB division was forced to restate 98% of its originally reported net income for the six-month period ended June 30, 2007.

9.    At the same time that Kerviel's trading was occurring, SocGen was becoming increasingly involved in structuring, trading and investing in a variety of financial instruments, including highly risky RMBS and CDOs, backed by U.S. residential subprime mortgages. Beginning in 2005, SocGen's New York office took on undisclosed positions in certain complex and risky RMBSs and CDOs. SocGen's subprime exposure arose primarily from large unhedged positions in

subprime-backed RMBS and CDOs, including "Mezzanine CDOs," and from other large positions in CDOs and RMBS that were purportedly hedged through protection purchased from monoline insurers.

10.     Unsatisfied that equity analysts continued to value SocGen at earnings multiples well below that of its Wall Street peers, even though SocGen's SGCIB division was reaping levels of profitability unmatched by any of its rivals in Europe or the U.S., SGCIB's CEO, Defendant Mustier set out to "establish a significant presence in the U.S. markets for structured-finance products and asset-backed securities." SocGen ramped up its fledgling U.S. subprime investments business by establishing a CDO Group in New York to structure and underwrite CDOs and RMBS. SocGen then hired away dozens of bankers from its Wall Street rivals to market and sell its U.S. mortgage-backed fixed income products.

11.     Even as the value of these mortgage-backed assets declined, SocGen refused to acknowledge its massive exposure or adequately account for the extent of losses on its positions. When analysts questioned the Company about its *exposure* to the decline in the prices of RMBS and CDOs, Defendants falsely downplayed the Company's exposure and understated the significance of the losses that the Company was experiencing on its positions. Unbeknownst to investors, SocGen had accumulated and warehoused massive amounts of RMBS and CDOs in anticipation of repackaging the securities and selling them to investors as even more complex structured finance products. However, before they could follow through on those plans, the market for these securities evaporated and the value of the securities dramatically declined. In effect, the subprime party ended and SocGen was left holding billions in impaired mortgage-backed assets that it had concealed from the market.

12.     During the Class Period, investors were never told the full extent of the Company's exposure to the subprime credit crisis and were caught completely by surprise when SocGen announced losses of over €2 billion on its RMBS and CDO positions in January 2008. Instead,

Defendants represented that the Company's exposure was "*low*" or "***negligible***" and that the brewing credit crisis would have only a "***limited impact***" on the Company's financial condition. Nothing could have been further from the truth. Defendants knew, but failed to disclose, among other things, that the Company was sitting on over $22 billion of assets tied to U.S. residential mortgages, including billions worth of toxic subprime assets, that they had repeatedly tested the value of these securities and determined that they were significantly over-valued on the Company's books and that they had disbanded their New York-based operations, which had been responsible for this line of business.

13.    According to several former employees who worked at SocGen's New York operations during the Class Period, as early as late 2006 (and certainly by early 2007), it was abundantly clear that SocGen could not sell its CDO/RMBS securities, as the market for these products had evaporated and the values these assets were recorded at on the Compay's books needed to be substantially reduced. By the end of March 2007, SocGen had been forced to scrap a planned CDO offering, and by the middle of 2007, SocGen had disbanded its New York-based CDO Group, which had specifically been created to structure and sell CDOs and other complex structured finance products. A former employee who worked in SocGen's New York operations during the Class Period summed it up best: SocGen's TGV (Turbo Growth Ventures) initiative to underwrite CDOs was a "train wreck."

14.    By the end of 2006, it was common knowledge at SocGen – primarily through discussions at sales meetings held weekly in New York – that the Company's RMBS and CDO portfolio values had nose-dived and that the market for those securities had become almost entirely illiquid. SocGen's management was aware that CDO/RMBS products were not selling. In fact, SocGen received numerous calls from previous customers complaining about "the crap" CDOs that SocGen had sold them earlier in the year. By March 2007, after acquiring and "warehousing" hundreds of millions in mortgage-backed assets for a planned CDO offering, SocGen realized that it

would be unable to sell pieces of the planned CDO, as the market for CDOs had completely dried up. SocGen had no choice but to cancel the offering, leaving it with millions of worthless mortgage-backed assets. Senior management at SocGen's New York operations viewed this failure as a clear sign that the RMBS/CDO market was shot.

15.    In this same time frame, SocGen could no longer obtain broker quotes for much of its RMBS/CDO portfolio because the market for these products had become illiquid. In fact, the situation became so dire that SocGen stopped using mark-to-market valuations and the ABX index, which it had previously relied upon, to value its RMBS/CDO portfolios. Instead, in a desperate attempt to buoy its RMBS/CDO portfolio values, SocGen switched to a "mark to model" valuation. Despite SocGen's attempts to change the model's parameters (*e.g.*, recovery rates, default rates and plugging in broker quotes), SocGen was never able to find a model that provided the values that it wanted to justify ***not*** writing down these assets. Indeed, these models never reflected reality, and it was clear that SocGen's RMBS/CDO portfolios needed to be dramatically reduced. SocGen, however, ignored these valuations, refusing to even begin writing down these securities until November 2007.

16.    Between January 18 and 21, 2008, news began leaking into the market that SocGen's RMBS/CDO portfolio was significantly overvalued and that writedowns were imminent. In reaction to this information, SocGen's stock dropped 16% from €93 to €78.52.

17.    Between January 21 and 23, 2008, SocGen was forced to unwind €50 billion worth of unhedged, directional positions placed by Kerviel. Although the market was still unaware of Kerviel's trading, or even the source of this massive sell-off, it triggered a worldwide collapse in share prices on January 21, 2008.

18.    By January 24, 2008, SocGen shocked the market by revealing – contrary to its many assurances concerning its internal controls and sophisticated risk control management systems – that a

31-year old junior trader, Jerome Kerviel, had engaged in massive unhedged, directional trades on the Eurex, Dax and FTSE, which resulted in SocGen having to book a *€4.9 billion loss*. In a blatant attempt to hide behind the Kerviel fiasco, and to create "noise" in the market, SocGen also chose to announce on January 24, 2008 that, contrary to its many statements that the subprime crisis was "under control," that the subprime market was "improving" and that SocGen had only "limited exposure" in any event, it was taking *an additional €2.05 billion writedown on its subprime assets, including an additional €1.1 billion writedown on its RMBS/CDO portfolio – 10 times more than it had announced just two months earlier in November 2007*. SocGen explained that the ABX index, which it had stated in November 2007 was not a credible tool to value its subprime portfolio, now, just weeks later, supported these writedowns. In response to this additional devastating news, SocGen's stock dropped from €79.08 to €75.81 in a single day – losing €1.42 billion in market capitalization. From January 17 to January 24, 2008, SocGen lost €7.49 billion in market capitalization. In the days that followed these revelations, SocGen's stock continued to decline significantly as the market learned that the risks due to SocGen's trading in equity derivatives and subprime exposure were significantly greater than the Company had publicly represented during the Class Period.

19.     Throughout the Class Period, and before the fraud was disclosed, Defendants Day, Bouton, Mustier, Citerne and Alix (the "Individual Defendants") engaged in a fraudulent scheme to sell the majority of their SocGen shares, while in possession of undisclosed, adverse, inside information, at grossly inflated prices to unsuspecting investors. In fact, Defendants sold between 50% and 81% of their total holdings at SocGen's ten-year share price highs. SocGen's Chairman and CEO, Defendant Bouton, the leading proponent and advocate for increasing the Company's multi-billion Euro share re-purchase program because shares were "cheap," *sold over 65% of his holdings*.

- 8 -

20.    The scheme began with a program to spend €680 million in shareholder money to repurchase outstanding SocGen shares.  Indeed, SocGen ultimately spent over €1.1 billion in repurchasing Company shares throughout the Class Period.  However, after convincing shareholders that its stock was undervalued, Defendant Day turned around and sold over 1.8 million of his SocGen shares (*53%* of his total available SocGen holdings) for proceeds of more than *€168 million*.  Incredibly, Defendant Day sold 1.5 million of those shares for proceeds of €140 million between January 9, 2007 and January 18, 2007, *just days before SocGen announced its €2.05 billion subprime writedown and the Kerviel-related loss of €4.9 billion*.  Significantly, Defendant Day was in a position to know that the subprime writedowns were coming, as he *concurrently* served as the Chairman of Trust Company of the West ("TCW"), SocGen's U.S. asset management subsidiary specializing in CDOs, and a SocGen Director during the Class Period.

21.    Defendant Bouton also took advantage of the artificial inflation in SocGen stock, unloading 255,713 of his SocGen shares for proceeds of more than €30 million.  These sales constituted *65%* of his total SocGen holdings.

22.    Defendant Mustier even cut short his Scotland vacation to rush home and unload *50%* of his available SocGen holdings on August 21, 2007.

23.    Likewise, Defendant Citerne sold 201,129 shares of his SocGen stock (*81%* of his available SocGen holdings) for proceeds of at least €23 million, while Defendant Alix sold 23,171 shares (*81%* of his available SocGen holdings) for proceeds of more than €3.3 million.  In all, while the Individual Defendants caused SocGen to spend *€1.1 billion to repurchase* over 12.3 million shares of its stock, these same individuals collectively *sold* over 2.3 million of their personal SocGen shares, reaping more than €225 million in proceeds, all while in possession of the adverse, non-public facts detailed herein.

- 9 -

24.    SocGen's January 24, 2008 announcement sparked numerous government investigations.  The French Finance Minister, the French Banking Commission and the Autorite des Marches Financiers ("AMF") (the French counterpart to the Securities and Exchange Commission ("SEC")) each conducted investigations into the Kerviel Fraud and SocGen's €4.9 billion derivatives trading loss.  The French Finance Minister found that "*[v]ery clearly, certain mechanisms of internal controls of Societe Generale did not function.*"  The French Banking Commission likewise found "serious deficiencies of the internal control system which go beyond the repetition of simple individual failures" and "*systemic and managerial shortcomings*."  The Banking Commission found numerous violations of French banking regulations and fined SocGen €4 million – *the largest penalty it has ever imposed*.

25.    Defendant Bouton even acknowledged that SocGen's internal control systems failed to keep up with the pace of growth in the derivatives business – "our derivatives business was going 130 miles an hour, risk control was only going 80."

26.    The AMF has issued letters of grievance to Defendants Day and Mustier charging them with insider trading related to Day's €140 million stock sales just prior to the Company's January 24, 2008 announcement and Mustier's August 21, 2007 sale of 50% of his SocGen shares.

27.    In the United States, the SEC also quickly launched an investigation in February 2008 into Defendant Day's massive insider stock sales on the eve of SocGen's disclosures.  The U.S. Attorney for the Eastern District of New York also opened an investigation into SocGen's reported loss due to Kerviel and into Defendant Day's insider sales.

28.    The Company's General Inspection Department conducted its own investigation in which it acknowledged numerous and repeated risk control failures that allowed Kerviel to engage in unhedged, directional trades.  The Company has since invested €100 million in its internal controls.

29.    In the wake of disclosing Defendants' massive fraud, SocGen made wholesale organizational and personnel changes.  In additional to terminating Kerviel's immediate supervisors, in early February 2008, Luc Franćios, head of global equities, the area in which the Delta One desk operated and where Kerviel worked, left the bank.  Likewise, Marc Breillout, head of fixed income, currencies and commodities (the area that traded RMBS and CDO securities) and Paolo Taddonio, head of SocGen's New York operations, also left the Company.  By mid-April 2008, Defendant Mustier, the head of the Company's investment banking division who is credited with building SocGen into a global leader in equity derivatives trading and who was the heir-apparent to Defendant Bouton as SocGen's CEO, was removed from the investment banking division and later reassigned to SocGen Asset Management ("SGAM").  Mustier later left the Company in August 2009, shortly after the AMF announced its investigation into Mustier's insider trading.  Defendant Bouton, who had been warned by France's Banking Commission of issues with SocGen's derivative trading, was forced to turn over his chief executive position to Frederic Oudea, the Chief Financial Officer.  Bouton subsequently stepped down as SocGen's chairman in May 2009.  And Defendant Citerne, Defendant Bouton's second in command with primary responsibility over SocGen's risk management, was forced to give up his seat on the Board and stepped down as Deputy CEO in April 2009.

30.    In October 2008, French President Nicolas Sarkozy announced that bailout money would be made available to French banks that needed a capital infusion.  Shortly before President Sarkozy's announcement, SocGen issued a formal denial that it was in financial trouble and might need a bailout.  SocGen nevertheless accepted €1.4 billion ($2.3 billion) in aid from the French government on or around October 20, 2008.  The French Finance Minister, Christine Lagard, stated that "the goal [of the bailouts] is to ensure the bank networks will be able to continue financing the

economy while maintaining the high solvency levels" they have today. French President Nicolas

Sarkozy stated that the government bailout as a whole was "necessary to avoid the total collapse of

the system – the only way to protect French savings and employment." In January 2009, a new set

of bailouts was announced by the French Finance Minister, in which SocGen received an additional

€1.4 billion. In all, SocGen received at least €3.4 billion in aid from the French Government.

31.    The following chart graphically depicts Defendants' fraudulent scheme, key events

during the Class Period and the devastating impact of the fraud on the Lead Plaintiff and the Class:



## II.    Jurisdiction and Venue

32.    The claims asserted herein arise under Sections 10(b), 20(a) and 20A of the Exchange Act, 15 U.S.C. §§78j(b), 78t(a) and 78t-1, and the regulations promulgated thereunder by the SEC, including SEC Rule 10b-5, 17 C.F.R. §240.10b-5.

33.    This Court has jurisdiction over the subject matter of this action pursuant to §27 of the Exchange Act and 28 U.S.C. §1331.

34.    Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391.  Many of the acts and practices giving rise to the violations of law complained of herein, including the misrepresentations and schemes alleged herein, occurred in substantial part in this District.  Additional facts supporting this Court's jurisdiction are set forth below in §XI.

35.    In connection with the acts alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## III.    Parties

### A.    Lead Plaintiff

36.    Lead Plaintiff Vermont Pension Investment Committee, as detailed in the attached certification, purchased or otherwise acquired SocGen common stock at artificially inflated prices during the Class Period and suffered damages when revelation of the fraud caused a decline in the value of Lead Plaintiff's investment.  Lead Plaintiff is a State of Vermont Government entity that holds the combined investment assets of the State Teachers' Retirement System of Vermont, the Vermont State Employees' Retirement System and the Vermont Municipal Employees' Retirement System.  In addition, as detailed in Plaintiffs' Fourth Claim for Relief below, Lead Plaintiff purchased shares contemporaneously with Individual Defendants Bouton's, Day's and Mustier's insider stock sales.

**B.     Foreign Plaintiff**

37.     Plaintiff Avon Pension Fund, Administered by Bath & North East Somerset Council, as detailed in the attached certification, purchased or otherwise acquired SocGen common stock at artificially inflated prices during the Class Period and suffered damages when revelation of the fraud caused a decline in the value of Plaintiff's investment.  Avon Pension Fund is the 7th largest local authority fund in the UK and has a membership of over 60,000.  At year-end 2007, the Fund value was £1.4 billion.

**C.     Additional Plaintiffs**

38.     Plaintiff Boilermaker-Blacksmith National Pension Fund ("Boilermakers"), as detailed in the attached certification, purchased or otherwise acquired Societe Generale common stock at artificially inflated prices during the Class Period and suffered damages when revelation of the true facts caused a decline in the value of Plaintiff's investment.  In addition, as detailed in Plaintiffs' Fourth Claim for Relief below, Boilermakers purchased shares contemporaneously with Individual Defendants Bouton's, Day's and Mustier's illegal insider stock sales.

39.     Plaintiff United Food and Commercial Workers Union Local 880 – Retail Food Employers Joint Pension Fund ("UFCW 880 Funds"), as detailed in the attached certification, purchased or otherwise acquired SocGen ADRs at artificially inflated prices during the Class Period and suffered damages when revelation of the true facts caused a decline in the value of Plaintiff's investment.  In addition, as detailed in Plaintiffs' Fourth Claim for Relief below, UFCW 880 Funds purchased SocGen ADRs contemporaneously with Individual Defendant Bouton's illegal insider stock sales.

**D.     The Corporate Defendant**

40.     During the Class Period, Defendant SocGen operated in approximately 82 countries and employed nearly 135,000 staff from 119 different nationalities.

- 14 -

41.    SocGen's stock is traded under the symbol GLE on the Euronext Paris stock exchange and trades in an efficient market.  In the United States, SocGen ADRs are traded on the over-the-counter market in New York, New York, under the symbol SCGLY.

42.    SocGen opened its first office in the United States in 1938, and, according to SocGen's website, it is currently "one of the largest foreign banking organizations in the U.S. with more than 2,400 professionals working in 9 U.S. cities."  Within the U.S., SocGen "[O]perate[s] within two divisions to provide investor, corporate and governmental clients with a complete array of financial services: Société Générale Corporate & Investment Banking [and] Société Générale Asset Management subsidiary TCW."

43.    Within the United States, Société Générale Corporate & Investment Banking ("SGCIB") offers corporate banking and fixed income services and securities through its branch in New York, as well as several other offices throughout the United States.  SGCIB also provides securities, investment banking and advisory services through SG Americas Securities, LLC, also located in New York.  SGAM provides, *inter alia*, asset management, brokerage, clearing and execution, custody and issuer services through its branch in New York, as well as through other offices located throughout the United States, including Los Angeles, California and Houston, Texas.

**E.    The Individual Defendants**

44.    Defendant Daniel Bouton was, at all relevant times during the Class Period, Chairman and Chief Executive Officer ("CEO") of the Company.  Defendant Bouton joined SocGen in 1991 and was appointed CEO in 1993.  From November 1997 to May 2008, Defendant Bouton served as Chairman and CEO of the Company.  In May 2008, Defendant Bouton stepped aside as CEO but remained Chairman of the Company.  On May 6, 2009, Bouton stepped down as Chairman of SocGen.  Bouton cited the repeated attacks against him as the reason for resigning.

- 15 -

45.     As detailed in ¶¶122-182 below, during the Class Period, Defendant Bouton made several false and misleading statements concerning the Company's financial results, its risk control management system and the value of its RMBS/CDO portfolio.  In addition, Defendant Bouton signed and certified SocGen's FY2005, FY2006 and FY2007 Registration Documents, which were filed with the AMF (French Securities Regulator).  The false and misleading statements contained in press releases, conference call transcripts, news articles, Registration Documents and the Company's reported financials contributed to the Defendants' presentation of a misleading picture of SocGen's business and investment risks, which resulted in SocGen's stock trading at artificially inflated levels throughout the Class Period.

46.     As the CEO and Chairman of the Company, Defendant Bouton was responsible for the strategic vision of SocGen, including the development and implementation of the Company's risk control management procedures.  Defendant Bouton's position as CEO and Chairman of the Company placed him in a position to access any and all Company information at his request.

47.     During the Class Period, while in possession of material, non-public, adverse information about SocGen, Defendant Bouton sold at least 255,713 shares of SocGen common stock (65% of his total available SocGen holdings) for net proceeds of more than €30 million.

48.     Defendant Jean-Pierre Mustier was at all relevant times during the Class Period the Chief Executive Officer ("CEO") of SGCIB, SocGen's corporate and investment banking unit. Defendant Mustier held that position until he stepped down in May 2008, to become head  SGAM, SocGen's asset management division.  He resigned from SocGen in August 2009, following the filing of an AMF grievance alleging insider trading violations related to Mustier's sale of half of his SocGen stock on August 21, 2007.

49.     Defendant Mustier joined SocGen in 1986 after graduating from France's prestigious engineering school, the Ecole Polytechinique (a classmate of Frederic Oudea). Defendant Mustier became the second employee of SocGen's then fledgling equity derivatives operation. Although considered a great trader, Mustier was tapped for his leadership skills and quickly rose through the management ranks at SocGen. In 1989, Mustier was sent to the U.S. to start up SocGen's market-making operation on the Philadelphia Stock Exchange. In the U.S. Mustier worked with Luc Francois, co-head of SocGen's GEDS division during the Class Period.[1] In 1991, Mustier was sent to Japan to run SocGen's derivative operations. In Japan, Mustier established SocGen as a leading dealer in Japanese equity derivatives. In 1993, Mustier returned to Paris to become global head of equity derivatives (known today as GEDS). In 1996, Mustier went to Asia to run SG Securities Asia. Following SocGen's failed merger attempt with Paribas Bank, Mustier returned to Paris in 1999 to run SocGen's global fixed income business, known today as FICC. In early 2003, Mustier was promoted to CEO of SGCIB.

50.     As the CEO of SGCIB, Defendant Mustier was responsible for the strategic vision of SGCIB, including the maintenance of its dominant equity derivative business and the development and implementation of SGCIB's TGV Initiative, which included SGCIB's expansion into the U.S. asset-backed securities market.[2] Defendant Mustier reported directly to CEO Defendant Bouton. Prior to the announcements of the Kerviel Fraud and the Subprime Fraud, Defendant Mustier was seen by many insiders as the natural successor to Defendant Bouton.

_____

[1]     Luc Francois acted as the co-head of GEDS when the Kerviel Fraud was announced. He left SocGen after the announcement. Luc Francois was co-head with Christopher Mianne, who was part of Mustier's management team at GEDS starting in 1993.

[2]     Following his rise to CEO of SGCIB, Defendant Mustier used SocGen's derivatives business as a springboard for expansion of SGCIB into fixed income and asset-backed securities.

51.     As detailed in ¶¶122-182 below, during the Class Period, Defendant Mustier made several false and misleading statements concerning the Company's financial results, its risk control management system and the value of its RMBS and CDO portfolio.  Mustier's false and misleading statements contained in press releases, conference call transcripts, news articles, Registration Documents and the Company's reported financials contributed to the Defendants' presentation of a misleading picture of SocGen's business and investment risks, which resulted in SocGen's stock trading at artificially inflated levels throughout the Class Period.

52.     During the Class Period, while in possession of material, non-public, adverse information about SocGen, Defendant Mustier sold 50% of his SocGen common stock on August 21, 2007, a mere two weeks after SocGen announced that its exposure to U.S. subprime was minimal.  In August 2009, Defendant Mustier was charged with insider trading by the AMF.

53.     Defendant Robert A. Day was, at all relevant times, a director of the Company.  In 1971, Defendant Day founded TCW, which SocGen acquired in 2001 for $1.3 billion in Company stock.  Defendant Day's holdings of SocGen stock after the acquisition of TCW "dwarf[ed]" that of the other SocGen board members, making him one of the largest individual shareholders in SocGen. Defendant Day is currently a SocGen director as well as the Chairman of TCW.

54.     During the Class Period, while in possession of material, non-public, adverse information about SocGen, Defendant Day sold at least 1.8 million shares of SocGen common stock (53% of his total available SocGen holdings) for proceeds of more than €168 million.  Of this total, over 265,000 of these shares were sold on the New York Stock Exchange, including a sale of shares placed in New York.  As discussed more fully below, in §XIII, the vast majority of Defendant Day's insider stock sales – approximately €140 million – were made over the 9 days leading up to the Company's devastating January 24, 2008 disclosure regarding Kerviel's positions and the

- 18 -

Company's massive increase in subprime-related writedowns. In August 2009, Defendant Day was charged with insider trading by the AMF.

55. Defendant Philippe Citerne, was, at all relevant times during the Class Period, a director and Co-Chief Executive Officer of SocGen. In April 2008, in the aftermath of the Subprime and Kerviel Frauds, Defendant Citerne resigned from SocGen's Board of Directors and announced that he would be leaving the Company within a year. Citerne stepped down as co-CEO on April 30, 2009. During the Class Period, Defendant Citerne assisted Defendant Bouton in carrying out his function as CEO. Defendant Citerne was also responsible for ensuring the overall consistency and efficiency of SocGen's internal control management system. Defendant Citerne chaired SocGen's Internal Coordination Committee ("CCCI"), which met on a quarterly basis during the Class Period and was responsible for the implementation and monitoring of SocGen's internal controls management systems. Additionally, Defendant Citerne is, and during the Class Period was, a director of TCW.

56. During the Class Period, while in possession of material, non-public, adverse information about SocGen, Defendant Citerne sold 201,129 shares of SocGen common stock (81% of his total available SocGen holdings) for net proceeds of at least €23 million.

57. Defendant Didier Alix was Co-Chief Executive Officer of SocGen during most of the Class Period. As Co-CEO, Defendant Alix assisted Defendant Bouton in carrying out his duties as CEO. Defendant Alix began his career at SocGen in 1971. Prior to being named Co-CEO on September 26, 2006, Defendant Alix was Chief Executive of SocGen's Retail Banking Division, a position he held from 1998-2006. Defendant Alix will step aside at the end of 2009 and will become a Special Advisor to current SocGen CEO Frederic Oudea.

58.     During the Class Period, while in possession of material, non-public, adverse information about SocGen, Defendant Alix sold at least 23,171 shares of SocGen common stock (81% of his total available SocGen holdings) for net proceeds of at least €3.3 million.

### F.     SocGen's Corporate Structure

59.     SocGen is organized around three core businesses: Corporate & Investment Banking, Global Investment Management & Services ("SGIMS"), and Retail Banking and Financial Services.

### G.     SocGen Corporate and Investment Banking

60.     SGCIB groups together all capital market and financing activities for corporate clients, financial institutions and institutional investors in Europe, the Americas and Asia Pacific. SGCIB develops high value-added, integrated financial solutions in each of its three key areas of expertise: derivatives, euro capital markets and structured finance.

61.     SGCIB employs over 12,000 staff in 46 countries.  The SGCIB group was modified into three business divisions in Q1 2007 as part of SocGen's "Step Up 2010" initiative: Financing and Advisory, Fixed Income, Currencies and Commodities and Equities.  According to its website, SGCIB issues and sells a significant part of the structured products, including debt and equity products, equity derivatives and commodity derivatives, sold in Europe, the United States and Asia.

62.     The Fixed Income, Currencies and Commodities ("FICC") division implements SocGen's strategy of structuring, trading and distributing flow products, structured interest rate, currency, credit and commodity products as well as securitization and treasury.  The group covers both integrated financial engineering and the distribution of flow and structured products relating to fixed income, currencies and commodities.  FICC operates both in Paris and the United States.  In the United States, FICC operates out of SocGen's New York office (under the name "FICC Americas") and is responsible for the purchase, packaging, valuation and monitoring of SocGen's CDO and RMBS portfolio.  In 2006, Defendant Mustier, then CEO of SGCIB, set out to "establish a significant