presence in the U.S. markets for structured-finance products and asset backed-securities" in order to "win a premium rating from investors." (*Pardon My French*, Institutional Investor America, April 2006.)

63. The Equities division is responsible for the creation and implementation of cash equity and equity derivatives products and services, as well as for equity research. A subset of the Equities division is Global Equities and Derivative Solutions ("GEDS"). GEDS is further broken down into several sub-divisions, including Arbitrage, which includes the Delta One Products Team. Jerome Kerviel was a junior trader and market maker on the Delta One Products Team. The Delta One trading desk focuses on program trading (trading a portfolio of stocks), index (the performance of an entire stock market or a sector of the market) and quantitative trading (using mathematical or statistical models).

64. The chart below depicts the relevant upper-level management structure within SocGen at January 24, 2008:



65. The Subprime Fraud was centered in SocGen's FICC Americas division in New York. Employees of FICC Americas were responsible for creating and analyzing market risk reports for SocGen's RMBS/CDO portfolio, analyzing SocGen's Value at Risk ("VaR"), establishing values for SocGen's RMBS and CDO portfolio, implementing SocGen's risk management policies and origination of the RMBS and CDOs sold and held by SocGen.

66. During the Class Period, Paolo Taddonio was head of FICC Americas and reported directly to Defendant Mustier, SGCIB's CEO. During the Class Period, FICC in Paris was headed by Marc Breillout and Gregroire Varenne, who also both reported directly to Mustier. Defendant Mustier in turn reported to Individual Defendants Citerne and Bouton.

67. Following the announcement of the Subprime Fraud (i) Taddonio stepped down as head of FICC Americas to pursue other activities, and (ii) Marc Breillout and Gregoire Varenne were removed from their respective positions and left the Company.

68. SocGen's derivatives operation (known today as Global Equities and Derivatives Solutions or GEDS) was formed in the mid-1980s and was mirrored after the derivative houses in the United States, namely Goldman Sachs, Citibank and Bankers Trust. Today, SGCIB's equity derivatives platform is the largest in the world.

69. GEDS is a division of SGCIB. GEDS includes several sub divisions, each with its own area of expertise, including Arbitrage, which includes Delta One, where junior trader Jerome Kerviel worked as a trader. The Delta One trading desk focuses on program trading (trading a portfolio of stocks), index trading (the performance of an entire stock market or a sector of the market) and quantitative trading (using mathematical or statistical models). As a junior trader in Delta One, Kerviel was an arbitrage trader.

70.     During the Class Period, GEDS was headed by Christopher Mianne ("Mianne") and Luc Francois ("Francois"). A month prior to the end of the Class Period, Mianne was promoted to head of Global Markets, but returned to GEDS following the announcement of the losses attributed to Kerviel and following the departure of Luc Francois. During the Class Period, both Mianne and Francois reported directly to Defendant Mustier. Kerviel's immediate supervisors, Eric Cordelle, Martial Rouyere and Piet –Yves Morlat were all terminated following the announcement of the trading losses. In all, seven of Kerviel's immediate supervisors and colleagues have been fired or have left SocGen since the losses attributed to Kerviel was revealed. (*SocGen Replaces Mustier*, FT.com, May 30, 2008.) In May 2008, Defendant Mustier, the heir apparent to Bouton, was replaced as CEO of SGCIB.

## IV.     Confidential Sources

71.     Numerous former SocGen employees have provided Plaintiffs with information demonstrating Defendants' knowledge, or reckless disregard, of the falsity of their Class Period statements. The confidential witnesses ("CW") include individuals formerly employed at the Company during the Class Period, whose accounts corroborate one another and confirm facts now admitted by the Company. The witnesses provided information to Plaintiffs on a confidential basis and are particularly described by job description, title, and/or duration of employment, thereby providing sufficient detail demonstrating that each was in a position to know the information provided and that their accounts are reliable.

72.     Confidential Witness 1 ("CW1") was a Vice President of FICC Analytics in New York and was part of the "Front Office." CW1 worked at SocGen's New York office ("SocGen-New York") from January 2006 to November 2007. CW1 reported to Director of FICC Analytics Jean-Francois Flobert. CW1's responsibilities included creating and analyzing market risk reports for Fixed Income products, including products in SocGen's RMBS/CDO portfolio, to insure the

numbers were consistent with those in the market. CW1 also conducted extensive analyses relating to SocGen's VaR, "stress testing" and benchmarking. CW1 was responsible for determining the degree of risk to which any particular investment portfolio was exposed. CW1 generated Daily Reports, which s/he provided to SocGen–New York's senior management. These Daily Reports included various risk and performance analyses regarding Fixed Income products.

73.  CW1 has information and knowledge regarding significant problems relating to the RMBS and CDO markets and the liquidity problems experienced by SocGen with respect to its RMBS/CDO portfolio. CW1 also has information and knowledge with respect to SocGen's valuation of its RMBS/CDO portfolio.

74.  Confidential Witness 2 ("CW2") was a Director of IT for Capital Markets (which included the Fixed Income and Global Equities Derivatives Divisions) in New York. CW2 was employed at SocGen–New York from April 2004 to January 2008, where s/he managed 20 to 40 subordinates. CW2 reported to Managing Director of FICC Americas Paolo Taddonio, who reported to SGCIB CEO Mustier. CW2 has information and knowledge regarding the Company's VaR analysis (used to measure the potential market risk exposure for the Company's various investment portfolios). CW2 also has information and knowledge regarding SocGen's Collateralized Debt Obligation Group ("CDO Group"), its RMBS and CDO products and the liquidity of those products. Additionally, CW2 has information and knowledge regarding the VaR and P&L reports that SocGen-New York sent to SocGen's Paris operations on a daily basis.

75.  Confidential Witness 3 ("CW3") worked at SocGen-New York in the Commercial Mortgage Backed Securities ("CMBS") group from July 2007 to July 2008. CW3 reported to CMBS Group Manager Preston Kibbe. When CW3 first joined SocGen-New York in July 2007, CW3 worked in the CMBS group's loan origination and underwriting department, where s/he was

responsible for purchasing commercial mortgages, which would eventually be securitized and offered on the market in financial instruments such as CDOs. However, after working at SocGen-New York for only a couple of months, the loan origination and underwriting department in which CW3 worked was disbanded "due to the credit crunch."

76. When the loan origination and underwriting department was disbanded, CW3's position changed to that of Senior Analyst for the Real Estate Finance Group. CW3's new responsibilities included analyzing the performance of existing CMBS loans. As part of this analysis, CW3 monitored and evaluated the key performance metrics of the underlying commercial loans, including cash flows, delinquency rates, loan repayment rates and loan terms. CW3 reported his/her findings to Kibbe. Using the information that CW3 provided to him, Kibbe conducted a variety of calculations to ascertain the potential risk from the CMBS assets. Kibbe then prepared memoranda and reports documenting this risk, which he provided to the Investment Committee. CW3 possesses information and knowledge regarding the performance of CMBS portfolios.

77. Confidential Witness 4 ("CW4") was Vice President of SocGen-New York's Middle Office Group. CW4 was employed by SocGen-New York from March 2005 to April 2006. Initially, CW4 reported to Anthony Pecarella. However, in late 2005, when Pecarella was transferred to another department within SocGen-New York, CW4 began reporting to Mark Johnson. Both Pecarella and Johnson reported to the Middle Office Managing Director, Sergio Leifert. During his/her tenure at SocGen-New York, CW4 also worked with Middle Office Director Mike Mears, Middle Office Manager of Fixed Income Products Don Orlando and FICC Analytics Representative Jean-Francois Flobert.

78. CW4's responsibilities included ensuring that SocGen-New York was in compliance with various internal and external policy and regulatory guidelines and requirements. CW4 was also

heavily involved with International Accounting Standards ("IAS") projects relating to interest rate swaps and other hedging activities. CW4 was also involved with Basel II[3] compliance initiatives. CW4 also had Profit and Loss reporting duties relating to CDOs and RMBS products. On a regular basis, CW4 prepared excel spreadsheet reports relating to CDO and RMBS Profits and Losses, which s/he submitted to either Pecarella or Johnson (depending upon the time frame). Another of CW4's responsibilities was to conduct valuation analysis for certain IAS-based products such as swaps (*i.e.*, loans such as zero coupon bonds that were hedged by derivative products).

79. The Middle Office, in which CW4 worked, was also responsible for implementing and administering Risk Management functions for the Company's United States operations. This included establishing and monitoring SocGen-New York's internal controls and maintaining internal policies and procedures designed to minimize credit exposure, including risk exposure related to CDOs and RMBS. The Middle Office was also tasked with validating the market prices or "marks" that the traders assigned to their trades.

80. CW4 has information and knowledge regarding significant problems with SocGen-New York's valuation of CDO and RMBS investments. CW4 also has information and knowledge regarding control deficiencies regarding the data inputted into SocGen-New York's General Ledger.

81. Confidential Witness 5 ("CW5") was a Vice President in the Structured Asset Group at SocGen-New York from July 2006 to January 2007. CW5 reported to Robert Caliendo, Managing Director of Fixed Income Sales and Trading. During the Class Period, CW5 was responsible for

---

[3]   Basel II is the second of the Basel Accords, which are the recommendations on bank laws and regulations issued by the Basel Committee of Banking Supervision. The purpose of Basel II, which was initially published in June 2004, was to create an international standard that banking regulators could use when creating regulations concerning the amount of capital that banks need to set aside to guard against the types of financial and operational risks that banks face.

selling synthetic CDOs structured by SocGen, as well as CDOs structured by other companies (*e.g.*, Lehman Brothers) where SocGen provided financing.

82.     CW5 has information and knowledge regarding the types of CDOs and RMBS sold by SocGen-New York, including information and knowledge regarding how the different types of SocGen CDOs and RMBS were sold. CW5 also has information and knowledge regarding how poorly SocGen CDOs were selling during the Class Period, which s/he learned through his/her participation in weekly "Sales Meetings." Additionally, CW5 has information and knowledge regarding purchasers' dissatisfaction with the RMBS that they purchased from SocGen (due to the RMBS's falling prices). CW5 also has information regarding SocGen's sale of the equity tranches of its CDOs to the Magnatar hedge fund, as well as information regarding Magnatar's standard practice of "shorting" the Mezzanine tranches that it bought equity in. Lastly, CW5 has information and knowledge regarding Taddonio's awareness of the problems occurring with SocGen's RMBS platform.

83.     Confidential Witness 6 ("CW6") worked at SocGen-New York from January 2007 to March 2008 as a Senior Operations Specialist in the Whole Loan Administration Group. During the Class Period, CW6 reported to Director of Operations Gean Augustine. CW6's responsibilities included administering pools of loans and securitizing them.

84.     CW6 has information and knowledge regarding the poor performance of subprime mortgage loans during the mid to late 2007 time period. Additionally, CW6 has information and knowledge concerning the losses suffered by SocGen-New York due to problems in the subprime mortgage market.

85.     Confidential Witness 7 ("CW7") worked at SocGen-New York as Vice President of Fixed Income Trade Support Operations during the Class Period. CW7's responsibilities during the

- 27 -

Class Period included sponsoring and implementing the Calypso system, which is a computer program designed to assign valuation to CDOs.

86. CW7 has information and knowledge regarding the valuation of SocGen-New York's CDO/RMBS portfolios. CW7 also has information and knowledge regarding the Profits and Loss reports that SocGen-New York sent to the Company's Paris operations on a nightly basis. Lastly, CW7 has information and knowledge regarding Mustier's visits to SocGen-New York.

### V. Control Person Allegations/Group Pleading

87. By virtue of their positions as officers and/or directors of SocGen and its subsidiaries, the Individual Defendants had access to undisclosed adverse information about SocGen, its business, operations, operational trends, finances and present and future business prospects. The Individual Defendants acquired this information through SocGen's internal corporate documents, conversations and connections with other corporate officers, directors, bankers, traders, risk officers, marketing experts, and employees, attendance at Board of Directors' meetings, including committees thereof, and through reports and other information provided to them in connection with their roles as SocGen officers and/or directors.

88. For pleading purposes, it is entirely appropriate to treat the Individual Defendants collectively as a group, and to presume that the materially false, misleading and incomplete information conveyed to investors in SocGen's public filings, press releases and public statements, as alleged herein, was the result of the Individual Defendants' collective actions identified above. The Individual Defendants, by virtue of their high-level positions within SocGen, were directly involved in the day-to-day operations of SocGen at the highest levels, directly participated in the management of the Company and were privy to confidential, proprietary information concerning SocGen, its business, operations, prospects, growth, finances and financial condition, as alleged herein.

89. The Individual Defendants participated in drafting, producing, reviewing and/or disseminating the materially false and misleading information alleged herein, and knew, or with extreme recklessness, disregarded the fact that materially false and misleading statements were being issued regarding the Company, and approved or ratified these statements in violation of federal securities laws.

90. As officers and controlling persons of SocGen, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to SocGen's financial condition and performance, growth, operations, financial statements, business, markets, management, risk, earnings and present and future business prospects, as well as to correct any previously issued statements that had become materially misleading or untrue. The Individual Defendants' material misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

91. The Individual Defendants, by virtue of their positions of control and authority as officers and/or directors of the Company, were able to, and did, control the content of the various public filings, press releases and other public statements pertaining to SocGen during the Class Period. The Individual Defendants were provided with, or had unlimited access to, copies of the documents herein alleged by Plaintiffs to be false and/or misleading prior to, and/or shortly after, these statements were issued and had the ability and/or opportunity to prevent the issuance of the statements or cause the statements to be corrected. Consequently, the Individual Defendants are responsible for the accuracy of the public reports and statements detailed herein.

92. Each of the Individual Defendants is liable as a participant in a scheme, plan and course of conduct that operated as a fraud and deceit on Class Period purchasers of SocGen's securities.

## VI. Background

93. This case is a story about two alarming and related frauds at one of the world's largest financial institutions. With the exception of information relating to SocGen's impending subprime writedowns leaking into the market between January 18, 2008 to January 21, 2008, both frauds remained largely hidden from investors and analysts until January 24, 2008, when SocGen simultaneously disclosed information about both frauds.

94. The first fraud, the Kerviel Fraud, involved massive losses from previously undisclosed and unauthorized derivatives trading by Jerome Kerviel, a junior trader on SocGen's Delta One trading desk. The second fraud, the Subprime Fraud, involved massive losses from previously undisclosed exposure to United States residential subprime mortgages. Both the Kerviel Fraud and the Subprime Fraud stemmed from SocGen's gross failures in risk control management (to prevent misconduct and fraud within the Company) and its internal controls relating to market risk.

95. SocGen intentionally deferred revealing the enormity of its subprime writedown until it was forced to disclose its loss on Kerviel's trades. This decision to make simultaneous disclosure illustrates the relationship between the Kerviel Fraud and the Subprime Fraud – they are both examples of the unbridled and undisclosed risks that SocGen engaged in throughout the Class Period. It also shows that SocGen's directors and officers were aware of the negative impact that revealing each fraud would have on the market price of SocGen's securities and Defendants' intent to defer revealing SocGen's exposure as long as possible. SocGen deliberately revealed both frauds at the same time in order to create "noise" or confusion about which fraud could be said to have caused the stock price decline.

96. The revelations of fraud at SocGen shattered the assumptions investors and analysts previously had held regarding SocGen's internal controls and risk management systems. These assumptions were based on SocGen's repeated assurances that it utilized highly sophisticated risk

controls and risk management systems and that its publicly issued financial results were in accordance with International Financial Reporting Standards.

97.     During the Class Period, the price of SocGen's securities was highly sensitive to the impact of equity derivatives trading and mortgage-backed securities exposure, as both of those markets experienced unprecedented growth and increasing levels of risk. The simultaneous disclosure of the Kerviel Fraud and Subprime Fraud led investors and analysts to revise substantially downward their assessments of SocGen's future earnings prospects. These revisions coincided with the steep decline in the price of SocGen securities.

98.     SocGen's disclosures were an alarming example of a series of recent disclosures by financial institutions regarding exposure to derivatives and mortgage-backed securities. The disclosures were particularly shocking given SocGen's reputation for sophisticated risk management of equity derivatives and mortgage-backed securities exposure. Indeed, during the Class Period, and throughout the revelations of the impact of the crisis at other major financial institutions, SocGen stood alone against the tide of bad news about derivatives- and mortgage-related losses. Throughout the Class Period, as bad news emerged from other banks, SocGen's assurances that it had little, if any, exposure led investors and analysts to believe it was different, and that because of its sophisticated risk management systems SocGen had avoided major losses from derivative and mortgage-backed securities.

99.     As is now apparent, SocGen's representations about its risk management systems and its risk were blatantly false. SocGen was different from other banks, not because it had superior risk management systems, but because it falsely led investors and analysts to believe its internal controls and risk management systems had prevented massive losses from derivatives and mortgage-backed securities, when in fact the opposite was true.

### A.     The Kerviel Fraud

100.    First, consider the Kerviel Fraud. Beginning in 2005, SocGen trader Jerome Kerviel, a junior trader in SocGen's "Delta One" arbitrage division, used a range of techniques to hide profits and losses, and to disguise the risk of a complex derivatives trading strategy. Derivatives are financial instruments whose value depends on some underlying instrument or index. The most common forms of derivatives are options (rights to buy or sell securities) and futures (obligations to buy or sell securities). The derivatives market was a multi-hundred-billion-dollar market throughout the Class Period.

101.    As a "Delta One" employee, Kerviel was tasked with trading derivatives as part of SocGen's strategy to "arbitrage" certain securities and indices. Arbitrage is a riskless profit earned from offsetting transactions. For example, one might find an arbitrage by purchasing some individual German stocks on the German Dax Exchange, and then selling a German stock index futures contract to another institution. If Kerviel could buy the German stocks for less money than he could receive by selling the index futures, he could pocket the "arbitrage" difference on behalf of SocGen. This arbitrage would be riskless, or close to riskless, because the prices of the German stocks and the index futures should move together. Thus, if properly hedged, these trades carry little risk. If Kerviel lost money on Germany stocks, he would make that up with profits on the index futures, and vice versa. The key to an arbitrage strategy is these kinds of offsetting trades.

102.    More specifically, SocGen was a leading seller of complex equity derivatives such as knock-out options and turbo warrants. These derivatives included an unusual feature, which caused them to be "deactivated" when a specified securities price reached a certain level. In other words, SocGen's clients would purchase contractual rights to buy or sell securities, but those rights would expire if the securities' prices rose or fell by a specified amount. These derivatives generally are known as "binary" or "digital" options due to their "off-on" features.

103. When SocGen sold these complex derivatives, it became exposed to the risk that its clients would make money and that it would be obligated to buy or sell the underlying securities from or to those clients at unfavorable prices. Moreover, SocGen's risk was non-linear, in that it would expire at certain "on-off" price levels. SocGen developed models and trading strategies to enable it to hedge these risks by purchasing other securities and derivatives in the market. Kerviel's job as part of the "Delta One" group was to hedge these risks, and to lock in arbitrage profits for SocGen.

104. As originally envisioned, these arbitrage strategies would involve low risk and low expected return. SocGen, "Delta One" and Kerviel would expect to earn a small arbitrage profit from offsetting trades, as described above, without taking on substantial directional risk.

105. Although Kerviel's trading began as essentially arbitrage, he soon took substantial unhedged directional positions. SocGen did not disclose these "naked" positions, or the earnings or risk associated with them. For example, in 2007, approximately €25 million of SocGen's earnings were attributed to Kerviel's supposed arbitrage strategies based on competitors' turbo warrants. However, the actual earnings generated by Kerviel's arbitrage trades amounted to just €3 million. The remaining €22 million resulted from directional positions. In other words, the lion's share of SocGen's earnings from this particular aspect of Kerviel's trading during 2007 were from unhedged, risky, directional bets, not from arbitrage.

106. Overall, the portion of SocGen's earnings attributable to Kerviel multiplied six times from 2006 to 2007, as Kerviel took increasingly risky positions. In 2007, Kerviel's earnings represented 59% of the earnings of Delta One revenues.

107. If investors and analysts had known the size of Kerviel's actual positions and earnings during the Class Period, they would have arrived at significantly lower valuations of SocGen's securities based on this substantial additional market risk. Actual earnings on Kerviel's fraudulent

positions were highly volatile, from as low as a several billion dollar loss in mid-2007 to a billion dollar-plus gain in late 2007. If investors had known about the volatility of SocGen's actual earnings, they would have applied a higher discount rate to SocGen's expected future cash flows, which would have caused SocGen's stock price to decline. Indeed, once Kerviel's unhedged, directional trades were unwound in January 2008, SocGen was forced to restate much of its earnings and revenue.

108. One key measure of SocGen's risk during the Class Period was its reported VaR, a key statistical measure of market risk based on estimated likelihood of losses. VaR is a measure, with a given degree of confidence, of how much one can lose from one's portfolio over a given time horizon. VaR analysis assumes a kind of "grading curve" for investors. Just as a few students in a class with a grading curve receive low grades, investors can expect that on a few trading dates of each year they will lose money. VaR analysis assumes that investor returns for each day can be arrayed along a bell-shaped normal distribution, like student grades. The trading dates with the largest losses – like "D" and "F" grades – are grouped in the left-most tail of the distribution, and the size of the losses in that tail are called the VaR. For example, of approximately 250 trading days in a year, a VaR measure might describe the expected losses on the worst two or three days.

109. Despite SocGen's assurances relating to its VaR calculation that its Risk Division performed a "daily analysis of the exposure and risks incurred by the groups' market activities and compar[ed] said exposures and risks with the limits set," SocGen reported the VaR metrics shown below.

|  | 2005 | | | | 2006 | | | | 2007 | | | | 2008 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 | Q2 | Q3 | Q4 | Q1 |
| Equities Trading VaR | 11.9 | 13.4 | 9.9 | 9.0 | 13.1 | 19.4 | 27.2 | 25.6 | 40.4 | 42.4 | 32.8 | 28.0 | 22.9 |
| Fixed Income Trading VaR | 20.3 | 16.2 | 14.9 | 16.4 | 15.5 | 15.6 | 14.6 | 12.7 | 10.8 | 13.6 | 12.4 | 15.3 | 12.0 |
| Total Trading VaR |  |  |  | 19.8 | 24.4 | 17.6 | 16.2 | 20.3 | 21.8 | 31.7 | 25.1 | 36.4 | 40.8 | 47.9 | 46.0 | 33.7 |

As shown above, SocGen apportioned its total Trading VaR calculation to each of its different trading activities, including Fixed Income (which included RMBS and CDOs) and Equities – the classification in which Kerviel's trading activities were covered. SocGen reported VaR to the market during every quarterly update and at year end in its Registration Documents.

110. These reported VaR metrics were false and failed to reflect the risk associated with Kerviel's trading. If SocGen had reported an accurate VaR measure during the Class Period, to account for the volatility of Kerviel's positions, investors and analysts would have applied a higher discount rate to SocGen's expected future cash flows to adjust for the increased risk associated with Kerviel's trades.

### B. The Subprime Fraud

111. Second, consider the Subprime Fraud. Beginning in 2005, SocGen took on similarly unhedged and undisclosed positions in certain complex and risky assets backed by US residential mortgages. As with the Kerviel Fraud, SocGen failed to disclose the risks or exposure associated with these positions and failed to record the necessary writedowns to reflect these assets at their true fair value. Finally, on January 24, 2008, at the same time it disclosed the Kerviel Fraud, SocGen also disclosed its massive losses on subprime-backed CDOs and other mortgage-backed assets, totaling over €2 billion.

112. SocGen's undisclosed subprime exposure arose primarily from large unhedged positions in subprime-backed RMBS and CDOs, including "Mezzanine CDOs," and from other large positions in CDOs and RMBS that were purportedly hedged through protection purchased from monoline insurers.

113. Subprime RMBS refers to Residential Mortgage-Backed Securities in which the underlying collateral consists of subprime mortgages. Subprime mortgages carry a significantly higher default risk than prime mortgages due to the creditworthiness of the borrowers who take out

these loans. Essentially, an investment in subprime RMBS is an investment in a pool of subprime home mortgage loans. When a financial institution makes a series of residential mortgage loans to individual subprime borrowers, it pools those mortgage loans together and sells them to investors as subprime RMBS. Mechanically, the financial institution and its advisors form a special purpose entity to purchase the underlying home mortgage loans; the entity then buys those loans and issues new securities backed by the loans to investors. Those new securities are called subprime RMBS. As shown in the chart below, the securities from a single securitization transaction are sliced into senior and junior pieces or "tranches." The junior tranches are the riskiest because they bear the first losses, whereas senior tranches are the least risky. Structuring the securities into different tranches allows for the senior tranches of RMBS to achieve high credit ratings (AAA, AA, and A) despite the fact that the mortgage loans underlying these securities are subprime in nature and would never otherwise qualify for such high credit ratings. The high credit ratings (AAA, AA, and A) make the senior tranches of RMBS more attractive to a range of large institutional investors seeking conservative fixed-income investments. Approximately 80%-85% of the securities offered in a subprime RMBS securitization are in senior tranches and have credit ratings of A, AA, or AAA. The remaining securities bear the majority of the risk and are rated BBB or even sub-BBB.



114.     Once subprime RMBS are created, they too can then be repackaged by pooling many RMBS together and completing another securitization to form CDOs. If an RMBS is a "first-level" pooling of mortgage loans, a CDO is a "second-level" pooling of RMBS. Just as the financial institution that set up a special purpose entity to purchase the subprime mortgage loans and securitize them into subprime RMBS, so too does a financial institution set up a special purpose entity to purchase subprime RMBS, securitize them, and issue new securities – CDOs. Different tranches of subprime RMBS can be pooled to create a CDO, but when only the junior tranches (BBB and sub-BBB rated) are pooled together and securitized, the result is a "*Mezzanine CDO*." As shown in the chart below, an investment in "Mezzanine CDO" securities is essentially an investment in a pool of only the junior tranches of subprime RMBS. Therefore, the collateral underlying a Mezzanine CDO security consists of the riskiest of all tranches of RMBS (BBB-and sub-BBB rated tranches), which, in turn, are backed by the riskiest of all mortgage loans (those held by subprime borrowers). Amazingly, financial institutions have found a way to turn these risky securities into what are purported to be investment grade, *i.e.*, AAA-rated securities. Just like a subprime RMBS, a

Mezzanine CDO can have several "tranches" of securities, ranging from junior to senior. The junior tranches are again the riskiest because they bear the first losses, the senior tranches are less risky, and a third class (known as "super-senior tranches") are the least risky. Structuring the risky Mezzanine CDO securities into different tranches allows for the super senior tranches to achieve high credit ratings (AAA, AA, and A) despite the fact that the junior tranches of subprime RMBS underlying these securities have already been rated BBB and sub-BBB.



115.    SocGen's positions in CDOs and RMBS hedged by monoline insurers carried the same risks as the unhdeged CDOs and RMBS because the value of the underlying assets were still tied to risky subprime mortgages. In addition, SocGen's risks and exposures were tied to *the ability of the monoline insurers to absorb the losses on the billions of dollars worth of subprime assets*

- 38 -

*they insured*. In the event the monoline insurers failed – and many did – exposure on hedged CDOs was no different than on unhedged and Mezzanine CDOs.

116. As the US subprime mortgage crisis began to unfold in 2006 and 2007 – nearly every type of asset tied to US residential mortgages was adversely affected. As such, Soc Gen's risks and exposures to losses arising from its massive positions in these assets reached astounding levels. Analysts upped their estimates of total losses related to the subprime mortgage crisis to loss levels that would wipe out most BBB and sub-BBB-rated RMBS. Moody's and Fitch slashed the ratings on several senior tranches of various Mezzanine CDOs all the way from investment-grade to junk (sub-BBB). Likewise, by early 2007, it was clear that monoline insurers, whose traditional business had been insuring relatively safe bonds issued by government authorities, were overextending themselves by insuring hundreds of billions of dollars worth of subprime-backed CDOs and other mortgage-backed assets. Accordingly, the notion that such assets were "hedged" was illusory because the monoline insurers could quickly be wiped out, leaving the holders of such assets to absorb the losses.

117. If investors and analysts had known the size of SocGen's subprime exposure during the Class Period, they would have arrived at significantly lower valuations of SocGen's securities based on this substantial additional market risk.

**VII.    Defendants' False and Misleading Statements**

    **A.    Summary of False Statements**

118. Throughout the Class Period Defendants made a number of false misleading statements regarding the quality of its risk control management systems, its financial results, and the size and risk associated with its CDO and RMBS portfolio. As early as August 2005, as Kerviel was ramping up his unhedged, directional trades, and exposing SocGen to billions of euros in unhedged trading risk, Defendants assured the investing public that "*we have invested in a number of highly*

- 39 -