*sophisticated control systems which have already proved their worth in extreme situations*." Defendants also represented that "*risk management is an integral part of our derivatives activity*." In addition to these and other specific representations regarding the quality of its risk controls, Defendants went even further. They represented that its risk expense (cost of risk) were extremely low and that its "*risk management and hedging techniques*" were "*improving*." In fact, even as SocGen management received numerous internal and external alerts specific to Kerviel's trading activities, Defendants represented in August 2007 that it was seeing "*improved risk management techniques and hedging of high-risk exposure*."

119.    Further, by the middle of 2007, as other banks were writing down their exposure to the U.S. subprime real estate market, primarily through CDOs and RMBS, SocGen represented just the opposite – that it had "*low exposure*" to the credit crisis and the subprime market. And market analysts were quick to relay these assurances to the market – that SocGen had "*reassured on risk exposure (subprime, CDO, LBO* . . . ), *which is apparently very limited* . . . ." Accordingly, analysts continued to rate SocGen stock high in comparison to its peers. Indeed, upon receiving assurance of SocGen's limited exposure to the credit crisis, certain analysts, including Deutsche Bank, upgraded SocGen stock to a "*Buy*."

120.    Even by the Fall of 2007, Defendant Bouton continued to tell the market that SocGen's exposure to the credit crisis was "*under control*" and that it would have only a limited impact on SocGen. In November 2007, Frederick Oudea, SocGen's CFO during the Class Period, represented that SocGen's exposure was only "*indirect*" and that it had only a "*small RMBS portfolio*." And while SocGen took a small writedown on its CDO and RMBS portfolio in Q3 O7, Defendants explained that it was nevertheless just "*to be on the safe side*." Defendants also assured the market in November 2007 that it would have "*no further writedowns*." Even as late as

December 19, 2007, Defendant Bouton represented that "*he saw 'limited impact' on the profitability of France's bank from the current subprime mortgage crisis*."

121.    Each of these and the other statements identified below were false and misleading, as SocGen was forced to announce on Janaury 24, 2008, contrary to Defendants' repeated assurances that SocGen's risk control management systems were state of the art, and indeed "improving," that SocGen would record a loss of €4.9 billion as a result of Kerviel's unhedged, directional trades. SocGen also chose to disclose on January 24, 2008, although Defendants had known for months, that SocGen would need to write down €2 billion in its CDO and RMBS portfolio, just weeks after Defendant Bouton had assured the market of only a limited impact on the bank's profitability due the subprime crisis.

### B.    Defendants' False and Misleading Class Period Statements

122.    On August 1, 2005, in a quarterly shareholder letter published on SocGen's web site, Defendants stated:

> ***One of the most important aspects of this business is controlling our exposure to the different types of risk (market risk, credit risk, etc.) in order to limit their impact on our profitability***. Of course, all our risk management is conducted in close conjunction with, and under the permanent supervision of the Group Risk Division.
>
> The risk of adverse movements in the financial markets is controlled at two levels:  Societe Generale's Board of Directors first defines a series of global exposure limits that applies to the whole division.  We then break this down into a series of more specific limits for each business activity and agent.  ***At the same time, we have invested in a number of highly sophisticated control systems which have already proved their worth in extreme situations, notably in the aftermath of 9/11***.

123.    SocGen's quarterly shareholder letter, published on SocGen's website in February 2006, similarly stated:

> Banking risk covers a broad spectrum and can, for example, arise if a person defaults on a loan repayment or if there is a drop in the market value of a given security. That said, there is one important distinction: financial risks materialise much faster than industrial risk.

- 41 -

*Hence the importance of risk management and the strict procedures it entails. At Société Générale, the Risk Management Division is expected to contribute as much to the Group's development as it is to the company's bottom line*. A key element in internal control, its role can prove to be a source of tension amongst the operating divisions which is why, to ensure its complete impartiality, it reports exclusively to the General Management.

An inherently transverse function, its role is to both advise and audit. With a primary remit that extends to the definition of suitable methods for the analysis, measurement, approval and monitoring of risks, the division subsequently works alongside the Group's different business lines in defining commercial and product strategies. Thirdly, given its entirely impartial position, the Risk Management Division is called upon to monitor and approve the transaction proposals put forward by the sales managers and, lastly, centralises all Group risk issues. I*n short, it is up to the Risk Division to ensure that the Group is in a position to take informed decisions on the risks that it is prepared to assume in order to enhance its profitability*.

124.    With respect to SocGen's risk management, the SocGen shareholder letter stated:

*Risk management – a broad gamut of expertise*

When faced with a variety of risks, you need a variety of profiles. *Indeed, our credit and market risk specialists that are on hand to advise on transactions interact on a daily basis with the operational teams from which they often originate*. Moreover, within the research department, our economists often brush shoulders with consultant engineers. With a background in industry, the latter are often in charge of assessing the quality of the industrial infrastructures of a given borrower.

*And last but certainly not least are the IT teams, there to provide the ever-demanding task of recalculating the risk on market positions each day*. At the end of 2005, Société Générale Group's Risk division employed around 1,900 members of staff.

125.    With respect to SocGen's risk management expertise in derivatives, the shareholder

letter claimed:

If we rank as a leader in this field it is undeniably because we have looked to develop our expertise therein for over 20 years now. *That said, the growth of this activity has only been possible, and more importantly, acceptable, thanks to the parallel development of a strong expertise in the management of risks linked to derivatives*.

At every step in its growth on these markets driven by the dynamism of the business line teams, Société Générale has always been careful to uphold the

principles of prudence and rigour that have long applied to traditional banking activities. Furthermore, given the diversity of the risks at play, we have developed a systematic approach and procedures based on the simulation of various market assumptions including extreme cases such as a stock market crash. *We have thus been able to check that, even in extreme situations, the degree of risk remains acceptable for the Group. As such, risk management is an integral part of our derivatives activity*.

126.    Each of the above statements regarding SocGen's risk management was false and misleading, as SocGen's risk control management systems, necessary in order to detect unauthorized derivatives trading, contained the following major deficiencies throughout the Class Period:

- Lack of supervision of the traders' *nominal* outstanding liabilities (contrary to the supervision of the *net* positions that by definition only reveal a limited market risk);

- Lack of monitoring of vacations by traders;

- Lack of follow up of the cash flows (margin calls and payments, margin deposit, the results obtained);

- Lack of controls over initial margin requirements and margin calls for listed futures;

- Lack of any in-depth treatment of the information requests that would have been addressed to the bank by the Eurex clearinghouse;

- Lack of follow up of the cancellations and modifications of transactions coming from a single trader;

- Lack of adherence to the "Chinese Wall" between the front and the back office;

- Lack of security of the computer systems and protection of the access codes and passwords;

- Lack of verification of confirmations of internal and external counterparts;

- Lack of documentation with respect to the terms and conditions of the operations completed with external counterparts;

- Lack of controls over canceled or modified transactions or over transactions with a deferred start date, or over transactions with technical counterparties, or over positions with a high nominal, or over non-transactional flows over a given month;

- No settlement or delivery due to the cancellation of the transactions;

- No confirmation until five days before the value date for transactions with a deferred value date;

- No confirmation for internal transactions as these are reviewed in the context of intra-group transactions;

- No margin calls with small counterparties that do not have any collateralization agreements;

- No control over intra-month provision flows;

- No control over prices for transactions carried out with external counterparties;

- Failure to systematically extend internal controls beyond what was called for by procedures;

- Lack of an escalation procedure for red flags arising as a result of a breach in control procedures;

- Deficient supervision of traders' activities;

- The fragmentation of controls between several units, with an insufficiently precise division of tasks, lack of a systematic centralization of reports and a feedback to the appropriate hierarchical level;

- Insufficient level of responsiveness for the implementation of the corrective actions identified as necessary by internal audit bodies;

- Lack of controls over canceled or modified trades; and

- Deficiencies in monitoring and handling of anomalies and alerts.

127. In addition, SocGen's risk control management system contained the following major deficiencies specific to Jerome Kerviel:

- Failure to conduct daily reviews and/or follow ups of Kerviel's activities, including failure to review unexplainable cash positions of the portfolios managed by Kerviel;

- Failure to audit information sent from Kerviel;

- Back Office and Middle Office were "insufficiently sensitized to the issues of fraud and misappropriation" even though the detection of fraud is an obligatory part of their assignments;

- Back Office and Middle Office ignored information that would have permitted them to identify that Kerviel's position were in violation of risk management rules;

- 44 -

- The internal procedures designed for the control of market risks were not well adapted to follow up on operational risk and made it possible for maneuvers of concealment to go undetected; and

- Risk Management systems failed to meet the requirement of Articles 5 and 32 set out by the Banking Commission, because SocGen failed to take into account operational risk and the risk of fraud.

(Banking Commission Report, June 20, 2008.)

- Failure to recognize the entry and then cancellation of fictitious transactions concealing market risks and earnings from unauthorized positions;

- Failure to recognize the entry of pairs of fictitious reverse transactions concerning equal quantities of the same underlying assets;

- Failure to recognize the booking of intra-monthly provisions used to temporarily cancel earnings;

- Front office allowed Kerviel to regularly take intraday directional position on index futures and on certain equities which were beyond Kerviel's level of authority;

- Delta One Trading Manager failed to analyze earnings generated by traders or of their positions;

- Prior to November 2007, Trading Manager at Delta One did not have written instructions regarding a clear definition of priorities and supervisory practices;

- Failure to detect unusually high levels of cash flow, as well as failure to react to high cash borrowings once informed of positions;

- Failure to carry out in-depth analysis of high amounts of brokerage commissions at year end;

- Tolerance of the taking of intraday directional position with the Delta One Desk which created atmosphere allowing traders to operate more freely;

- Failure to react to numerous alerts, which denotes a lack of sensitivity to the risk of fraud at the front office level;

- Failure to implement additional risk controls in light of rapid growth in GEDS and numerous signals revealing a deterioration in the Middle Office;

- SocGen's internal control procedures did not sufficiently describe the tasks of all the parties involved in risk control resulting in situations where risk control operators do not have the reflex to inform hierarchical superiors or front office superiors of the

- 45 -

> appearance of anomalies, even for high amounts of trading, if not specifically identified as part of the relevant procedures; and

- Middle Office does not have ability to carry out control over aggregate deposits per account.

(Mission Green Report, May 20, 2008.)

128.   In addition, Defendants' statements were false and misleading, as Kerviel had been reprimanded as early as July 2005 after making a €500,000 profit on an Allianz short position.

129.   In a press release dated February 16, 2006, SocGen announced that the Company's 2005 results were "up sharply." The release stated, "[s]trong organic growth in revenues: +14.8% vs. 2004," "[v]ery low cost of risk: 16 bp," and a "[v]ery strong fourth quarter 2005." The press release also stated that the "credit risk environment remained favourable," enabling write-backs in provisions for this risk, and that "[m]arket risk was lower."

130.   On March 9, 2006, SocGen filed its 2006 Registration Document with the AMF (French securities regulator). Among other things, the 2006 Registration Document assured investors that SocGen engages in *daily analysis "of the exposure and risks incurred by all the Group's market activities and comparison of these exposure [sic] and risks with the limits set," "constant analysis of exposure and results*," and "*daily limit monitoring for each activity, and constant checking that appropriate limits have been set for each activity*."

131.   The 2006 Registration Document also contained a "Report of the Chairman on Internal Control Procedures," which noted that "internal control is part of a strict regulatory framework applicable to all banking establishments and Group staff," that risk management procedures were defined at SocGen's highest management level and that 1,900 staff were dedicated to reviewing and controlling risk exposures on a permanent basis. The 2006 Registration Document also claimed that *teams of independent risk controllers "carry out daily reviews of all positions and risks taken in the course of the Group's market activities," that any cases where limits have been*

- 46 -

*exceeded were highlighted, that market parameters used to calculate risks and results were verified each day, that precise methods have been defined for evaluating risks and that controls were further reinforced through targeted action plans*. Investors were also assured that compliance was regularly monitored by SocGen's compliance, legal and tax departments, and that inspections were carried out by the Internal Audit and General Inspection Departments.

132. Defendant Bouton signed a "Certification of the Person Responsible for the Registration Document," affirming that he certified that the information in the 2006 Registration Document was, "to the best of [his] knowledge, true and there are no omissions that could impair its meaning."

133. Each of the statements identified above from SocGen's 2006 Registration Document regarding its risk control management systems was false and misleading for each of the reasons set forth above in ¶¶126-127, including specifically that SocGen lacked sufficient controls in the following areas:

- Supervision of the traders' nominal outstanding liabilities (contrary to the supervision of the net positions that by definition only reveal a limited market risk);
- An escalation procedure for red flags arising as a result of control procedures;
- Supervision of traders' activities; and
- Monitoring and handling anomalies and alerts.

134. On May 18, 2006, Defendants announced SocGen's first quarter 2006 results in a press release entitled "[e]xcellent first quarter 2006." The release reported "[s]trong organic growth: revenues up +18.2% vs. Q1 05," "[v]ery low cost of risk: 25 bp," "[g]roup net income: EUR 1,471m (+20.0% vs. Q1 05)" and "[g]roup ROE [Return on Equity] after tax: 30.2%."

135. In his quarterly letter to shareholders, published on SocGen's web site in June 2006, Defendant Bouton stated:

> *For the tenth quarter in a row, the Group's risk expense remained very low as a result of* an ever-buoyant credit environment and the different measures taken by the Group: diversification of its portfolio of businesses and *improvement of its risk management and hedging techniques*.

136.  Defendant Bouton's June 2006 statement in his quarterly letter to shareholders was false and misleading as SocGen had not "improved" its risk management techniques. Its internal controls and risk control management systems were abysmal and deficient in numerous respects, including each of the areas identified above in ¶¶126-127, 133.

137.  On August 3, 2006, Defendants issued a press release entitled "[e]xcellent second quarter 2006." The release reported "[v]ery strong organic growth: revenues up 26.6% vs. Q2 05," "[c]ost of risk remains low: 21 bp," "[n]et income: EUR 1,320m (+37.9% vs. Q2 05)," "[g]roup ROE after tax: 25.7%," and "[f]irst half results up sharply." The release stated that against a mixed, but overall favorable, financial and economic environment for SocGen's business, "the Group reported very good performances over the quarter, posting gross operating income of EUR 2,220 million, up 40.0% on Q2 05, and net income of EUR 1,320 million, up by a substantial 37.9%."

138.  On November 9, 2006, Defendants issued SocGen's third quarter 2006 press release, which stated: "Increase in revenues: +7.1% vs. Q3 05," "[c]ost of risk remains low: 21 bp," "[n]et income: EUR 1,272 million (+12.4% vs. Q3 05)," and "[g]roup ROE after tax: 23.6%." The release stated that against a backdrop of a mixed, but overall favorable, economic and financial environment, "the Group reported higher levels of activity than in the third quarter of 2005, which was already a strong comparative base: gross operating income was EUR 2,049 million for the period, representing a rise of 8.7% on Q3 05, while net income amounted to EUR 1,272 million, up 12.4% on the previous year."

139. On February 14, 2007, Defendants issued a press release entitled "2006: Sharp increase in results," which included SocGen's 2006 financial results. The press release stated: "Strong organic growth in revenues: +15.7% vs. 2005," "[c]ost of risk low: 25 bp," "[g]roup net income: EUR 5,221 M (+18.6% vs. 2005)," "[g]roup ROE after tax: 25.8%," "[e]arnings per share EUR 12.33 (+15.2% vs. 2005)," and "[r]ecommended dividend: EUR 5.20 (+16.3% vs. 2005)." The release also represented that SocGen *"improved [its] risk management techniques and hedging of high-risk exposure*."

140. The statements above regarding SocGen's financial results for fiscal 2005, each quarter of 2006, and fiscal 2006 were false and misleading and did not provide a fair presentation of SocGen's true financial position for the following reasons:

(a) The results were prepared in violation of International Financial Reporting Standards ("IFRS"). IAS 1 Presentation of Financial Statements clearly states that **"[t]he application of IFRS, with additional disclosure when necessary, is presumed to result in financial statements that achieve a fair presentation."** As described at ¶¶329-371, SocGen violated various IFRS by failing to disclose and record known risks, uncertainties, and exposures related to both the Kerviel Fraud and the Subprime Fraud as of the time the statements, referenced above, were made.

(b) Under the *IASB Framework for the Preparation and Presentation of Financial Statements*, SocGen was also required to exercise prudence in the preparation of its financial results, including the statements referenced above. "Prudence is the inclusion of a degree of caution" in such preparation "such that assets or income are not overstated and liabilities or expenses are not understated."

(c) SocGen had not "*improved its risk management techniques and hedging of high-risk exposure*" and its "*cost of risk*" did not "*remain low*" during this period, as its internal

controls and risk control management systems were abysmal and deficient in each of the areas identified above in ¶¶126-127, 133. In addition, these statements were false and misleading because in 2006, Kerviel had taken unhedged positions totalling €135 million, and in February 2007, SocGen was notified of a discrepancy with certain of Kerviel's trades by the FIMAT Frankfurt, and by July 2006, Kerviel's trading activity had already generated internal alerts.

141.  The February 14, 2007 press release also stated:

> Société Générale Asset Management (SG AM) has a complete, high quality offering and its innovative capability is recognised by the market. ***In 2006, SG AM confirmed its positioning . . . as the leading player in the CDO market with TCW (the number one player in cash CDOs) and SG AM AI (number 2 worldwide in synthetic CDOs)***.

142.  SocGen's statements in its February 14, 2007 press release regarding its exposure to subprime assets, including CDOs, were false and misleading for failing to disclose (i) SocGen's actual and growing exposure to RMBS and CDO assets, and (ii) that the market for CDOs, offered by SocGen, through its New York office, was becoming illiquid, and SocGen was unable to sell much of its inventory of CDOs, as detailed herein and as explained more fully below (¶¶226-250) and by CW5 (¶¶242-248) based on his/her participation in weekly sales meetings in SocGen's New York office in which the need to sell RMBS/CDO products was discussed and based on his/her review of inventory reports, received in connection with the weekly sales meetings, which discussed these products. According to CW5 the inventory reports reflected that *no* sales activity had occurred with respect to SocGen's RMBS/CDO products during this time period.

143.  On March 16, 2007, the Individual Defendants caused the Company to issue its 2007 Registration Document, signed by Defendant Bouton. The 2007 Registration Document discussed SocGen's risk management, stating:

- Given the diversity and ongoing evolution of its activities, the Group is exposed to a wide range of risks, which are generally grouped into four categories:

\* \* \*

- market risk: risk of loss resulting from changes in market prices and interest rates and in the correlation between these elements and their volatility . . . .

\* \* \*

***Risk management procedures are defined at the highest management level***

The Group organizes a monthly Risk Committee meeting, chaired by the General Management, at which the Executive Committee defines the framework required to manage risk, reviews changes in the characteristics and risks of Group portfolios, and decides on any necessary strategic changes. The Group also has a Major Risks Committee, which focuses on reviewing areas of substantial risk exposure (on individual counterparties or segments of a portfolio).

\* \* \*

Lastly, the procedures for managing, preventing and evaluating risks are regularly analyzed in-depth by the Board of Directors and, in particular, its Audit Committee.

144. The 2007 Registration Document further discussed the Company's Risk Division:

- An independent Risk Division, responsible for implementing an effective system of risk management and for ensuring risks are monitored in a coherent fashion across the Group

The Risk Division is completely separate from the business entities and reports directly to the General Management. ***Its role is to contribute to the development and profitability of the Group by guaranteeing a robust and efficient framework of risk management and overseeing all transactions carried out within its businesses***.

***Accordingly, the Group Risk Division is responsible for identifying all risks borne by the Group, defining and validating the methods and procedures for analyzing, measuring, approving and monitoring risks, ensuring risk information systems are adequate, managing risk portfolios, monitoring cross-disciplinary risks and anticipating levels of risk provisioning for the Group. Furthermore, it also assists in the appraisal of risks incurred on transactions proposed by the Group's sales managers***.

- Procedures and organization

Based on the monitoring framework defined by the Risk Committee, a set of specific procedures has been compiled for each type of risk.

\* \* \*

Procedures for market risk:

- based on the Risk Division's recommendations, the Group Risk Committee defines limits for each type of activity which are then submitted for approval to the Board of Directors;

- *teams of risk controllers who are completely independent from the front-office staff, carry out daily reviews of all positions and risks taken in the course of the Group's market activities*;

- *daily summaries of risk exposure are produced, highlighting any cases where limits have been exceeded*;

- the market parameters used to calculate risks and results are verified each day;

- *precise methods have been defined for evaluating risks*, and the Risk Division must validate the valuation models used to calculate risks, results and provisioning levels.

*These procedures and structures are progressively adapted to accommodate changes in regulations and the rapid growth of increasingly sophisticated businesses*. Some controls are further reinforced through targeted action plans.

145. The 2007 Registration Document also discussed SocGen's compliance control systems:

*The permanent supervision of activities at a local level by operational staff forms the cornerstone of ongoing control within Société Générale Group*

*This comprises all procedures implemented on a permanent basis to guarantee that transactions carried out at an operational level are correctly handled, secure and valid*. The first level of responsibility for ongoing control lies with the operational staff.

Permanent supervision comprises two elements:

- *day-to-day security: all operational staff are required to permanently comply with the applicable rules and procedures governing all transactions carried out*;

- *formal supervision: management is required to make regular checks using written procedures to verify that staff are complying with the rules and procedures for processing transactions and for ensuring effective day-to-day security*.

In order to ensure this system functions correctly . . . permanent supervision procedures are adapted for each Group entity according to their specific activities.

146. The 2007 Registration Document also described the Company's Internal Audit Departments:

*Each Internal Audit Department regularly identifies the areas of risk to which its division is exposed. It then defines an annual schedule of audits to make sure that the exposure is covered in full.* Entities within the Group's Retail Banking Network, for example, are audited every 17 months, *whilst in the Corporate and Investment Banking Division, highest-risk entities are audited around once a year*.

In the course of their assignments, the auditors carry out controls to check the security, compliance and efficiency of the division's activities, and evaluate the quality of the permanent supervision system in place. They then put forward recommendations based on their findings, and follow these up to check they are implemented correctly. Any problems noted or recommendations put forward are entered into the recommendation monitoring system managed by the Audit Departments and General Inspection.

147. The 2007 Registration Document also discussed internal controls governing accounting and financial data, stating:

Accounting data are compiled by the back and middle offices and independently from the sales teams, thereby guaranteeing that information is both reliable and objective. These teams carry out a series of controls defined by Group procedures on the financial and accounting data:

- daily verification of the economic reality of the reported information;

- reconciliation, within the specified deadlines, of accounting and management data using specific procedures;

- production of a quarterly analytical report on the supervision carried out, which is submitted to the management of the entity or division, and to the Group Finance Department.

Given the increasing complexity of the Group's financial activities and organizations, staff training and IT tools are reviewed on a permanent basis to check that the production and verification of financial and management accounting data are effective and reliable.

148. Each of the above statements in SocGen's 2007 Registration Document regarding SocGen's risk management was false and misleading, as SocGen's risk control management

systems, necessary in order to detect any unauthorized trading, was abysmal and contained numerous deficiencies, including each of those identified above in ¶¶126-127, 133, including the following:

- Failure to "carry out daily reviews of all positions and risks taken in the course of" Kerviel's activities;

- Failure to highlight cases, such as Kerviel, "where limits have been exceeded" and, indeed, where limits were routinely exceeded;

- Failure on the part of the Back Office and Middle Office to investigate diligently the discrepancies that appeared several times in 2007;

- After automation of monthly controls in 2006, there was an absence of exchange of confirmations with counterparties within the group and an abandonment of daily control of the flows;

- Failure to implement any interim structure for the monitoring of Kerviel's activities after Delta One lost its manager; and

- In March 2007, Kerviel was permitted to validate his own earnings.

149.   In addition, by the time SocGen had issued its 2007 Registration Document in March 2007, Kerviel had already amassed at least €88 million in fictitious counterparty trades and had exposed the Company to significant market risk based on tens of millions of euros worth of unhedged, directional trades. And by March 2007, SocGen had received warnings from more than one market exchange and the Bank of France about its derivatives trading. In fact, in March and April 2007, the Bank of France sent two separate letters to Defendant Bouton, warning him that SocGen's risk control system/security procedures for certain financial derivatives – the area in which Kerviel was trading – were "wanting" and that SocGen needed to reinforce its internal controls. Indeed, by March 2007, Kerviel was allowed to validate his own earnings, and Kerviel was trading well beyond the net risk limit for the Delta One desk. And from January through February 2007, Kerviel was allowed to sign off on his own trading activities.

150.   At its meeting on May 10, 2007, the SocGen Board of Directors approved the financial results for the first quarter of 2007. Its release, entitled "First quarter 2007: solid