performances against a high first quarter 2006," reported net banking income for SGCIB of

€1,947 million and stated in part:

> The Group's cost of risk was once again low (26 bp of risk-weighted assets), due to both a continued favourable credit environment and factors specific to the Group: a policy of diversification of the businesses portfolio, **improved risk management techniques and hedging of high-risk exposure**.

151.    On May 10, 2007, the Company held a conference call with market analysts in which

SocGen's CFO Frédéric Oudéa stated:

> We are targeting an increase of risk rated assets between 10 and 15% per year, maintaining the percentage of capital allocated to SG CIB to this same maximum threshold than previously commented, while one-third of the capital allocated. ***And risk is kept under control, under strong supervision and using our expertise***. We've tried to illustrate that with a ratio of the NBI of market activity and growing NBI of fixed equities and fixed income commodities revenues; it does not include the financing revenues. Related to the stress test, you know, we have 26 different stress tests, so we have taken the average of the worst stress test for SG CIB parameter. As you can see this ratio, it is in line with the average of 2005 for the last two years. I think that shows that the relative risk level has not changed and let me just point out that we release every year in our registration documents the results of this stress test on the 1st of December, 2006, for the group scope, covering not only for SG CIB but also the other market activities in global investment management in retail banking outside France.
>
> The increase in value-at-risk in particular this quarter is mainly due to a change in methodology which accounted basically for two-thirds of the increase of the equity VaR. ***The risk management policy includes transaction selection based on the application of very strict risk criteria, an active hedging policy, and increased distribution of risk***. And SG CIB clearly is favoring the development of an originate and distribute model rather than a take and hold model.

152.    SocGen's May 10, 2007 First Quarter 2007 release and statements by Frédéric Oudéa

during the Company's conference call with market analysts were false and misleading as its risk

management techniques had not "***improved***" and its risk was not "***kept under control***." In fact,

SocGen's risk control management systems were abysmal and deficient in numerous respects,

including for each of the reasons identified in ¶¶126-127, 133, and for the following reasons:

- The failure to react to external alert signals from EUREX and SocGen's subsidiary FIMAT relating to trading activities;

- The failure to respond to inquiries from EUREX, even though direct hierarchical line was notified in March and April 2007;

- The failure on the part of the Back Office and Middle Office to investigate diligently the discrepancies that appeared several times in 2007;

- After automation of monthly controls in 2006, there was an absence of exchange of confirmations with counterparties within the group and an abandonment of daily control of the flows;

- The failure to implement any interim structure for the monitoring of Kerviel's activities after Delta One lost its manager;

- In March 2007, Kerviel was permitted to validate his own earnings;

- The failure to adequately analyze sources of the profits posted by Kerviel, in spite of the fact that these very favorable incomes seemed difficult to explain by Kerviel, especially in light of his authority level and the market conditions in Q107; and

- The failure of the Middle Office to respond to alerts regarding Kerviel in April and May 2007.

153.    In addition, by May 10, 2007, SocGen was already aware that Kerviel was engaging in numerous fictitious transactions, totaling at least €94 million, as explained in an April 16, 2007 email from Marine Auclair, the director of the "middle results" department, to several financial controllers, among others, as detailed below at ¶¶211-213.

154.    The reported financial results were false and misleading because they failed to incorporate the losses from unhedged trading positions related to the Kerviel Fraud as of March 31, 2007. These losses were material during the first quarter of 2007, and SocGen was forced to restate its financial results in accordance with International Financial Reporting Standards, as detailed at ¶¶323-328. Through the restatement, SocGen has admitted that its originally reported net income for Q1 2007 was overstated by €64 million.

155.    Additionally, the financial results as reported were false and misleading because they failed to incorporate known losses related to the decline in fair market value of the Company's

portfolio of subprime-backed CDO and RMBS assets. As described below at ¶¶330-371, Defendants failed to incorporate information known or recklessly disregarded by them during the first quarter of 2007 in the valuation of SocGen's RMBS and CDO portfolio, in violation of International Financial Reporting Standards.

156.   On June 27, 2007, European Equity Research reiterated SocGen's statements that the SGCIB division's: "*Exposure to high-risk (sub-prime) mortgages in the U.S. is limited as is exposure to securitisation [sic] of these loans (<0.5% of CIB revenues*)."

157.   SocGen's statement to market analysts repeated in the June 27, 2007 European Equity Research report was false and misleading as SocGen's exposure to subprime mortgages was not "limited" for the reasons set forth above in ¶142.

158.   On August 2, 2007, the Company issued a release entitled "Strong growth in second quarter 2007," which stated in part:

> At its meeting of August 1st 2007, the Board of Directors of Societe Generale approved the results for the second quarter of 2007.  The Group posted a very good performance in Q2 07 on the back of revenue growth in all its core businesses, with gross operating income of EUR 2,805 million, up +26.4% on Q2 06.  Net income totalled EUR 1,744 million, up +32.7% on Q2 06.
>
> \*       \*       \*
>
> **The Group's cost of risk remained low (25 bp of risk-weighted assets) due to** both a still favourable credit environment and factors specific to the Group: a policy of diversification of the businesses portfolio, **improved risk management techniques and hedging of high-risk exposure**. . . .
>
> **Moreover, the Group has low exposure to the current credit market crisis**.
>
> \*       \*       \*
>
> Corporate and Investment Banking's net banking income for the second quarter of 2007 amounted to EUR 2,077 million, up +16.7% (+16.9 % in absolute terms) vs. Q2 06.  NBI for the first half of 2007 came to EUR 4,024 million, an increase of +10.9% (+10.1% in absolute terms) vs. a H1 2006 which represented a high comparison base.  This performance confirms the success of SG CIB's profitable growth strategy focusing on its three key areas of expertise (derivatives,

structured products and euro capital markets). SG CIB continues to make targeted investments in markets offering real and stable potential and allowing it to rapidly capitalise on its areas of expertise (for example, SG CIB has rapidly established itself as one of the leaders in warrants in Korea).

The Equities business enjoyed an excellent quarter, with NBI up +35.4% vs. Q2 06 (+37.9% in absolute terms) at EUR 1,044 million. NBI for the first half of 2007 came to EUR 2,112 million, up +18.1% vs. H1 06 (+18.3% in absolute terms). Commercial performances were excellent, especially for the sale of structured products in France and abroad.

(Footnote omitted.)

159.    On August 2, 2007, following SocGen's announcement of its Q207 results, analysts

at European Equity Research reiterated that:

### Little Exposure to CDOs and LBOs

According to SG, less than 1% of Investment Banking revenue comes from securitisations [sic] and activities related with CDOs, and around 1% of the Investment Banking lending portfolio is LBO financing. Hedge fund exposure is around 1% of total counterparty risk.

160.    On August 3, 2007, Natixis Securities commented on SocGen's second quarter 2007

earnings, concluding that SocGen had: "*[l]ow exposure to credit risk segments*." Natixis Securities

also highlighted the fact that SocGen "*has given some reassuring numbers on its exposure to risky*

*credit segments (subprime, CDO, LBO, etc.)*." Natixis Securities went on to comment:

*The group has reassured on risk exposure (subprime, CDO, LBO . . .), which is apparently very limited*: no retail exposure in the US, no direct exposure for TCW (a leader in CDO management), LBO = 1% of the loan portfolio in CIB, under 1% of CIB revenues coming from securitisation and CDO in the US . . . .

161.    Based on SocGen's Q2 2007 results, which beat market expectations, Credit Suisse,

on August 2, 2007 maintained their outperform designation for SocGen and stated as follows:

Q2 Results: First Thoughts

Societe Generale (SG) *published group net income of €1.74 bn versus our forecast of €1.4 bn and consensus of €1.4 bn. Operating profit of €2.8 bn is 17% above our forecast of €2.39 bn and compares with consensus of €2.37 bn*.

- 58 -

*    *    *

Valuation has become more compelling, however, with a 2008E P/E of 8.8x as at close of 1st August we believe that downside is very limited. . . .

*    *    *

***Given a compelling valuation, however, we believe the shares offer limited downside.  Outperform rating maintained***.

*    *    *

Outperform maintained: still 20% upside in our view

*    *    *

We feel comfortable that the revenues and risks are contained enough to potentially be offset by other areas of growth such as the derivatives and rising spreads and margins.

*    *    *

We believe that SG's shares will continue to benefit from good fundamentals and could continue to be supported by consolidation expectations as we discussed in our recent publication "mid-summer thoughts", 20th July 2007.  ***We maintain our Outperform rating and have upgraded our SOTP-based target price to €155.  We see about 20% upside from current level***.

*    *    *

The Riskier Areas

We are optimistic with regards to BNPP and SG's ability to withstand the current challenging credit environment because ***we believe that their exposure is limited in size, closely monitored, collateralized, and rather safe in our view***.  Additionally we believe that their CIB division should be able to benefit from the current increasing volatility which increases demand for derivatives, their main franchise.  Finally we note that with GDP world-wide still growing at 5% according to most economists, demand for financing should remain strong, even if the froth experienced in 2006 and H1 2007 on some segments (M&A, LBO, securitization) may ease somewhat into H2.

***The group tried to reassure . . . with regards to its exposure to the current credit crisis and areas of concerns, such as subprime, LBOs, or hedge funds***.

162.    Based on SocGen's Q2 2007 results, Deutsche Bank, on August 3, 2007, upgraded

SocGen from Hold to buy, stating as follows:

- 59 -

***Upgrade Societe Generale to Buy . . .***

We are positive on French banks in a pan-European context: We confirm our Buy on BNP Paribas and upgrade Societe Generale to Buy. Both banks trade on a discount vs. the sector, 21% for BNPP and 14% for SocGen, they have little exposure to current credit market jitters and offer positive business perspectives in current market conditions due to their leading franchises in derivatives. We have upgraded our target price to Euro 149.6 for Socgen.

***Little Exposure to Current Credit Crisis***

SocGen shares have dropped as most European banks because of concerns about credit risk, ***but the bank has confirmed that it has negligible exposure***: no US retail activity, no risk-taking on managed assets of TCW, its US fund manager, and low revenue sensitivity, 1% of CIB revenues from securitization and CDO activity in the US, 1% of credit portfolio in LBO financing for a total amount of Euro 2.7 bn and 1% of market counterparty risk in hedge fund.

\*       \*       \*

Attractive Stock Price, TP Upgraded to Euro 149.6

***SocGen trades on 9.4x 2008E adjusted EPS, a 14% discount to the European average, and has dropped 9% since our initiation on June 21st. We consider that this level is not justified and we upgrade our recommendation to Buy. Following the Q2 results, we also upgrade our target price to Euro 149.6 from Euro 147.5, which leaves a 16% upside potential for the stock price***.

\*       \*       \*

Potential in French Bank Stocks

***We upgrade Societe to Buy from Hold for the following reasons:***

- The stock is 20% off its year-high and has gone down 9% since June 21st. We consider that the 14% discount to European peers is now a good opportunity to go long on the stock.

- SocGen shares have dropped as most European banks because of concerns about credit risk, ***but the bank has confirmed that it has negligible exposure***.

- We were already positive on business trends of French banks and we have reinforced our views on BNPP and SocGen because of their leading expertise in derivatives which could drive up the revenues in current volatile markets with good perspectives of future growth. We expect a 12% 06-09 EPS CAGR.

*    *    *

***Small Exposure to Credit Crisis***

We believe that the recent drop of the stock is due to its enrollment in current credit crisis as most European banks, ***but SocGen has low subprime and LBO exposure and should not be relevantly concerned by a potential slow down of these markets. We have also no doubt on the quality of internal procedure to highlight potential weaknesses. The management detailed the small exposure of the bank to current credit crisis with its Q2 results***.

*    *    *

Societe Generale Reported Good Results in Q2 07

***SocGen reported on 2 August Q2 net profit of Euro 1,744m, versus our forecast of Euro 1,362m. The difference came from the strong performance of CIB in equity***; a Euro 235m of capital gain on Euronext shares and Euro 50m income from the equity portfolio of the group. The bank has communicated reassuring news from French retail. International retail and Asset Management & Services continue to deliver strong growth. Adjusted EPS was Euro 6.47 for H1 07, +5% YoY.

***Surprising CIB***

***CIB has benefited from a very good general environment to deliver strong results in its equities activity (revenues +38% YoY)***. Globally, CIB's net income increased by 23% YoY in Q2 07 vs. forecast of a flat activity YoY.

*    *    *

Estimate Changes

Following the Q2 07 set of results, we have upgraded our target price to Euro 149.6 from Euro 147.5. We have increased our 08E revenues by 1.6% and our 08E core earnings by 2.9%.

163.    SocGen's statements made in its August 2, 2007 Second Quarter 2007 earnings release and Defendants' statements to market analysts, repeated in the August 2, 2007 European Equity Research report, the August 2, 2007 Credit Suisse report, the August 3, 2007 Natixis Securities Report and the August 3, 2007 Deutsche Bank report were false and misleading as its risk management techniques had not improved and, in fact, were deficient for each of the reasons identified in ¶152. In addition, by August 2, 2007, SocGen knew of numerous fictitious transactions

and unhedged, directional trades conducted by Kerviel, but failed to take any action. Such fictitious trades were even approved by directors of SocGen's finance department. ***By late June-early July 2007, SocGen knew that the accounting gap – fictitious deals conducted by Kerviel with no economic reality – had reached at least €2.2 billion***. Further, from June 2006 to August 2007, SocGen had received several alerts from FIMAT regarding discrepancies with certain of Kerviel's trades. Kerviel's trading activity had also generated numerous internal alerts regarding risk limits and other issues. For example, by July 2007, Kerviel had amassed €30 billion worth of Dax futures; he had made €500 million in profits, and the Delta One desk had received two notices of cash borrowing of €500 million each.

164.    SocGen's statement that it had "low exposure to the current credit market crisis" was also false and misleading as it had significant exposure, as detailed below in ¶¶226-250, which it failed to disclose in violation of International Financial Reporting Standards. *See* ¶¶330-371, below. Further, according to CWs 1, 2 and 5, no viable market existed for CDOs by mid-2007. For example, according to CW2, SocGen knew that its CDO valuation models "did not reflect reality" by this time.

165.    SocGen's reported financial results were false and misleading because it failed to incorporate the losses from Kerviel's unhedged trading positions, as of June 30, 2007. These losses were material during the second quarter and SocGen was forced to restate its financial results in accordance with International Financial Reporting Standards, as detailed at ¶¶323-328. Through the restatement, SocGen has admitted that its originally reported net income for Q2 was overstated by €1.4 billion.

166.    Additionally, the financial results, as reported, were false and misleading because they failed to incorporate known losses related to the decline in the fair market value of the

Company's RMBS and CDO portfolio. As described at ¶¶330-370, Defendants failed to incorporate information known or recklessly disregarded by Defendants during the second quarter of 2007 in the valuation of SocGen's RMBS and CDO portfolio.

167.    On or about September 7, 2007, Defendant Bouton represented to *Le Figaro* newspaper that the *credit crisis was "under control"* and reaffirmed that *it would have only a limited impact on France's second biggest listed bank*. As for the subprime crisis specifically, Defendant Bouton stated that the Company only had *marginal exposure to the subprime market*.

168.    Defendant Bouton's September 7, 2007, statements to *Le Figaro* that SocGen had limited or marginal exposure to the credit crisis were patently false and misleading for the reasons set forth in ¶¶142, 155, above. According to CWs 1, 2, 3, 5 and 6, by August and September 2007, the market for SocGen's RMBS and CDO products was illiquid and SocGen's New York loan origination and underwriting department was disbanded only two months into its operation, as detailed below at ¶¶226-250.

169.    On November 7, 2007, during the Company's third quarter 2007 earnings call, Frédéric Oudéa made the following statements:

> The solid resilient business model is based on, first of all, 63 diversified profit centers, which help reduce fluctuations in results and increase the matching of rates. ***Secondly, significant experience in market risk management based on the professionalism of its teams and recognized ability in recycling risks***. The third quarter of 2007 was marked by excellent client-driven activity, with a 65.4% increase in revenues versus last year and 40% increase if we look at the first nine months compared with last year.

*        *        *

> Let's turn now to page 31 and look at the Fixed Income and Currencies & Commodities business. As I said here on the contrary, revenues are down sharply by 78.2% versus last year. In a market which was seriously affected by the financial crisis, the trading activities posted a negative contribution of €277 million. This performance was due mainly to a negative €213 million impact on the different positions exposed to the US residential mortgage sector.

We subjected all our activities exposed to US residential mortgages to stress test in order to measure the maximum potential losses at these activities. As we have no retail banking activities in the US, *our exposure is indirect via exposure to originators of subprime loan, RMBS securitization and CDO structuring and trading activity*.

Valuation of illiquid position in CDOs were based on a model using forward-looking scenario of $196 billion cumulative loss for the whole industry in the US residential mortgage sector within the next three years. This scenario was applied to subprime, Alt-A and prime loans rented in the different vintages in 2006 and 2007 and then, again, applied also in a gradually reduced rate to produce generation of loans.

For example, let me just give you a few of the figures that we took to build this scenario. For 2006 subprime loans production, the cumulative probability of loss is 14.6% that results from a 30% probability of default and a 49% loss given default.

*Regarding our small RMBS portfolio*, it was marked down based on observable data and will be valued on that basis going forward. Overall that said we came out with €230 million write-down, which was booked in the NBI. There is a site in our supplementary data detailing our exposure to US residential mortgage risk, as well as our stress test assumptions.

*        *        *

[KIMON KALAMBOUSSIS]: Hi. This is Kimon Kalamboussis from Citi. Two questions, if I may. First on the provisions, could you tell us how the €230 million write-down is split between RMBS and CDO split? And also, how is the LBO write-down rate of 5% calculated, please? Second question is on Rosbank actually, could you update us on the case and when you plan to exercise the option? And also would you have to bid for the minorities, please? Thanks.

[OUDÉA]: I'll answer your question on Rosbank, but first turn to Jean-Pierre Mustier to perhaps answer your first question on the 230 million and the LBO provision. Jean-Pierre?

[MUSTIER]: Yeah. We don't give the split between the values – components of our write-down basically on our US residential mortgage exposure, which are disclosed on page 57 of the presentation. On the LBO side, we took a present markdown of 5%, which we consider is probably too prudent in the sense that we feel that at this stage a certain number of the loans we are underwriting likely to syndicate at a better level. *But we felt as for US residential mortgage that we want it to be on the safe side for all the markdown we were taking our books*.

*        *        *

[JEAN PIERRE LAMBERT]: Thank you very much. Can I have a follow-up question? *If the CDS has been structured in 2005 and why are they still in your*

- 64 -

*portfolio? Is it because using the valuable assets or is it because it's difficult for you to place them in the market? What is the explanation for the presence of those CDOs?*

*[MUSTIER]:  I am not always in the mind of our creditors, but usually when we keep assets on our books, it's because we feel there is value in the books basically.  So these assets have risk profile at this stage the 2005 mezzanine CDOs, as I said, are under our conservative stress scenario, are very likely impacted by the stress.  So in a way we feel they are good assets.  Another issue is that we have to clarify one thing and the difference of what US banks could release in their 10-Q, we have released here all our exposure risk on our US residential mortgage on CDOs we have structured and CDOs on which we have participated but not structured.  So the parameter basically could be potentially wider.  And on the CDOs here, we were participant but not structured on the mez '05 and mez '06 and we were the structure on the A grade.*

170.    On November 7, 2007, the Company issued a release entitled "Third quarter 2007:

Good resilience of Q3 07 results."  The release stated in part:

At its meeting of November 6th 2007, the Board of Directors of Société Générale approved the results for the third quarter of 2007.  Group net income totalled EUR 1,123 million, down -11.5% on Q3 06 and ROE after tax came to 18.0% (vs. 24.6% in Q3 06).  For the first 9 months, the Group posted an increase in its results (Group net income of EUR 4,298 million, or +6.3% vs. 9M 06) and a high level of profitability (ROE after tax 23.8% for 9M 07 vs. 27.5% for 9M 06).

\*        \*        \*

Corporate and Investment Banking's net banking income amounted to EUR 1,159 million in Q3 07 (-22.3% vs. Q3 06, -23.6% in absolute terms), in a very unfavourable market environment.  NBI for 9M 07 came to EUR 5,183 million, up +1.9% (+0.2% in absolute terms) vs. 9M 06, with client-driven revenues increasing +18.4% over the same period.

The good third quarter performance of Equities activities, which represent a significant proportion of the division's revenues (44% in 2006 and more than 50% in H1 07), helped limit the effects of the crisis.  Commercial performances were good in all the businesses (client-driven NBI +21.1% vs. Q3 06).  The NBI of trading activities came to EUR 180 million in Q3 07, with negative NBI for Fixed Income, Currencies and Commodities trading activities, which were directly impacted by the financial crisis, and a positive contribution for Equities activities.

The NBI of the Equities business was up +13.4% (+11.5% in absolute terms) at EUR 679 million in Q3 07 vs. Q3 06.  NBI for 9M 07 amounted to EUR 2,791 million, up +18.4% (+16.6% in absolute terms) vs. 9M 06. The business line produced good third quarter performances in all its client-driven activities, where

revenues were up +65.4% vs. Q3 06: flow products rose +67% in Q3 07 vs. Q3 06; revenues generated from the sale of structured products were 67% higher than in Q3 06 and revenues from cash equities were 52% higher. Despite an adverse market environment, Lyxor recorded positive net inflows in Q3 07 (EUR +530 million).

(Footnote omitted.)

171.    Defendants' November 7, 2007 Third Quarter 2007 earnings call statements were false and misleading as its risk management techniques had not improved and, in fact, were deficient for each of the reasons identified above in ¶¶152, 163. In addition, by August 2, 2007, SocGen knew of numerous fictitious transactions and unhedged, directional trades conducted by Kerviel, but failed to take any action. Such fictitious trades were even approved by directors of SocGen's finance department. ***By late June-early July 2007, SocGen knew that the accounting gap – fictitious transactions by Kerviel with no economic reality – had reached €2.2 billion***.

172.    Defendants' November 7, 2007 statements regarding SocGen's risk management techniques were further false and misleading as the Company had received two letters from Eurex in November 2007, which had questioned certain of Kerviel's trades.

173.    SocGen's November 7, 2007 statements regarding its exposure to the credit crisis were false and misleading for each of the reasons set forth above in ¶¶142, 155, 168. In addition, Defendant Mustier's statements in response to the question regarding the 2005 Mezzanine CDOs were patently false and misleading. Defendants, including Mustier, knew, but failed to disclose, that the 2005 Mezzanine CDOs remained in SocGen's portfolio because SocGen was unable to sell them, as the market was illiquid, and that they should have been immediately written down by the middle of 2007, at the latest.

174.    Defendants' Third Quarter 2007 earnings release statement was false and misleading because the reported financial results failed to incorporate the financial impact of Kerviel's unhedged, directional trading positions as of September 30, 2007. The financial impact was material

- 66 -

during the third quarter, and SocGen was forced to restate its financial results in accordance with International Financial Reporting Standards, as detailed below at ¶¶323-328. Through its restatement, SocGen has admitted that its originally reported net income for Q3 was misstated by €1.7 billion.

175. Additionally, SocGen's Third Quarter financial results, as reported, were false and misleading because they failed to incorporate known losses related to the decline in fair market value of the Company's RMBS and CDO portfolio. As described below at ¶¶330-371, Defendants failed to incorporate information known or recklessly disregarded by Defendants during the third quarter of 2007 in the valuation of SocGen's subprime-backed RMBS and CDO portfolio, in violation of International Financial Reporting Standards.

176. On November 7, 2007, Marketwatch quoted CEO Defendant Bouton, stating that "*[a]lthough gradually improving*, the [subprime] market environment has not at this stage returned to normal."

177. On November 23, 2007, after meeting with SocGen's management the day before, Deutsche Bank made the following comments:

> We met SocGen's management yesterday: they anticipate Q4 to be a tough environment for CIB *but with no further write-downs*. They also highlighted that *they are not exposed to US assets except their CDO exposure that they see as a "mistake*."
>
> *          *          *
>
> From their point of view, *the crisis impact on CIB's business model will be a normalisation of cost of risk which was far too low last year*, and the capital markets' coming back to strong earnings growth will depend on the structured credit ability to reinvent itself and find new way of disintermediation and more transparent products.
>
> *          *          *
>
> *The management also does not anticipate to be forced to book further write-downs on their Euro 4.8bn CDO exposure (Euro 230m markdown booked in Q3) if*

*most of experts' final loss anticipations on 06 & 07 subprime vintages remain at a maximum of 15%.* However they could change their assumption if conditions actually deteriorate.

178.    In a newspaper interview on December 19, 2007, Defendant Bouton reiterated that "he saw '*limited impact*' on the profitability of France's banks from the current subprime mortgage crisis."

179.    SocGen's statements on November 7 and 23 and December 19, 2007, regarding its exposure to subprime-related securities, were false and misleading, as its exposure was not "limited," and, in fact, was significant as set forth below in ¶¶142, 155, 168.  Further, although required under International Financial Reporting Standards to fully disclose the nature, scope and extent of its exposure to subprime-related securities, even if the Company deemed its exposure to be minimal, SocGen failed to do so.

180.    In addition, by November 7, 2007, Defendants knew that SocGen would have to make significant additional writedowns of its hedged and unhedged RMBS and CDO portfolio, as detailed below at ¶¶226-250.  According to CW2, Defendants knew by Q107 that its subprime-related portfolio was not valued correctly and needed to be significantly written down, as Carlos Beneto (head of CDO structuring) and Arno Derries (head of RMBS), both of whom reported directly to Paulo Taddonio (head of FICC Americas), were feverishly changing parameters in their valuation models (within the Calypso system) in order to artificially inflate the value of SocGen's RMBS/CDO portfolio, thereby enabling SocGen to defer taking the necessary writedown of these assets.  According to CW2, based on meetings with Taddonio, Greg Condas, Dave Askin and Richard Baksin, by mid-2007, at the latest, SocGen knew that the valuation models used to value SocGen's RMBS/CDO portfolio *did not "reflect reality"* and were not reliable.  According to CWs 1 and 2, by mid-2007, no viable market for CDO offerings existed.

181.    SocGen's €230 million writedown of its RMBS/CDO portfolio in November 2007 was woefully inadequate, as SocGen's RMBS/CDO portfolio valuation failed to reflect (i) the ABX Index, (ii) the illiquidity of such assets as experienced by SocGen's traders in its New York office and (iii) the experience of SocGen's U.S. asset management subsidiary TCW which was managing and servicing CDOs for its clients and understood their rapidly declining value. *Indeed, only two months later, SocGen wrotedown ten times this amount on its subprime exposure*.

182.    Each of SocGen's statements regarding the quality and sophistication of its internal controls and risk control management systems, identified above, was false and misleading for the reasons set forth in ¶152. Indeed, SocGen had received at least 64 internal and external alerts, 39 of which related directly to Kerviel's trading activity. Kerviel had amassed a trading profit of €1.4 billion for SocGen by year-end 2007, and had requested a €600,000 bonus. In response, Defendants failed to take *any* meaningful action. In addition, Kerviel's trades, made in the presence of many other traders and his superiors on the Delta One desk, alone, ultimately exposed the Company to €50 billion ($73.5 billion) in market risk, shortly before they were unwound in January 2008 – *more than the entire market capitalization of SocGen*. Any institution where a single, junior trader can bet the company on movements in the market can not reasonably be said to manage market risk or to have a sophisticated risk control management system.

## VIII.   The Truth Begins to Come to Light

183.    By January 18, 2008, rumors began circulating about significant writedowns at SocGen and that its exposure to monoline insurers may be increasing. A BNP Paribas analyst reported that the market believed that SocGen had significant monoline exposure. Another analyst estimated that significant additional writedowns of €1.3 billion on SocGen's unhedged CDO portfolio were imminent. SocGen stock dropped 8.2% on January 18, 2008 and another 7.99% on January 21, 2008, for a total drop of 16% over those two days, based on these market rumors. A

Santander analyst reported that this 16% drop "*coincides with the impact on net profit of 2007E we estimated in the event that SG were to book writedowns for its CDO portfolio of €1.3bn*, which we think is a conservative figure."

184.    On January 24, 2008, before the market opened, the Company issued a press release which stated in part:

> Société Générale Group has uncovered an exceptional fraud in a sub-section of its market activities.
>
> The Group expects its net income for 2007 to be in the range of Euro 0.6-0.8bn, including the loss resulting from this fraud and additional US residential mortgage and monoline related write-downs. The Group intends to pay a dividend for 2007 in line with its pay-out ratio target of 45%.
>
> As a result of this fraud and in order to strengthen its capital base, the Group will launch a capital increase of Euro 5.5bn, with preferential subscription rights which has been fully underwritten by a bank syndicate.
>
> Losses on a fraudulent and concealed position
>
> Société Générale Group (the "Group") has uncovered a fraud, exceptional in its size and nature; one trader, responsible for plain vanilla futures hedging on European equity market indices, had taken massive fraudulent directional positions in 2007 and 2008 beyond his limited authority.
>
> Aided by his in-depth knowledge of the control procedures resulting from his former employment in the middle-office, he managed to conceal these positions through a scheme of elaborate fictitious transactions.
>
> There is no residual exposure in relation to these positions, which were discovered and investigated on January 19th and 20th, 2008. It was decided to close these positions as quickly as practicable in the best interest of market integrity and the Group's shareholders. Given the combination of the size of the positions and the very unfavourable market conditions encountered, this fraud has a negative impact of Euro 4.9bn that the Group has decided to recognise in its 2007 pre-tax income.
>
> The trader's positions have been reviewed and a thorough analysis of all his department's positions confirmed the isolated and exceptional nature of this fraud. The employee who has confessed to the fraud has been suspended and a dismissal procedure has been initiated. The individuals in charge of his supervision will leave the Group.
>
> Additional write-downs in relation to US RMBS CDOs and monoline insurers

The Group will post additional write-downs of Euro 2.05bn in Q4 07, comprising the following:

– Euro 1.1bn in relation to US residential mortgage risk;

– Euro 550mm in relation to exposure to US monoline insurers; and

– Euro 400mm unallocated additional provision in relation to the above-mentioned exposures.

US residential mortgage exposure

The Group's exposure to US residential mortgage risk mainly consists of a portfolio of unhedged super senior CDO tranches of RMBS.  In light of the worsening of the US residential mortgage crisis, the Group will apply new write-downs of Euro 1.1bn in Q4 07, consistent with the valuation levels of the ABX indices where they exist (see detailed assumptions and outcome in Appendices 1 to 3).  The consistency of the modelling and the parameters has been reviewed by the Group's auditors.

The subprime RMBS portfolio (Euro 550mm as of September 30th, 2007), which is valued directly on the basis of market parameters, has been hedged, amortised or sold.  As of end 2007, residual exposure stood at around Euro 35mm.

Exposure to US monoline insurers

Other assets on the Group's balance sheet benefit from credit enhancements supplied by monoline insurers.  Applying the same stress test methodology to the underlying portfolio as to the assets underlying the unhedged CDO portfolios, the Group will book a write-down of Euro 500mm in Q4 07 (see Appendix 4).  In addition, a write-down of Euro 50mm has been taken to eliminate the whole of its ACA-related exposure.

185.    As a result of these disclosures, artificial inflation was removed from the price of

SocGen securities, with shares of SocGen stock declining from €79.08 to €75.81 in one day.

186.    On January 26, 2008, more details of Defendants' misconduct were revealed.

(a)    In an article entitled "Socked, not gently," *The Economist* stated:

[M]arket-watchers expressed disbelief that such huge positions, in instruments that the bank itself described as "plain vanilla," could have been built unnoticed.

(b)    *The Wall Street Journal* published an article entitled "Société Générale's Damage Control – After Alleged Fraud, French Bank Strives To Save Reputation."  The article stated in part:

> Paris prosecutors have launched a preliminary criminal investigation into Mr. Kerviel's actions, though no charges have been pressed.  Shareholders also have launched a complaint with Paris prosecutors.

187.    On January 27, 2008, the press continued to cover SocGen with stories about the magnitude of Defendants' fraud:

(a)    *The Financial Times (London)* published an article entitled "Kerviel is just part of a global rogues' gallery," which stated in part:

> In addition, the bad news from SocGen last Thursday was not limited to Mr. Kerviel.  The same press release that blamed "one trader" for a €4.9bn loss disclosed another risk management failure: write-downs of €2.05bn related to "unhedged super senior CDO [collateralised debt obligation] tranches" and other subprime-related derivatives.  A proper ranking of the losses SocGen announced would go: first, trading losses by management; second, CDOs; third, Mr. Kerviel. The leading rogue trader in history was a distant third on SocGen's list of bad news that day.

(b)    *The Globe and Mail* published an article entitled "Exchange says it questioned Kerviel's actions," which stated in part:

> Société Générale SA struggled yesterday to defend its stated assertion that Jérôme Kerviel, the young trader the French banking giant accuses of massive fraud, acted entirely undetected for almost a year as his trading positions climbed to tens of billions of euros.

> French investigators said Eurex, the European futures and options exchange, questioned trades by Mr. Kerviel, 31, in November. . . .

> "In November, 2007, Eurex said it was worried about a particular position that had been taken," said Jean-Claude Marin of the Paris prosecutor's office.

188.    Between January 29 and January 31, 2008, several articles discussing the SocGen scandal were published:

(a)    *The Financial Times (London)* published an article entitled "Kerviel 'invented contracts in quest for bonus.'"  The article stated in part:

> Jérôme Kerviel, the trader at the centre of the Société Générale scandal, had previously been the subject of internal investigations in his department, French investigators said yesterday.

> \*        \*        \*

> Prosecutors also revealed that Eurex, one of the derivatives exchanges on which Mr. Kerviel had traded, had flagged concerns about his activities last November.

> \*        \*        \*

> Mr. Kerviel has admitted to acting alone but claimed the practice of making trades for which he did not have permission was widespread.

> "He said that, although his positions were large, other traders were acting on a smaller level," the prosecutor said.  "He thinks that, for a long time, he generated profit and that he was tolerated to a certain extent."

(b)    *The Guardian (London)* published an article entitled "Eurex exchange told SocGen about rogue trader in November: Bank admits it was warned on more than one occasion: Shareholders go to court over alleged insider dealing."  The article stated in part:

> SocGen faces intense criticism from its own shareholders.  An enraged Colette Neuville, head of Adam, a minority shareholders' lobby, has asked the AMF, the French financial services authority, for a formal inquiry into alleged insider trading by a director and/or others at the bank.

> She also wants the AMF to investigate whether the bank deliberately misled investors about the scale of its sub-prime losses in November last year when it put them at euros 230m – only to announce a euros 2.05bn hit two months later.

> "It appears to me hard to explain that between November and January the scale of the losses was multiplied 10 times," she said, "There are strong possibilities that the information given to shareholders was incorrect, misleading."

(c)    *The New York Times* published an article entitled "French Inquiry: Bank's Inaction Grows as Issue," which stated in part:

The credibility of Société Générale's management came under fresh scrutiny Monday after Jérôme Kerviel told French prosecutors that his fictitious trading started as far back as 2005 – a year earlier than the bank had acknowledged.

(d)    *The Wall Street Journal* published an article entitled "The Fallout at Société Générale: Tasks Mount for a Point Man – Explaining Scandal Is Latest Challenge on Mustier's Plate."  The article stated in part:

Even before the trading scandal, the bank was preparing to detail fresh losses on mortgage-related investments.  For the fourth quarter, in a report overshadowed by the €4.8 billion trading loss, Société Générale said it would take 2.05 billion euros in write-downs, up from only 230 million euros in the third quarter.  More could be coming: In a recent report, Citigroup bank analyst Kimon Kalamboussis estimated that Société Générale might have to take an additional markdown of 1.5 billion euros.

(e)    *The Los Angeles Times* published an article entitled "Trader at bank quelled suspicion, officials say; Société Générale was warned of risky bets by Jérôme Kerviel."  The article stated in part:

Executives at French bank Société Générale were warned about risky bets being made by rogue trader Jérôme Kerviel two months ago . . . authorities said Monday.

Internal bank audits also flagged Kerviel's actions, "but each time he managed to explain them," prosecutor Jean Claude Marin said.  Kerviel, he added, thought bank officials didn't probe too deeply because he was pulling in profits for the financial institution.

*        *        *

Also Monday, a group of bank shareholders filed a suit accusing Robert A. Day – founder of Los Angeles-based Trust Co. of the West – of insider trading in connection with $126 million in stock sales Jan. 9 and 10, before Kerviel's trades were exposed.

Day, who became a Société Générale director after the French company bought TCW in 2001, denied the accusation through a spokesman.

(f)    *Business Week* published an article entitled "SocGen Had Been Warned About Kerviel," which stated in part:

- 74 -

Shares in Société Générale (SOGN.PA) swooned nearly 4% in Paris trading on Jan. 28, to [€]71 [$104.35], as speculation mounted over a possible breakup of the battered French bank, while the Paris prosecutor cited evidence that SocGen had received multiple warnings about unauthorized transactions by rogue trader [Jérôme] Kerviel that ultimately cost the bank $7.1 billion [BusinessWeek.com, 1/24/08].

Prosecutor Jean-Claude Marin, who announced the filing of attempted-fraud charges against Kerviel, told reporters the derivatives exchange Eurex had alerted SocGen last November about questionable trades by Kerviel. Separately, several of the bank's internal control units also had flagged some of his trades in recent months, Marin said.

\*      \*      \*

In its most detailed public explanation of the scandal to date, SocGen acknowledged on Jan. 27 that the trading positions taken by Kerviel had reached more than $73 billion, far exceeding the bank's roughly $50 billion market capitalization, by the time the bank learned of the problem over the weekend of Jan. 19-20. The bank said Kerviel took advantage of his knowledge of the bank's internal control systems, gained during his five years in back-office jobs.

The bank's explanation, however, didn't mention the warning flags raised earlier. According to prosecutor Marin, SocGen's middle office, accounting department, and risk department had raised questions about Kerviel's trades in recent months, as had Eurex, the derivatives exchange operated jointly by Deutsche [Börse] (DB1GN.DE) and the SWX Swiss Exchange stock markets.

(g)      *The Financial Times (London)* published an article entitled "Watchdog probes

share deals," which stated in part:

The AMF, the French financial watchdog, on Tuesday said it had launched an investigation into share dealings in Société Générale.

**It emerged on Monday night that Robert Day, one of the richest men in the US and a member of SocGen's board since 2002, had sold €140m ($206m) worth of SocGen shares in the two weeks before it announced €7bn of exceptional losses.**

\*      \*      \*

**Mr. Day and his foundation sold €45.02m of shares on January 18 – two days before the SocGen board met to discuss a €2.05bn writedown on its exposure to US subprime mortgages and €4.9bn of losses from the alleged rogue trader.**

(h)      *The Financial Times (London)* published an article entitled "SocGen to call on

outside audit team for probe," which stated in part:

- 75 -

The Société Générale board is set to call in independent auditors to examine events leading to the biggest rogue trading scandal in history, as directors seek to bolster Daniel Bouton, the increasingly vulnerable chairman, ahead of a crucial meeting today.

But the fate of Jean-Pierre Mustier, SocGen's star executive, was hanging in the balance ahead of the meeting, as the head of corporate and investment banking is set to be grilled on what he knew of an alarm raised by Eurex, Europe's top derivatives exchange, in November.

"Our previous assumptions have to be questioned," said a director. "If the Eurex warning is confirmed then there is a lot more responsibility in the organisation than we thought."

SocGen admitted it had received letters from Eurex at the end of last year questioning the strategy of Jérôme Kerviel, the 31-year-old trader now accused of exposing the bank to potentially fatal unauthorised futures positions.

(i)    *The Guardian (London)* published an article entitled "Kerviel's defence,"

which stated in part:

Jérôme Kerviel, the 31-year-old rogue trader, has accused his superiors at SocGen of deliberately "turning a blind eye" to his mammoth operations in equity derivatives trading and of being part of a culture of fear.

\*       \*       \*

"I can't believe that my superiors were unaware of the amounts I was committing, it's impossible to generate such profits with small positions," he told the police after giving himself up on Saturday.

He claimed to have made a "profit" of euros 1.4bn (£1bn) by the end of 2007 but to have taken steps to conceal this and instead declare one of euros 55m in the hope of winning a euros 600,000 bonus. ***"As long as we are winning and that's not too obvious, that it fits in, one says nothing***," he added.

Kerviel, who insisted his techniques of concealment were "***not at all sophisticated***" and should have been picked up by correct controls, sums up the bank's culture as "***Not seen, not taken.  If taken, you're hanged***."

(j)    *The New York Times* published an article entitled "Beyond Bank's $7 billion

Loss, Fear of More," which stated in part:

Jérôme Kerviel's 4.8 billion euro trading loss ($7.1 billion) had a positive effect for Société Générale, at least temporarily.

- 76 -

"***The news at Soc Gen may have masked their subprime losses***," said Richard Batty, a fund manager at Standard Life Investments in Edinburgh, using financial-world shorthand for the bank.

The same day Société Générale said that Mr. Kerviel, a rogue trader, had cost it billions, it announced one of the largest subprime-related write-downs by a European bank. Société Générale, based in Paris, said it would write off 1.1 billion euros (now $1.62 billion) related to the United States housing market and 550 million euros ($813 million) related to American bond insurance companies. Only UBS has announced a larger write-down.

Mr. Kerviel's lawyers, Elisabeth Meyer and Christian Charrière-Bournazel, told Agence France-Presse that Société Générale aimed to "raise a smoke screen that would distract the public's attention from far more substantial losses that it had made in recent months, notably in the unbelievable subprime affair."

(k)     *The Financial Times (London)* published an article entitled "Esprit de corps keeps workers loyal to SocGen," which stated in part:

[T]he banking establishment has voiced astonishment that warnings from Eurex, the German derivatives exchange, about suspicious trading activity by Mr. Kerviel last year had not led to the earlier discovery of his unauthorised positions.

Eurex wrote several letters to SocGen in late 2007 asking for information about the strategy behind Mr. Kerviel's transactions. "In my firm, if we got a call from Eurex, there would be absolute hell to pay," says an executive in equities at a US competitor.

189.     On February 5, 2008, *The Globe and Mail* published an article entitled "U.S. investigates SocGen stock sales," which stated in part:

The U.S. Department of Justice is looking into stock sales by a member of French bank Société Générale's board shortly before the bank announced billions of dollars in losses by a single trader, a source close to the investigation said yesterday. "The U.S. Attorney for the Eastern District of New York is taking the lead," the source said, referring to the investigation of Robert Day, a board member of Société Générale and investment manager of U.S.-based Trust Co. of the West.

190.     Also on February 5, 2008, *The Wall Street Journal* published an article entitled "SEC Probes French Bank – U.S. Investigation Of SocGen Focuses On Stock Sales," which stated in part:

The U.S. attorney in Brooklyn, New York, has also opened a criminal probe related to Société Générale, according to a person familiar with the matter, although its precise focus wasn't immediately clear. A spokesman for Société Générale said

- 77 -

the bank's New York branch was contacted by the U.S. Attorney's Office for the Eastern District of New York Jan. 25 regarding the trading losses announced Jan. 24. The bank is cooperating fully with the investigation.

191.    On February 7, 2008, additional press coverage of the scandal was published:

(a)    *The Wall Street Journal* published an article entitled "Tax Twist in the

Trading Scandal," which stated in part:

> Société Générale says it lost 4.9 billion euros ($7.17 billion) at the hands of 31-year-old trader Jérôme Kerviel.  Now, the embattled French bank could face another financial hit – this time from the tax man.
>
> As they pore over the trades, financial books and mobile-phone records of Mr. Kerviel, Société Générale officials have discovered that the trader booked a real gain for the bank of 1.4 billion euros by the end of last year, according to people close to the bank.
>
> That profit now "is subject to corporate tax," according to one person close to the bank.  "We will argue against it, but fiscal authorities will want their share," this person said.
>
> *        *        *
>
> The discovery doesn't alter the bank's reported 4.9 billion euros net loss announced three weeks ago.  However, the realization that Société Générale was sitting on a 1.4 billion euros profit – enough to offset subsequent write-downs the bank announced for its exposure to U.S. subprime mortgages – and didn't notice is likely to raise further questions about the bank's internal control systems.
>
> Already, an internal bank committee, French prosecutors and the French Finance Ministry have been trying to figure out how Mr. Kerviel could engage in his risky trades for so long without being detected.

(b)    *The Financial Times (London)* published an article entitled "SEC investigates

whether SocGen breached US securities laws," which stated in part:

> The US Securities and Exchange Commission is looking at whether Société Générale violated US securities laws as it unwound and revealed its €4.9bn loss from Jérôme Kerviel's allegedly rogue derivatives trades, the Financial Times has learnt.
>
> *        *        *
>
> News of the probe is another blow to SocGen's capital-raising plans.  The bank's board met last night to decide the timing and terms of its emergency €5.5bn capital increase, which could be launched as early as tomorrow.  It is understood that

when the capital increase is complete, Daniel Bouton, chairman, could decide to step down, according to people close to the situation.

(c)    *The Financial Times (London)* published another article, entitled "McCreevy

condemns SocGen's 'abject' failure," which stated in part:

Société Générale was accused last night of "***abject carelessness***" as European Union regulators delivered a scathing attack on the French bank's failure to prevent the biggest rogue trader scandal in financial history.

***Charlie McCreevy, the EU's internal market commissioner, said it was inexcusable that SocGen had not heeded warnings from Eurex, one of the world's leading derivatives exchanges, about transactions conducted by Jérôme Kerviel, the bank employee blamed for the scandal****.*

Mr. McCreevy's remarks in a London speech amounted to the strongest public condemnation by any regulator of SocGen's behaviour in the affair, which cost the bank almost €5bn ($7.3bn, £3,7bn) in net losses.

He emphatically endorsed the opinion of risk control and fraud experts who have criticised SocGen's internal control systems, and he said it underlined the need "to reinforce the supervision of major cross-border banking groups and financial conglomerates" in the EU.

\*        \*        \*

"As far as treasury and proprietary trading risk is concerned, it seems to me amazing that, despite all the lessons about controls that should have been learnt from a sequence of multi-billion dollar losses clocked up by rogue traders in several financial institutions around the world over the past decade, a top-class institution has once again been exposed as having fundamental control weaknesses," Mr. McCreevy said.   "It is inexcusable that the entire market value of a financial institution can be placed at risk by such abject carelessness on the part of a leading European bank, that that institution failed to heed the warnings of a significant market counter-party and failed to learn the lessons that rogue traders have taught us about the checks, balances and controls that must be in place for risk to be effectively managed and controlled."

The commissioner was referring to warnings that SocGen received from Eurex last November about Mr Kerviel's activities and which the bank brushed aside.

(d)    *The Daily Telegraph (London)* published an article entitled "SocGen days

from rights issue," which stated in part:

- 79 -

Mr. Bouton suffered a further blow yesterday as a former inspector of trading operation from 2001 to 2004, Maxime Legrand, detailed the weak controls. He told Agence-France Presse: "Since inspectors do not have enough power in the bank, we are not given the time we need, or the means to check things out. We pretend to have an inspection to please the banking commission. That's where the hypocrisy lies with management: everyone knows about this."

(e)    *The Australian* published an article entitled "French trader 'carried away,'"

which stated in part:

Jérôme Kerviel lost $8 billion but claims his employer made him a scapegoat.

\*        \*        \*

Jérôme Kerviel, 31, accepted that he had made mistakes but said that he had been turned into a scapegoat by his employer, Société Générale.

In his first interview since being placed under investigation in connection with the biggest rogue trader scandal in history, Mr. Kerviel sought to offload blame on to the bank itself.

"I assume my share of responsibility, but I will not be the Société Générale's scapegoat," he said.

192.    On February 8, 2008, *The Financial Times (London)* published an article entitled

"How Kerviel exposed lax controls at Société Générale," which stated in part:

Moreover, it has become clear that Mr. Kerviel's managers ignored multiple warning signs that, if heeded, would have allowed them to stop the young trader long before he was able to do so much damage.

\*        \*        \*

However, rival executives say Mr. Kerviel's ability to avoid detection for years suggests several glaring shortcomings in SocGen's controls. For example, the bank was not monitoring the gross trading positions he was taking but looking only at his net exposure, which he manipulated through fake hedging contracts. Mr. Kerviel's technique of regularly cancelling trades, or claiming to have made a mistake when challenged, should have alerted his superiors that something strange was going on. SocGen also admits it did not change its computer passwords regularly, as standard industry practice requires.

\*        \*        \*

But financial success, and the pressure to keep performing, combined to produce an arrogant culture. Maxine Legrand, a former trading floor inspector who

- 80 -

left the bank in 2004, this week complained to Agence France-Presse that SocGen's risk controls were weak, traders were not punished for breaking rules and the inspection team was treated with disdain on the trading floor.  SocGen dismisses his claims.  Another former SocGen employee, who left the bank in 2002 after doing work experience for a year, says a "lack of controls" allowed him to work on a big debt syndication that lost the bank several hundred thousand euros through a basic mistake.  "In French banks there is much less control and more risk-taking than Anglo-Saxon firms," says the trader, who now works for a mid-sized European brokerage.

Mr Kerviel's own testimony suggests his activities were founded on some fairly basic methods to fool his superiors.  He created false e-mails by reproducing the format and header of e-mails he had received from clients, to rebuff any questions from the bank's internal controls team.  "The techniques I used later were not at all sophisticated, in my view: any correctly carried out control is bound to have uncovered these operations.  There was nothing Machiavellian about my behaviour," he told police.

*By last July – when the US subprime mortgage crisis was deepening – Mr. Kerviel's unauthorised short-selling strategy was proving very profitable.  He was sitting on $500m profit, about which he admits he started feeling intimidated: "I cannot believe my superiors did not know the amounts I was investing, as it is impossible to make these kinds of profits with small positions." But he was not caught for several more months.*

Apart from deficiencies in its own controls, SocGen missed external warning signs about Mr. Kerviel.  Last March France's banking commission, after a series of inspections, twice wrote to Mr. Bouton about the need to reinforce SocGen's controls, particularly in the equity derivatives team where Mr. Kerviel worked.  Then, on November 7, a surveillance officer at Eurex, the derivatives exchange, e-mailed SocGen questioning Mr. Kerviel's purchase of 1,700 Eurostoxx futures and 2,000 Dax futures.

\*       \*       \*

Later that month, when SocGen's human resources department alerted Mr. Kerviel's boss that he had not been on holiday for eight months except for four days in August, he was asked to take some leave.  But Mr. Kerviel told them December was the anniversary of his father's death and he did not want to be alone, persuading his boss that he could wait until January.  "With hindsight, this was a mistake," admits Mr. Martineau.  Most investment banks require traders to take at least two consecutive weeks' holiday a year, which limits the scope for concealing their positions.

\*       \*       \*

After consulting with regulators Mr. Bouton decided to close the €50bn position built up by Mr. Kerviel as quickly as possible. It took one of the bank's top traders three days to do so.

Before European markets opened on Monday, shares were falling sharply across Asia in reaction to worries about the stability of monoline bond insurers, which could trigger more big losses for the financial sector. That day, stock markets suffered their worst fall since September 11, 2001.

"I was in front of my trading screen that morning and could not believe what was happening," says Erick Tripoli, proprietary trading manager at Van der Moolen, the Dutch market maker. "It was horrible. Someone was selling a massive position by volume, not by price. When we heard it was SocGen, we just laughed, as no trader would do such a bad job."

Mr Kerviel told police his positions had still been profitable before markets closed that Friday, his final day of trading. He had switched his strategy since the start of the year to taking long positions – betting on a rise in stock markets – as he was "convinced the market was at a low point and would rebound."

However, SocGen says his positions by that stage were €2.7bn in the red. By selling those positions into a falling market, the losses rose to €6.3bn. But when it reported the loss, SocGen subtracted the €1.4bn profit Mr. Kerviel had made in 2007 – even though it subsequently claimed his unauthorised trading had made only a "small profit" that year.

193.    On February 9, 2008, *The New York Times* published an article entitled "2nd Trader

Emerges In Inquiry In France," which stated in part:

French investigators said Friday that they were questioning a second trader in connection with Société Générale's 5 billion euro ($7.1 billion) loss, the worst in history caused by a rogue trader.

\*        \*        \*

Legal experts said the revelation that Mr. Kerviel might not have been the lone operator suggested that oversight of Société Générale's trading room might have been recklessly lax. That could put added pressure on Daniel Bouton, the bank's chief executive, and other top managers to explain more fully the circumstances that led to the losses.

"It really suggests a higher-level failure of risk management than we thought two weeks ago," when the bank initially disclosed its trading losses, said Christopher Mesnooh, an international business lawyer in Paris.

"It's one thing to overlook one person," he added, "but if it's two people then it begins to stagger the imagination."

- 82 -

194.    On February 11, 2008, *The Financial Times (London)* published an article entitled

"SocGen is accused of complicity by Kerviel lawyer," which stated in part:

> The lawyer for Jérôme Kerviel – the man who allegedly masterminded the biggest rogue trading fraud in financial history – yesterday accused his employer, Société Générale, of complicity in the scandal that has cost the bank €4.9bn ($7.1bn).
>
> "The question we ask is: can we really speak of fraud when it seems that everyone knew what Jérôme was doing?" said Guillaume Selnet. He insisted there was "no Jérôme Kerviel organisation. He is not at the head of some network," implying that Mr. Kerviel had worked alone but suggesting complicity on the bank's part because it was aware of his trades.

195.    On February 11, 2008, *The Financial Times (London)* published an article entitled

"Internal threats need to become a security priority," which stated in part:

> The staggering €4.9bn loss incurred by a rogue trader at Société Générale has repercussions that extend far beyond the rarefied world of derivatives trading – notably concerning IT security issues that affect many organisations.
>
> Richard Stiennon, an IT security consultant, says: "The SocGen case is a classic internal one, carried out by a knowledgeable insider and, technically, it would have been very easy to detect."

                        *        *        *

> As Mr. Kerviel told the police himself: "The techniques I used were not at all sophisticated, and in my opinion, any correctly conducted control should have been able to detect these operations."

196.    On February 12, 2008, *BusinessWeek Online* published an article entitled "SocGen

Sinks on Stock Issue, Writedown." The bank's Feb. 11 announcement reveals another drop thanks

to the rogue trading a scandal and subprime-related losses." The article stated in part:

> Société Générale's already-battered shares fell more than 4% in Paris trading on Feb. 11, to [€]74.59 [$108.22] a share, after the bank announced a heavily discounted $8 billion capital increase to help offset losses from a rogue trading scandal and bad U.S. real estate investments. SocGen (SOGN) shares have fallen nearly 50% over the past year but had risen slightly since the scandal was disclosed Jan. 24 on speculation the bank could be a takeover target.
>
> "We offered attractive terms in a volatile market," SocGen Chief Financial Officer Frédéric Oudea said in a conference call, explaining why existing

- 83 -

stockholders will be able to buy additional shares for [€]47.50 [$68.91], a 39% discount on the Feb 8 closing price.  Outside investors will have to buy additional dividend rights that would raise the cost to [€]71 [$103] per share, the bank said.

Also on Feb. 11, SocGen disclosed it suffered an additional $871 million in losses related to the U.S. real estate market, on top of $2.9 billion in subprime-related losses disclosed earlier this year.  Among European banks, SocGen now ranks second in its subprime exposure, behind UBS (UBS) – though the Swiss bank's losses of $18 billion are much higher [BusinessWeek.com, 1/30/08].

SocGen won't release official 2007 results until Feb. 21, but it is forecasting net earnings of $1.3 billion, down from nearly $7.8 billion in 2006.

197.    On February 15, 2008, the *International Herald Tribune* published an article entitled "French trader's bets said to have generated alerts," which stated in part:

Someone deeply familiar with Société Générale's trading controls said it was "inconceivable" that Jérôme Kerviel's immediate supervisors were not alerted after his trades set off alarm bells at Eurex, the derivatives exchange based in Frankfurt.

The person, who requested anonymity because he was not authorized to speak to the media, lent credence to claims that Kerviel made during interrogation by the financial police that his superiors – experienced former traders – had received clear and repeated warnings that he was trading beyond his limits.

Separately, the French daily Le Parisien disclosed Thursday that the second stockbroker caught up in the scandal over Société Générale's $7.1 billion loss had told authorities that he knew Kerviel had a "problem" with supervisors.

"I knew that he had a problem with his bosses without knowing why," Moussa Bakir, a 32-year-old broker at Société Générale's futures brokerage, Newedge, told the police during questioning last week, according to Le Parisien.

The statement raised new questions about when Kerviel's superiors became aware of the scale of his unauthorized bets, and whether those bets had been the source of his problem with his bosses.

Kerviel told the police during his own interrogation in late January that his supervisors in the derivatives trading office - known as Delta One - had been familiar with his overreaching limits since April.

Those supervisors were Martial Rouyère, head of Delta One, and Rouyère's deputy, Éric Cordelle, according to lawyers with knowledge of the case.

"The only thing that was said to me is to manage a way to straighten it out," Kerviel said.  "The other warnings that they get after don't make them react more."

Those warnings came in November, when the surveillance office at Eurex, the derivatives exchange, sent two e-mail messages to Société Générale's compliance department questioning transactions by Kerviel over the previous seven months.

According to the person familiar with Société Générale's control procedures, Rouyère and Cordelle, Kerviel's superiors, would have been contacted by compliance officers at Société Générale following up on the Eurex messages.

"A question like that, coming from outside, is something unusual," this person said.

Rouyère has been questioned by the authorities. A lawyer for Société Générale, Jean Veil, has said he expects Kerviel's "entire hierarchy" to be questioned.

On at least one occasion in late 2006 or early 2007, the person familiar with the trading controls said, Kerviel made a €500,000 profit on an unspecified one-way bet.

Kerviel's role on the trading desk did not allow him to speculate with the bank's money, and he was reprimanded by his bosses, who said his profit would not be included in the tally used to calculate year-end bonuses, according to the person familiar with the bank's controls.

The incident would have been sufficient grounds to fire Kerviel, this person said, and normally he would have been watched closely afterward.

"They should not have let Kerviel continue to take risks," he said.

198.    On February 15, 2009, *The Sunday Times*, in an article entitled "Tricks of the Trader," published a detailed account of Kerviel's trading activities at SocGen. The article stated in part:

[A]t the beginning of 2005, [Kerviel] was made a trader.

His base salary was Eur 35,000, laughable by financial-services standards. "That didn't matter to me though, because I was doing what I wanted to do," [Kerviel] said. He was 28. Kerviel sat deep inside Societe Generale's trading division, the most important and profitable arm of the bank.

*            *            *

Kerviel was on the Delta One desk within the equity-finance division of arbitrages, surrounded by desks named Fundamental, Quantitative, Tourmaline and Turquoise. He was a market maker for German turbo warrants, a financial instrument resembling a stock option. Kerviel was given a sum of money and instructed to buy

- 85 -

and sell these warrants to keep the market for them ticking over. He might make a small profit or loss, but nobody much cared. His job was to keep the market liquid enough to entice investors, whose trades generate revenue for the bank.

It was mechanical, unremunerative and frustrating, especially as within feet of him, traders were making tens of millions of euros for the bank and for themselves. So, in the middle of 2005, Kerviel began to trade with the bank's money, unhedged and without authorization.

His first bet was a short position of Eur 10m on the German banking and insurance firm Allianz.

In 2006, Kerviel's confidence grew, and before long he had built up unhedged positions worth Eur 135m. This did not mean he had spent Eur 135m of the bank's money. One of the privileges afforded big banks is to assemble positions with little collateral, similar to mortgages with almost nothing down. Kerviel would have only had to put up a few hundred thousand to buy the positions. A move of less than 1% in the right direction and he would have been able to close out his positions at a profit.

**His extreme leverage and gutsy trades drew the attention of the trading floor. He was nicknamed "the cash machine" and, as Kerviel explained after he was caught, "there was a snowball effect."**

For 2006 his pay was increased to Eur 95,000, a still a derisory sum by the standards of his peers.

\*       \*       \*

[F]or the first 2 months of 2007, Kerviel was allowed to sign off on his own trading activities. Nobody was monitoring the cash-flow statements on Delta One, which were starting to show massive inflows and outflows to Kerviel's account. The snowball was fast turning into an avalanche. "I began to see signs of overheating in Asia," he told investigators, "and that turned out to be true. At first my position was in the red as the market climbed. The fake deal went unnoticed because there was no coherent control system at Societe Generale in January. Finally, in mid-February, there was a mini-crash in Asia and I cut my position. At the end of February I was out completely. I had made Eur 28m. I was more than proud and satisfied." So satisfied, in fact, that he began rebuilding his position immediately.

\*       \*       \*

[By the end of July Kerviel's bets had proved right] Kerviel unwound his positions. He had made Eur 500m for the bank without authorization. "I was very scared by the sum of 500m and didn't know how to make it known between July and the end of September," he said.

For the next few months, he restricted himself to day-trading individual stocks, and by the end of the year his profits had risen to Eur 1.4 billion, half the total for the entire-trading division. Had he been running his own private hedge fund, Kerviel would have been beating off investors wanting him to manage their money.

\*    \*    \*

"I didn't know how to handle it," Kerviel said later to police." I was happy, proud of myself, but didn't know how to explain it. So I decided not to tell the bank, but rather to hide it by creating fake trades the other way." On December 31 he created eight fictitious forward transactions worth Eur 30 billion, the losses on which would cancel out all but Eur 55m of the 1.4 billion he had made in 2007. With this Eur 55m profit in hand he requested a bonus of Eur 600,000.

The firm offered him 300,000 on the grounds that he was not senior enough for anything more.

199.    On February 20, 2008, the "Progress report of the Special Committee of the Board of Directors of Société Générale" (the "Special Committee Report") stated in part:

– [T]he absence of certain control measures for which no provision was made and which would have been liable to identify the fraud, essentially within OPER;

*No control exists over cancelled or modified transactions or over transactions with a deferred start date, or over transactions with technical counterparties, or over positions with a high nominal, or over non-transactional flows during a given month, all analyses which would probably have allowed the fraud to be identified.*

\*    \*    \*

3.    MOTIVES AND POTENTIAL COLLUSION

**[W]e have not identified any indication of embezzlement of funds**. It nevertheless appears that JK might have been able to take advantage of his fraudulent activities in order to increase his "official" P&L and therefore to increase indirectly the amount of flexible compensation that could be claimed by him for 2007.

(Emphasis in original.)

200.    The Special Committee's progress report found that the Company had received dozens of alerts as to Kerviel's conduct. Specifically, the report found that the Company received six alerts between January 2007 and January 2008 regarding what were called "control of input." These included a transaction that purportedly occurred on a Saturday, when the markets were closed.

- 87 -

The Company received 11 alerts between January and October 2007 regarding discrepancies in Kerviel's "front-back spreads/buffer banks" that warned, for example, that Kerviel had failed to supply the name of the broker for given trades. The Company received 13 alerts between March and October 2007 regarding "gateways," which flagged, among other things, the high nominal value of Kerviel's transactions. In February 2007, SocGen received an alert of a discrepancy in a trade Kerviel claimed with FIMAT Frankfurt. The Company received four alerts between June 2006 and August 2007 regarding problems with "settlement/delivery," reporting further discrepancies in Kerviel's trades. In December 2007, SocGen was alerted to an unusually high commission (€1.2m) related to one of Kerviel's trades. Between December 2006 and June 2007, SocGen was warned on five occasions of cumulative discrepancies in Kerviel's trades in excess of €3.5 billion. The Company received alerts seven times between January and December 2007 regarding tens of billions of euros in discrepancies between various accounts related to Kerviel. In July 2007 and January 2008, SocGen was notified of anomalies regarding counterparty risk, including that Kerviel had exceeded the Company's internal risk limits. Finally, SocGen generated 24 alerts between July 2006 and September 2007 regarding market risk, including that Kerviel's Delta One desk had exceeded its stress test limit for risk.

201.   On February 20, 2008, *The New York Times* published an article entitled "Document Says Trader's Rogue Bets Began in Summer," which stated in part:

> New details about the actions of a former trader accused of making billions of dollars of unauthorized bets at the French bank Société Générale showed that he exposed the bank to a significant trading loss in July, six months earlier than the bank has acknowledged.
>
> According to a French court document obtained by The International Herald Tribune, the trader, Jérôme Kerviel, exposed the bank to a trading loss of 2.156 billion euros ($3.16 billion) as of July 31, and a profit of 500 million euros a month later, on Aug. 31.

Société Générale, which is preparing to release on Wednesday the findings of its inquiry into the unauthorized trades, has revealed details of Mr. Kerviel's profits and losses dating back only to Dec. 31. The bank has said it booked 1.4 billion euros in profit in the fourth quarter from his unauthorized trades, and lost 4.82 billion euros in January from unwinding his bets.

Melody Jeannin, a Société Générale spokeswoman, declined to comment on any gains or losses linked to Mr. Kerviel's trading positions beyond what the bank has already publicly disclosed. Ms. Jeannin also would not say whether the discovery of the trading losses and gains for July and August might lead the bank to restate its financial results for the third quarter.

According to the document, Mr. Kerviel entered eight large transactions into the bank's computers on Dec. 12, consisting of four purchases of unspecified financial instruments and four sales. It was the eventual unwinding of these eight operations from Jan. 21 to Jan. 23 that led to the loss of 4.82 billion euros (more than $7 billion) announced last month.

The timeline indicates that Mr. Kerviel continued to place new unauthorized bets after his supervisors were alerted to potential problems. Eurex, the German bourse, communicated with Société Générale's compliance department from Nov. 7 to Dec. 10 over the exchange's questions about Mr. Kerviel's trading activities.

*       *       *

Risk management experts said the futures markets where Mr. Kerviel was active were liquid, with daily trading volumes valued in the hundreds of billions of dollars. This allows individual traders to assume very large positions without drawing much attention. Still, a loss of the size that was on Mr. Kerviel's trading book in July would have been unlikely to escape notice in Société Générale's back office, they said.

"Large losses would have implied very large margin calls, which the bank would have had to cover in cash," said Jean Dermine, a specialist in asset and liability management at Insead, a leading French business school.

202. On February 21, 2008, *White Collar Crime Prof Blog* posted an article entitled

"Société Générale Isn't Too Hard On Itself Despite Losing $7.2 billion," which stated in part:

When you are the victim of a $7.2 billion fraud perpetrated by an employee, one would think that there would be a fair measure of self-criticism for not detecting the misconduct. French banking giant Société Générale issued an [sic] progress report . . . on its internal investigation, called "Mission Green," into the losses caused by rogue trader Jérôme Kerviel, based on the work of its General Inspection department – which sounds like the equivalent of the internal auditors – and reviewed by PriceWaterhouseCoopers. While Kerviel's unauthorized trades began in