2005 or 2006, they increased substantially in size in March 2007, and went undetected until mid-January 2008. That's nine months in which he took increasingly risky positions, estimated to total as much as 50 billion euros at the peak.

The obvious question is how Kerviel could get away with trading such huge amounts when he was a fairly low-level trader dealing in a narrow range of market indexes. The progress report is not particularly critical, making Kerviel's trading the result of what almost seems like just minor oversight glitch . . . .

Société Générale may give itself only a B- in the internal controls department, but *it's hard to see any oversight system that misses such a large amount of unauthorized trading for nearly nine months as anything other than a [sic] abject failure*. The bank continues to maintain that Kerviel acted alone, and to this point it hasn't identified any accomplices nor even any theft or personal enrichment from the trading. Kerviel admitted his role in the transactions, but asserts that there were warning signs about what he was doing that were ignored by his superiors, or perhaps even worse, they acquiesced in his conduct because at one point he had generated profits for Société Générale of over 1 billions [sic] euros.

## IX.    Defendants' Scienter

### A.    According to Kerviel His Superiors at SocGen Not Only Knew of His Trading Activities, They Condoned Them

203.    Former and current SocGen employees describe SocGen's derivative operation as one "*where risk taking was embraced, as long as it made money for the bank*." According to one unnamed current employee who used to work with Kerviel, *traders were encouraged to make proprietary bets: "you must take positions, even if you are not a proprietary trader*." The same employee told the *Herald Tribune* that "[d]uring appraisals by bosses, they made it clear you were judged by how well you did your basic job, as well as how much money you made on prop [proprietary] trades." (*Societe Generale Scandal: A suspicion that this was inevitable*, Herald Tribune, Feb. 5, 2008.)

204.    These accounts are consistent with Kerviel's explanation that his superiors certainly knew of his proprietary trades. In February 2008, when asked by French prosecutors whether his superiors knew of his activities, Kerviel explained that "*at the beginning just as at the end of my*

*maneuvers, they didn't want to intervene*," adding, "*[t]hey know the machinery*." (*Societe Generale Scandal: A suspicion that this was inevitable*, Herald Tribune, Feb. 5, 2008.)

205.    Kerviel insists that although he did "dumb things," the positions and trades he took were known by his superiors and that "*[SocGen] let me do them and encouraged me to do them*." (Bloomberg.com, *Kerviel Afraid of Going to Prison over SocGen Loss*, Feb. 6, 2009.)  According to Kerviel, his superiors at SocGen called him "*la cash machine*" and would routinely ask him how much he had made on any given day.  ('*It was like playing a video game' says Kerviel*, Guardian.co.uk, Jan. 22, 2009.)

206.    Kerviel told RTL Radio in February 2009 that "*Everything was visible.  I took my positions in front of everyone, in front of managers.  I wanted to earn money for my bank, all my operations were seen, monitored and controlled*."   According to Kerviel, his supervisors had encouraged him and bragged that on a good day he could make up to a million euros in profit for the firm through his trading.  Kerviel further stated that "*Do you honestly believe a 15 billion euro operation could go unnoticed and that the bank would ask no questions*?  For my part, I wasn't hiding myself.  *I was at the middle of the desk and everyone could see me work*." (*Suspected French Rogue Trader Blames Bosses*, Agence France Presse, Feb. 6, 2009.)

207.    In an interview with the French equivalent of 60 minutes, *sept a huit*, in or around February 10, 2009, Kerviel again insisted that his superiors knew what he was doing.  During the interview Kerviel explained that the size of his positions was no secret at the bank.  Traders sit within a few feet of each other, it was no secret that he was taking positions as large as *€10bn* on some days.  Indeed, it would be impossible to hide such trades.  Traders sitting next to him could hear the size of the orders he was shouting down the telephone, and his large trades were the prime

topic at the water cooler.  (*Kerviel Speaks Out: Far from the Typical Rogue Trader Story*, Seeking Alpha, Feb. 10, 2009.)

208.    And it was not just his direct superiors according to Kerviel.  Management was also aware of his activity.  Kerviel points to two glaring red flags.  First, an outside party sent a letter to SocGen alerting management that Kerviel had placed €2 billion of trades within two hours.  This letter was ignored.  Another major red flag was an email from an internal auditor to management informing them that Kerviel had run up losses of €90 million that had been hidden through fictitious trades.  According to Kerviel, instead of management telling him to stop, Kerviel said he was commended for making profits.  (*Id.*)

209.    More recently, during a television appearance in or around September 18, 2009, Kerviel again stated that some of the blame should be apportioned to his superiors. He also stated that the insinuation that he did what he did for the money was "completely wrong."  According to Kerviel, he "*went overboard, because every day we are pushed into taking more and more risks*."

## B.    Defendants Knew of or Recklessly Disregarded Numerous Red Flags Indicating that Kerviel Was Engaging in Unhedged Directional Trades and that SocGen Lacked Adequate Risk Control Management Systems

210.    Based on numerous red flags that SocGen received throughout the Class Period, SocGen either knew or recklessly disregarded that its traders were engaged in highly risky unhedged, directional trades, well above their authority levels, and that its risk control management systems were seriously flawed.  The failure of its risk control management systems allowed Jerome Kerviel – a 31-year-old junior trader on the Delta One desk – to place €50 billion of unhedged, directional trades, which, when ultimately unwound, resulted in a €4.9 billion loss for the Company.  Indeed, SocGen clearly knew about Kerviel's trades at least as early as February 2007, when it was notified of an issue with certain Kerviel trades by the FIMAT Frankfurt.  SocGen also received warnings

from more than one market exchange and the Bank of France beginning at least by March 2007. However, because Kerviel's trading was highly profitable for SocGen up through 2007, the Company refused to take any action.

211.    Defendants knew or recklessly disregarded that their statements about SocGen's internal controls, including its risk control management systems, were demonstrably false and misleading based on an April 16, 2007 internal e-mail addressed to Kerviel's supervisors that identified €94 million in fictitious transactions conducted by Kerviel. The April 16, 2007 email was written by the Director of the "Middle Results" department, Maureen Auclair, and was addressed to Kerviel's superiors. Auclair also sent a copy of the e-mail to several financial controllers, and Auclair's supervisor, Maia Miori-Otai, was also informed. The e-mail includes the following:

> This email is to inform you that we have a FO/CO difference of 88 mill Euros [between what is reported by the trader and the accounting value] on three June dax futures of the gop 2A [products purchased on the German market – the Dax being the Frankfurt stock market index. The gop 2A is Jerome Kerviel's operating center] and 6 mill Euros on a Forward [product that is negotiated over the counter] booked against Click Option on 03/30/2007 . . . those futures/FWD [forwards] are "fictitious" transactions.

212.    Shortly thereafter, the Company held an "emergency meeting" to discuss how to account for transactions such as those identified in the Auclair e-mail which had no economic reality. Attendees of this meeting included, *inter alia*, Auclair, Miori-Otai and Vincent Guyot, one of Kerviel's supervisors.

213.    At this emergency meeting, when Kerviel was asked to explain his trades, Kerviel admits that he "invent[ed] a lie." In its report, the Commission Green, which was charged with investigating SocGen after the Kerviel Fraud had been revealed, concluded that Kerviel's on-the-spot explanation of the fictitious transactions was not credible. These fictitious trades created an accounting gap that reached *€2.2 billion* by late June-early July 2007.

214. In March and April 2007, inspectors from the Bank of France sent **two separate letters** to SocGen CEO Bouton, warning him that SocGen's risk control system/security procedures for certain financial derivatives – **the area in which Kerviel was trading** – were "wanting" and providing Bouton with its recommendations. (*Shape Up*, The Globe and Mail, Feb. 5, 2008.)

215. Also in 2007, the derivative exchange Eurex specifically warned SocGen about Kerviel's trading activities. According to a February 5, 2008 *New York Times* article entitled "Société Générale Scandal: 'A suspicion that this was inevitable,'" in November 2007, SocGen received an unusual Eurex alert questioning trades by Kerviel:

> The first e-mail message arrived in Société Générale's offices on Nov. 7. The surveillance office at Eurex, one of the biggest European exchanges, alerted a compliance officer at the bank that for seven months a trader named Jérôme Kerviel had engaged in not just one but "several transactions" that had raised red flags.
>
> Société Générale, taking its time, responded on Nov. 20, when another risk-control expert at the bank replied that there was nothing irregular. "The recent volatility increase on the U.S. and European stock markets explains our new need for after-hours trading," the bank official wrote about Kerviel's trades, according to e-mail messages reviewed by the International Herald Tribune and The New York Times.
>
> A second e-mail message from Eurex came on Nov. 26. Not satisfied by the bank's explanation, the bourse demanded more details. Société Générale provided them on Dec. 10 – and both Eurex and the bank's own risk managers let the matter of Kerviel's trades drop.

By the time Kerviel set off another alarm, on Jan. 18, five weeks later, it was too late.

216. Significantly, these were not vague or generalized warnings. Rather, as was highlighted in a February 6, 2008 *International Herald Tribune* article entitled: "A suspicion in France 'that this was inevitable'; culture of risk led Societe Generale to neglect warning signs from traders," the Eurex was very specific in regard to Kerviel's trades:

> Kerviel's method of entering trades was one red flag cited by Eurex in its initial warning, along with questions about two "large" positions - one net short position in DAX futures and one net long position in Euro Stoxx 50 futures. In the same letter, they asked what his investment strategy was and why these transactions

were often entered through a London-based Société Générale subsidiary called FIMAT Futures Limited. Eurex even inquired whether Kerviel had entered the transaction automatically or manually.

''Please explain the background for this procedure,'' two officials from Eurex wrote to Xavier de la Maisonneuve, a compliance officer at Société Générale who has been questioned by investigators.

Vincent Duclos, another compliance officer in the equity derivatives division, who has not yet been questioned by the police, provided the Nov. 20 and Dec. 10 responses to Eurex. His replies in part were based on accounts provided by Kerviel and his supervisor, as well as a compliance officer at FIMAT, said Jean Veil, a lawyer for Société Générale. Kerviel's ''supervisor had signaled that there was no anomaly whatsoever,'' Veil said.

217.    SocGen also received a number of warnings from within the Company itself that, had SocGen's risk controls been properly working as it publicly claimed, would have alerted SocGen's management to Kerviel's trading. Indeed, as Kerviel himself has acknowledged, his failure to take vacation time, as required by SocGen, should have been warning enough. According to a February 4, 2008 *Associated Press* article entitled "How to Lose $7.2 billion," Kerviel only took four days of vacation in 2007. As Kerviel himself explained, "It is one of the first rules of internal controls: *a trader who doesn't take holidays is a trader who doesn't want his books to be seen by others*."

218.    SocGen subsidiary FIMAT, which is one of the brokerage houses that Kerviel used to make his trades, also launched an investigation into the regulatory conformity of Kerviel's transactions that, according to the May 20, 2008 Mission Green Report, should have led SocGen to discover Kerviel's improper trading. FIMAT's investigation suggested that SocGen should be contacted in order to discuss the increase in execution volumes allowed by SocGen's Investment Banking division.

219.    Moreover, the sheer volume of Kerviel's earnings between 2006 and 2007 alone should have alerted Kerviel's supervisors to the magnitude of his trades. Indeed, Kerviel's direct

supervisors knew, on at least one occasion, that Kerviel had made €500,000 on an unspecified, one-way (*i.e.*, unhedged) trade. While Kerviel was reprimanded, he was permitted to keep trading. According to the Mission Green Report, between 2006 and 2007, Kerviel's earnings increased dramatically, eventually growing large enough to represent 59% of the earnings of Delta One desk listed products. Additionally, Kerviel's weighted earning in proprietary trading grew from representing 0% of Delta One's proprietary earnings in 2006 to representing 22% of Delta One's proprietary earnings in 2007. However, because SocGen was profiting from Kerviel's trading activity at that point in time, SocGen ignored the magnitudes of Kerviel's trades.

220. According to the Mission Green Report, an analysis of the cash flow of Kerviel's principal operational center would also have revealed Kerviel's unusually high trading activities, as the cash flow level did not correspond to the activity for which Kerviel had authorization. For example, the equity derivatives division treasurer provided Kerviel with two €500 million loans. This information was communicated to Kerviel's Delta One manager, yet no action was taken.

221. Notably, SocGen's Middle Office, accounting department and risk department each raised questions about Kerviel's trades in the months leading up to the Company's €4.9 billion loss. This is not surprising given that Kerviel, who made nearly 1,000 unauthorized transactions beginning in 2005, had been the "subject of more than 70 'alert' warnings" at SocGen. (*Investors boo, jeer SocGen*, National Post's Financial Post & FP Investing, May 28, 2009.) Additionally, SocGen management tolerated Kerviel making "intraday" trades, "even though such transactions were 'unjustified' given his job assignment and experience level." Alarmingly, between January and April 2007, Kerviel "was virtually unsupervised after his immediate manager resigned." (*Inside Job Highlights IT and Oversight Failures at Bank*, Computer World, June 2, 2008.)

- 96 -

222.    According to the February 20, 2008 Special Committee Report, the Company had received dozens of alerts regarding Kerviel's conduct.  Specifically, the report found that the Company had received six alerts between January 2007 and January 2008 regarding "control of input."  These included a transaction that purportedly occurred on a Saturday, when the markets were closed.  The Company received 11 alerts between January and October 2007 regarding discrepancies in Kerviel's "front-back spreads/buffer banks" that warned, for example, that Kerviel had failed to supply the name of the broker for certain trades.  The Company received 13 alerts between March and October 2007 regarding "gateways," which flagged, among other things, the high nominal value of Kerviel's transactions.  In February 2007, SocGen received an alert of a discrepancy in a trade Kerviel claimed with FIMAT Frankfurt.  The Company received four alerts between June 2006 and August 2007 regarding problems with "settlement/delivery," reporting further discrepancies in Kerviel's trades.  In December 2007, SocGen was alerted to an unusually high commission (€1.2m) related to one of Kerviel's trades.  Between December 2006 and June 2007, SocGen was warned – on five different occasions – about cumulative discrepancies in Kerviel's trades in excess of €3.5 billion.  The Company received alerts seven times between January and December of 2007 regarding tens of billions of euros in discrepancies between various accounts related to Kerviel.  In July 2007 and January 2008, SocGen was notified of anomalies regarding counterparty risk, including that Kerviel had exceeded the Company's internal risk limits.  Finally, SocGen generated 24 alerts between July 2006 and September 2007  regarding market risk, including that Kerviel's Delta One desk had exceeded its stress test limit for risk.

223.    As a former SocGen inspector of trading operations, Maxime Legrand, explained, SocGen's management was aware that the Company's internal controls were woefully inadequate:

> Since inspectors do not have enough power in the bank, we are not given the time we
> need, or the means to check things out.  We pretend to have an inspection to please

the banking commission.  That's where the hypocrisy lies with management: everyone knows about this.

(*SocGen days from Rights issue*, The Daily Telegraph (London), Feb. 7, 2008.)

224.    Others have also suggested that SocGen must have been reckless in maintaining its internal and risk controls.  For example, legal experts have stated that the revelation that Kerviel might not have been the lone operator suggests that oversight of SocGen's trading room may have been recklessly lax.  As Christopher Mesnooh, an international business lawyer in Paris, explained, this revelation "suggests a higher-level failure of risk management than we thought two weeks ago," when the bank initially disclosed its trading losses.  (*2nd Trader Emerges in Inquiry in France*, The New York Times, Feb. 9, 2008.)

225.    Given the numerous external and internal red flags raised regarding Kerviel's trading, SocGen either knew or recklessly disregarded that its traders, like Kerviel, were taking much higher risks than the Company was willing to publicly disclose.

### C.    Defendants Knew of or Recklessly Disregarded Numerous Red Flags Indicating that SocGen's RMBS/CDO Portfolio Was Materially Overstated

226.    Throughout the Class Period, Defendants were aware of, or with extreme recklessness disregarded, information demonstrating that SocGen's CDO/RMBS portfolio was highly illiquid and was materially overvalued.  Despite their knowledge or reckless disregard of this information, Defendants accumulated large concentrations of these risky, illiquid assets in direct contravention of their explicit statements to the market that SocGen followed "a policy of diversification of the portfolio of businesses, improved risk management techniques and hedging of high-risk exposure," all as part of its "strict risk management policy."  (2007 Reg. Doc.)

227.    Consistent with the various factors known by management, as discussed in detail at ¶¶355-371, confidential former employees of SocGen and its various subsidiaries, with whom

Plaintiffs conferred in drafting this Complaint, provided information confirming Defendants' knowledge regarding problems in the subprime mortgage market during the Class Period.

228.    CW1, a SocGen-New York Vice President of FICC Analytics who was employed by SocGen-New York from January 2006 to November 2007, was primarily responsible for: (1) creating and analyzing market risk reports for products in SocGen-New York's RMBS/CDO portfolio and (2) analyzing SocGen-New York's VaR portfolio performance.  According to CW1, the purpose of these analyses was to assess the degree of risk to which these portfolios were (or were foreseeably) exposed.  CW1 recorded the results of his/her analyses in Daily Reports, which s/he submitted via e-mail to executives, including CW1's immediate supervisor, Director of FICC Analytics Jean-Francois Flobert or Delphine De-Chaisemartin (depending upon the time period), and Director of FICC Americas Paolo Taddonio.

229.    According to CW1, by mid-2007 at the latest, SocGen-New York began experiencing significant problems relating to the CDO and RMBS markets.  In particular, the value of underlying RMBS loans began to decline rapidly, competitors began to announce write-offs for their CDO and RMBS assets and credit rating agencies began downgrading the ratings for CDO and RMBS products.  According to CW1, as a result of these negative developments in the CDO and RMBS markets, trading of these products declined significantly, causing CDO and RMBS assets to effectively become illiquid.

230.    According to CW1, another way that SocGen responded, in mid-2007 (at the latest), to the declining RMBS and CDO markets was to transition from valuing these assets using the mark-to-market valuation method to the mark-to-model valuation method.  Prior to mid-2007, SocGen had valued its CDO and RMBS assets using mark-to-market principles, under which the values of CDO and RMBS portfolios were determined and assigned based on existing market prices of securities

exchanged in global markets. However, according to CW1, as the market for CDO and RMBS products began rapidly diminishing, SocGen adopted the mark-to-model valuation method in instances where no viable and active market existed by which to monitor and determine values. According to CW1, in this mid-2007 time frame, SocGen-New York's FICC division was having "serious problems with liquidity" and was "not getting many quotes for many products."

231.    According to CW1, in mid-2007 (at the latest), SocGen also dissolved the New York-based CDO Group, which was responsible for the purchasing and "warehousing" of mortgages that would ultimately be securitized and offered on the market via various financial instruments. CW1 believes that the dissolution of this group was another indicator that the market for CDO and RMBS products was no longer viable.

232.    According to CW1, another change that occurred in mid-2007 (at the latest) was that SocGen-New York's office stopped using the ABX Index as a tool for assessing how its RMBS portfolio was performing. The ABX Index tracks the performance of a variety of RMBS products and serves as a barometer that allows investment banks to determine how other RMBS are performing in the marketplace. The ABX Index also tracks the cost of buying and selling "insurance" (in the form of credit default swaps) for RMBS products. According to CW1, this tracking of the buying and selling of insurance for RMBS products was a critical indicator because, if the cost for purchasing insurance for RMBS assets rose, this indicated that the market believed that RMBS products were becoming riskier and more volatile. In mid-2007 (at the latest), as the cost of this insurance began rising precipitously, which, according to CW1, clearly showed that SocGen-New York's RMBS valuations needed to be reduced, SocGen-New York abruptly discontinued its prior practice of relying on the ABX Index as a tool for tracking the performance and value of its RMBS portfolio.

233.    Information gained from CW2 further demonstrates Defendants' knowledge of the problems in the subprime mortgage market during the Class Period.  CW2 was employed by SocGen-New York from April 2004 to January 2008 as Director of IT for Capital Markets (which included the FICC and Global Equities Derivatives divisions).  As IT Director, CW2 was responsible for managing and implementing the IT systems in the Company's New York operations.  During the Class Period, CW2 reported directly to Chief Investment Officer Sergio Leifert.  Leifert reported to Director of FICC Americas Paolo Taddonio, who, in turn, reported to CEO of SGCIB Jean Paul Mustier.

234.    From March 2007 through the summer of 2007, CW2 participated in regular budget meetings with Leifert and Taddonio to discuss the annual budget for IT.  During a meeting in March 2007, CW2 recalls that additional funds were being allocated to the IT budget.  However, CW2 recalls that in mid-2007, the IT budget was suddenly reduced by 20%.  CW2 stated: "in the 30 years I've been in the business, I had never seen such a dramatic drop off" in terms of budgets reductions. Through CW2's conversations with other employees in the New York office, CW2 learned that the drastic budget reduction for the IT department was not unique, but rather, reflected overall budget reductions for all operating groups, which were being implemented throughout SocGen's North American operations.  According to CW2, it was widely known that the reason for these budget reductions was based, at least in part, on the collapse of the United States residential mortgage market.

235.    CW2 also has pertinent information concerning SocGen-New York's CDO Group. According to CW2, SocGen-New York only acquired CDOs through their underwriting (structuring) activity.  As CW2 explained, SocGen-New York's CDO Group, which consisted of approximately 100 employees, including Taddonio, Carlos Benito and Dansby White, acquired CDOs and bonds

(which were possibly mortgage-backed) through a third party and then warehoused those assets. The CDO Group then packaged and structured the CDOs and bonds. Once the CDOs and bonds had been packaged and structured by the CDO Group, they were sold to investors as SocGen-structured CDOs. It was SocGen-New York's practice, however, to retain a portion of the CDOs from each underwriting. In other words, according to CW2, SocGen-New York would not acquire or sell any CDOs via "proprietary trading" (*i.e.*, simply buying or selling CDOs in the market). According to CW2, while CDO underwriting was supposed to be a significant part of SocGen's "TGV" initiative, "it turned out to be a train wreck," as it was clear that SocGen was late to the game.

236.    CW2 further recalls that either late in the first quarter of 2007 or early in the second quarter of 2007, the CDO Group had purchased and warehoused a substantial number of CDOs and bonds that it intended to restructure and resell as its next CDO offering. However, according to CW2, by mid-2007 at the latest, it was abundantly clear that the CDO Group would be unable to sell any of these CDOs, as the market had completely dried up, rendering the CDOs virtually illiquid. CW2 viewed this to be a very strong indicator that the CDO market was shot.

237.    In this same time frame, CW2 recalls that Carlos Beneto, Head of CDO Structuring, and Arno Derries, Head of RMBS, both of whom reported directly to Taddonio, issued an urgent mandate that the IT department change the parameters of its valuation models (within the Calypso system) in order to obtain a realistic valuation of the CDOs. According to CW2, for a two-week period during the late Q1 early Q2 2007 time frame, the IT department worked around the clock, running hundreds of different valuation models, in an attempt to obtain a proper valuation for the CDOs. However, according to CW2, the IT department's efforts were to no avail because even changing the model's parameters (*e.g.*, recovery rates, default rates, and plugging in broker quotes) did not allow SocGen to obtain an accurate valuation for the CDOs. In fact, CW2 recalls attending a

meeting, which was also attended by Taddonio, where the participants specifically discussed the fact that none of the various valuation models that they had tried were working.

238.    According to CW2, there was a lot of interaction between SocGen-New York and the Company's Paris office.  For example, CW2 recalled that SocGen-New York sent VaR and P&L reports to the Paris office on a daily basis.  Through these reports, SocGen Paris could see cash shortfalls and the deteriorating performance of the securities.  CW2 also recalled that Defendant Mustier typically visited the New York office once a month (and never visited the New York office less than two times during any given quarter), primarily to meet with Taddonio.

239.    According to CW2, during Defendant Mustier's visits to New York, Mustier held quarterly or semi-annual "Town Hall meetings," which were attended by all personnel in the New York office.  During these meetings, Mustier discussed the performance, outlook and strategy for the North American operations.  During a November 2007 Town Hall Meeting, Mustier told the attending employees that there was "no doubt that half of you . . . should be fired and the other half should get raises."  CW2 believed that Mustier's comments concerned the various ways in which individuals working within SocGen-New York's office had responded to the adverse economic conditions that existed.  During this same meeting, Mustier acknowledged that, given the negative economic conditions that SocGen currently faced, he too might not have a job in 2008.

240.    CW3's recollections further confirm Defendants' knowledge of problems in the subprime market during the Class Period.  CW3 worked at SocGen-New York from July 2007 until July 2008 in the CMBS group and reported to CMBS Group Manager Preston Kibbe.

241.    When CW3 first joined SocGen-New York in July 2007, s/he worked in the CMBS group's loan origination and underwriting department, where s/he was responsible for purchasing commercial mortgages, which would eventually be securitized and offered on the market in financial

instruments such as CDOs. However, according to CW3, after working at SocGen-New York for only a couple of months, the loan origination and underwriting department in which CW3 worked was disbanded "due to the credit crunch."

242.    Information obtained from CW5 further bolsters Plaintiffs' allegation that Defendants knew of problems in the subprime market during the Class Period. CW5 was employed by SocGen-New York from July 2006 to January 2007 as a Vice President in the Structured Asset Group. CW5, who reported to Managing Director of Fixed Income Sales and Trading Robert Caliendo, was primarily responsible for selling RMBS and synthetic CDOs structured by SocGen, as well as CDOs structured by other companies where SocGen provided the financing.

243.    According to CW5, during the Class Period, investors/customers were typically unwilling to buy the top (super senior/AAA tranch) or middle (Mezzanine tranch) pieces of SocGen's CDOs until the bottom and most risky piece, the equity tranch, was sold. However, as CW5 explained, as 2006 progressed, SocGen, as well as other arrangers, had greater difficulty finding investors/customers who were willing to purchase these risky equity tranches. Equity investors increasingly wanted to short the deals simultaneously.

244.    CW5 believes that, in order to deal with this problem, SocGen engaged in a short sell scheme that made it appear as though a willing investor had purchased the equity tranch of the CDO unconditionally. CW5 explained that this would have allowed SocGen to then sell the remaining tranches of the CDO to its investors/customers. CW5 believes that SocGen had an agreement with Magnetar, or a similar Wall Street hedge fund, whereby Magnetar agreed to purchase the equity tranch of the CDO on the condition that Magnetar would then be allowed to "short" the CDO via a credit default swap (CDS). As CW5 explained, SocGen would then sell the remaining tranches of

the CDO to its investors/customers.  According to CW5, the heads of SocGen-New York, including

Taddonio and Randy Fairhurst, would surely have been aware of this scheme.

245.    CW5 also explained that by the end of 2006, it was common knowledge within

SocGen that CDO and RMBS assets had become illiquid.  According to CW5, s/he attended weekly

sales meetings, which were held at the beginning of the week.  CW5 recalled that while his/her

product manager, Abner Figueroa, ran these sales meetings, both Taddonio and Dansby White

sometimes attended.  According to CW5, during these meetings Figueroa always told the sales staff,

including CW5, that they needed to sell the CDO and RMBS products.  However, according to

CW5, it became increasingly difficult to sell these products because the market was showing signs of

an imminent collapse.

246.    CW5 recalled that at these sales meetings, or by e-mail prior to the meetings, the sales

staff would receive inventory reports showing which RMBS and CDO products needed to be sold.

CW5 remembered that the inventory reports also showed which assets had been sold, at what price,

class, rating, etc.  According to CW5, the turnover of RMBS and CDO products decreased

dramatically throughout 2006.  CW5 recalls that the other sales staff repeatedly told Figueroa that

the RMBS and CDOs were "crap."

247.    CW5 explained that another way in which SocGen was aware of the deteriorating

value of its CDOs was through the monthly cash reports that it received.  According to CW5, these

monthly cash reports showed how much cash was being received on the CDOs that SocGen held in

its portfolio.  CW5 explained that by the end of 2006, it was clear that defaults had increased

dramatically.

248.    CW5 also recalled that during the Class Period s/he received many complaints from

investors/clients who had purchased SocGen RMBS and were upset the RMBS were falling in price.

249.     CW6, who worked at SocGen-New York from January 2007 to March 2008 as a Senior Operations Specialist in Whole Loan Administration Group, also provided Plaintiffs with additional information evidencing SocGen's awareness of problems in the subprime mortgage market during the Class Period.  According to CW6, during the Class Period, s/he was primarily responsible for administering and securitizing pools of subprime loans.

250.     CW6 recalled that as early as mid-2007, s/he recognized that "things were not going well" with SocGen-New York's securitized subprime loans.  According to CW6, when SocGen-New York acquired subprime loans from mortgage companies, it insisted upon a contractual term whereby the mortgage company that sold SocGen-New York the loan agreed to repurchase the loan if the pool of subprime loans that it had sold to SocGen-New York failed to perform according to the parties' previously agreed-upon expectations.  CW6 explained that in the mid-2007 time frame, CW6's group sent out numerous claim letters to mortgage companies asking them to repurchase subprime loans that were underperforming.  However, according to CW6, these companies refused to repurchase the subprime loans, claiming that they lacked the funds to do so.

**D.     Government Investigations, Pursued by U.S. and French Government Agencies, and SocGen's Internal Investigations Further Support Plaintiffs' Scienter Allegations**

251.     Following SocGen's January 24, 2008 press release announcing the fraud, a number of governmental agencies in both France and the United States initiated investigations of the Company.  The agencies that have launched investigations include, the French Finance Minister, the French Banking Commission, the AMF, the SEC and the U.S. Attorney for the Eastern District of New York.  The various investigations concern events relating to the Kerviel and Subprime Frauds. In addition SocGen also authorized the General Inspection Department to investigate the Kerviel Fraud.

### 1.    The French Finance Minister Investigation

252.    French Finance Minister Christine Lagarde conducted a seemingly cursory investigation into SocGen's misconduct relating to the Kerviel Fraud.  However, even Lagarde's report, which was published merely eleven days after the Company's announcement, repeatedly faulted SocGen's "internal controls."  The Lagarde report made the following findings regarding Kerviel's trades:

- The operator carried out unauthorized operations beginning in 2005.

- In 2006, these operations remained marginal.  However, during 2007, these operations increased precipitously, reaching approximately €30 billion by the end of the year.

- In November 2007, Eurex questioned SocGen about the trades made by "the operator in question."

- In January 2008, the real positions reached €50 billion on futures on Eurostoxx, €30 billion, Dax, €18 billion and FTSE 100 €2 billion.

- The question has to be asked whether, given the exceptional nature of the events, the Government should have been informed before the morning of January 23, 2008.

- Given the exceptional nature of the situation and the consequences that it could have had for the stability of the financial system, it would, without doubt, have been advisable for the Government to have been informed before Wednesday, January 23, 2008.

- In the future, it would be appropriate to clarify the communication between the authorities and the Government in this type of situation to avoid all uncertainty on the method of information, the timing of this information and the rules of absolute confidentiality which are necessary.

(*The Lagarde Report: Key Findings*, Times Online, Feb. 4, 2008.)

253.    After delivering her report to the French Prime Minister, Lagarde publicly stated: "[v]ery clearly, certain mechanisms of internal controls of Societe Generale did not function, and those that did were not always followed up with appropriate changes."  (*French Official Scolds Bank; Report Criticizes Internal Controls Not Management*, The Washington Post, Feb. 5, 2008.)

### 2.    Testimony from the Governor of the Banque de France

254.    The Governor of the Banque de France, chairman of the French Banking Commission, testified before the Senate Finance Commission on January 30, 2008 less than a week after the Kerviel Fraud was disclosed, that based on the information he had received, SocGen's internal control systems had not functioned as it should have. Even more telling the Governor of the Banque de France testified that in the instances where SocGen's internal control system did function properly, SocGen failed to follow up on the alerts.

### 3.    The French Banking Commission Investigation

255.    After concluding its investigation of SocGen, the French Banking Commission fined the Company €4 million for serious failings in its internal controls – the largest fine ever imposed by the Commission for such breaches.  Indeed, the fine "reflects the scale of *systemic and managerial* short-comings identified" by the commissions' investigators. (*French Regulator Fines SocGen €4M*, FT.com, July 5, 2008.) Moreover, the "regulator reprimanded SocGen management for allowing the failings in its controls systems to persist for so long despite numerous internal warning signs." *Id*.

256.    The French Banking Commission's investigation also revealed a number of violations of French Banking and Financial Regulation Committee amended regulation 97-02.  According to the Commission, "serious failures have taken place in the follow-up and the control of the first level." (Commission Report at 1.)  In discussing the profits that Kerviel's trading initially garnered in 2007, the Commission pointed out that "there was not an adequate analysis of the source of the profits posted by [Kerviel], in spite of the fact that these very favorable incomes seemed difficult to explain by the only operations that he was authorized to carry out, especially in the market conditions that prevailed in the 4th quarter of 2007." *Id.*

257.    The Commission next noted that "the internal procedures, designed for the control of market risks, were not well adapted to the follow-up of operational risk and have made it possible for

maneuvers of concealment to go undetected." *Id.* at 2.  SocGen's "insufficient taking into account of the operational risk and in particular of the risk of fraud" led the Commission to conclude that SocGen "did not meet the requirements contemplated by" articles 5 and 32 of Regulation 97-02. *Id.* SocGen also violated article 7-1, according to the Commission, as "the operators of the 'Delta One' desk benefited from broad rights to create, modify and delete operations in the data processing application." *Id.*

258.    Notably, the Commission also discovered that an internal SocGen report received by management revealed that "the measures dedicated to the permanent control were insufficient in both qualitative and quantitative terms, with regard to the necessity of preventing operational risk." *Id*. at 3.  Attempting to assign the blame for its inadequate risk controls on budget constraints, SocGen's internal report stated that "'the relaxation of the budgetary constraints in 2007 should have been prolonged over several years in order to sustainably reabsorb the under-sizing of these functions.'" *Id.*  Accordingly, as the Commission determined, SocGen clearly violated article 9-1 of Regulation 97-02.

259.    The Commission also found a violation of article 14a of Regulation 97-02, which requires SocGen to "periodically evaluate the level of security of the data processing systems and undertake, when appropriate, the necessary corrective actions." *Id.*  The Commissions investigation revealed that SocGen discovered major flaws in the security of its data processing system, but failed to correct them in a timely manner. *Id.*  And while the investigation revealed that SocGen had a plan to correct the weaknesses at the Delta One desk that permitted Kerviel to continue his activities, the plan was never implemented. *Id*.

260.    The Commission further found that SocGen's activities also violated articles 32-1 and 34 of Regulation 97-02, which requires SocGen to perform a regular review of its "systems of risk

- 109 -

measurement and of determining the limits so as to verify the relevance with respect to the evolution of their activity." *Id.* Accordingly, SocGen was required to equip itself with systems to ensure that the procedures and limits described in article 32-1 were properly monitored. *Id.* In finding that SocGen violated both articles 32-1 and 34, the Commission determined "that the limiting mechanism supervising the 'Delta One' desk was poorly adapted to the follow-up of the operational risk, in particular because of the absence of limits on the gross positions and on the intraday positions." *Id.* According to the Commission, the purported limits established by SocGen operated "more as alert indicators than as imperative limits which the regulations require." *Id.*

261.    Finally, while SocGen continues to assert that Kerviel was nothing more than a rogue employee whose misconduct shocked the Company, the Commission disagreed with the Company's assessment, concluding that there were ***"serious deficiencies" in SocGen's internal control systems that went "beyond the repetition of simple individual failures*."** Accordingly, the Commission refused to allow SocGen to place the blame on Kerviel without taking responsibility for its own failures:

> [T]hat the fact that these lapses were not known by management, who thus could not remedy them, cannot be invoked by SOCIETE GENERALE to exonerate itself from its responsibility as regards [to] the banking regulations; that thus SOCIETE GENERALE has infringed several essential provisions of the applicable regulations in matters of internal control. *Id.* at 3-4.

262.    In sum, the Commission found that the following deficiencies in SocGen's internal controls allowed Kerviel to engage in unauthorized trading: (1) Failure to conduct daily reviews and/or follow ups of Kerviel's activities, including the failure to review unexplainable cash positions of the portfolios managed by Kerviel; (2) Failure to respond to inquiries from EUREX, even though the hierarchical line at SocGen was notified in March and April 2007; (3) Failure to adequately analyze the source of the profits posted by Kerviel, in spite of the fact that these very favorable incomes seemed difficult to explain by Kerviel and in light of market condition in Q407;

(4) SocGen's Back Office and Middle Office were "insufficiently sensitized to the issues of fraud and misappropriation" even though the detection of fraud is an obligatory part of their assignments; (5) Back Office and Middle Office ignored information that would have permitted them to identify that Kerviel's positions were in violation of risk management rules; (6) Failure to implement or have available a global vision of the pending or anomalous operations by a particular "desk" or activity center; (7) the internal procedures designed for the control of market risks were not well adapted to follow up on operational risk and made it possible for maneuvers of concealment to go undetected; and (8) After automation of monthly controls in 2006, there was an absence of exchange of confirmations with counterparties within the group and an abandonment of daily control of the flows.  These deficiencies prompted the Commission to conclude that SocGen's Risk Management systems did not meet the requirements of articles 5 and 32 of Banking Regulation 97-02.

263.    Ultimately, the Commission censured SocGen and imposed a €4 million fine on the Company.  "[T]he penalty is the biggest imposed by the Banking Commission for breaches of its risk control regulations and reflects the scale of systemic and managerial short-comings identified by its investigators."  (*French Regulator Fines SocGen €40 million*, FT.com, July 5, 2008).

### 4.    The AMF Investigation

264.    On August 6, 2009, the AMF sent letters of grievance to Defendants Day and Mustier informing them that insider trading charges were being brought against them individually.

265.    The AMF will begin proceedings against Defendants Day and Mustier before the AMF's sanctions commission for insider trading.  According to a SocGen press release, the charges relate to whether Defendants Day and Mustier  dumped massive amounts of their  SocGen shares based on undisclosed inside information of SocGen's true subprime exposure.

266.    For instance, the AMF is investigating  Day's sale of more than €140 million in SocGen stock just days prior to SocGen's January 24, 2008 announcement.

267.    The AMF's insider trading charges against Defendant Mustier arise from his sale of 50% of his SocGen shares on August 21, 2007, a mere 19 days after SocGen announced that it had "low exposure to the current credit market crisis."[4]

268.    Defendant Mustier's August 21, 2007 stock sale caught the AMF's attention because on that same date, Mustier rushed home from a vacation in Scotland and ordered his stock portfolio manager to liquidate a large portion of his SocGen stock. According to the AMF, Mustier did this because he knew that SocGen's stock value was about to crash due to its subprime exposure. Liberation.fr., Aug. 7, 2009.

### 5.    The SEC Investigation

269.    In early February 2008, the SEC announced that it too was investigating the timing of Defendant Day's stock sales. Defendant Day, who sold more than €140 million in SocGen stock just days before SocGen's January 24, 2008 announcement, is the founder and Chairman of TCW, a SocGen subsidiary responsible for managing a large amount of SocGen's mortgaged-backed securities. The SEC's investigation of Defendant Day's stock sales is ongoing.

### 6.    The U.S. Attorney Investigation

270.    On January 25, 2008, the U.S. Attorney's Office for the Eastern District of New York contacted SocGen-New York to inform it that the U.S. Attorney had opened a criminal investigation into SocGen. According to media reports, the investigation focuses on at least two separate issues: (1) The loss SocGen incurred from Kerviel's trades, and (2) Defendant Day's stock sales prior to the Company's January 24, 2008 announcement. The U.S. Attorney's investigation is ongoing.

---

[4]    Because Defendant Mustier was not required to publicly disclose his sales of SocGen shares, at the time of the First Amended Consolidated Complaint was filed, Plaintiffs were unaware that Defendant Mustier had sold any SocGen securities during the Class Period.

### 7.    Mission Green Report

271.    In addition to the government investigations, following the announcement of the Kerviel losses, SocGen authorized its General Inspection Department to investigate the Kerviel matter in order to determine how Kerviel was allowed to engage in unauthorized trading.  The General Inspection Department, on May 20, 2008, issued its Mission Green Report outlining the numerous, glaring deficiencies in SocGen's internal controls, and in particular finding that SocGen had received a number of internal and external alerts regarding Kerviel's trading activities.  Similar to the findings of the Commission, the General Inspection Department concluded that SocGen's internal controls were deficient.

272.    The Mission Green Report found that in all, SocGen received approximately 64 alerts, both internal and external, which relate directly or indirectly to Kerviel's trading activities.  Certain of these alerts were received as early as July 2006.  Of those alerts, 39 relate directly to the Kerviel Fraud.  Defendants nonetheless ignored these alerts and failed to take any meaningful action to address Kerviel's unauthorized trading activities or to shore up SocGen's abysmal risk control management systems.

273.    For instance, SocGen lacked responsiveness in the face of several internal alerts, such as (1) Kerviel's high level of declared earnings and strong growth from 2006 to 2007; (2) Kerviel's unusually high levels of cash flow (Delta One manager was informed of two cash borrowings of €500 million); (3) two alerts from SocGen's Middle Office in April 2007 and May 2007, informing the Delta One manager and his superiors of anomalies uncovered in relation to Keviel's "passerelle" reviews; (4) the high amounts of brokerage commission generated by Kerviel; and (5) the breach of Delta One's market risk limit caused by three overnight positions taken by Kerivel which amounted to a €125 million position, well above Delta One's €10 million market risk limit.

274.    SocGen also lacked responsiveness to external alerts.  For example, SocGen received two letters from EUREX concerning Kerviel's activities in November 2007.  According to the Mission Green Report, SocGen's superiors failed to react to the facts contained in the EUREX letters.  Kerviel's hierarchy limited itself to simply communicating Kerviel's responses.

275.    The Mission Green Report concluded that, specific to Kerviel's activities, that SocGen's internal controls suffered from the following deficiencies: (1) Failure to recognize the entry and then cancellation of fictitious transactions concealing market risks and earnings from unauthorized positions; (2) Failure to recognize the entry of pairs of fictitious reverse transactions concerning equal quantities of the same underlying assets; (3) Failure to recognize the booking of intra-monthly provisions used to temporarily cancel earnings; (4) *the Front Office allowed Kerviel to regularly take intraday directional position on index futures and on certain equities which were beyond Kerviel's level of authority;* (5) Failure to implement any interim structure for the monitoring of Kerviel's activities after Delta One lost its manager; (6) In March 2007, Kerviel was permitted to validate his own earnings; (7) Delta One Trading Manager failed to analyze earnings generated by traders or of their positions; (8) Prior to November 2007, the Trading Manager at Delta One did not have written instructions regarding a clear definition of priorities and supervisory practices; (9) Failure to detect unusually high levels of cash flow, as well as failure to react to high cash borrowings once informed of positions; (10) Failure to carry out in-depth analysis of high amounts of brokerage commissions at year end; (11) *Tolerance of the taking of intraday directional position with the Delta One Desk which created an atmosphere allowing traders to operate more freel*y; (12) Failure to implement additional risk controls in light of rapid growth in GEDS and numerous signals revealing a deterioration in the Middle Office; (13) Failure to react to external alert

signals from EUREX and SocGen's subsidiary FIMAT relating to trading activities; and (14) Middle Office does not have ability to carry out control over aggregate deposits per account.

276.    The Mission Green Report also found that as a whole, SocGen's internal controls suffered from the following deficiencies: (1) Failure to react to numerous alerts, which denotes a lack of sensitivity to the risk of fraud at the front office level; (2) SocGen's internal control procedures do not sufficiently describe the tasks of all the parties involved in risk control resulting in situations where risk control operators do not have the reflex to inform hierarchical superiors or front office superiors of the appearance of anomalies, even for high amounts of trading, if not specifically identified as part of the relevant procedures; and (3) SocGen did not have internal control procedures to review cancelled or modified trades, over trades with a deferred start date, over trades with technical counterparties, over positions with a high nominal value, or over non-trading flows during any given month.

277.    The Mission Green Report also concluded that certain specific deficiencies existed in the supervision of Kerviel, including that:

- Kerviel's superiors tolerated the regular practice by Kerviel of taking intraday directional positions on index future and on certain equities which were unrelated to Kerviel's assignment and level of seniority as a trader;

- Kerviel's superiors did not examine Kerviel's activities despite the high value amount and very strong growth of Kerviel's declared earnings. Between 2006 and 2007, Kerviel's earnings were multiplied by 6, growing to represent 59% of the earnings of Delta One. Of the €25 million that Kerviel declared in 2007, only €3 million came from the arbitrage of competitors' turbo warrants, Kerviel's assignment;

- Kerviel's superiors did not react to the unusually high levels of cash flow generated by Kerviel. For instance, in July 2007, the Delta One manager was informed of two cash borrowings of €500 million, which did not correspond to Kerviel's level of trading authorization;

- Kerviel's superiors did not respond in April 2007 or May 2007, when they were informed by the Middle Office of anomalies with Kerviel and when Kerviel's explanations were not coherent;

- Kerviel's supervisors did not respond to the high amounts of brokerage commissions generated by Kerviel's trading;

- Kerviel's supervisors did not investigate a breach of the Delta One's desk's €10 million limit caused by an overnight directional position of €125 million taken by Kerviel on three equities; and

- Kerviel's supervisors did not question Kerviel's reluctance to take vacation time.

278.  The Mission Green Report concluded that if these deficiencies had not existed, Kerviel would not have been able to engage in unauthorized trading.

### 8.  Report of the Special Committee of the Board of Directors of Societe Generale

279.  On January 30, 2008, SocGen's Board of Directors formed a special committee ("Special Committee") composed of independent directors to conduct an internal audit of the Kerviel Fraud.  The Special Committee set the scope of the internal audit by the General Inspection Department conducted which resulted in the Mission Green Report.  The Special Committee also retained PricewaterhouseCoopers Audit ("PwC") to provide assistance to the Special Committee. PwC was given the assignment of reviewing weaknesses in SocGen's internal controls and reviewing the action plans adopted by SocGen.  On February 20, 2008, the Special Committee released its Progress Report of the Special Committee of the Board of Directors of Societe Generale ("Special Committee Progress Report"), which stated "[a]s soon as the fraud was uncovered, weaknesses were identified in the supervision and control system which required immediate corrective measures."

280.  On May 23, 2008, the Special Committee released its Report of the Board of Directors to the General Shareholders meeting ("Special Committee Report").  In forming the Special Committee Report,  the Special Committee took into consideration the Mission Green Report and PwC's report.  The Spescial Committee Report found that "the fraud was facilitated or its

detection delayed by weaknesses in the supervision of the trader and in the controls over market activities." (Special Committee Report at 2-3.) Among others weaknesses, the Special Committee Report found that Kerviel's hierarchy proved deficient in the supervision of Kerviel's activities. For example, Kerviel's hierarchy tolerated the taking by Kerviel of intraday directional positions. Also, neither Kerviel's direct supervisor or hierarchy carried out an adequate review of Kerviel's activities on the basis of available figures and reports or reacted to the alerts that would have allowed them to identify the concealed positions.

### 9.    PwC's Diagnostic Review

281.    Although PwC was principally charged with reviewing the remedial steps taken by SocGen following the announcement of the Kerviel Fraud, PwC did review SocGen's internal controls. PwC released its Summary of PwC Diagnostic Review and Analysis of the Action Plan ("PwC Report") on May 23, 2008. The PwC Report found that specific to the Delta One desk, supervision was found to be lacking in terms of both trading and management of individuals. Specifically:

- Kerviel's managers and superiors did not perform the necessary analyses of known data, such as Kerviel's positions, valuations, earning or cash flows, which would have revealed the true nature of Kerviel's activities;

- The surge in Delta One trading volumes and profits was accompanied by the emergence of unauthorized practices, with limits regularly exceeded and results smoothed or transferred between traders;

- The general environment did not encourage the development of a strong support function able to assume the full breadth of its responsibilities in terms of transaction security and operational risk management.

### E.    SocGen's Financial Restatement Further Evidences Defendants' Scienter

282.    SocGen's restatement of its fiscal Q1 through Q4 2007 financial statements, announced May 13, 2008, detailed herein at ¶¶323-328, provides further evidence of Defendants'

- 117 -

scienter.  Under international accounting standards, a restatement is an admission of the falsity of previously reported financial results and that the Company knew or should have known of that falsity, based on facts existing at the time.  Here, SocGen has admitted that it restated its fiscal 2007 financial statements due to "errors" contained in those statements.  Importantly, SocGen's fiscal 2007 financial statements were not erroneous due to mathematical errors, honest misapplication of accounting standards or simple oversight.  Rather, SocGen was required to restate its fiscal 2007 financial statements because they contained false and misleading information, of which SocGen was aware at the time it publicly disseminated the statements.  Defendants' naked admission – through their issuance of a restatement – that they were aware (or could reasonably have been expected to be aware) that the Company's financial statements contained false and misleading information at the time they were issued further evidences Defendants' scienter.

### F.     Defendants' Insider Sales Also Support Plaintiffs' Scienter Allegations

283.    During the Class Period, while in possession of material, adverse, non-public information and while Defendants were issuing false and misleading public statements, the Individual Defendants, to maximize their personal benefit, illegally unloaded large blocks of their total SocGen stock holdings for millions of euros in profits. The Individual Defendants' Class Period trades are suspicious due to the large percentage of shares sold, the huge amount of profits gained and the opportunistic timing of the sales. Because the Individual Defendants' trades are suspicious, they further bolster Plaintiffs' scienter allegations.

### 1.     The Percentage, Amount and Timing of the Individual Defendants' Class Period Sales Are Suspicious

284.    The percentage, amount and timing of the Individual Defendants' Class Period stock sales are suspicious, which lends further support to Plaintiffs' scienter allegations.  During the Class Period, the Individual Defendants collectively sold over *2.3 million* of their SocGen shares for more

- 118 -

than *€225 million*.[5]  Even more astounding is that, during the Class Period, the Individual

Defendants unloaded *50% to more than 81%* of their total SocGen holdings.

285.    Defendant Day sold 1,886,187 SocGen shares (*53%* of his total available SocGen

holdings) for a huge amount of proceeds (more than *€168 million*) during the Class Period.  *See*

Insider Sales Chart at ¶428.  Moreover, the opportunistic timing of the majority of Defendant Day's

stock sales magnifies their suspicious nature.  From January 9, 2007 through January 18, 2007 – just

days before SocGen's blockbuster disclosures concerning the Company's massive fourth quarter

2007 subprime writedown and billions of euros of trading losses – Defendant Day unloaded

approximately *1.5 million* shares of SocGen securities for proceeds of more than *€140 million*.

286.    Importantly, throughout the Class Period, Defendant Day *concurrently* served as a

member of SocGen's Board of Directors and as Chairman of TCW, a United States subsidiary of

SocGen.[6]  By virtue of his dual roles as a SocGen director and Chairman of TCW, Defendant Day

was certainly in a position to know both the extent of SocGen's CDO exposure, as well as the

adverse affect such exposure would have on SocGen's financials.

287.    In early January 2008, when it became clear to Defendant Day that SocGen could no

longer continue to down-play its subprime exposure and had no choice but to write down an

additional €2 billion of subprime-related assets, including €1.1 billion of its RMBS and CDO

portfolio, Defendant Day, and foundations related to him, began selling off millions of shares of

---

[5]    Because neither SocGen nor Mustier has disclosed the number of shares sold by Defendant
Mustier or the illegal proceeds he reaped as part of his insider trades, Mustier's sale of SocGen
shares on August 21, 2009 is not included in the 2.3 million shares figure or €225 million figure.

[6]    Despite SocGen's post Class Period attempts to distance Defendant Day from the Company
by describing him as a "non-executive" director due to Defendant Day's dual role as both Chairman
of TCW and a SocGen director during the Class Period, the Company classified him as a "non-
independent" member of its Board of Directors.