SocGen stock at artificially inflated prices. On January 9, 2008, less than two weeks before SocGen intended to publicly disclose the Company's €1.1 billion subprime writedown, Defendant Day sold more than *901,486* shares of SocGen stock for proceeds of more than *€85 million*. The following day, on January 10, 2008, two foundations linked to Defendant Day, the Robert A. Day Foundation and the Kelly Day Foundation, collectively sold more than *100,000* shares of SocGen stock for a profit of more than *€9.5 million*.

288.    Incredibly, just over a week later, Defendant Day and foundations related to him sold more than *500,000* shares of SocGen securities for proceeds of more than *€45 million* on January 18, 2008, the very *same day* that SocGen claims it discovered Kerviel's trades and the *last possible day to sell* before the Company intended to publicly disclose its €1.1 billion subprime writedown.[7]

289.    Given that the huge amounts and opportunistic timing of these stock sales is highly suspicious, the AMF, in August 2009, charged Defendant Day with insider trading based on his sale of SocGen stock in January 2008. In addition, both the U.S. Attorney for the Eastern District of New York and the SEC are investigating Defendant Day's January 2008 trading activities.

290.    Defendant Mustier sold 50% of his total available SocGen holdings on August 21, 2007. The opportunistic timing and size of Defendant Mustier's stock sale magnifies the suspicious nature of the sale. *See* Insider Sales Chart at ¶442. In a single day of trading, a mere 2 1/2 weeks after SocGen told investors that it "has low exposure to the current credit market crisis," Defendant Mustier unloaded 50% of his SocGen stock. As the CEO of SGCIB, Defendant Mustier was clearly

---

[7]    SocGen planned to publicly disclose its enormous subprime writedown on Monday, January 21, 2008. However, according to SocGen, when it discovered Kerviel's fraudulent trades on Friday, January 18, 2008, the Company decided *to delay disclosure* of the writedown until January 24, 2008, so that it could have time to unwind Kerviel's trades and then make both disclosures simultaneously.

in a position to know of and had access to internal information relating to SocGen's true subprime exposure.

291.    The factual circumstances surrounding Defendant Mustier's sale of 50% of his holdings in SocGen stock also create a heightened appearance of suspicion. On August, 21, 2007, while on vacation in Scotland, Defendant Mustier cut his vacation short so he could rush back to Paris to order his stock portfolio manager to liquidate half of his holdings of SocGen stock.

292.    Given that the huge amount and opportunistic timing of Defendant Mustier's stock sales, the AMF has initiated insider trading charges against Mustier.

293.    Defendant Bouton's sales throughout the Class Period also support Plaintiffs' scienter allegations, as they too were suspicious in percentage, amount and timing. During the Class Period, while in possession of material, adverse, non-public information, Defendant Bouton sold *255,713 shares* of SocGen securities (more than *65%* of his total available SocGen holdings) for at least *€30,299,515* in proceeds. The timing of Defendant Bouton's sales is suspicious as well, as his Class Period sales occurred when SocGen's stock price was near its zenith. *See* Insider Sales Chart at ¶435. Moreover, as the CEO and Chairman of SocGen and a director at TCW, Defendant Bouton was clearly in a position to know, at the time he made these Class Period sales, about the financial exposure SocGen was facing as a result of the United States subprime meltdown.

294.    Defendant Citerne's Class Period sales were suspicious as well. During the Class Period, Defendant Citerne sold at least *201,129* shares of his SocGen common stock for more than *€23 million* in proceeds. In total, Defendant Citerne unloaded an astronomical *81%* of his available SocGen holdings during the Class Period. As with Defendant Bouton, Defendant Citerne's Class Period sales were highly unusual and were timed to take advantage of the near all-time stock price highs. *See* Insider Sales Chart at ¶448. Defendant Citerne, as a director and Co-CEO of SocGen and

a director of TCW, had access to information showing the Company's subprime exposure and risk control problems at the time that he made his Class Period sales.

295.    The percentage, amount and timing of Defendant Alix's Class Period trades was also suspicious.  During the Class Period, Defendant Alix sold *23,171* SocGen shares for proceeds of *€3,311,911* in proceeds.  Defendant Alix, like Defendant Citerne, unloaded an incredible *81%* of his available SocGen shares during the Class Period.  In addition to being suspicious in percentage and amount, the timing of Defendant Alix's sales is also suspicious, as Defendant Alix's two Class Period sales were made within nine months of his becoming Co-CEO of SocGen and of his learning about the risk SocGen was facing due to its CDO and RMBS exposure.  Defendant Alix's Class Period sales are suspicious for the additional reason that they were executed when SocGen stock price was at its peak.  *See* Insider Sales Chart at ¶455.

296.    While the Individual Defendants profited, SocGen investors who had no insider knowledge purchased SocGen securities and suffered damages when the Company's securities dropped after it disclosed a massive writedown and huge losses stemming from Kerviel's undisclosed trades.

### 2.    The Individual Defendants' Stock Sales Made Shortly After SocGen's Repurchasing of Company Stock Are Suspicious as Well

297.    Throughout the Class Period, the Individual Defendants engaged in a massive stock repurchasing or "buy-back" program that was calculated to prop up SocGen's share price so that the Individual Defendants could unload their personally-held SocGen shares for the maximum amount of personal profit.

298.    From 2005 through 2008, the Individual Defendants insisted that buying back SocGen stock was the best investment of the Company's shareholders' money because SocGen stock was a good bargain.  However, in reality, the Individual Defendants caused SocGen to spend

hundreds of millions of euros repurchasing SocGen shares throughout the Class Period, not because they were a good investment, but rather, because the Individual Defendants wanted to maintain the Company's stock price so that they could sell their own personally-held SocGen shares at the highest possible price. The Individual Defendants' scheme worked. By the end of the Class Period, the stock buy-back program engineered by the Individual Defendants enabled them to reap hundreds of millions of euros in personal profit from their insider selling, while costing SocGen shareholders more than €1 billion.

299.    As detailed with more specificity in §XIII.B., below, the Individual Defendants' pattern, throughout the Class Period, of selling their own personally-held stock *shortly after* SocGen's repurchase of shares propped up the Company's stock price demonstrates that the Individual Defendants' Class Period sales were calculated to maximize the Individual Defendants' personal benefit.[8]  Because the Individual Defendants' insider sales were timed to maximize their personal benefit, they are suspicious on their face, and provide further evidence of Defendants' scienter.

### G.    The Termination, Resignation and Reassignment of Key Members of SocGen's Senior Management Team and Other Participants in the Fraud Is Further Evidence of Defendants' Scienter

300.    Following SocGen's January 24, 2008 announcement of Kerviel's €4.9 billion trading loss and massive writedown of assets, including its €1.1 billion writedown of its RMBS and CDO portfolio, the Company terminated and/or forced the resignations of several high level employees, including Defendant Bouton, who was stripped of his role as CEO and Defendant Mustier, who was removed as CEO of SGCIB. The departure and reassignment of so many top-level SocGen

---

[8]    Indeed, there is no other rational explanation for why the Individual Defendants would *sell* their personally held stock during the very time periods when they were causing the Company to *repurchase* SocGen stock because it was purportedly such a good bargain.

employees further demonstrates the depth of the fraud, which provides additional evidence of Defendants' scienter.

301.    As early as February 1, 2008, SocGen began to make major personnel changes. Certain of these changes were described in a February 1, 2008 "*Risk*" article:

> Top management at Societe Generale has been reshuffled in the wake of the losses. Mianne, who had been promoted to head of global markets in December, was parachuted back into head the global equities and derivatives division. His former co-head of global equities and derivatives, Luc Francois,[9] who took sole charge of the division after Mianne's promotion, has left the bank, as has Marc Breillout,[10] head of fixed income, currencies and commodities. Olivier Khayat, formerly co-head of capital raising and financing, succeeds Breillout, while the other co-head of capital raising and financing, Jean-Luc Parer, will now take sole charge of the division.

302.    On April 17, 2008, SocGen announced another set of key personnel changes affecting the Company's top-level executives. *The International Herald Tribune* reported on April 19, 2008, that SocGen CEO/Chairman Defendant Bouton was forced to "hand over the chief executive's job to Frederic Oudea." Moreover, Defendant Citerne, Defendant Bouton's second in command, was forced to give up his seat on SocGen's board of directors when his mandate ended in May 2008, as the Company decided to replace him with an independent board member. *Id. The International Herald Tribune* article explained:

> Oudea's rapid rise to the chief executive's suite also signifie[d] a sharp turn in the fortunes of Jean-Pierre Mustier, the head of Societe Generale's investment banking division, who until the trading scandal had been widely considered to be Bouton's heir-apparent.
>
> Mustier . . . helped to create Societe Generale's derivatives trading business in the mid-1980s, building the bank's reputation as a global leader in [the] area. But it

---

[9]    Luc Francois was the head of the Global Equities department, and oversaw the Delta One desk where Kerviel worked.

[10]    Marc Breillout was the co-head of FICC, the area that traded and valued SocGen's RMBS/CDO portfolio.

was his division that employed Kerviel, and Mustier's star ha[d] been waning since the trading scandal was disclosed, according to board members and other bank insiders.

303.    On May 31, 2008, SocGen announced that Defendant Mustier would step down as CEO of SGCIB during the Class Period, but would remain at SocGen to take another job. *The Wall Street Journal* explained the move:

> Mr. Mustier, once considered a rising star at the bank, has been under scrutiny since SocGen announced the massive trading loss in January, which wiped out most of its 2007 net profit, forcing the bank to start a 5.5 billion euros capital increase to repair the damage. The bank has blamed the losses on low-level trader Jerome Kerviel, *while an internal report into the trading scandal released a week ago described the bank as a chaotic workplace that fostered the flouting of rules and oversight*.
>
> *        *        *
>
> Mr. Mustier presided over a division that was one of SocGen's main earnings drivers. Before the scandal, he was widely considered the likely eventual successor to Daniel Bouton, who was then the bank's chairman and chief executive.

304.    In August 2009, Mustier announced that he would leave SocGen altogether amid the AMF insider trading probe.

305.    In an effort to distance itself from Kerviel's activities, SocGen's executive management also terminated and/or forced the resignations of lower-level management who worked directly above Kerviel. According to a May 24, 2008 *Wall Street Journal* article:

> [T]he bank has also started dismantling the chain of command that existed over Mr. Kerviel. Two executives have already left, while Mr. Kerviel's two most immediate supervisors are in the process of being dismissed, people familiar with the situation said.

306.    The "two-executives" referred to in the *Wall Street Journal* article were Luc Francois and Pierre-Yves Morlat, and the two "immediate supervisors" were Eric Cordell and Martial Rouyere, who headed the Delta One desk.

307.    As further fallout from the RMBS and CDO writedowns, in September 2008, the Company announced that Liz Hogan and Jerome Jacques would become co-heads of FICC

Americas, replacing Taddonio, who had run the United States division when it was forced to writedown over €2 billion in assets.

### H.     SocGen's Simultaneous Disclosure of Both Frauds Confirms Scienter

308.     As further evidence of Defendants' scienter, Defendants caused SocGen to defer any disclosure of the Subprime Fraud until it disclosed the Kerviel Fraud.  Defendants understood that disclosing these frauds separately would more negatively impact SocGen's stock price than revealing the two frauds simultaneously.  Therefore, Defendants intentionally delayed disclosing the Subprime Fraud, even though it was clearly material to investors.  By disclosing both frauds at the same time, Defendants also intended to create "noise" or confusion in the market about which fraud actually caused the stock price decline.  In short, by disclosing both frauds simultaneously, Defendants sought to avoid accountability under the U.S. federal securities laws.

### I.     Defendants' Participation in a Scheme to Defraud Shareholders

309.     During the Class Period, each of the Individual Defendants (senior executives and/or directors of SocGen) were privy to confidential and proprietary information concerning SocGen and its operations.

310.     Because of the Individual Defendants' positions with the Company, they each had access to adverse, undisclosed information about its business, operations, products, operational trends, financial statements, markets and present and future business prospects via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and board of directors meetings and committees thereof and via reports and other information provided to them in connection therewith.

311.     Defendants received both VaR and P&L reports from SocGen-New York on a daily basis.  Through their review of these daily reports, Defendants were able to monitor cash shortfalls and the deteriorating performance of the Company's RMBS/CDO portfolio.

- 126 -

312.    Defendant Day, who concurrently served as the Chairman of TCW – a United States subsidiary of SocGen with over $52 billion of CDOs under management – and a director at SocGen, was privy to information regarding the extent of SocGen's CDO exposure, as well as the adverse affects such exposure would have on SocGen's financials.  Defendant Day utilized this inside information when trading SocGen stock during the Class Period.  *See* §XIII.C., below.

313.    Defendant Bouton, as the CEO and Chairman of SocGen and a director of CDO giant TCW, had access to any and all Company information at his request, including information regarding the extent to which the United States subprime residential meltdown was adversely affecting the value of SocGen's RMBS/CDO portfolio.  Defendant Bouton also had access to information relating to the Kerviel Fraud, as he was responsible for developing and implementing SocGen's risk control management procedures.  Moreover, in March 2007, France's Banking Commission notified Defendant Bouton – ***on two separate occasions*** – about the need to reinforce SocGen's internal controls, particularly with respect the equity derivatives area in which Kerviel worked.  Defendant Bouton used this inside information when trading SocGen shares during the Class Period.  *See* §XIII.D., below.

314.    Defendant Mustier was the acting CEO of SGCIB, the epicenter of the Kerviel Fraud and Subprime Fraud.  Defendant Mustier had access to information relating to the Kerviel Fraud as he was ultimately responsible for SocGen's derivative business.  Moreover, Christopher Mianne and Luc Francois, co-head of GEDS during the Class Period, the division where Kerviel worked, both reported directly to Mustier.  Defendant Mustier also had access to information relating to the Subprime Fraud as the expansion of SocGen's structured finance business into U.S. subprime occurred at the behest of Mustier and was one of Mustier's TGV programs.  Also, Mustier visited SocGen's New York office on a monthly and quarterly basis and he participated in planned retreats

with SocGen's New York front office (traders).  Defendant Mustier used this inside information when trading SocGen shares during the Class Period.  *See* §XIII.E., below.

315.    Defendant Citerne, similarly, had insight into two problematic areas for the Company – subprime exposure and risk control.  As a director at TCW, information regarding the United States subprime residential meltdown and its affect on the value of SocGen's RMBS/CDO portfolio was certainly available to Defendant Citerne.  Moreover, as the Co-CEO of SocGen, Defendant Citerne was also in a position to understand how the decreasing value of the Company's RMBS/CDO portfolio would adversely affect SocGen's financials.  As Chairman of SocGen's Internal Coordination Committee, which met on a quarterly basis and was responsible for the implementation and monitoring of SocGen's internal control management systems, Defendant Citerne also had access to information relating to the Kerviel Fraud.  Defendant Citerne used this inside information when trading SocGen stock during the Class Period.  *See* §XIII.F., below.

316.    Defendant Alix, as the Co-CEO of SocGen, was aware that the Company was dangerously exposed due to its risky involvement in Mezzanine grade CDOs and other high-risk mortgage-backed securities.  Defendant Alix used this inside information when trading SocGen securities during the Class Period.  *See* §XIII.G., below.

317.    During the Class Period, Defendants directly and indirectly engaged and participated in a continuous course of conduct to misrepresent the results of SocGen's operations and to conceal adverse material information regarding SocGen's operations as specified herein.  Defendants employed devices, schemes and artifices to defraud, and engaged in acts, practices and a course of conduct as herein alleged in an effort to increase and maintain an artificially high market price for the securities of the Company.  This included the formulation, making, and/or participation in the making of untrue statements of material facts, and the omission to state material facts necessary in

order to make the statements made, in light of the circumstances under which they were made, not misleading, which operated as a fraud and deceit upon Plaintiffs and the other members of the Class.

318.    The Defendants are liable, jointly and severally, as direct participants in the wrongs complained of herein.  Defendants had a duty to promptly disseminate accurate and truthful information with respect to the Company's operations, business and future business prospects, to correct any previously issued statements from any source that had become untrue, and to disclose any trends that would materially affect the present and future financial operating results of SocGen, so that the market price of the Company's publicly traded securities would be based upon truthful and accurate information.

## X.    SocGen Violated International Financial Reporting Standards During the Class Period

319.    International Accounting Standard No. 1 states: "***the application of IFRS [International Financial Reporting Standards], with additional disclosure when necessary, is presumed to result in financial statements that achieve a fair presentation***."  As detailed herein, SocGen's financial statements[11] issued during the Class Period violated IFRS and were not a fair presentation of its financial position for the following reasons:

(a)    SocGen failed to reflect any of the transactions associated with the Kerviel Fraud in its 2007 financial statements in violation of IAS 1, IAS 34, IAS 39, and the IASB Framework; and

(b)    SocGen failed to disclose the nature, extent, and concentrations of risk arising from its portfolio of subprime-backed CDOs and other U.S. residential mortgage-backed assets and

---

[11]    Financial statements, as used herein, broadly refers to SocGen's publicly issued annual and interim financial results and related earnings releases which were purported to have been prepared in accordance with IFRS.

failed to record writedowns to reflect these assets at their fair market value in its 2006 and 2007 financial statements in violation of IAS 1, IAS 10, IAS 34, IAS 39, IFRS 7, IAS 30, IAS 32 and the IASB Framework.

### A.    Applicable Accounting Standards

320.    As a publicly traded company, SocGen was required by the EU Commission, Regulation (EC) No. 1606, Article 4 to issue financial statements in accordance with International Financial Reporting Standards.  Additionally, as a publicly traded company in France, SocGen was required to comply with all AMF accounting and financial regulations.[12]

321.    Under IFRS, the preparation and presentation of the financial statements are the responsibility of management (IFRS framework ¶11).  More specifically, the Defendants were responsible for the accurate presentation of SocGen's financial statements as evidenced by the following certification included in SocGen's 2007 registration statement:

> CERTIFICATION OF THE PERSON RESPONSIBLE FOR THE REGISTRATION DOCUMENT
>
> Having taken all reasonable care to ensure that such is the case, I hereby certify that the information set out in the present Registration Document is, to the best of my knowledge, true and there are no omissions that could impair its meaning. . . .
>
> The Chairman and Chief Executive Officer
> Daniel Bouton

---

[12]    The AMF, created by the Financial Security Act of August 1, 2003, is the French equivalent to the United States SEC.

### B.    Defendants' Violations of International Financial Reporting Standards Related to the Kerviel Fraud

322.    As detailed herein, in January 2008, SocGen announced that it was recording €4.9 billion or $7.2 billion[13] in losses relating to the Kerviel Fraud.  However, far earlier than January 2008, SocGen's senior management, as pled herein, knew or recklessly disregarded that  traders, such as Kerviel,  were engaged in directional, *i.e.*, unhedged, trades and were exceeding their trade authorization limits.  By failing to  record the material impacts of these unhedged trading positions in its financial statements, SocGen's publicly issued financial statements during fiscal 2007 were materially false and misleading and in violation of IFRS.

### 1.    SocGen's Restatement of Its 2007 Financial Statements

323.    SocGen restated its 2007 financial statements as a result of the Kerviel Fraud. On May 13, 2008, SocGen disclosed the following:

> *Reported 2007 historic quarterly results have been restated for the fictitious operations recorded on unauthorized and concealed market activities.* **The quarterly results at March 31st 2007, June 30th 2007, September 30th 2007, and December 31st 2007 . . . have been adjusted to restate the accounting consequences of the fictitious operations** *recorded in 2007 and 2008 on unauthorized and concealed market activities discovered in January 2008.*

324.    The table below reflects SocGen's restatement of its 2007 financial statements related to the Kerviel Fraud:

---

[13]    Figures presented in U.S. dollars, as used herein, calculated based on 12/31/07 Euro to USD currency exchange rate at www.oanda.com.

**SOC GEN**
**RESTATEMENT OF 2007 RESULTS**

| | Q1 | | |
|---|---|---|---|
| | Reported | Restated | % Overstatement/ (Understatement) |
| **SG Corporate and Investment Banking** | | | |
| Operating Income | € 895 | € 798 | 12% |
| Net Income | € 666 | € 602 | 11% |
| | | | |
| **Societe Generale Group** | | | |
| Operating Income | € 2,156 | € 2,059 | 5% |
| Net Income | € 1,431 | € 1,367 | 5% |

| | Q2 | | |
|---|---|---|---|
| | Reported | Restated | % Overstatement/ (Understatement) |
| **SG Corporate and Investment Banking** | | | |
| Operating Income | € 996 | € (1,068) | 193% |
| Net Income | € 721 | € (641) | 212% |
| | | | |
| **Societe Generale Group** | | | |
| Operating Income | € 2,619 | € 555 | 372% |
| Net Income | € 1,744 | € 391 | 346% |

| | Q3 | | |
|---|---|---|---|
| | Reported | Restated | % Overstatement/ (Understatement) |
| **SG Corporate and Investment Banking** | | | |
| Operating Income | € 407 | € 2,931 | -86% |
| Net Income | € 310 | € 1,976 | -84% |
| | | | |
| **Societe Generale Group** | | | |
| Operating Income | € 1,775 | € 4,299 | -59% |
| Net Income | € 1,123 | € 2,778 | -60% |

| | Q4 | | |
|---|---|---|---|
| | Reported | Restated | % Overstatement/ (Understatement) |
| **SG Corporate and Investment Banking** | | | |
| Operating Income | € (6,056) | € (6,419) | 6% |
| Net Income | € (3,918) | € (4,158) | 6% |
| | | | |
| **Societe Generale Group** | | | |
| Operating Income | € (4,748) | € (5,111) | 7% |
| Net Income | € (3,351) | € (3,589) | 7% |

325.    As evidenced by the above restatement, SocGen's originally reported financial statements were materially false and misleading when issued.  For example, of the €1.7 billion in "Group" net income reportedly earned by the Company during the three-month period ended June 30, 2007, SocGen was forced to restate €1.4 billion, or 78% of all net income recorded during that time.  The effect of this restatement was even more profound for the SGCIB division, a key business segment which was a significant growth driver for SocGen and closely watched by the market.  According to the restatement, SGCIB's originally reported Q1 net income was overstated by 11%, and previously reported Q2 net *income* of €721 million was, in reality, a net *loss* of €641 million.  In total, SGCIB was forced to restate 98% of its net income recorded for the six-month period ended June 30, 2007.

326.    Through this restatement, SocGen and the Defendants have admitted that: (i) its 2007 financial statements originally issued during the Class Period and its public statements regarding those results *were materially false and misleading because they contained  material  omissions and/or misstatements* and (ii) its financial statements issued during the Class Period were *incorrect based on misuse of  information available to the Defendants at the time the results were originally reported*.  Restatements of previously issued financial statements are governed by IAS 8 *Accounting Policies, Changes in Accounting Estimates and Errors* which states, in relevant part:

> Prior period errors are *omissions from, and misstatements in, the entity's financial statements* for one or more prior periods *arising from a failure to use, or misuse of, reliable information* that:
>
>      (a)    *was available when financial statements for those periods were authorized for issue*; and
>
>      (b)    *could reasonably be expected to have been obtained and taken into account* in the preparation and presentation of those financial statements.
>
> Such errors include the effects of mathematical mistakes, *mistakes in applying accounting policies, oversights or misinterpretations of facts, and fraud*.

\* \* \*

**[A]n entity shall correct material prior period errors** retrospectively in the first set of financial statements authorized for issue after their discovery by:

(a) **restating the comparative amounts for the prior period(s)** presented in which the error occurred;

\* \* \*

**Material omissions or misstatements of items are material if they could, individually or collectively, influence the economic decisions that users make on the basis of the financial statements**.

327. The restatement of previously issued public financial statements is a serious and meaningful event. As shown above, the IFRS rules governing correction of errors or fraud in previously issued financial statements do not allow a company any discretion or election in deciding whether to retroactively restate previous financial statements. IAS 8 only permits (and requires) restatements of previously issued financial statements for a change in accounting policy, change in accounting estimate **or** to correct material "errors" resulting from mathematical mistakes, mistakes in applying accounting policies, oversights or misinterpretations of facts (that existed at the time the financial statements were prepared) and fraud. Restatements cannot be used to make any adjustments to take into account subsequent information that did not and could not have existed at the time the original financial statements were prepared.

328. In this case, SocGen has admitted that its restatement was done solely to correct material "errors," and not as a result of a change in accounting policies or accounting estimate. Additionally, as alleged herein, it is clear that the type of "error" correction contained in SocGen's restatement was not due to a simple mathematical error, honest misapplication of an accounting standard or oversight; rather, it was due to misuse of the facts, or fraud, that were **either known or could reasonably be expected to have been known** at the time the original financial statements were issued to the public. Therefore, SocGen's restatement demonstrates that SocGen's previously

- 134 -

reported financial statements were false and that Defendants knew or recklessly disregarded the Kerviel Fraud.

### 2.    IFRS Violations Related to the Kerviel Fraud

329.    The material misstatements that led to the restatement were the result of SocGen failing to record any of the financial impacts of the Kerviel Fraud in its originally issued 2007 financial statements, in violation of IFRS. Specifically, SocGen violated the following basic IFRS requirements:

•    The IAS 1 requirement that: All items of income and expense recognized in a period shall be included in profit or loss unless a Standard or an Interpretation requires otherwise.

•    The IAS 39 requirements that: An entity shall recognize a financial asset or a financial liability in its statement of financial position when, and only when, the entity becomes a party to the contractual provisions of the instrument.

*        *        *

An entity shall remove a financial liability (or a part of a financial liability) from its statement of financial position when, and only when, it is extinguished — ie when the obligation specified in the contract is discharged or cancelled or expires.

•    The IASB Framework requirements that financial statements should:

. . . provide information about the financial position, performance and changes in financial position of an entity that is useful to a wide range of users in making economic decisions. (Framework 12);

*        *        *

. . . show the results of the stewardship of management, or the accountability of management for the resources entrusted to it. (Framework 14);

*        *        *

. . . provide information about the "economic resources" controlled by an entity, as well as "its financial structure, its liquidity and solvency, and its capacity to adapt to changes in the environment in which it operates. (Framework 16);

*        *        *

- 135 -

. . . provide information about an entity's performance during a period, "in particular its profitability . . . in order to assess potential changes in the economic resources that it is likely to control in the future" and, importantly, "the variability of performance." (Framework 17);

\*        \*        \*

. . . be reliable in that it represents what it purports to represent (*i.e.*, "free from material error and bias"). That information should be reliable as well as relevant is a notion that is central to accounting. (Framework 31);

\*        \*        \*

. . . prepared with prudence. "Prudence is the inclusion of a degree of caution" in such preparation "such that assets or income are not overstated and liabilities or expenses are not understated." (Framework 37).

C.    **Defendants' Violations of International Financial Reporting Standards Related to the Subprime Fraud**

330.    During the Class Period, Defendants caused the Company to accumulate a massive exposure to subprime-backed CDOs and other U.S. residential mortgage-backed assets, totaling more than $22.2 billion.[14] Defendants not only knew of SocGen's massive subprime exposure during the Class Period, they also knew, or recklessly ignored, readily available information as to the significant risks and losses arising from these assets in 2006 and 2007. SocGen has since admitted that it was aware of the subprime "crisis" at least by July 2007[15]; however, the information known by Defendants, as described herein, clearly demonstrates that they were aware of the deteriorating

---

[14]    The $22.2 billion figure may be a conservative estimate of SocGen's exposure to subprime-backed CDOs and other U.S. residential mortgage-backed assets. On January 7, 2010, SocGen announced that in order to bolster operational and tax benefits, SocGen would pool €35 billion ($50.17 billion) of toxic assets in France into a dedicated vehicle.

[15]    SocGen's 12/31/08 consolidated financial statements:

U.S. residential mortgage exposure. . . The second half of 2007 was affected by a crisis involving all financial instruments related to the residential real estate sector in the United States.

quality of subprime assets months prior.  As a result, SocGen was required, under the IFRS rules described herein, to disclose the nature, extent, and concentration of risks arising from these subprime assets, and to record timely writedowns to reflect these assets at their true fair value at the end of each reporting period.  Instead, in violation of IFRS,  SocGen failed to disclose its *exposure* to subprime-backed CDOs and other U.S. residential mortgage-backed assets until November 2007 and failed to disclose its full exposure until January 2008.  Likewise, in violation of IFRS, SocGen failed to record any *writedowns* of the purported value of these assets prior to November 2007 and did not begin to meaningfully attempt to write down these assets to fair value until the end of January 2008.

       1.       **IFRS Required SocGen to Disclose the Risks Arising from Its Subprime Exposure**

331.     International Financial Reporting Standard No. 7 *Financial Instruments: Disclosures* ("IFRS 7"), which was effective beginning January 1, 2007, requires disclosures that enable users of the financial statements to evaluate the significance of financial instruments, such as subprime-backed CDOs and other subprime-related assets, to an entity's financial position and performance. IFRS 7 also requires the disclosure of the nature and extent of risks arising from those financial instruments.

332.     Specifically IFRS 7 states:

> An entity shall disclose information that ***enables users of its financial statements to evaluate the nature and extent of risks arising from financial instruments to which the entity is exposed*** at the end of the reporting period. . . . These risks typically include, but are not limited to, ***credit risk, liquidity risk and market risk***.

> For each type of risk arising from financial instruments, an entity ***shall disclose***:

> (a)     the ***exposures to risk*** and how they arise;

(b)     its objectives, policies and processes for managing the risk and the methods used to measure the risk; and

(c)     any changes in (a) or (b) from the previous period.

*          *          *

Entities [are required] to provide disclosures in their financial statements that enable users to evaluate:

(a)     ***the significance or financial instruments for the entity's financial position and performance***; and

(b)     the nature and extent of risks arising from financial instruments to which the entity is exposed during the period and at the end of the reporting period, and how the entity manages those risks.

333.     Prior to the effective date of IFRS 7, International Accounting Standard No. 32 *Financial Instruments: Disclosure and Presentation* ("IAS 32")  and  International Accounting Standard No. 30 *Disclosures in Financial Statements of Banks and Similar Financial Institutions* ("IAS 30") required similar disclosures.

334.     Specifically, IAS 32 states:

Transactions in financial instruments may result in an enterprise's assuming or transferring to another party one or more of the financial risks described below. ***The required disclosures provide information that assists users of financial statements in assessing the extent of risk related to*** both recognized and unrecognized ***financial instruments***:

(a)     Price risk – There are three types of price risk: currency risk, interest rate risk and market risk.

*          *          *

(iii) ***Market risk is the risk that the value of a financial instrument will fluctuate as a result of changes in market prices*** whether those changes are caused by factors specific to the individual security or its issuer or factors affecting all securities traded in the market.

*          *          *

(b)     ***Credit risk*** – Credit risk is the risk that one party to a financial instrument will fail to discharge an obligation and ***cause the other party to incur a financial loss.***

- 138 -

(c)    *Liquidity risk* – Liquidity risk, also referred to as funding risk, is the risk that an enterprise will encounter difficulty in raising funds to meet commitments associated with financial instruments. ***Liquidity risk may result from an inability to sell a financial asset quickly at close to its fair value***.

\*        \*        \*

For each class of financial asset, financial liability and equity instrument, both recognized and unrecognized, an enterprise should disclose: (a) information about the extent and nature of financial instruments, ***including significant terms and conditions that may affect the amount, timing and certainty of future cash flows*** . . .

335.    IAS 30 states:

***A bank should disclose any significant concentrations of its assets, liabilities and off balance sheet items***. Such disclosures shall be made in terms of geographical areas, customer or industry groups ***or other concentrations of risk*** . . . .

***A bank discloses significant concentrations*** in the distribution of its assets and in the source of its liabilities ***because it is a useful indication of the potential risk inherent in the realization of the assets and the funds available to the bank***. Such disclosures are made in terms of geographical areas, customer or industry groups or other concentrations of risk which are appropriate in the circumstances of the bank.

### 2.    SocGen's Class Period Financial Statements Failed to Disclose Its Subprime Exposure in Violation of IFRS

336.    The above IFRS disclosure requirements support the fundamental accounting principle in the IASB framework:

. . . ***information about the current level and structure of asset holdings has value to users when they endeavor to predict the ability of the entity to take advantage of opportunities and its ability to react to adverse situations***.  [IASB framework ¶27]

By failing to disclose ***any*** information about the "level and structure" of its subprime "asset holdings" (as described herein at ¶¶347-354) nor any of the required disclosures about the nature, extent, concentrations, or exposure of risks arising from its subprime "asset holdings," SocGen's financial statements were materially false and misleading and prevented investors from determining the effect that the subprime mortgage crisis was having on the Company during 2006 and 2007, *i.e.*,

its exposure to the subprime crisis.  Accordingly, investors were unable to react to the adverse subprime situation because SocGen was telling them they had no exposure.

337.    The massive amount of subprime-backed CDOs and other U.S. residential mortgage-backed assets held by SocGen – *more than $22.2 billion* – in itself created a concentration of assets that was significant and material to SocGen's financial position and performance and was therefore required under IFRS to be disclosed to investors.  However, with the additional information available to Defendants during 2006 and 2007 (described at ¶¶345-371) regarding the deterioration and illiquidity of its subprime-related assets, Defendants were certainly required under IFRS to disclose the breadth of SocGen's *entire* subprime exposure.  The disclosure of these exposures and risks was necessary to prevent SocGen's financial statements from being materially misleading. Instead, SocGen kept investors in the dark as it concealed its subprime exposure until *well after* the losses were already harming investors. Defendants failed to disclose anything about the Company's subprime exposure until November 2007 and failed to fully disclose its true exposure and risks until January 2008, when it finally recorded meaningful writedowns.[16]  In fact, rather than make the disclosures required by IFRS prior to November 2007, SocGen misled investors even further by repeatedly assuring investors that it had almost no exposure to U.S. subprime mortgages.  On August 2, 2007, SocGen stated, "*the Group has low exposure to the current credit market crisis.*" SocGen repeated this statement on September 7, 2007 when Defendant Bouton represented to *e Figaro* that the *credit crisis was "under control"* and reaffirmed that *it would have only a limited impact on SocGen*.

---

[16]    In November 2007, SocGen disclosed its exposure to unhedged subprime-backed CDOs and RMBS but failed to mention an additional $11.6 billion of subprime-backed CDOs and other mortgage-backed assets that were exposed to monoline insurers or its subprime exposure related to the PACE SIV.

338.    SocGen further misrepresented its true subprime exposure by using an irrelevant

metric – *revenue* – in order to demonstrate its purportedly immaterial exposure to CDOs.  For

example, on August 2, 2007, following SocGen's announcement of its Q207 results, analysts at

European Equity Research reiterated that:

> **Little Exposure to CDOs** . . .
> According to SG, less than 1% of Investment Banking *revenue* comes from
> securitizations [*sic*] and activities related with CDOs.

Defendants clearly knew that the risks related to SocGen's subprime exposure did not relate at all to

its revenues from securitizations, but rather to the immense risks of holding a massive portfolio of

these toxic assets and the potential for massive losses in the form of writedowns.  Assuring investors

that its *revenue* derived from CDOs was less than 1% of its total Companywide revenues was

misleading and entirely irrelevant to its true financial condition and simply another way to conceal

its total subprime exposure and risks.

### 3.    IFRS Required SocGen to Writedown Its Subprime-Backed Assets to Fair Value

339.    Under IAS 39, SocGen was required to accurately value its subprime-backed CDOs

and other subprime-related assets at their fair value at each reporting period and to record losses in

its income statement, in the form of writedowns, arising from any decreases in fair value since the

prior reporting period.  Under IAS 39, SocGen was required to incorporate all relevant factors,

including those described herein at ¶¶355-371, as opposed to relying on its own contrived valuation

assumptions to calculate the fair value of its subprime-backed assets and to determine if writedowns

were necessary. IAS 39 states, in relevant part:

> The objective of using a valuation technique is to *establish what the*
> *transaction price would have been on the measurement date in an arm's length*
> *exchange motivated by normal business considerations*. Valuation techniques
> include using recent arm's length market transactions between knowledgeable,
> willing parties, if available, reference to the current fair value of another instrument
> that is substantially the same. . . . *The chosen valuation technique makes maximum*

*use of market inputs* and relies as little as possible on entity-specific inputs.  *It incorporates all factors that market participants would consider in setting a price and is consistent with accepted economic methodologies for pricing financial instruments*.  Periodically, an entity calibrates the valuation technique and tests it for validity using prices from any observable current market transactions in the same instrument (i.e., without modification or repackaging) or based on any available observable market data.

340.    It is without question that IAS 39 applied to SocGen's portfolio of subprime-backed assets during the Class Period and that, even as the subprime crisis worsened, SocGen was required at the end of each period to value its subprime-backed CDOs and other assets at their true fair value based on the then-current market conditions - not a hypothetical value based on SocGen's own internal assumptions.  Sir David Tweedie, Chairman of the International Accounting Standards Board, commenting on the fair value calculations of instruments affected by the subprime crisis, stated, "accounts [including those affected by the subprime crisis] are supposed to reflect the current situation, not a probable future one."  Tweedie also commented that "*[a]ccounting has to reflect facts, not assume stability when it doesn't exist*."

341.    Similarly, the IASB has issued the following comments related to fair value calculations affected by the subprime crisis:

Some have suggested that, when market prices are depressed or markets are 'in crisis', fair value should be measured using a fundamental value approach based primarily on management's estimate of future cash flows.  In such an approach, if cash flow estimates are not expected to decline over the life of the instrument (*i.e.*, until settlement or maturity), there should be no decline in the fair value of the instrument. The argument put forward is that, in market turmoil, adverse market sentiment creates an illogical view of risk, and this should not be taken into account when measuring fair value.

*However, fundamental values are not consistent with the objective of a fair value measurement because they do not take into account factors that market participants would consider when pricing the instrument, such as illiquidity and credit risk.  Fair value reflects the amount for which financial instruments can be exchanged in the market for those instruments. Transaction prices continue to reflect fair value and cannot be ignored, even in a market crisis. Accordingly, a value measured using a 'fundamental value' approach might not represent an*

***estimate of a current transaction price***.  (IASB draft release: Fair value of financial instruments in markets that are no longer active; Sept, 2008).

### 4.    SocGen's Class Period Financial Statements Failed to Write Down Its Subprime Assets in Violation of IFRS

342.    Consistent with SocGen's failure to comply with the IFRS disclosure requirements described above, SocGen specifically failed to comply with IAS 39 in valuing its subprime and other mortgage-backed assets.  In order to conceal its true exposure, SocGen improperly valued these assets using internally generated valuation models that relied on variables and highly subjective forward-looking estimates supplied by SocGen's own management.  These valuations were clearly inconsistent with actual current market conditions (including the factors described at ¶¶355-371) and blatantly missed the objective of fair value, *i.e.*, "***the amount for which an asset could be exchanged, or a liability settled, between knowledgeable, willing parties in an arm's length transaction***."  The result was a manipulated valuation that SocGen  used to avoid reporting any significant losses on its subprime exposure prior to January 2008, despite the fact that all indications of fair value (as described herein at ¶¶355-371) explicitly showed these assets were nowhere near the 100% of par value that SocGen's models purported to show.

343.    Defendants failed to disclose the Company's true loss exposure and failed to even begin writing down the value of its assets until November 2007.  Even then, in November 2007, SocGen recorded only a small writedown, including a CDO writedown of less than €167 million (***just 3% of its unhedged CDO balance***), that did not reflect the true fair value of those assets.

344.    On January 24, 2008, when it had the opportunity to hide its mounting CDO and RMBS losses behind the disclosure of the Kerviel fraud, the Company announced that it would record over $3 billion in subprime-related losses, driven by writedowns of its subprime-backed

CDOs.[17]  The unhedged CDO losses, alone, were written down over $1.5 billion, a writedown of 26% of the face value, demonstrating how misleading its paltry 3% CDO writedown was in November 2007.  SocGen admitted that, unlike its prior valuations which revealed little or no loss in value on its subprime-backed assets because they failed to incorporate known market conditions, the January 2008 valuation was "***compared to the implied write-downs from the ABX index***" and that "***[a]dditional writedowns were taken so as to reflect the illiquidity of the relevant tranches***."  These two key factors, the ABX index and market illiquidity, along with the additional factors described below at ¶¶355-371, were knowingly and intentionally disregarded in prior periods, as described herein, resulting in valuations that failed to accurately reflect the fair value of SocGen's subprime and other mortgage-backed assets.

### 5.    Defendants Knowingly Concealed the Risks and Losses Arising from SocGen's Subprime Exposure

345.    During the Class Period, while SocGen represented to the market that it had little or no exposure to the growing U.S. subprime crisis, Defendants clearly knew otherwise and concealed SocGen's true, massive exposure from investors**.**  Defendants were aware of, or with extreme recklessness disregarded, several factors that ***under IFRS, SocGen was required to incorporate in valuing and writing down its CDOs and other mortgage-backed assets and in preparing disclosures regarding the risks arising from these assets***.  Specifically, Defendants were aware of, or with extreme recklessness disregarded, all of the following:

(a)    SocGen's subprime exposure was massive, totaling more than ***$22.2 billion***, and highly susceptible to the adverse events occurring in the U.S. subprime real estate market;

---

[17]    After the initial announcement on January 24, 2008, these losses were later increased in SocGen's 2007 Registration Statement to €2.6 billion or ($3.9 billion) for the period ended Dec. 31, 2007.