(b)     early warning signs of the U.S. subprime crisis directly affected the collateral underlying SocGen's subprime-backed assets;

(c)     the ABX index, a leading indicator of the value of mortgage-backed assets, was rapidly declining;

(d)     information from SocGen's subsidiary TCW revealed the risks and deterioration in value of SocGen's mortgage-backed assets; and

(e)     SocGen's own trading experience revealed the increasing illiquidity of its CDOs and mortgage-backed assets.

346.    Defendants' knowledge of these factors during the Class Period, while at the same time clearly signaling to investors that SocGen had little or no exposure to the worsening U.S. subprime crisis, constituted material IFRS violations and resulted in SocGen's financial statements being materially misleading.

### a.    SocGen's Exposure to Subprime and Other U.S. Residential Mortgage-Backed Assets

347.    Unbeknownst to investors (due to its lack of required IFRS disclosures or any indication of writedowns in its Class Period financial statements), SocGen was concealing a massive exposure to the U.S. residential real estate mortgage market, totaling over €15 billion (or more than $22.2 billion) during the Class Period.  This exposure clearly represented a concentration that was significant to SocGen's financial position and performance as evidenced by the more than $7.5 billion in recorded losses that SocGen recorded on these assets within 12 months of the end of the Class Period.  SocGen's primary exposures consisted of the following categories:

### (1)    Mezzanine and Unhedged CDOs

348.    SocGen had €4.9 (or more than $7.1 billion) of completely unhedged exposure to CDOs backed primarily by subprime mortgages.[18]

349.    Of this amount, €3.1 billion (or $4.6 billion) consisted of mezzanine CDOs. Mezzanine CDOs were particularly risky and susceptible to the decline of the subprime mortgage market because they were backed by nothing more than the **lowest rated** and **highest risk** tranches of RMBS. In fact, SocGen's Mezzanine CDOs were susceptible to catastrophic loss, even at relatively benign stages of what would become the subprime financial crisis.  The collateral underlying SocGen's $4.6 billion of Mezzanine CDOs consisted of 83% subprime mortgages, and 10% of below-prime Alt-A mortgages.  SocGen was well aware (but chose not to disclose) that 100% of its Mezzanine CDOs could be wiped out even if the default rate of the underlying subprime mortgages only reached 10%.  By March 2008, SocGen had recorded total unhedged CDO and Mezzanine CDO writedowns of over $2.4 billion.

### (2)    CDOs and Other U.S. Mortgage-Backed Assets Exposed to Monoline Insurers

350.    SocGen also had an additional portfolio of approximately €7.9[19] (or more than $11.6 billion) of CDOs and other U.S. mortgage-backed assets[20] that were hedged through protection

---

[18]    SocGen's 12/31/07 consolidated financial statements released on March 3, 2008.

[19]    SocGen's 12/31/07 consolidated financial statements released on March 3, 2008.

[20]    This is a conservative estimate based on SocGen's public statements made during 2008. However, according to a December 12, 2009 *Wall Street Journal* article regarding the AIG bailout, SocGen's exposure to CDOs hedged by AIG alone may have been as high $16.5 billion:

That CDO [Davis Square Funding VI.], assembled by Goldman in March 2006, contained mortgage securities underpinned by subprime home loans originated by

purchased from monoline insurers. Even though these investments were purportedly "hedged," they still represented significant exposure to U.S. subprime mortgages losses and ultimately resulted in significant losses.

351. Indeed, like its unhedged Mezzanine and CDOs, the assets hedged by monoline insurers also rapidly declined in value during the Class Period. SocGen's risks and exposures were tied to the values of the CDOs *and the ability of the monoline insurers to absorb the losses on the billions of dollars worth of subprime assets they insured*. In the event the monoline insurers failed – and many did – exposure on hedged CDOs was no different than on unhedged and Mezzanine CDOs. Therefore, the nature, extent and concentrations of risk associated with these CDOs and other U.S. mortgage-backed assets were required to be disclosed under the IFRS rules described above. Instead, SocGen did not say a single word about this massive exposure until January 2008, at which time it also disclosed almost $1.4 billion in losses tied to this exposure. The purpose behind the IFRS disclosure requirements was to warn investors about concentrations in financial instruments that *may* result in losses under changed conditions – not to wait until those losses were substantial and realized and then disclose the concentration of risk *after* the losses were already recorded.

352. By early 2007, it was clear that monoline insurers, whose traditional business had been insuring relatively safe bonds issued by government authorities, were overextending

---

firms such as Countrywide and New Century Mortgage Corp., one of the first subprime lenders to fail in 2007.

A big investor in Davis Square's top layer was Société Générale, which bought protection on it from AIG, according to the internal memo. The French bank was the largest beneficiary of the New York Fed's Nov. 2008 move to pay off banks in full on their AIG insurance contracts. . . . *Société Générale received payments from AIG and the New York Fed [i.e., U.S. taxpayers] totaling $16.5 billion*.

themselves by insuring hundreds of billions of dollars worth of subprime-backed CDOs and other mortgage-backed assets. Accordingly, the notion that such assets were "hedged" was illusory. As monoline insurers could quickly be wiped out, leaving the holders of such assets to absorb the losses. On March 14, 2007, *The Wall Street Journal* reported that "[t]raders were looking for trouble in two insurers with exposure to the mortgage industry, MBIA Inc. and MGIC Investment Corp., which were perceived as vulnerable to a wave of defaults." Similarly, in a May 2007 presentation entitled "Who's Holding the Bag?," which was widely reported in the financial press, hedge fund manager William Ackman asserted that MBIA and Ambac were "effectively insolvent" on account of predicted losses arising from their insurance of subprime-backed CDOs and other subprime-related assets.

### (3)    RMBS

353.    SocGen also had an additional €2.0B (or $3.0 billion) of RMBS backed primarily by U.S. subprime and other non-prime mortgages.[21]  Of the subprime collateral, over 75% was originated in 2006 and 2007, during which mortgage default rates were more than double the loss rates of 2005 and earlier vintages. Despite not disclosing a single word about its RMBS exposure prior to November 2007, SocGen recorded almost $500 million in losses on these assets by January 2008.

### (4)    PACE SIV

354.    SocGen had additional subprime exposure as the sponsor of a $4.3 billion Structured Investment Vehicle ("SIV") known as the Premier Asset Collateralised Entity ("PACE"). An SIV is a fund which borrows money by issuing short-term securities at low interest rates and uses that

---

[21]    SocGen's 12/31/08 consolidated financial statements released on April 8, 2009.

money to buy long-term securities at higher interest rates, including mortgage-backed assets. PACE, Société Générale's SIV, held over $500 million of mortgage-backed assets (primarily subprime) in addition to exposure to CDOs (19 percent of the SIV's holdings) and debt guaranteed by monoline insurers (18 percent of the SIV's holdings).[22] SIVs are ordinarily kept off-balance sheet by their sponsoring banks; however, in the wake of the subprime mortgage crisis, liquidity risks forced banks to rescue the SIVs they had sponsored by bringing them onto their balance sheets. Société Générale announced in December 2007 that it was consolidating PACE's assets on its balance sheet and that, as a result, the Company would record a writedown of approximately $75 million in fiscal 2007. SocGen failed to disclose the existence of this subprime exposure prior to December 2007.

### b.    SocGen Knew or Recklessly Disregarded the Early Warning Signs of the U.S. Subprime Crisis

355.    Because Defendants failed to disclose SocGen's massive subprime exposure, investors were unable to interpret the effect that the U.S. subprime crisis would have on SocGen. Instead, investors were led to believe that SocGen was *not* exposed to the U.S. subprime crisis.

356.    From late 2006 to early 2007, well prior to SocGen's first disclosure of any U.S. subprime exposure, Defendants clearly knew that its exposure to subprime-related assets created significant concentrations of risk that needed to be disclosed at least in part based on the following indications of market conditions:

- Beginning in mid 2006 and accelerating into 2007, the U.S. housing market collapsed as illustrated in the chart below:

---

[22]    (*Société Générale Takes On $4.3 Billion of SIV Assets*, Bloomberg, Dec 10, 2007.)

- 149 -



- On August 29, 2006, *Dow Jones Newswires* reported "[m]ore subprime borrowers are defaulting in the early months of their home loans, a trend that has led to greater fear among investors and lenders of rising delinquencies and losses."

- A September 15, 2006 article on *CNNMoney.com* stated, "In August, 115,292 properties entered into foreclosure, according to Realty Trac, an online marketplace for foreclosure sales. That was 24 percent above the level in July and 53 percent higher than a year earlier."

- On November 13, 2006, *American Banker* reported:

  > UBS Securities issued a report last week that found that subprime loans made this year are "going bad" at a rate that is 50% faster than the rate for those made last year. About 2.4% of sub-prime loans originated this year were more than 60 days delinquent by the sixth month, compared with 1.6% for 2005 loans and 0.9% for 2004 loans, the report said.

- On November 30, 2006, the *National Mortgage News* reported:

  > "How bad is 2006 sub-prime collateral is a question I think most of you have an opinion on already," said Mr. Zimmerman [the Executive Director of UBS Securities]. "We were a bit surprised at the magnitude and speed at which this vintage year deteriorated."

  > Mr. Liu [a Director at UBS Securities] pointed out at the conference that the industry is seeing "a steady increase of delinquencies and that rate has been accelerating over the past two to three months." Not only have there been higher delinquencies but also the delinquency

numbers have been showing up earlier in 2006 than they had been in 2005. "2006 is tapped to be the worst vintage ever." he said.

***Foreclosures have also risen. And the foreclosures, like the delinquency rates, are also happening at earlier dates***.

• On December 13, 2006, the *Associated Press* reported:

*U.S. mortgage delinquency rate rises sharply.*

Delinquency rates in the third quarter were considerably higher for "subprime" borrowers – people with weaker credit records who are considered higher risks – especially those who have adjustable-rate mortgages.

Subprime borrowers had a delinquency rate of 12.56 percent in the third quarter, ***the highest in more than three years***. The delinquency rate for these borrowers holding adjustable-rate mortgages was even higher – at 13.22 percent in the third quarter, also the worst reading in more than three years. [Emphasis added.]

• On January 3, 2007, subprime mortgage lender Ownit Mortgage Solutions Inc., the 16th largest issuer of subprime mortgages in the U.S., filed for Chapter 11 bankruptcy protection.

• On February 5, 2007, Mortgage Lenders Network USA Inc., the country's 15th largest subprime lender with $3.3 billion in loans funded in third quarter 2006, filed for Chapter 11 bankruptcy protection.

• On February 7, 2007, HSBC. the largest subprime mortgage originator in the U.S., announced that's its loan loss provisions would exceed analysts estimates due to deteriorating conditions in the U.S. housing market  and increasing subprime delinquencies. HSBC announced that it was raising its loan loss provision by 20%, from $8.8 billion to over $10.5 billion.

• According to a February 9, 2007 article published by *The Wall Street Journal*, foreclosure rates on subprime mortgage loans in 2006 ***more than doubled*** from 2005.

• On February 13, 2007, ResMae Mortgage Corp., the country's 26th largest subprime lender, filed for Chapter 11 bankruptcy protection.

• In early March 2007, the Mortgage Bankers Association reported that about 13 percent of subprime loans were delinquent, more than five times the delinquency rate for home loans to prime borrowers.

• During March 2007, the subprime mortgage industry continues to collapse with several more subprime lenders declaring bankruptcy, announcing significant losses,

- 151 -

or putting themselves up for sale, including Accredited Home Lenders, New Century Financial, DR Horton, Countrywide Financial, and SouthStar Funding LLC.

- In April 2007, the early signs of distress described above turned into actual CDO failures, when two Bear Stearns hedge funds began to report material losses arising from funds' subprime-linked CDOs. The meltdown of the Bear Stearns funds was a key indicator that CDO holdings could not be sold at or near par, and that banks exposed to such paper faced substantial losses. Upon default of the Bear Stearns funds, Merrill Lynch seized at least $850 million worth of collateral assets from the funds. On June 22, 2007, *The New York Post*, in an article entitled "Merrill Blinks," reported that Merrill Lynch had cancelled planned auctions for most of the securities that it had seized from the Bear funds and, instead, "[took them] in-house." According to the article, investors were "too baffled by the ultra-complex securities, known as collateral debt obligations, to offer attractive bids." The article also noted that "CDOs are so illiquid that Merrill's trades – even at fire sale prices – would have forced a wide scale re-evaluation of prices across the sector, perhaps *leading some CDO issues to be marked down as much as 30 percent*."

- On April 2, 2007, New Century Financial, the nation's second largest subprime mortgage lender filed for Chapter 11 bankruptcy protection.

Despite these red flags, SocGen chose not to disclose its subprime exposure to investors.

### c. Defendants Knew or Recklessly Disregarded Information from SocGen's Subsidiary TCW About the Deterioration of SocGen's Mortgage-Backed Assets

357.    Société Générale, through its U.S. subsidiary TCW, was well aware that the fair values of its subprime-backed assets were deteriorating rapidly. TCW's senior management were experts in the CDO business as SocGen acknowledged in its 2007 Registration document, "*In 2006, SGAM [Societe General Asset Management] confirmed its positioning . . . as the leading player in the CDO market with TCW (the number one player in Cash CDOs)*."

358.    In fact, TCW was the largest CDO manager and issuer in the world with over $64 billion in CDO assets under management in 2006-2007. With Defendant Day being the CEO of TCW and also a SocGen Board Member, TCW was well represented at the senior executive level of SocGen. Additionally, TCW's Vice Chairman, Marc Stern, was serving on the Management Committee of Société Générale. As part of the Management Committee, Mr. Stern participated in

meetings, along with Société Générale's 12 member Executive Committee, regarding Société Générale's operational efficiency, discussed business strategy and addressed other issues of general interest to the group. Accordingly, information regarding market condition, and liquidity of CDOs, as well as the subprime security market, was consistently made available to SocGen's executive management by some of the highest ranking officials at the Company. TCW's views on the susbprime CDO market were known and understood by SocGen's senior management throughout the relevant period.

359.    Beginning in early 2007, TCW's Chief Investment Officer, Jeffrey E. Gundlach, a well-respected investment advisor, advised of the disturbing trends in the subprime market, including rising delinquency rates and lower underwriting standards:

- On May 3, 2007, Gundlach made a *sell* recommendation for subprime related bonds and CDOs.

- A *June 20, 2007 USA Today* article stated:

   Merrill Lynch's bond sale highlights the pain felt by investors in subprime mortgage loans and the dramatic steps taken by Wall Street giants to clean it up.

   The rapid decline in the value of subprime mortgages is creating a crash of historic proportions for players in that niche of the bond market, Gundlach said, *"In the world of subprime, it's a major, major debacle."*

- A June 28, 2007 *Business Week.com* article stated:

   Already the riskiest bonds backed by mortgages taken out by people with the lowest credit scores have dropped 40% in value. Better stuff is down only 10% to 30% and the very best, basic AAA-rated stuff isn't off much at all. *But it's all a house of cards*, Gundlach explains. . . . "As defaults pile up, the losses flow up the chain."

   *          *          *

   The delinquency rate on subprime mortgages is almost 14% and it's still climbing, he warns. . . . Even 30% is a possibility given

- 153 -

the watered-down lending standards and crazy loan structures, Gundlach says.  If that happened, "*nothing is okay*."

- On August 9, 2007, Gunlach stated:

> That story explains as well the current disaster in the subprime mortgage arena.  People bought bonds backed by subprime mortgages based on credit ratings bestowed by the rating agencies.  These credit ratings were based upon a naïve extrapolation of historical default rates.  In fact, mortgage lending had undergone a serious deterioration in underwriting standards – to the point that, in an open letter on May 3, I forecast a cascade of downgrades and losses on subprime-backed bonds rated "investment grade" and on collateralized debt obligations (CDOs) backed by these bonds.
>
> Many investors had assumed that the risk profile of these bonds was comparable to that of like-rated bonds of earlier vintage.  Instead, they took part in the biggest calamity in the history of rated debt. . . .
>
> More than a wake-up call, the subprime mortgage market has suffered a psychological blow whose effects probably will extend well past 2007.
>
> \*       \*       \*
>
> Many of the mortgage loans originated in late 2005 and early 2007 suffer from the same sins of those underwritten in 2006. . . .
>
> In the months ahead, we should expect to see the liquidation of billions more in subprime-related assets by all manner of investors as further waves of downgrades and defaults roll over the market.  Many portfolios with concentrated exposure to subprime will be forced to sell assets.  A number of hedge funds and subprime lenders have already succumbed under the pressure of margin calls and repurchase demands.  There will be more.  Other portfolios will be forced to liquidate downgraded securities to satisfy minimum ratings requirements and other investment constraints.  This also will be the case for certain structured-finance vehicles, including CDOs.
>
> \*       \*       \*
>
> History appears to be repeating itself in subprime.  In 2006, the first signs of trouble emerged in the form of heightened delinquency rates due to tile deterioration of underwriting characteristics in securitized loan pools.  As more fully described in my May 3 letter, the first casualties included subprime lenders, which were overwhelmed by repurchase demands on early-default loans.

(According to a recent body count by Bloomberg News, at least 70 lenders have exited the subprime business – up from 40 as of my last letter.) . . . .

The long grind will result in forced sales by and of structured-finance vehicles such as CDOs.

- An August 17, 2007 Asset-Backed Alert article stated, "*I think liquidity's going to get worse, not better*," TCW investment chief Jeffrey Gundlach said.

360. Despite the knowledge it had from its own subsidiary, TCW, SocGen chose not to disclose its exposure to the more than $22 billion of subprime and other mortgage-backed assets it was holding during the Class Period. As a result of this lack of disclosure, along with SocGen's affirmative reassurances that it had "low exposure" to the credit crisis, Defendants were materially misleading investors about SocGen's true financial condition.

### d.    Defendants Knew or Recklessly Disregarded the ABX Index

361. The ABX Index was created in January 2006 when several banks collaborated with a Company called "Markit" to create an index which provided banks with the ability to track RMBS and to estimate CDO market values. During the Class Period, the ABX Index tracked the performance of 15 to 20 equally-weighted RMBS tranches backed by subprime collateral and was a leading indicator of the value of subprime-backed CDO's and other subprime assets. In fact, the ABX Index was used by SocGen as a barometer for assessing how subprime mortgage-related assets were performing in the marketplace. The ABX Index tracked the cost of buying and selling Credit Default Swaps on selected RMBS tranches. Each of the 15-20 RMBS tranches had a different rating, from AAA to BBB, and was considered a representative sample of other RMBS tranches backed by subprime collateral with the same rating.

362. The "TABX Index," launched in February 2007, tracks the value of the BBB and BBB- tranches of the ABX indices, but *also* takes into account varying levels of subordination. Like CDOs,

which include senior and junior tranches, the TABX Index accounts for high levels of subordination and therefore provides a benchmark for the valuation of senior CDO positions such as those owned by SocGen. The most senior index is the TABX.HE 07-1 06-2 40-100 (the "40-100 TABX"), because that index is tied to underlying RMBS collateral with a subordination level of 40%.

363. The ABX and TABX indices were objective, directly observable, *real-time* indicators of the value of SocGen's subprime-backed CDOs and other subprime-related assets. These indices were closely tracked by banks, investment banks, and other market participants in the mortgage market.

364. Significantly, the American Institute of Certified Public Accountants' Center for Audit Quality has stated that "the pricing indicated by the ABX credit derivative index for subprime mortgage bonds may be a Level 2 input when used as an input to the valuation of a security backed by subprime mortgage loans." Similarly, the SEC considered the ABX a "relevant market ind[ex]" for CDO valuation.[23] Therefore, according to the AICPA and the SEC, the ABX could and should be used by banks in valuing RMBS and CDOs. In fact, SocGen *itself* admitted the relevance of these indices in its 2008 Registration Document, in which it stated:

> Financial instruments linked to U.S. residential mortgage exposure (subprime crisis) . . . the valuation technique was based on using observable prices on benchmark indices, in particular the ABX Index (valuation based on observable market data).

Completely disregarding this very same ABX index in its earlier valuations[24] was a violation of IAS 39, as described above.

---

[23]    *See* March 2008 "Dear CFO" letter from SEC to public companies, available at http://www.sec.gov/divisions/corpfin/guidance/fairvalueltr0308.htm.

[24]    According to CW1, SocGen's New York office clearly followed the ABX index to assess the valuation of its assets. However, the New York office stopped using the ABX Index in mid-2007, at

365.    By February and March 2007, the ABX Index for RMBS tranches rated BBB and BBB- had suffered serious declines, with some BBB- tranches dropping as much as 60%. By September 30, 2007, the ABX BBB Index had fallen to 30% of par, and this decline continued during subsequent quarters.

366.    The ABX Index showed that all subprime RMBS tranches were being adversely affected by the subprime mortgage crisis beginning in late 2006 and into 2007. As shown in the chart below, during the fourth quarter of 2006 and the first half of 2007, the value of the ABX Index plummeted.



367.    The TABX indices also plunged. From its inception in February 2007, when it was already indicating CDO values were more than 15% under par, the 40-100 TABX simply collapsed, falling to less than 35% of par by September 28, 2007.

---

the latest, after the ABX had declined precipitously. According to CW1, the drop in the ABX index clearly showed that SocGen's valuations needed to be reduced but instead, SocGen abruptly discontinued its prior practice of relying on the ABX Index in its valuations.

| Date | Value (100 = 100% of par) |
| --- | --- |
| 3/30/2007 | 83.8 |
| 6/29/2007 | 69.08 |
| 9/28/2007 | 34.25 |

368.    The collapse of the ABX and TABX indices made it clear that the value of SocGen's subprime-backed CDOs and other subprime-related assets were declining significantly beginning no later than the early 2007.  IFRS required SocGen to: (1) disclose the risks associated with these assets, and (2) timely writedown the value of its CDO holdings to fair value in accordance with IAS 39.  Nonetheless, SocGen failed to disclose or record its first writedowns of its CDO holdings until November 2007 and did not record meaningful writedowns until January 2008.

### e.    Defendants Knew or Recklessly Disregarded that SocGen's Own Trading Experience Reflected the Increasing Illiquidity in the Market

369.    It was abundantly clear during the Class Period that SocGen could not sell the CDO/RMBS securities that it held.  As confirmed by CW2, by March 2007, SocGen had "warehouse[d]" hundreds of millions of dollars worth of subprime-backed securities that it planned to structure and sell in its next CDO offering.  However, according to CW2, SocGen knew at this time that a CDO offering could not be successful.  The New York group had been unable to sell CDOs or RMBS as the market had dried up and become illiquid.  According to CW2, SocGen canceled its CDO offering and was stuck with the "warehouse[d]" assets.  Moreover, CW2 understood that this was a clear sign that the RMBS/CDO market was illiquid.  According to CW1, SocGen dissolved the New York-based CDO Group on or about the Q2 2007.  This group was responsible for purchasing and "warehousing" residential subprime mortgages and other subprime-backed securities in order to securitize them into CDOs.

- 158 -

370.    SocGen had billions of Euros worth of CDO/RMBS securities whose values had rapidly diminished.  According to CW1 there were serious problems with liquidity and SocGen could not obtain quotes for many of its portfolio assets in mid 2007.  Instead of following the required IFRS, which required SocGen to value its CDO securities based on the amount for which the asset could be exchanged between knowledgeable and willing parties in an arms'-length transaction, according to CW1, SocGen simply stopped using mark-to-market valuations and instead substituted in a "Mark to Model" valuation.  However, these models did not work and SocGen was scrambling to create a value for its RMBS/CDO portfolios and avoid a writedown.  CW2 recalls that Carlos Beneto, Head of CDO Structuring, and Arno Denies, Head of RMBS, both of whom reported directly to Paolo Taddonio, issued an urgent mandate that the IT department change the parameters of its Calypso system (a computer program designed to assign valuations to CDOs) in order to obtain valuations of the CDOs.  For a two-week period between late Q1 and early Q2 2007, the IT department was working around the clock, trying hundreds of different valuation models, in an attempt to obtain valuations for its CDOs.  However, according to CW2, the IT department's efforts were to no avail, during a meeting attended by Taddonio, the participants specifically discussed the fact that the valuation models were not working and did not reflect reality.  Despite these circumstances, SocGen chose to conceal its CDO exposure and failed to record the necessary writedown as required by IFRS accounting standards.

371.    By the end of 2006, it was common knowledge in sales meetings that the RMBS and CDO assets had diminished in value and had become illiquid – no one wanted them.  As a seller of structured products, CW5 attended weekly sales meetings.  These meetings would take place about once a week, at the beginning of the week.  Abner Figueroa ran the meetings.  CW5 explained that it was clear to everyone, including Taddonio, that they could not sell the CDO/RMBS products.

Figueroa always told the sales staff that they needed to sell the CDO and RMBS products but everyone knew they could not sell them. At the meetings, or by email prior to the meetings, the sales staff would receive inventory sheets showing what RMBS and CDO products needed to be sold. The inventory sheet would also show what had been sold, at what price, class, rating, etc., and the RMBS and CDO products were always on the sheet with no activity. CW5 stated that the other sales staff were telling Figueroa that the RMBS/CDOs could not be sold. According to CW5, Dansby White and Taddonio sometimes sat in on these meetings as well. CW5 explained that SocGen was aware of the deteriorating value in its CDO portfolio because a daily cash report would show how much cash SocGen was receiving on its CDOs. Thus, not only was SocGen stuck with CDO's it could not sell, it was clear that SocGen's portfolio of RMBS/CDOs were worth a fraction of their face value.

> **D.** **Defendants' Failure to Disclose the Internal Control and Risk Management Deficiencies Relating to the Kerviel Fraud and the Subprime Fraud Violated Financial Regulations AMF**

372.    In addition to SocGen's numerous IFRS violations related to both the Kerviel Fraud and the Subprime Fraud described herein, the Company's true financial condition and results of operations presented in its Class Period financial statements were further masked by false and misleading statements that the Company maintained an effective framework of internal controls covering financial disclosures, financial reporting, and risk management.

373.    In its 2007 Registration document and in similar statements made in other Class Period financial statements, SocGen provided a report on Internal Controls which, in accordance with article L. 225-37 of the French Commercial Code, was certified by SocGen's Chairman. Other SocGen senior executives were equally involved in the oversight of internal controls as noted in the report:

Philippe Citerne, Société Générale's Chief Executive Officer is responsible for ensuring the overall consistency and efficiency of the internal control system. He chairs the Internal Control Coordination Committee (CCCI) which meets on a quarterly basis and is attended by the Corporate Secretary, the Head of Risk Management, the Chief Financial Officer, the Chief Information Officer and the Head of Group Internal Audit.

374.    Throughout the report, the Company clearly described the importance of effective internal controls at SocGen:

Given the extent and diversity of the risks inherent in banking activities, internal control within banks is a vital instrument in risk management and thus plays an important role in ensuring the sustainability of their business.

\*        \*        \*

Internal control is designed to:

• detect and measure the risks borne by the Company, and ensure they are adequately controlled;

• guarantee the reliability, integrity and availability of financial and management information;

• verify the quality of the information and communication systems.

375.    The report outlined the specific control procedures that were purportedly in place to ensure the accuracy of the financial statements and provided false assurance to investors that these controls were operating effectively.  These false assurances included:

The departments *involved in the production of financial data* are as follows:

• the middle office in the Corporate and Investment Banking division *validates the valuations of financial instruments*. . . .

• the back office . . . *checks that financial transactions are economically justified*, records transactions in the accounts and manages means of payment;

\*        \*        \*

• the Group Finance Department gathers all accounting and management data . . . in a series of standardized reports . . . . so that it can be used in the overall management of the Group and *disclosed to third parties (supervisory bodies, investors, etc.)*.

- 161 -

Above and beyond its role of consolidating the Group's accounting and financial information, the Group Finance Department is also entrusted with large-scale audit assignments: it monitors the financial aspects of the Group's capital transactions and its financial structure, manages its assets and liabilities, and consequently defines, *manages and controls the Group's financial position and structural risks*. Furthermore, it ensures that the regulatory financial ratios are respected, *defines accounting standards, frameworks, principles and procedures for the Group, ensures they are observed and verifies that all financial and accounting data published by the Group is reliable*.

*     *     *

Local accounts are drawn up in accordance with local accounting standards, and the *consolidated Group accounts are compiled in accordance with the standards defined by the Group Finance Department, based on the IFRS adopted by the European Union*. The Group Finance Department has its own standards unit, which monitors the applicable regulations and drafts new internal standards to comply with any changes in the regulatory framework.

*     *     *

Accounting data are compiled by the back and middle offices and independently from the sales teams, *thereby guaranteeing that information is both reliable and objective*. These teams carry out a series of controls defined by Group procedures on the financial and accounting data:

- daily verification of the economic reality of the reported information;

- *reconciliation*, within the specified deadlines, of accounting and management data using specific procedures;

- production of a quarterly analytical report on the supervision carried out, which is submitted to the management of the entity or division, and to the Group Finance Department.

Given the increasing complexity of the Group's financial activities and organizations, staff training and IT tools are reviewed on a permanent basis to check that the *production and verification of financial and management accounting data are effective and reliable*.

*     *     *

In practice, *the internal control procedures implemented by the various businesses are designed to guarantee the quality of the financial and accounting information, and notably to*:

- *ensure the transactions entered in the Group's accounts are exhaustive and accurate*;

- 162 -

- *validate the valuation methods used for certain transactions*;

- ensure that transactions are correctly assigned to the corresponding fiscal period and *recorded in the accounts in accordance with the applicable accounting regulations*, and that the accounting aggregates used to compile the Group accounts are compliant with the regulations in force;

*        *        *

*The accounting audit team is comprised of experienced audit professionals* and is charged with the following functions:

- *audits of any areas where financial information is deemed to be most sensitive, to verify that accounting standards are correctly applied*;

*        *        *

At the third level of control, the General Inspection Department generally carries out accounting audits as part of its general inspections, but also conducts specific audits to check the quality of the controls carried out by the staff responsible for producing accounting, financial and management data.

376.    The numerous assurances made by the Defendants in the 2007 Registration Document as outlined above as well as similar statements made throughout the Class Period regarding the effectiveness of the Company's disclosure controls and procedures, internal control over financial reporting, and risk management were materially false and misleading because, in fact, SocGen had numerous deficiencies in these areas related to the Kerviel Fraud and the Subprime Fraud, as detailed herein.

377.    On July 4, 2008, France's Banking Commission fined SocGen €4 million for serious breaches in internal controls.  The Commission said it detected "grave deficiencies in the internal control system," that "made possible the development of the fraud and its serious financial consequences."  The Commission also said:  "The weaknesses brought to light in particular the deficiencies in hierarchical controls, carried on over a long period, throughout 2007, without being detected or rectified by the internal control systems."

- 163 -

## XI.    Additional Jurisdiction Allegations

378.    This Court has subject matter jurisdiction over the claims brought on behalf of investors who purchased or acquired SocGen securities on foreign markets and/or on the over-the-counter market as the focus of the Subprime Fraud was the U.S.

379.    During the Class Period, there was but a single worldwide market for SocGen shares and SocGen ADRs, which traded in tandem, as set forth in the chart at ¶31.

380.    SocGen's ADRs are traded on the over-the-counter market under the symbol SCGLY. At the end of the Class Period, SocGen had outstanding approximately 3.8 million holders of ADRs, which are issued by Bank of New York Mellon.  During the Class Period, SocGen's ADRs had substantial trading volume, reaching a high of 4,423,717 on August 20, 2007, and a total volume of trading during the Class Period of 87,412,345.  On January 24 and 25, 2008, trading volume reached a high of 2,543,895 and 976,679,  respectively. Importantly, SocGen is closely followed by a number of U.S. analysts, including Goldman Sachs & Co., Morgan Stanley and Merrill Lynch.  Additionally, SocGen has significant U.S. institutional ownership.

### A.    Defendants' False Statements Were Made, and Its Fraudulent Conduct Occurred in the United States

381.    SGCIB's New York office was integral to the perpetration of the fraud alleged herein. SocGen's FICC Americas division in New York was responsible for the purchasing, packaging, valuation and management of SocGen's CDO and RMBS portfolio, which was subject to a €2 billion plus writedown, announced January 24, 2008.  Each of Defendants' false and misleading statements regarding the valuation of its RMBS and CDO portfolio, as well as its exposure to the subprime market, emanated from its FICC America's division in the U.S.

382.    By 2006, after three years as CEO of SGCIB, Defendant Mustier had successfully extended SGCIB's worldwide lead in equity derivatives and developed powerful franchises in

structured finance, all while attaining unmatched levels of profitability. Under Defendant Mustier, SGCIB increased its profitability and solidified its role as a derivative and fixed income powerhouse. Operating profits for SGCIB rose by 75% from 2003 to 2006. SocGen had attained levels of profitability unmatched by its rivals.

383. Notwithstanding this success, SocGen was still being valued by equity analysts at earnings multiples well below that of Wall Street rivals such as, Merrill Lynch & Co., Morgan Stanley and Goldman Sachs Group. Defendant Mustier blamed SocGen's lower trading multiple on cultural prejudice and stated that SocGen was being viewed through an "Anglo-Saxon filter."

384. Determined to "win the respect of investors and rivals," Mustier set out to further build on SocGen's equity derivatives, debt capital markets and structured-finance businesses, believing that these were the keys to SocGen's worldwide success. The aim was to make SocGen a global niche player through its New York operations, focused on its highly profitable areas of expertise, namely, equity derivatives and fixed income.

385. To accomplish this, Mustier initiated several Turbo Growth Ventures or TGV to build on SGCIB's fixed income and equity derivative businesses in the United States. To improve and build its fixed income business, SGCIB set out to "*establish a significant presence in the U.S. markets for structured-finance products and asset-backed securities*."

386. Before a TGV project was implemented, it was identified by SGCIB staff and vetted by management before being run like an entrepreneurial venture. (*SG Bumper profits set a precedent for Defendant Mustier*, Aug. 14, 2006.)

387. One such TGV Project initiated during the Class Period was to increase SocGen's *U.S. derivative and fixed income businesses*. For instance, in April of 2005, in order to boost the sales of derivative products to U.S. fund managers and insurers, SGCIB purchased from Bank of

America a hedge-fund-linked structured investments business.[25] This purchase allowed SGCIB to become the leading provider of derivatives to U.S. fund managers and insurers. By 2006, SGCIB had gone from the fourth largest provider of derivatives to U.S. fund managers to number one.

388.     Another TGV Project and key to Mustier's vision of further increasing SocGen's U.S. fixed income business was the development and expansion of SBCIB's presence within the U.S. mortgage-backed securities market. SocGen believed that such expansion would allow it to reap the enormous profits that the large Wall Street banks were generating from selling United States mortgage-backed securities – in particular, structuring and underwriting CDOs

389.     To accomplish this, SocGen set out to quickly expand its presence in the U.S. subprime mortgage-backed securities market. Defendant Mustier wanted to capitalize on SocGen's growing strength among U.S. institutional investors to boost the sales of its fixed income products, such as asset-backed securities. Jean-Jacques Ogier, chief executive of SocGen's U.S. operations, stated, "[o]ne of our challenges as a bank is to get more credible in the huge U.S. market, but we are going to do it by selling our European profile in a realistic and pragmatic way." (*Pardon My French*, Institutional Investor America, Apr. 2006.)

390.     The TGV Project had two components. First, SocGen established its own CDO Group in SocGen's New York Office. The CDO Group included approximately 100 people responsible for underwriting (structuring) CDOs and RMBS. Second, SocGen hired dozens of bankers experienced in both leveraged finance and asset-backed securities to market its CDOs and RMBS. CW5 was one of the bankers recruited to SocGen to sell SocGen CDOs and RMBS. With

---

[25]     SocGen also purchased in 2003 Constellation Financial Management Co., a private partnership that created asset-backed securities out of management commissions.

its expansion into asset-backed securities, SocGen's New York office quickly grew to approximately 2,000 people and became a one-stop-shop for the structuring and sale of CDOs and RMBS.

391.    SocGen's TGV Projects were developed by Defendant Mustier and other SGCIB executives in Paris, but were implemented and supervised in the United States by Paolo Taddonio, head of FICC Americas in New York, who reported directly to Mustier. Mustier routinely visited SocGen's New York office almost every month to meet with Taddonio and other U.S.-based personnel. Mustier would also hold quarterly "Town Hall" meetings in New York for all of SocGen's New York personnel, where he would discuss the performance and outlook of SocGen's North American strategy. Mustier also participated in planned retreats with SocGen's New York front office personnel (including traders) geared towards motivating and rewarding the front office. Accordingly, the Subprime Fraud was largely perpetrated and carried out in the U.S. under Mustier's direct supervision and involved U.S. mortgage-backed securities.

392.    As alleged in more detail herein: (i) SocGen's New York office accumulated, sold and eventually got stuck with billions of dollars in U.S. subprime residential mortgage-backed securities (RMBS and CDOs); (ii) SocGen's New York office created bogus valuations of its RMBS and CDO portfolio; (iii) SocGen's New York office generated trade, cash and profit reports, as well as VaR reports, and sent them to SocGen Paris, some on a daily basis; and (iv) SocGen's New York office engaged in a short selling scheme with hedge fund Magnetar in order to induce its customers into buying its "crap" CDOs. SocGen's New York office was at the heart of the Subprime Fraud and the acts taken in New York were more then merely preparatory to the Subprime Fraud – they were central to it.

393.    Numerous former SocGen employees who worked in the Company's New York office during the Class Period have confirmed that SocGen was aware in early 2007 (and no later

than mid-2007) that there was no market for its RMBS and CDOs. In fact, in the beginning of 2007, SocGen's New York office had to cancel its planned CDO offering because there was no market for CDOs. When SocGen's New York CDO Group was dissolved in mid-2007, it confirmed that the market for RMBS and CDO products was not viable. Moreover, when the CDO Group was ultimately dissolved in mid-2007, SocGen-New York was "stuck" with a large portfolio of CDOs that could not be sold in the open market given the lack of a viable market.

394.    By early to mid-2007, it had become increasingly apparent to SocGen-New York that its CDO portfolio suffered from serious valuation problems. A former employee recalls a specific meeting at SocGen-New York on or about Q1 or Q2 2007, attended by Taddonio, Gregg Condas, Dave Asking and Richard Basking, in which they discussed the fact that the valuation models did not reflect reality. Indeed, there were several sales meetings in New York throughout 2006 and into 2007, where Tadonnio was present, in which it was clear that the RMBS/CDO values had dropped significantly and that the market had become illiquid.

395.    Beginning in 2006, as a means to rid itself of virtually worthless CDOs, SocGen-New York engaged in a short selling scheme with the Magnetar hedge fund (based in Evanston, Illinois) that allowed SocGen to sell its CDOs to its customers by giving the false appearance that the lowest, riskiest piece of the CDO, the equity tranch, had been sold unconditionally. In fact, Magnetar purchased the equity tranch, but only on the condition that SocGen insure its value through a credit default swap, allowing Magnetar to short it. This allowed SocGen to sell the remaining CDO tranches and enabled Magnetar to make hundreds of millions in profit when the price of the CDO dropped, as both SocGen and Magnetar expected it would.

396.    SocGen-New York was in constant communication with SocGen Paris. SocGen-New York generated and sent P&L cash, trade and sales reports to Paris on a daily basis. These daily

reports were reviewed by SocGen Paris. Paris had a checks and balances system to monitor the reports that came in from New York.

397.    During the Class Period, SocGen Paris was clearly aware of how badly the RMBS and CDO market had deteriorated based on its communications with SocGen-New York. By mid-2007, in response to this deterioration, SocGen executives in Paris implemented several "significant" initiatives in an attempt to remedy the valuation issues with its RMBs and CDO portfolio.

398.    Nevertheless, SocGen's executives represented to analysts in the United States, as well as with other members of the United States financial community on September 10, 2007, that it had only "limited exposure to US mortgage and LBO financing." This blatantly false statement was made at the Lehman Brothers Financial Services Conference in New York by Frederic Oudea, SocGen's current CEO and former CFO during the Class Period.

399.    At the September 10, 2007 Lehman Brothers conference in New York, Oudea represented that SocGen had "[d]irect and indirect exposure to US mortgage assets and loans leading to limited losses in case of severe stress tests." Oudea further stated: "In a scenario of USD 150 bn cumulative losses on subprime mortgage loans for the whole industry, SG CIB estimated loss under EUR ~100 m (for a total cumulative industry loss of USD 200 bn, SG CIB estimated loss under EUR ~200 m)." Oudea's statements at the Lehman conference in New York were false and misleading. At the time Oudea was speaking at the Lehman Brother's conference, Defendants knew, or recklessly disregarded, that SocGen's subprime losses were estimated to far exceed €100 million, or even €200 million.

400.    Because SocGen has a clear affect on U.S. markets and on U.S. investors, SocGen released all of its filings in English on its website, and at every earnings release SocGen provided analysts with packets, written in English, explaining the performance of its business.

401.    SGCIB's New York office was also responsible for implementing SocGen's risk management policies.  The New York office houses one of two "risk division[s]" for SocGen (the other is located in Paris), which is responsible for "analyzing the quality of the group's counterparties and approving the exposure limits allocated to all entities and business lines."  (*See* 2007 Reg. Doc.)

402.    In addition, SocGen's audit committee, which is responsible for implementing SocGen's risk management policies, held several meetings at its New York office during the Class Period.  At these meetings, the audit committee reviewed "principal risks, asset and liability management, internal control and the financial aspects of planned acquisitions."  (*See* 2007 Reg. Doc.)

## B.    SocGen's Additional U.S. Operations

403.    SocGen has been operating in the U.S. since 1938.  During the Class Period, SocGen represented on its website that it "is now one of the largest foreign banking organizations in the U.S. with more than 2,400 professionals working in 13 U.S. cities."  Within the United States, SocGen operates principally through two divisions, SGCIB and SGAM (a division of SGIMS).  SocGen maintains offices and facilities in New York, Chicago, Dallas, Houston, Jersey City, Boston and Los Angeles.  In 2004, SGCIB derived 29% of its income from its U.S. operations.

404.    The SGCIB division has several wholly owned subsidiaries operating in the U.S., including SG Americas Inc., SG Americas Securities, LLC, SG Constellation LLC, and SG Energie (USA) Corp.  Each of these subsidiaries maintains offices at SocGen's New York headquarters, which is located within the District at 1221 Avenue of the Americas, New York, New York.

405.    In addition to SGCIB, SocGen's Global Investment Management and Services division or SGIMS (of which SGAM is a core division), a self-described "international asset manager," also has several wholly owned subsidiaries in the U.S.  For instance, SG Investment

Management Corp and TCW Group, Inc., which is the parent company for Trust Company of the West, a recognized leader in CDO asset management, has offices in Los Angeles, New York and Houston. TCW was acquired by SocGen in 2001 to provide SGAM with a larger U.S. presence and to facilitate the sale of SGAM products in the U.S.

406.    TCW has 700 employees and manages $130.8 billion in assets (as of March 31, 2008). Of the $130.8 billion in assets that TCW manages, $70.5 billion are dedicated to U.S. Fixed Income, of which roughly $56 billion are dedicated to CDOs. TCW specializes in fixed income strategies, specifically MBS and CDOs. TCW's three flagship products are Concentrated Core Equities, Mortgage-Backed Securities and Mezzanine Investing. In 2007, *Total Securitization* named TCW CDO Manager of the Year. TCW also had been named CDO Manager of the Year in 2006 by *Risk Magazine*. In 2007, *Morningstar* named TCW's Chief Investment Officer, Jeffrey Gundlach, Fixed Income Manager of the Year.

407.    Defendant Day who is, and at all relevant times was, a U.S. resident, is, and at all relevant times was, the Chairman of TCW.

408.    Defendant Day reaped more than €175 million in proceeds from his insider sales by selling his SocGen stock ***through U.S. stock exchanges*** in 2006 and 2007. This fraud, perpetrated against investors trading on U.S. exchanges in Los Angeles and New York, allowed Defendant Day to directly profit from the insider knowledge he gained in the U.S. through his position at TCW. Defendant Day utilized insider knowledge, thereby violating his duty both to SocGen shareholders and to investors trading on U.S. markets, when he ***dumped millions of SocGen shares in 2006 and 2007 on U.S. exchanges at artificially inflated prices***.

409.    During the Class Period, SocGen's SGAM division purported to be one of the world's leading asset managers, with €357.7 billion in assets under management as of December 21, 2007.

As of March 31, 2008, its U.S. division employed 750 managers and analysts. SGAM markets itself as "one of the only European asset managers to have a global structure founded on local expertise." SGAM also claims to be "a renowned player in the USA."

410.    Of SGAM's roughly €358 billion in assets under management at December 31, 2007, 27% came from the U.S.

411.    Since its acquisition of TCW, SGAM's management of U.S. assets has increased to €115 billion (as of December 31, 2007). In 2001, only 2% of SGAM's assets under management were from the U.S. and less than 5% of TCW's assets came from outside the U.S. At the end of 2006, however, 31%, or €345 billion in assets managed by SGAM came from the U.S. Since its acquisition by SGAM, TCW's asset base has grown from $86 billion to $144.9 billion. This accounts for approximately 32% of SGAM's total assets.[26] By the end of the Class Period, TCW managed roughly one-third of SGAM's assets.

412.    As part of its acquisition of TCW, SocGen named several SocGen executives to TCW's board, including Defendant Citerne, GIMS's CEO Collas and SGAM's CEO Clot. Likewise, Defendant Day was appointed to SocGen's Board of Directors. During the Class Period, TCW's vice-Chairman Mark I. Stern was appointed to SocGen's Management Committee on June 19, 2007. As a member of the management committee, Stern participated in meetings relating to SocGen's operational efficiency, business strategy, and other issues of general interest to the group.

## XII.    Applicability of Presumption of Reliance: The Fraud-on-the-Market Doctrine

413.    Plaintiffs will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

---

[26]    (*Brawl in the Family*, Europmoney Institutional Investor, Feb. 2007.)

(a)    Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)    The omissions and misrepresentations were material;

(c)    The Company's stock and ADRs traded in efficient markets;

(d)    The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's stock and ADRs; and

(e)    Plaintiffs and other members of the Class purchased SocGen stock and/or ADRs between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

414.    At all relevant times, the markets for SocGen stock and ADRs were efficient for the following reasons, among others:

(a)    As a regulated issuer, SocGen filed periodic public reports; and

(b)    SocGen regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services.

## XIII.    Defendants' Insider Sales During the Class Period

### A.    Defendants' Insider Trading Scheme

415.    The Individual Defendants' insider trading was timed to take advantage of artificially inflated share prices at all-time stock price highs, either during or immediately following very substantial stock re-purchase activity by SocGen and occurring just in time to avoid precipitous drops in share prices.  Individual Defendants made the following sales during the Class Period while they were aware of material adverse facts about SocGen which they knew had not been disclosed to the market:

- 173 -

| Name | Date of Sale | Location | Shares Sold[27] | Price | Proceeds | Percent of Stock Sold |
|---|---|---|---|---|---|---|
| **Didier Alix** | 05/17/2007 | Euronext Paris | 23,171 | € 142.93 | € 3,311,911 | |
| | | | **23,171** | | **€ 3,311,911** | **81.2%** |
| | | | | | | |
| **Daniel Bouton** | 03/17/2006 | Euronext Paris | 92,794 | € 116.23[28] | € 10,785,376 | |
| | 04/12/2006 | Euronext Paris | 13,373 | € 109.53 | € 1,464,845 | |
| | 05/30/2006 | Euronext Paris | 12,906 | € 114.76 | € 1,481,040 | |
| | 06/30/2006 | Euronext Paris | 12,906 | € 106.56 | € 1,375,200 | |
| | 09/29/2006 | Euronext Paris | 21,401 | € 117.57 | € 2,516,092 | |
| | 11/30/2006 | Euronext Paris | 21,259 | € 118.73 | € 2,524,054 | |
| | 12/20/2006 | Euronext Paris | 30,329 | € 119.61 | € 3,627,641 | |
| | 01/12/2007 | Euronext Paris | 10,149 | € 122.90 | € 1,247,350 | |
| | 02/15/2007 | Euronext Paris | 10,149 | € 126.27 | € 1,281,550 | |
| | 03/15/2007 | Euronext Paris | 10,149 | € 114.22 | € 1,159,190 | |
| | 05/16/2007 | Euronext Paris | 10,149 | € 144.20 | € 1,463,475 | |
| | 06/15/2007 | Euronext Paris | 10,149 | € 135.35 | € 1,373,700 | |
| | | | **255,713** | | **€ 30,299,515** | **65.3%** |
| | | | | | | |
| **Philippe Citerne** | 07/03/2006 | Euronext Paris | 93,027 | € 107.12 | € 9,964,801 | |
| | 12/28/2006 | Euronext Paris | 53,516 | € 121.12 | € 6,482,095 | |
| | 12/28/2006 | Euronext Paris | 54,586 | € 121.12 | € 6,611,778 | |
| | | | **201,129** | | **€ 23,058,674** | **81.3%** |
| | | | | | | |
| **Robert Day** | 04/05/2006 | Los Angeles | 3,657 | $140.28 | $512,962 | |
| | 01/04/2007 | New York Stock Exchange | 225,356 | € 123.09 | € 27,739,186 | |
| | 01/11/2007 | New York Stock Exchange | 53,416 | $156.27 | $8,347,181 | |
| | 01/11/2007 | New York Stock Exchange | 1,282 | $156.98 | $201,183 | |
| | 01/09/2008 | Euronext Paris | 961,486 | € 89.18 | € 85,744,964 | |
| | 01/10/2008 | Euronext Paris | 10,683 | € 89.77 | € 959,066 | |
| | 01/10/2008 | Euronext Paris | 96,149 | € 89.77 | € 8,631,595 | |
| | 01/18/2008 | Euronext Paris | 53,416 | € 84.28 | € 4,502,111 | |

---

[27]    Amounts are adjusted for the Company's capital changes via rights issue on 10/26/06 & 3/13/08.

[28]    Share price used is closing price on 3/17/06.