| | 01/18/2008 | Euronext Paris | 480,743 | € 84.28 | € 40,518,995 | |
|---|---|---|---|---|---|---|
| | | | **1,886,187** | | **€ 168,095,917** **– plus –** **$9,061,326** | **53.5%** |
| **Jean Pierre Mustier** | 08/21/2007 | Euronext Paris | | €110.36 | | **50%** |

416.     As set forth in greater detail below, Defendants failed to publicly disclose any detail about their sale of SocGen shares, except for total holdings and number of options exercised, until required to do so by the exchange regulator, the AMF, in March 2006.  Even so, based on the incomplete trading details available, we know that Defendants **sold, at least, during the Class Period over 2.3 million of their shares for at least €225 million.  These massive sales constituted 50% to over 81% of Defendants' individual available holdings** and were timed to take advantage of a huge multi-bullion euro share re-purchase plan that was devised, controlled and executed by Defendants.  Defendants manipulated the timing and amounts of the re-purchases in order to create and support the demand for shares which acted to contribute to the artificial inflation of share prices just as the Individual Defendants were heavily selling their personal shares.  The Individual Defendants' millions of euros of insider selling was often **in addition** to huge salaries and undeserved and inflated bonuses obtained based on manipulated Company financial results.

417.     During the Class Period Defendant Bouton was paid a base salary of €1,000,000, €1,250,000, and €1,250,000 in the years 2005, 2006, 2007, respectively, and obtained performance-linked bonuses of €2,300,000 and €2,180,000 in the years 2005 and 2006, respectively, based on bogus results that grossly **overstated** the quality of earnings and **understated** the huge risks SocGen had to take in order to generate those earnings.  Defendant Citerne was paid a base salary of €600,000, €750,000, and €750,000 in the years 2005, 2006, 2007, respectively, and obtained performance-linked bonuses of €1,270,000 and €1,310,000 in the years 2005 and 2006, respectively. Additionally, in 2006 and 2007, Defendant Bouton received a total of 270,914 stock options and

- 175 -

Defendant Citerne received a total of 156,503 stock options that accounted for millions of dollars in additional compensation.[29]

418.    Defendants Bouton and Citerne received performance-related bonuses for 2005 and 2006 only because of the false financials and *inflated results* that SocGen was reporting during the Class Period, which these two Defendants knew about at the time.  But, even with their inflated multi-million dollar pay and undeserved performance bonus payouts, the appetite for more pay that Defendants Citerne and Bouton had developed remained unsatisfied.  At the expense of Company shareholders and market participants, Defendants caused the Company to embark on a manipulative and well-timed stock buy-back program while simultaneously dumping their own personal Company shares.  The buyback program allowed Individual Defendants to artificially manipulate or influence the stock price of SocGen at key periods of time so that they could unload their personal shares with the help of a corresponding additional boost.

**B.    SocGen's Stock Repurchase Program Was Timed to Boost Share Prices to Support and Benefit Defendants' Sales**

419.    Individual Defendants caused SocGen to engage in a stock buy-back program from 2005 to 2008 that cost shareholders of SocGen nearly *€1 billion*.  The entire rationale for any stock re-purchase plan is that it constitutes the best use – *i.e.* investment – of corporate funds.  However, SocGen's stock buy-back and re-purchase plan was used to prop up the share price in a calculated manner – to facilitate and assist insiders in obtaining the highest price for their personal shares.  In other words, the Individual Defendants were *selling* their personal shares while simultaneously causing the Company to spend hundreds of millions of euros to *re-purchase* shares.  Accordingly,

---

[29]    Defendant Mustier's base salary and performance-linked bonuses are not public record. According to SocGen's registration documents, Mustier received a base salary, a performance-linked bonus, and stock options.

Defendants manipulated and defrauded the market in order to sell their shares at the highest possible price.

420.    From January 1, 2005 to November 23, 2006, Individual Defendants **caused SocGen to re-purchase 8.6 million shares of SocGen Stock for approximately €680,000,000**. By the end of 2005, the share price had reached the record price of approximately €96 per share. Throughout 2005 and until March 21, 2006, Individual Defendants were not required by the French regulator, the AMF, to publicly disclose the details of their stock sales. The new rule requiring public disclosure was to go into effect March 21, 2006. Until that time, Individual Defendants only had to disclose their trades to the AMF.

421.    On March 8, 2006, Individual Defendants caused SocGen to re-purchase over 87,000 shares at approximately €113 per share for a total expenditure of nearly €10 million. **Just days later**, Defendant Bouton, the Chairman and CEO of SocGen, **sold 92,794 SocGen shares** for approximately €116 per share and over €10 million in total proceeds. This was the largest known share sale by Defendant Bouton and it was completed just after the Company made a similarly large re-purchase. Defendant Bouton's huge sale was also completed just days before Defendant Bouton was required to begin publicly disclosing details of his insider trading. This massive sale was timed to take advantage of both the boost and support from the re-purchase by the Company as well as the last chance to conceal the details of a huge trade from shareholders.

422.    From November 13, 2006 to November 17, 2006, Individual Defendants caused SocGen to re-purchase over 1 million Company shares at about €129 per share for total expenditures of approximately €134 million. Within a few trading days, on November 30, 2006, Defendant Bouton sold over 21,000 of his SocGen shares at approximately €118 per share for over €2.5 million in proceeds – his third highest grossing sale of shares that Plaintiffs have been able to identify.

423.    From December 4, 2006 to December 22, 2006, Individual Defendants caused SocGen to re-purchase over 850,000 shares at approximately €124-127 per share for over €106 million of shareholders' cash.  During this same period of time, on December 20, 2006, Defendant Bouton made his second largest known share sale of over 30,000 shares at over €119 per share for over €3.6 million in proceeds.  On December 28, 2006, Defendant Citerne also made his largest known combined sale and sold over 108,000 shares at €121 per share for over €13 million in proceeds.

424.    Incredibly, the Individual Defendants were just getting started.  Within days, the insider selling and SocGen re-purchase program started up again.  From January 15, 2007 to January 19, 2007, the Individual Defendants caused SocGen to re-purchase over 420,000 shares at over €131 per share for total expenditures of €55 million of shareholders' cash.  From January 4, 2007 to January 11, 2007, Defendant Day sold over 280,000 of his shares at approximately €123 per share for total proceeds of over €27.5 million, plus U.S. dollar transactions for proceeds in excess of $8.5 million *all over U.S. exchanges*.  Not to be left out of this next re-purchase, on January 12, 2007, Defendant Bouton also sold over 10,000 of his SocGen shares at over €122 per share for over €1.2 million in proceeds.  All of these sales – from November 2006 to January 2007 – occurred as SocGen reported record results, indicated greater growth potential, and the Individual Defendants were reassuring investors about SocGen's "low exposure to credit risk," which, according to them, justified the huge share re-purchase program.  The entire rationale of the share re-purchase was that SocGen shares were "cheap," and therefore it was the best use of shareholder funds, but Defendants Bouton, Day and Citerne knew these statements were false as they were dumping huge amounts of their own shares at prices near the all-time highs, and almost double what the shares trade at today.

425. From April 2, 2007 to June 29, 2007, SocGen's re-purchase program and Defendants' illegal insider trading continued. During these four weeks, the Individual Defendants caused SocGen to re-purchase *over 805,000 shares at a cost to shareholders of over €114 million*. During this same time, Defendant Bouton made two large sales of his SocGen shares *at the highest price per share of any of his known sales*. On May 16, 2007, Defendant Bouton sold over 10,000 shares at *over* €144 per share for proceeds of over €1.4 million. *Defendant Alix also got in on the action the very next day and sold 23,171 shares for €3,311,900 in a single trade. This represented a sale of over 81% of Defendant Alix's available holdings and was at the top of the Class Period share price*. And on June 15, 2007, Defendant Bouton again sold over 10,000 shares at over €135 per share for proceeds of over €1.3 million.

426. The last share re-purchase occurred later in 2007. From November 1, 2007 to November 30, 2007, the middle of 4Q07, the Individual Defendants caused SocGen to re-purchase *over 580,000 shares at a total cost of nearly €60 million*. Within a few weeks, Defendant Day engaged in the largest insider selling of any Defendant. From *January 9, 2008 to January 18, 2008, at the same time SocGen purported to discover Kerviel's trades, Defendant Day sold over 1.6 million shares for over €140 million in proceeds*. The huge purchases of shares by SocGen, and the timing of those purchases, acted to artificially create demand for SocGen shares and boost the share price during periods of time when Defendants engaged in massive amounts of illegal insider trading and sold a majority of their available share holdings to profit from their scheme.

## C. Defendant Day's Insider Trading

427. During the Class Period, while in possession of material, adverse undisclosed information about the Company, SocGen Director, and TCW founder and Chairman, Defendant Day, *sold at a minimum over 1.8 million shares of his SocGen stock at inflated prices, for a staggering €168,095,917 plus $9,061,326 USD in illegal insider trading proceeds*, and 204,577

units of "Other Financial Instruments" related to SocGen securities for about €223,754 in additional illegal insider trading proceeds. Of this massive amount, *€140,356,731 were sold just after SocGen admits that abnormal trading risks were detected and the process that led to the unwinding of Kerviel's positions began*.

428.    Defendant Day's sales were highly unusual in their amount and timing. In fact, Defendant Day completed his sales just days before the devastating public disclosure of *SocGen's subprime losses caused the stock price to drop over 23%*. These were the largest known sales Defendant Day ever completed – and dwarfing all others as indicated in the chart below:



429.    On January 28, 2008, the UK's *Times Online* discussed Defendant Day's massive end of Class Period sales (and underestimated the total that Defendant Day actually gained by over

- 180 -

€40 million) in an article entitled: "*SocGen director offloaded €100m worth of shares; Jerome Kerviel is charged as it emerged that Robert Day sold nearly €100m in shares eight days before the scandal erupted*":

> Mr. Day, 65, is the founder of TCW, a Los Angeles investment company which is a subsidiary of Société Générale's asset management group.  TCW, based in Los Angeles, has a portfolio of $66 billion in collateralized debt obligations (CDOs) of which $52 billion are under management for Société Générale Asset Management. CDOs are complex financial instruments which are often backed by sub-prime mortgage debt.  Société Générale revealed last week it has €4.9 billion in CDOs backed by US sub-prime mortgage debt.

430.    The Company's 2008 Registration document identifies Defendant Day as Chairman and CEO of SocGen's U.S. subsidiary TCW, and one of the "directors [that] carry out functions within the group."  Defendant Day took advantage of material non-public information, including SocGen's imminent massive writedowns related to its subprime exposure, as well as the Company's exposure to massive unhedged, directional trades by Kerviel, by selling over 1.6 million shares, *over 49.44% of his holdings* for over €140 million in the month of January 2008 alone.

431.    The timing of Defendant Day's end of Class Period sales were highly suspicious, as they took place at the same time management was discerning Kerviel's positions and just before the Company's planned Monday announcement of a massive increase of subprime writedowns. Specifically:

(a)    After unloading over 1 million shares over the course of just two days, January 9 and 10, 2008, Defendant Day then sold over 500,000 more shares on Friday, January 18, *several days after SocGen admits that abnormal trading risks were detected that resulted in additional controls being put into place which started the process that led to the unwinding of Kerviel's positions*;

(b)    All of Defendant Day's January 2008 trades took place at share prices between €84 and €90. SocGen's shares closed on January 24, 2008, after the €7 billion writedown disclosure, at €75.81, it quickly collapsed further to €71.05 per share;

(c)    On January 17, 2008, SocGen's stock traded on volume of 4,361,876 shares on the Euronext Paris. On January 18, 2008, the day that SocGen management admits that it was made aware of Kerviel's position, but still prior to any public disclosure, SocGen's trading volume jumped to 11,578,779 shares. Yet still, Defendant Day's trades on January 18, 2008 *made up close to 5% of all trading in the Company's stock on that high volume day*, a day when Kerviel's perilous positions were made aware to only a select few;

(d)    SocGen's official statement that these trades were made during a "window of time where such trades were permitted under Societe Generale's trading policies for directors[,]" is highly misleading since its directors' trading window was apparently open on Friday, January 18, 2008, when a press conference to announce subprime writedowns was scheduled for Monday, January 21, 2008. The Monday press conference was postponed until after Kerviel's positions could be unwound; and

(e)    Further, a meeting of the Board of Directors Audit Committee was scheduled in advance and set for that Sunday January 20, 2008, just prior to the Board of Directors meeting which Defendant Day would attend, to specifically discuss the writedowns related to U.S. residential mortgage assets, in particular Mezzanine CDOs.

432.    In addition, of Defendant Day's minimum 1,886,187 Class Period shares sold, a significant portion of these fraudulent trades were performed over U.S. exchanges. Defendant Day's illicit insider trades in 2006 and 2007 were reportedly accomplished in Los Angeles and over the New York Stock Exchange, and total 283,711 shares of SocGen common stock for gross proceeds of

€27,739,186, plus an additional $9,061,326 USD. While Defendant Day's massive trades in January 2008 tend to overshadow his prior sales in 2006 and 2007, these earlier sales still amount to an extraordinary number of shares dumped and proceeds gained, all while in possession of material, adverse, inside information and ***all completed over U.S. exchanges***. Also, Defendant Day's U.S. trading activities in January 2007 coincided with the Company's stock re-purchase program. From January 15, 2007 to January 19, 2007, the Individual Defendants caused SocGen to re-purchase ***over 420,000 shares at over €131 per share for total expenditures of €55 million of shareholders' cash***. From January 4, 2007 to January 11, 2007, Defendant Day sold over 280,000 of his shares at approximately ***€123 per share for total proceeds of over €27.5 million plus U.S. dollar transactions for proceeds in excess of $8.5 million***.

433.    ***The total Class Period insider trading proceeds realized by Defendant Day of €168,095,917, plus $9,285,079 USD, was enormous and represented his dumping of over 53% of his available SocGen holdings during the Class Period***.

434.    Given that the huge amounts and opportunistic timing of these sales is highly suspicious, both the U.S. Attorney for the Eastern District of New York and the SEC are investigating Defendant Day's January 2008 trading activities.

### D.    Defendant Bouton's Insider Trading

435.    During the Class Period, while he was in possession of material, adverse, non-public information, Defendant Bouton sold at least ***255,713 shares*** of SocGen stock for illegal insider trading proceeds of ***€30,299,515***. ***Defendant Bouton sold over 65% of his available SocGen holdings during the Class Period***. These are sales by the Chairman and CEO of the Company – over 65% of his holdings – during a time when he had devised and executed a €1 billion stock re-purchase program that, in effect, told shareholders the stock price was cheap and under-valued. Defendant Bouton's trading is set forth below:



**Société Générale**
Daniel Bouton - Insider Sales
July 1, 2005 to February 29, 2008

436.    Defendant Bouton's sales throughout the Class Period were suspicious in both timing and amount, especially when compared to Defendant Bouton's positive statements to the market while he was dumping his own personal shares.  Defendant Bouton unloaded millions of euros worth of shares at near all-time historic highs for SocGen stock throughout the Class Period, all while making positive public statements regarding the Company's risk control procedures and exposure to the subprime market.  Indeed, Defendant Bouton completely misrepresented the effect that the subprime meltdown was having on SocGen's highly exposed Mezzanine grade CDOs and other subprime investments.  Defendant Bouton's final two trades came as SocGen's stock price peaked in May and June 2007, just as he downplayed the threat that the subprime crisis posed to the Company.

437.    In addition to the sales that Defendant Bouton reported to the AMF which were subsequently posted on the AMF's website, Defendant Bouton exercised two batches of options and

then immediately sold on March 17, 2006.  This sale came after the AMF order of March 9, 2006 which required that certain insider's sales be publicly reported on the AMF website, **but just days before this order was officially published and took effect on March 21, 2006.**  As vividly shown by the above chart, Defendant Bouton's well-timed sale away from the public eye **is by far the single largest sale Defendant Bouton makes during the entire Class Period, and before Defendant Bouton was required to publicly disclose the details of the sale, including that he was able to sell 92,794 shares at a then all-time stock price high of €116 per share for proceeds in excess of €10.7 million**.

438.    The timing of Bouton's massive sale, **after** the AMF March 9, 2006 order but **prior to** the official publication of the AMF order on March 21, 2006, contradicts the so-called ethical reform that Bouton himself advocated in the highly publicized September 23, 2002 report, "Promoting Better Corporate Governance In Listed Companies" or more commonly referred to as, simply, the Bouton Report on Corporate Governance.  A *Dow Jones* article observed:

> Amid the criticism, big business is trying to salvage what it can. The new Bouton report on corporate governance issues - put together last month by the chairman of one of France's biggest banks and signed by nine other chief executives or chairmen of other large French companies – advocates cautious reform . . . . **The Bouton report admits there is a need for reform but puts the emphasis on self-discipline in the boardroom rather than new laws. "It's the way we behave, individually and collectively, that is the best way of bringing about an improvement in corporate governance," says the report** . . . French businessmen point out that Enron and WorldCom happened in a highly regulated environment in the U.S. They also warn of the danger of knee-jerk legislation and allowing the U.S. to effectively set the rules for corporate governance along the lines of the recent Sarbanes-Oxley Act, which tightens up accounting governance and disclosure rules."

(*French Business Fights Rearguard Action Over Co Reform*, Dow Jones International News, Oct. 7, 2002.)

439.    As the CEO and Chairman of the Company, Defendant Bouton was responsible for the strategic vision of SocGen, including the development and implementation of the Company's

risk control management procedures.  Defendant Bouton's position as Chairman and CEO placed

him in a position to access any and all Company information at his request, especially as the wave of

news related to the subprime market, and related investments, spread throughout the financial world

starting as early as 2005.  Defendant Bouton used the Company-specific knowledge that he gained

through his position as Chairman and CEO, and within TCW along with Defendants Citerne and

Day, to dump 65% of his available shares throughout the Class Period for over €30 million in

proceeds.

440.    Finally, the insider trading proceeds realized by Defendant Bouton of over

€30 million was many times greater than his salary and provided him a huge incentive to drive the

SocGen share price up in order to obtain maximum prices for the sales of his shares.

### E.    Defendant Mustier's Insider Trading

441.    During the Class Period, while in possession of material, adverse undisclosed

information about the Company, SGCIB's CEO Defendant Mustier sold 50% of his SocGen stock

on August 21, 2007 at inflated prices.  During the Class Period, Defendant Mustier was not required

to publicly disclose any of his sales of SocGen securities or the amount of SocGen securities he held

during the Class Period.  Thus, the total number of shares sold by Mustier on August 21, 2007 is

uncertain, as is the total amount of Mustier's sales; however, Mustier has admitted that he sold 50%

of his holdings of SocGen securities on August 21, 2007.  French media has reported that Mustier's

profit (as opposed to proceeds) from the sale of SocGen stock is upwards of €200,000.

442.    As identified in the chart below, Mustier's massive insider selling was timed to

maximize Mustier's profit from his sales since SocGen stock continued to trade close to its stock

price highs when Mustier sold his shares:

**Société Générale**
Jean-Pierre Mustier - Insider Sales
July 1, 2005 to February 29, 2008

443.    Mustier sold 50% of his SocGen stock in a single day of trading, a mere 2-1/2 weeks after SocGen told investors that it "has low exposure to the current credit market crisis" and only several weeks before Defendant Bouton told the *Le Figaro* newspaper that SocGen had marginal exposure to the subprime market.

444.    The timing of Mustier's sale of his SocGen shares on August 21, 2007 in relation to key events that took place or were taking place at SocGen-New York is also highly suspicious. Mustier's sale coincided or followed, among other events, the closure of the SGCIB's CMBS Group in New York, the closure of the New York based CDO Group, SocGen-New York's decision to stop using the ABX index to assess the performance of its RMBS portfolio, the slashing of SocGen-New York's IT budget by 20%, the inability of SocGen-New York to unload or sell any of its remaining

CDOs and RMBS because the market for these products had completely dried up, and the decision to switch from mark-to-market to mark-to-model to determine the value of SocGen's CDO and RMBS assets.

445.    The peculiar factual circumstances surrounding Mustier's sale of 50% of his holdings of SocGen shares further evidences the suspicious nature and timing of Mustier's sales. On August, 21, 2007, while on vacation in Scotland, Defendant Mustier decided to cut his vacation short so that he could rush back to Paris to order his stock portfolio manager to liquidate half of his holdings of SocGen stock.   According to the AMF, Mustier acted in this suspicious manner because he knew that SocGen's stock value was about to crash due to its subprime exposure.

446.    During the Class Period, Defendant Mustier was the acting CEO of SGCIB, SocGen's corporate and investment banking division – the epicenter of the Kerviel Fraud and the Subprime Fraud. Defendant Mustier's position as CEO of SGCIB placed him in a unique position to access any and all Company information at his request. As the CEO of SGCIB, Defendant Mustier was responsible for the strategic vision of SGCIB.  As alleged herein, it was Mustier who masterminded SocGen's TGV Initiative that created the CDO Group in New York responsible for the origination and underwriting of CDOs and RMBS – the same CDOs and RMBS which would eventually be sold and held by SocGen, and could not unload throughout 2007.  Moreover, it was Mustier who visited SGCIB's New York office once a month to meet with the head of FICC Americas Paolo Tadonio.

447.    Given the suspicious nature and huge amount and opportunistic timing of Mustier's sales, the AMF, on August 6, 2009, initiated insider trading proceedings against Defendant Mustier regarding his August 21, 2007 sales of SocGen shares.

**F.    Defendant Citerne's Insider Trading**

448.    During the Class Period, while in possession of material, adverse, undisclosed information about the Company, Director and Co-CEO Defendant Citerne sold at least 201,129

shares of his SocGen common stock for €23,058,674 in illegal trading proceeds and 40,244 units of "Other Financial Instruments" related to SocGen securities for €33,678 in illegal trading proceeds. Defendant Citerne's massive unloading of SocGen common stock resulted in him selling *81% of his available holdings during the Class Period*. As shown below, Defendant Citerne's massive insider selling was highly unusual and timed to take advantage of the near-all-time stock price highs:



Société Générale
Philippe Citerne - Insider Sales
July 1, 2005 to February 29, 2008

449.    As discussed above, Defendant Citerne's unique position within SocGen gave him a high level of access into the specific areas of the Company that would result in the accumulation of huge risks and the end of Class Period writedowns. Not only was Defendant Citerne a Director and Co-CEO of SocGen, as well as a director of Defendant Day's SocGen U.S. subsidiary TCW, he also chaired the Company's CCCI, which met on a quarterly basis and was attended by the Corporate

Secretary, the Head of Risk Management, the Chief Financial Officer, the Chief Information Officer and the Head of Group Internal Audit, all of whom are responsible for the implementation and monitoring of SocGen's risk control management systems.

450.    With the level of insight that Defendant Citerne had into the two key problematic areas for the Company, risk control and subprime exposure, the timing of Defendant Citerne's known Class Period sales is highly suspicious.  In a single day of trading, just three days before the end of FY2006, Defendant Citerne sold 108,102 shares.  ***This one day of trading by Defendant Citerne resulted in illegal trading proceeds of over €13,093,873*** and came when executives and analysts within TCW, the CDO experts and SocGen's U.S. subsidiary at which Defendants Citerne and Day were directors, knew of the significant and substantial increase in risk in the subprime market – and therefore risk to SocGen's subprime-related holdings, including its RMBS and CDO portfolio, and business model – due to significant increases in the default rates on subprime mortgages.  Armed with such knowledge gained from his position at TCW, combined with his non-public knowledge of SocGen's heightened exposure to its subprime portfolio, including the Company's portfolio of Mezzanine CDOs and other structured finance instruments, Defendant Citerne sold big, ***€13,093,873*** in a single day, and again, like Bouton's sales, in direct violation of SocGen's Director's Charter which banned such short swing sales.

451.    On top of all this, as discussed more fully below, from December 4, 2006 to December 22, 2006, Individual Defendants caused SocGen to re-purchase ***over 850,000 shares at approximately €124-127 per share for over €106 million of shareholders' cash, thus inflating SocGen's share price even more just prior to Defendant Citerne's huge end of December payday.*** While Company funds were put to use buying the supposedly under-valued shares of SocGen,

Defendant Citerne was unloading his personal stake within the Company at near all-time-high share prices.

452.    Defendant Citerne, unfortunately, was not the only executive bailing out and selling his SocGen shares.  Defendant Bouton's second largest Class Period sale occurred just one week before Defendant Citerne's largest sales, and to top it all off, ***Defendant Day then unloaded €27,739,186, plus an additional $8,548,364 USD, in his own shares over the two weeks after Defendant Citerne's December 28, 2006 trades***.  All of this trading by TCW directors in the same three-week period directly corresponds to the Company's stock buyback program and to TCW's knowledge of the rapidly deteriorating condition of the U.S. real estate market and the resulting meltdown that subprime lending and securitization would cause for SocGen's subprime-related investments, including its RMBS and CDO portfolio.

453.    Finally, Defendant Citerne's minimum insider trading proceeds of over €23 million was a huge multiple over his 2006 and 2007 salary of €750,000, with these sales timed to take maximum advantage of the near all-time high in the price of SocGen shares.

### G.    Defendant Alix's Insider Trading

454.    During the Class Period, while in possession of material, adverse, undisclosed information about the Company, Co-CEO Defendant Alix sold at least 23,171 shares of his SocGen common stock for €3,311,911 in illegal insider trading proceeds and 3,516 units of "Other Financial Instruments" related to SocGen for an additional €151,117 in illegal insider trading proceeds. Defendant Alix's securities sales during the Class Period were suspicious in both timing and amount.

455.    Defendant Alix's two sales were accomplished in less than nine months after Defendant Alix was appointed Co-CEO and soon after he learned of the significant and substantial increase in risk in the RMBS and CDO markets and SocGen's exposure thereto through its undisclosed heavy involvement in Mezzanine grade CDOs and other mortgage-linked securities.

These Mezzanine CDOs were highly susceptible, drastically more so than most CDOs, to this increase in risk related to RMBS. Defendant Alix, like Defendant Citerne, sold an unbelievable 81% of his available holdings of SocGen shares during the Class Period. In fact, as shown below, Defendant Alix sold his SocGen shares at peak prices – at almost three times the price of SocGen shares after the truth of SocGen's risk exposure was uncovered:



**Société Générale**
Dider Alix - Insider Sales
July 1, 2005 to February 29, 2008

Class Period: 8/1/05 - 1/23/08

**Class Period Sales:**
Shares Sold:        23,171
Proceeds:        €3,311,911
Percentage
of Shares Sold:        81.2%

456.    The timing of Defendant Alix's single known Class Period SocGen common stock sale on May 17, 2007 is highly suspicious. This single sale of common stock for proceeds of €3,311,911 came just 9 trading days after the Company's stock price reached its all-time high closing price of €158.42. Also, as previously discussed, this sale took place right in the middle of the April 2, 2007 to June 29, 2007, SocGen stock re-purchase program. This extremely well timed dumping of *81% of his available stock holdings came less than nine months after Defendant Alix*

- 192 -

*entered his new role as Co-CEO of SocGen*. In addition, Defendant Alix's insider trading proceeds of over €3,311,911 was a high multiple relative to his 2007 salary of €500,000.

## XIV.  Loss Causation/Economic Loss

457.  On January 24, 2008, SocGen revealed that its risk control management process was so lax that 31 year-old junior trader Jerome Kerviel had been able to take massive unhedged equity positions on various European indices totaling €50 billion – exceeding SocGen's market capitalization and causing SocGen to book a €4.9 billion loss to pre-tax income once those equity positions were unwound. At the same time SocGen chose to announce €2.05 billion of further writedowns, including a €1.1 billion writedown on its RMBS and CDO portfolio – confirming market rumors only days earlier that significant additional writedowns were indeed necessary.

458.  When the truth concerning SocGen's lack of risk control management system and RMBS and CDO writedowns entered the market and became apparent to investors, SocGen's stock fell precipitously as the prior artificial inflation came out of SocGen's stock price. As a result of their purchases of SocGen stock artificially inflated prices during the Class Period, Plaintiffs and other members of the Class suffered economic loss, *i.e.*, damages under the federal securities laws, as the truth was disclosed on and around January 24, 2008.

459.  By misrepresenting the Company's financial results, its risk control management system and the value of its RMBS and CDO portfolio, including the need to write down further significant amounts of its RMBS and CDO portfolio, Defendants presented a misleading picture of SocGen's business risks and internal controls. Thus, instead of truthfully disclosing during the Class Period that SocGen lacked the necessary internal controls to adequately prevent misconduct and manage its trading risks and that its RMBS and CDO portfolio was overvalued in excess of €1 billion, Defendants caused SocGen to falsely report its financial results and made false and

misleading statements about SocGen's financial condition, including the strength of its risk control management system and the value of its RMBS and CDO portfolio.

460.    These false and misleading statements caused and maintained the artificial inflation in SocGen's stock price throughout the Class Period, until the truth was revealed to the market. Defendants' false and misleading statements had the intended effect and caused SocGen stock to trade at artificially inflated levels – reaching a high of €148.29 per share on May 4, 2007.

461.    On January 18 though January 21, 2008, SocGen's stock price dropped 16% from €93 to €78.52 as information began leaking into the market that SocGen had failed to fully write down its RMBS and CDO portfolio to accurately reflect its true value.  The price drop on January 18 through January 21, 2008 was statistically significant, *i.e.*, not explained by movements in the market as a whole, and the direct result of the leakage of information into the market that SocGen's RMBS and CDO portfolio was significantly overvalued.  As explained by one analyst, the 16% drop in share price during these few days was consistent with a drop in 2007 net profit ***if SocGen were to write down its RMBS and CDO portfolio €1.3 billion***.

462.    Similarly, as a result of SocGen's January 24, 2008 disclosure, SocGen's stock dropped from €79.08 to €75.81 on January 24, 2008, or €3.27 per share, on heavy volume of over 26 million shares.  This price decline was statistically significant.  SocGen's ADR shares in the U.S. similarly lost value as a result of these revelations.

463.    In sum, as the truth was revealed, initially through the leakage of information concerning further subprime writedowns and later upon the Company's disclosure of the Kerviel-related loss and confirmation of additional subprime writedowns, the Company's stock price plummeted, the artificial inflation came out of the stock and Plaintiffs and other members of the Class were damaged.

464.    The timing and magnitude of SocGen's stock price declines negate any inference that the loss suffered by Plaintiffs and other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the Defendants' fraudulent conduct.  The economic loss, *i.e.*, damages, suffered by Plaintiffs and other members of the Class was a direct result of Defendants' fraudulent scheme to artificially inflate SocGen's stock price and the subsequent significant decline in the value of SocGen's stock when the truth was revealed to the market.

## XV.    No Safe Harbor

465.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements plead in this Complaint.  Many of the statements pleaded herein were not specifically identified as "forward-looking statements" when made, and many were representations about the Company's present status.  To the extent there were any forward-looking statements: (a) there were no meaningful cautionary statements identifying the important then-present factors that could cause actual results to differ materially from those in the purportedly forward-looking statements; and (b) the particular speakers of such forward-looking statements knew that the particular statements were false or misleading, and/or the forward-looking statements were authorized and/or approved by an executive officer of the Company who knew that those statements were false when made.

466.    Any purported warnings contained in the press releases and statements quoted herein were generic and unparticularized boilerplate statements of risks, and thus lacked the meaningful cautionary language necessary to insulate any purportedly forward-looking statements.

## XVI.    Class Action Allegations

467.    Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased SocGen ADRs and other securities on the

open market during the Class Period and who suffered damages as a result of their purchases (the "Class"). Excluded from the Class are (1) the Company and the Individual Defendants; (2) members of the immediate family of each of the Individual Defendants; (3) the subsidiaries or affiliates of the Company; (4) any person or entity who is, or was during the Class Period, a partner, officer, director, employee or controlling person of the Company; (5) any entity in which any of the Defendants has a controlling interest; and (6) the legal representatives, heirs, successors or assigns of any of the excluded persons or entities specified in this paragraph.

468.    The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are, at minimum, thousands of members of the Class who purchased SocGen securities during the Class Period. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. During the Class Period, SocGen had more than 500 million shares of stock outstanding, owned by thousands of persons.

469.    There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions solely affecting individual Class members include:

- Whether Defendants violated the 1934 Act as alleged herein;

- Whether Defendants omitted and/or misrepresented material facts;

- Whether Defendants knew or recklessly disregarded that their statements were false and misleading;

- Whether the price of SocGen's securities during the Class Period was artificially inflated due to non-disclosures and/or misrepresentations complained of herein; and

- The extent of damage sustained by Class members and the appropriate measure of damages.

- 196 -

470.    Plaintiffs' claims are typical of the claims of the members of the Class as Plaintiffs and members of the Class sustained damages arising out of Defendants' wrongful conduct in violation of federal law as complained of herein.

471.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class actions and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the other Class members.

472.    A class action is superior to other available methods for the fair and efficient adjudication of the controversy since joinder of all members of the Class is impracticable. Furthermore, because the damages suffered by the individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for the Class members individually to redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## XVII.  First Claim for Relief

### For Violation of §10(b) of the 1934 Act and Rule 10b-5
### Against All Defendants

473.    Plaintiffs repeat and reallege ¶¶1-472.

474.    Each of the Defendants is liable for making false and misleading statements, or failing to disclose material adverse facts and acting directly or indirectly as a participant in a scheme and/or course of business which: (i) deceived the investing public regarding SocGen, its business, finances and prospects; (ii) artificially inflated the price of SocGen ADRs and other securities during the Class Period; (iii) caused Class members to purchase SocGen stock at inflated prices; and (iv) permitted Defendants to sell shares of SocGen stock at inflated prices.

475.    Defendants' direct participation included preparing and/or reviewing SocGen's false and/or misleading public filings and/or press releases, and knowingly or recklessly giving false

information to securities analysts, money and portfolio managers and institutional investors in conference calls and other presentations.

476.    Despite their knowledge of SocGen's false and misleading statements, Defendants failed, throughout the Class Period, to disclose material adverse facts about the financial condition and business prospects of SocGen, which caused the Company's filings, press releases and other public statements issued during the Class Period to be materially false and misleading for the reasons set forth herein.  The Defendants directly and indirectly, knowingly or recklessly engaged and participated in a fraudulent scheme and course of conduct to conceal adverse material information about the business, finances, financial condition operations and future business prospects of SocGen.

477.    As a result of the above described acts of the Defendants, they have violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that they (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made in light of the circumstances under which they were made not misleading; or (c) engaged in acts, practices and a course of business which operated as a fraud or deceit upon Plaintiffs and the other members of the Class in connection with their purchases of SocGen stock.

478.    Plaintiffs and the other members of the Class, at the time of the misrepresentations and omissions, did not know that these statements were false and misleading and believed them to be true.  In reliance upon the integrity of the market, Plaintiffs and the other Class members were damaged as they paid artificially inflated prices for SocGen ADRs and other securities.  Had Plaintiffs and the other members of the Class known the truth, they would not have bought their ADRs and other securities at the prices they paid.

479.    The market for SocGen securities was open, well-developed and efficient at all relevant times. Defendants' misrepresentations and misleading omissions were the reason for the loss suffered by Plaintiffs and the other Class members.

## XVIII. Second Claim for Relief

### For Violations of §10(b) of the 1934 Act and Rule 10b-5
### Against the Individual Defendants

480.    Plaintiffs repeat and reallege ¶¶1-472.

481.    During the Class Period, each Individual Defendant occupied a position that made him privy to non-public information concerning SocGen. Because of this access, each of the Individual Defendants knew that the adverse facts specified herein were being concealed and that false and misleading statements were being made. Notwithstanding their duty to refrain from selling SocGen stock while in the possession of material, non-public information concerning SocGen, the Individual Defendants sold over 2.3 million shares of the Company's stock, profiting from their fraudulent scheme. The Individual Defendants made the following sales during the Class Period, while they were aware of adverse facts about SocGen that they knew had not been disclosed to the market:

**Societe Generale (SOCGEN)**
Insider Sales: 4/12/06-1/24/08
Amounts are adjusted for the Company's capital changes via rights issue on 10/26/06 & 3/13/08

**Ordinary Shares**

| Name | Date of Sale | Location | Shares Sold | Share Price | Proceeds |
|------|-------------|----------|-------------|-------------|----------|
| **Didier Alix** | 5/17/2007 | Euronext Paris | 23,171 | € 142.93 | € 3,311,911 |
| | | | **23,171** | | **€ 3,311,911** |
| **Daniel Bouton** | 3/17/2006 | Estimate: used closing price | 92,794 | € 116.23 | € 10,785,376 |
| | 4/12/2006 | Euronext Paris | 13,373 | € 109.53 | € 1,464,845 |

- 199 -

| | | | | | |
|---|---|---|---|---|---|
| | 5/30/2006 | Euronext Paris | 12,906 | € 114.76 | € 1,481,040 |
| | 6/30/2006 | Euronext Paris | 12,906 | € 106.56 | € 1,375,200 |
| | 9/29/2006 | Euronext Paris | 21,401 | € 117.57 | € 2,516,092 |
| | 11/30/2006 | Euronext Paris | 21,259 | € 118.73 | € 2,524,054 |
| | 12/20/2006 | Euronext Paris | 30,329 | € 119.61 | € 3,627,641 |
| | 1/12/2007 | Euronext Paris | 10,149 | € 122.90 | € 1,247,350 |
| | 2/15/2007 | Euronext Paris | 10,149 | € 126.27 | € 1,281,550 |
| | 3/15/2007 | Euronext Paris | 10,149 | € 114.22 | € 1,159,190 |
| | 5/16/2007 | Euronext Paris | 10,149 | € 144.20 | € 1,463,475 |
| | 6/15/2007 | Euronext Paris | 10,149 | € 135.35 | € 1,373,700 |
| | | | **255,713** | | **€ 30,299,515** |
| **Philippe Citerne** | 7/3/2006 | Euronext Paris | 93,027 | € 107.12 | € 9,964,801 |
| | 12/28/2006 | Euronext Paris | 53,516 | € 121.12 | € 6,482,095 |
| | 12/28/2006 | Euronext Paris | 54,586 | € 121.12 | € 6,611,778 |
| | | | **201,129** | | **€ 23,058,674** |
| **Robert Day** | 4/5/2006 | Los Angeles | 3,657 | $140.28 | $512,962 |
| | 1/4/2007 | New York Stock Exchange | 225,356 | € 123.09 | € 27,739,186 |
| | 1/11/2007 | New York Stock Exchange | 53,416 | $156.27 | $8,347,181 |
| | 1/11/2007 | New York Stock Exchange | 1,282 | $156.98 | $201,183 |
| | 1/18/2008 | Euronext Paris | 480,743 | € 84.28 | € 40,518,995 |
| | 1/10/2008 | Euronext Paris | 10,683 | € 89.77 | € 959,066 |
| | 1/10/2008 | Euronext Paris | 96,149 | € 89.77 | € 8,631,595 |
| | 1/9/2008 | Euronext Paris | 961,486 | € 89.18 | € 85,744,964 |
| | 1/18/2008 | Euronext Paris | 53,416 | € 84.28 | € 4,502,111 |
| | | | **1,886,187** | | **€ 168,095,917** |
| | | | | | **$9,061,326** |
| **Jean-Pierre Mustier** | 8/21/2007 | Euronext Paris | | €110.36[30] | |

**Other Securities**

| Name | Date of Sale | Location | Securities Sold | Unit Price | Proceeds |
|---|---|---|---|---|---|
| **Didier Alix** | 10/9/2006 | Euronext Paris | 3,516 | € 42.98 | € 151,117 |
| | | | **3,516** | | **€ 151,117** |

---

[30]    Share price used is closing price on 8/21/2007.

| | | | | | |
|---|---|---|---|---|---|
| **Philippe Citerne** | 10/9/2006 | Euronext Paris | 40,244 | € 0.84 | € 33,678 |
| | | | **40,244** | | **€ 33,678** |
| | | | | | |
| **Robert Day** | 10/5/2006 | New York Stock Exchange | 7,824 | $1.11 | $8,699 |
| | 10/6/2006 | New York Stock Exchange | 136,798 | $1.09 | $149,244 |
| | 10/10/2006 | New York Stock Exchange | 59,955 | $1.10 | $65,811 |
| | | | **204,577** | | **$223,754** |

482.     The Individual Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they, directly or indirectly:

(a)     employed devices, schemes and artifices to defraud;

(b)     engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of SocGen securities during the Class Period; and

(c)     traded SocGen shares while in possession of material, non-public information.

## XIX.    Third Claim for Relief

### For Violation of §20(a) of the 1934 Act
### Against All Defendants

483.     Plaintiffs repeat and reallege ¶¶1-472.

484.     Defendants acted as controlling persons of SocGen within the meaning of §20(a) of the Exchange Act, 15 U.S.C. §78t(a), as alleged herein.  By virtue of their positions as officers, directors or controlling shareholders of SocGen, their high-level positions, and participation in and/or awareness of the Company's operations, Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiffs contend are false and misleading.  Defendants were provided with or had unlimited access to copies of the Company's

reports, press releases, public filings and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

485.    In particular, each of the Individual Defendants had direct involvement or intimate knowledge of the day-to-day operations of the Company during the Class Period.  Therefore, each is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.  SocGen controlled the Individual Defendants and all of its employees.

486.    By reason of such wrongful conduct, Defendants are liable pursuant to §20(a) of the 1934 Act.  As a direct and proximate result of the wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's stock during the Class Period.

## XX.    Fourth Claim for Relief

### For Violation of §20A of the 1934 Act
### Against the Individual Defendants Bouton, Day and Mustier

487.    Plaintiffs repeat and reallege ¶¶1-472.

488.    During the Class Period, each Individual Defendant occupied a position that made him privy to non-public information concerning SocGen.  Because of this access, each of the Individual Defendants knew that the adverse facts specified herein were being concealed and that false and misleading statements were being made.  Notwithstanding their duty to refrain from trading in SocGen stock while in the possession of material, non-public information concerning SocGen, the Individual Defendants sold over 2.3 million shares of the Company's stock, profiting from their fraudulent scheme while Plaintiffs purchased contemporaneously.  Plaintiffs identified in the

following table purchased shares contemporaneously with Individual Defendants Bouton's and

Day's stock sales on the following dates:

| Name | Date of Sale | Plaintiffs Making Contemporaneous Purchases | Units Sold | Proceeds |
|------|--------------|---------------------------------------------|------------|----------|
| **Bouton** | 4/12/2006 | Avon | 13,373 | €1,464,845.00 |
| | 1/12/2007 | Boilermakers | 10,149 | €1,247,350.00 |
| | 3/15/2007 | Vermont | 10,149 | €1,159,190.00 |
| | 6/15/2007 | UFCW 880 Funds | 10,149 | €1,373,700.00 |
| **BOUTON SUB-TOTAL:** | | | **43,820** | **€5,245,085.00** |
| **Day** | 4/5/2006 | Avon | 3657 | $512,962.08 |
| | 1/4/2007 | Boilermakers | 225,356 | €27,739,186.00 |
| | 1/11/2007 | Boilermakers | 53,416 | $8,347,181.00 |
| | 1/11/2007 | Boilermakers | 1282 | $201,182.52 |
| | 1/18/2008 | Vermont | 534,159 | €45,021,106.00 |
| **DAY SUB-TOTAL:** | | | **817,870** | **€72,760,292.00 –plus– $9,061,325.60** |
| **Mustier** | 8/21/2007 | Vermont | | |
| | 8/21/2007 | Boilermakers | | |
| **MUSTIER SUB-TOTAL** | | | | |
| **GRAND TOTAL OF DEFENDANTS BOUTON'S AND DAY'S CONTEMPORANEOUS SALES:[31]** | | | | **€78,005,377.00 –plus– $9,061,325.60** |

489.    Plaintiffs and all other members of the Class who purchased shares of SocGen

securities contemporaneously with the sales of SocGen securities by the Individual Defendants:

(1) have suffered substantial damages in that they paid artificially inflated prices for SocGen

---

[31]    The figures do not include the units sold or proceeds made by Defendant Mustier.

securities as a result of the violations of §10(b) and Rule 10b-5 herein described; and (2) would not have purchased SocGen securities at the prices they paid, or at all, if they had been aware that the market prices had been artificially inflated by Defendants' false and misleading statements.

## XXI.  Prayer

WHEREFORE, Plaintiffs pray for judgment as follows:

A.     Declaring this action to be a proper class action pursuant to Fed. R. Civ. P. 23;

B.     Awarding Plaintiffs and the members of the Class damages and pre-judgment interest;

C.     Awarding Plaintiffs' reasonable costs, including attorneys' fees; and

D.     Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## XXII.  Jury Demand

Plaintiffs demand a trial by jury.

DATED:  January 8, 2010

COUGHLIN STOIA GELLER
  RUDMAN & ROBBINS LLP
PATRICK J. COUGHLIN
THEODORE J. PINTAR
RYAN A. LLORENS
MICHAEL F. GHOZLAND
JESSICA T. SHINNEFIELD

_____
              THEODORE J. PINTAR

655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

- 204 -

COUGHLIN STOIA GELLER
   RUDMAN & ROBBINS LLP
SAMUEL H. RUDMAN
58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
631/367-1173 (fax)

COUGHLIN STOIA GELLER
   RUDMAN & ROBBINS LLP
RANDI D. BANDMAN
52 Duane Street, 7th Floor
New York, NY 10007
Telephone: 212/693-1058
212/693-7423 (fax)

Lead Counsel for Plaintiffs

CERTIFICATION OF NAMED PLAINTIFF
PURSUANT TO FEDERAL SECURITIES LAWS

VERMONT PENSION INVESTMENT COMMITTEE ("Plaintiff") declares:

1.      Plaintiff has reviewed a complaint and authorized its filing.

2.      Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's litigation counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.      Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.      Plaintiff has relied upon litigation counsel's review of the custodial records in order to determine that Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

| Security | Transaction | Date | Price Per Share |
|---|---|---|---|

*See* attached Schedule A.

5.      Plaintiff has not sought to serve or served as a representative party for a class in an action filed under the federal securities laws except as detailed below during the three years prior to the date of this Certification:

None.

6.      The Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery.

SOFGEN

except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 9th day of May , 2008.

VERMONT PENSION INVESTMENT COMMITTEE

By: _____

Its: _____

- 2 -

SOCGEN

SCHEDULE A

SECURITIES TRANSACTIONS

Acquisitions

| Date Acquired | Type/Amount of Securities Acquired | Price |
|---|---|---|
| 10/11/2005 | 3,920 | € 88.47 |
| 11/02/2005 | 1,357 | € 89.22 |
| 06/01/2006 | 796 | € 107.49 |
| 08/11/2006 | 4,115 | € 114.75 |
| 03/27/2007 | 796 | € 122.29 |
| 05/08/2007 | 18,626 | € 119.31 |
| 08/16/2007 | 27,646 | € 106.43 |
| 11/01/2007 | 871 | € 106.15 |
| 01/21/2008 | 2,015 | € 73.74 |
| 01/23/2008 | 928 | € 73.33 |

Sales

| Date Sold | Type/Amount of Securities Sold | Price |
|---|---|---|
| 03/27/2006 | 1,837 | € 115.21 |
| 05/24/2006 | 12,125 | € 111.39 |
| 10/19/2006 | 4,115 | € 122.34 |
| 11/22/2006 | 1,509 | € 122.17 |
| 04/24/2007 | 1,657 | € 139.45 |
| 05/09/2007 | 827 | € 146.44 |
| 10/11/2007 | 3,198 | € 116.95 |
| 12/06/2007 | 3,138 | € 97.98 |

*Opening position of 47,780 shares.

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

AVON PENSION FUND, ADMINISTERED BY BATH & NORTH EAST SOMERSET COUNCIL ("Plaintiff") declares:

1.    Plaintiff has reviewed a complaint and authorized its filing.

2.    Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.    Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.    Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

| Security | Transaction | Date | Price Per Share |
|----------|-------------|------|-----------------|

*See* attached Schedule A.

5.    Plaintiff has not sought to serve or served as a representative party for a class in an action filed under the federal securities laws except as detailed below during the three years prior to the date of this Certification:

*Borochoff v. GlaxoSmithKline plc., et al.*, No. 1:07-cv-05574-LLS (S.D.N.Y.)

6.    The Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery,

SOCGEN

except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 1st day of OCTOBER , 2008.

AVON PENSION FUND,
ADMINISTERED BY BATH & NORTH
EAST SOMERSET COUNCIL

By: _E Maister_

Its: _INVESTMENTS MANAGER_

- 2 -

SOCGEN

## SCHEDULE A

### SECURITIES TRANSACTIONS

**Acquisitions**

| Date Acquired | Type/Amount of Securities Acquired | Price |
|---|---|---|
| 03/31/2006 | 13,513 | € 115.82 |
| 04/04/2006 | 1,132 | € 114.05 |
| 04/05/2006 | 5,712 | € 114.20 |
| 04/06/2006 | 815 | € 114.70 |
| 07/10/2007 | 11,087 | € 126.38 |

**Sales**

| Date Sold | Type/Amount of Securities Sold | Price |
|---|---|---|
| 12/08/2006 | 7,714 | € 115.03 |
| 12/14/2006 | 7,079 | € 119.35 |
| 07/13/2007 | 11,087 | € 127.21 |

CERTIFICATION OF NAMED PLAINTIFF
PURSUANT TO FEDERAL SECURITIES LAWS

BOILERMAKER-BLACKSMITH NATIONAL PENSION FUND ("Plaintiff")
declares:

1.    Plaintiff has reviewed a complaint and authorized its filing.

2.    Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.    Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.    Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

| Security | Transaction | Date | Price Per Share |
|---|---|---|---|

See attached Schedule A.

5.    Plaintiff has not sought to serve or served as a representative party for a class in an action filed under the federal securities laws except as detailed below during the three years prior to the date of this Certification:

*In re Exodus Communications, Inc. Sec. Litig.*, No. C-01-2661-MMC (N.D. Cal.)

6.    The Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery,

SOCGEN

except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 7th day of _May_ , 2008.

BOILERMAKER-BLACKSMITH
NATIONAL PENSION FUND

By: _____

Its:    Executive Administrator

- 2 -

SOCGEN

SCHEDULE A

SECURITIES TRANSACTIONS

**Acquisitions**

| Date Acquired | Type/Amount of Securities Acquired | Price |
|---|---|---|
| 01/09/2007 | 13,707 | € 122.30 |
| 03/05/2007 | 25,317 | € 114.70 |
| 03/14/2007 | 800 | € 114.82 |
| 08/20/2007 | 4,982 | € 111.35 |

**Sales**

| Date Sold | Type/Amount of Securities Sold | Price |
|---|---|---|
| 06/04/2007 | 5,092 | € 135.93 |
| 10/10/2007 | 8,343 | € 118.06 |
| 12/05/2007 | 7,966 | € 93.88 |
| 12/17/2007 | 695 | € 92.15 |
| 01/21/2008 | 373 | € 75.53 |

*Opening position of 43,917 shares.

CERTIFICATION OF NAMED PLAINTIFF
PURSUANT TO FEDERAL SECURITIES LAWS

UNITED FOOD AND COMMERCIAL WORKERS UNION LOCAL 880 –
RETAIL FOOD EMPLOYERS JOINT PENSION FUND ("Plaintiff") declares:

1.    Plaintiff has reviewed a complaint and authorized its filing.

2.    Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.    Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.    Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

| Security | Transaction | Date | Price Per Share |
|----------|-------------|------|-----------------|

*See* attached Schedule A.

5.    (a)    Plaintiff has been appointed to serve as a representative party for a class in the following actions filed under the federal securities laws during the three years prior to the date of this Certification:

*UFCW Local 880 – Retail Food v. Newmont Mining Corp., et al.*, No. 05-CV-1046-MSK-BNB (D. Colo.)
*Charatz v. Avaya, Inc., et al.*, No. 3:05-cv-02319-MLC-TJB (D.N.J.)
*In re Cooper Companies, Inc. Sec. Litig.*, No. SACV-06-00169-CJC(RNBx) (C.D. Cal.)

(b)    Plaintiff is seeking to serve as a representative party for a class in the following actions filed under the federal securities laws:

(c)    Plaintiff initially sought to serve as a representative party for a class in the following actions filed under the federal securities laws during the three years prior to the date of this Certification:

*UFCW Local 880 – Retail Food, et al. v. Sunrise Senior Living, Inc., et al.*, No. 07-cv-00102-RBW (D. DC)

SOCGEN

6.    The Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _18_ day of _April_, 2008.

By: _____

Its:   Trustee, United Food and Commercial
       Workers Union Local 880 - Retail
       Food Employers Joint Pension Fund

- 2 -

SOCGEN

SCHEDULE A

SECURITIES TRANSACTIONS

**Acquisitions**

| Date Acquired | Type/Amount of Securities Acquired | Price |
|---|---|---|
| 04/27/2007 | 15,500 | $42.49 |
| 06/11/2007 | 3,200 | $38.55 |
| 11/01/2007 | 5,890 | $32.69 |

**Sales**

| Date Sold | Type/Amount of Securities Sold | Price |
|---|---|---|
| 06/05/2007 | 90 | $38.50 |
| 01/10/2008 | 4,800 | $27.97 |

DECLARATION OF SERVICE BY MAIL

I, the undersigned, declare:

1.      That declarant is and was, at all times herein mentioned, a citizen of the United States and a resident of the County of New York, over the age of 18 years, and not a party to or interested party in the within action; that declarant's business address is 52 Duane Street, 7th Floor, New York, NY 10007.

2.      That on January 8, 2010, declarant served the SECOND AMENDED AND CONSOLIDATED COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS by depositing a true copy thereof in a United States mailbox at New York, New York in a sealed envelope with postage thereon fully prepaid and addressed to the parties listed on the attached Service List.

3.      That there is a regular communication by mail between the place of mailing and the places so addressed.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 8th day of January, 2010, at New York, New York.

_____
JAMIE M. EAGEN

Randi Dawn Bandman
Coughlin Stoia Geller Rudman
   & Robbins LLP
52 Duane Street, 7th Floor
New York, NY  10007

Elizabeth Ann Berney
Cohen, Milstein, Hausfeld & Toll, P.L.L.
150 East 52nd Street, 30th Floor
New York, NY  10022

Kent Andrew Bronson
Milberg Weiss Bershad & Schulman LLP
One Pennsylvania Plaza
New York, NY  10119

Robert Samuel Cohen
Joseph Serino, Jr.
Kirkland & Ellis LLP
153 East 53rd Street
New York, NY  10022

Mark C. Holscher
Kirkland &Ellis LLP
777 South Figueroa St., Ste. 3400
Los Angeles, CA  90017

Bryan Joshua Levine
Scott D. Musoff
George Abraham Zimmerman
Joseph Andrew Matteo
Skadden, Arps, Slate, Meagher & Flom LLP
Four Times Square
New York, NY  10036

Ted Pintar
Ryan A. Llorens
Michael Ghozland
Jessica Shinnefield
Coughlin Stoia Geller Rudman
   & Robbins LLP
655 West Broadway, Suite 1900
San Diego, CA  92101

James Stuart Notis
Gardy & Notis, LLP
440 Sylvan Avenue, Suite 110
Englewood Cliffs, NJ  07632

Ira M. Press
Kirby McInerney LLP
825 Third Avenue, 13th Floor
New York, NY  10022

Samuel Howard Rudman
David Avi Rosenfeld
Coughlin, Stoia, Geller, Rudman
   & Robbins LLP
58 South Service Road, Suite 200
Melville, NY  11747

Joseph Harry Weiss
Weiss & Lurie
551 Fifth Ave,
New York, NY 10176