**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

IN RE SOCIÉTÉ GÉNÉRALE SECURITIES   :       08 Civ. 2495 (RMB)
LITIGATION                                              :
                                                                 :       **Electronically filed**
                                                                 :       **ECF Case**
                                                                 :
                                                                 :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - x


**MEMORANDUM OF LAW IN SUPPORT OF THE MOTION OF DEFENDANTS
SOCIÉTÉ GÉNÉRALE, DANIEL BOUTON, PHILIPPE CITERNE, DIDIER ALIX,
JEAN-PIERRE MUSTIER AND ROBERT DAY TO DISMISS THE SECOND
AMENDED AND CONSOLIDATED COMPLAINT**


SKADDEN, ARPS, SLATE,              KIRKLAND & ELLIS LLP
    MEAGHER & FLOM LLP             Mark Holscher
Scott D. Musoff                    333 S. Hope Street
George A. Zimmerman                Los Angeles, California 90071
Bryan Levine                       (213) 680 8400
Four Times Square
New York, NY  10036                Joseph Serino, Jr.
(212) 735-3000                     601 Lexington Avenue
                                   New York, New York 10022
                                   (212) 446 4800

**Attorneys for Defendants**              **Attorneys for Defendant Robert A. Day**
**Société Générale, Daniel Bouton, Philippe**
**Citerne, Didier Alix and Jean-Pierre Mustier**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................... 1

BACKGROUND ............................................................................................................... 2

    A.    Société Générale ............................................................................................ 2

    B.    The Individual Defendants ............................................................................ 3

    C.    The Subprime Mortgage Collapse and SG's Disclosure of CDO and RMBS Write Downs ................................................................................... 3

    D.    Rogue Trader Jérôme Kerviel Defrauds SG .............................................. 6

    E.    The Complaint .............................................................................................. 7

ARGUMENT
THE COMPLAINT SHOULD BE DISMISSED WITH PREJUDICE .............................. 8

I.    SECTION 10(b) DOES NOT COVER CLAIMS BY INVESTORS PURCHASING SG SHARES ON A FOREIGN EXCHANGE ......................... 9

II.    PLAINTIFFS HAVE FAILED TO STATE A CLAIM UNDER SECTION 10(b) OF THE EXCHANGE ACT OR SEC RULE 10B-5 ...................................... 11

    A.    Plaintiffs Have Failed to Sufficiently Plead Scienter ............................. 11

    B.    Plaintiffs Have Failed to Plead Actionable Misrepresentations or Omissions ................................................................................................. 23

    C.    Plaintiffs Fail to Plead Loss Causation .................................................. 28

III.    PLAINTIFFS HAVE FAILED TO STATE A CLAIM AGAINST THE INDIVIDUAL DEFENDANTS FOR INSIDER TRADING ........................... 29

    A.    Plaintiffs' Second Claim for Relief Must be Dismissed in its Entirety .............. 29

    B.    Plaintiffs Have Failed to State a Claim for Insider Trading ................... 30

IV.    PLAINTIFFS FAIL TO ALLEGE A VIOLATION OF SECTION 20(a) ......... 38

V.    THIS COURT LACKS PERSONAL JURISDICTION OVER DEFENDANTS CITERNE AND ALIX ............................................................................. 38

CONCLUSION .............................................................................................................. 40

i

# TABLE OF AUTHORITIES

## CASES

PAGE

In re 2007 Novastar Finance Inc. Securities Litigation,
No. 07-0139-CV-ODS, 2008 WL 2354367 (W.D. Mo. June 4, 2008) ........................9, 25

Acito v. IMCERA Group, Inc.,
47 F.3d 47 (2d Cir. 1995) ................................................................................1, 16

In re Alcatel Securities Litigation,
382 F. Supp. 2d 513 (S.D.N.Y. 2005) ...........................................................................24

In re Alstom SA Securities Litigation,
406 F. Supp. 2d 346 (S.D.N.Y. 2005) .....................................................................10, 38

In re Ambac Fin. Group Securities Litigation,
No. 08 Civ. 411 (NRB), 2010 WL 727227 (S.D.N.Y. Feb. 22, 2010) ...............................4

In re AstraZeneca Securities Litigation,
559 F. Supp. 2d 453 (S.D.N.Y. 2008), .....................................................................20, 39

In re Avista Securities Litigation,
415 F. Supp. 2d 1214 (E.D. Wash. 2005).......................................................................28

Avon Pension Fund v. GlaxoSmithKline PLC,
343 F. App'x 671 (2d Cir. 2009) .................................................................................19

In re Bausch & Lomb, Inc. Securities Litigation,
592 F. Supp. 2d 323 (W.D.N.Y. 2008).....................................................................20, 21

Boguslavsky v. Kaplan,
159 F.3d 715 (2d Cir. 1998) .......................................................................................38

Bond Opportunity Fund v. Unilab Corp.,
No. 99 Civ. 11074 (JSM), 2003 WL 21058251 (S.D.N.Y. May 9, 2003) .......................26

In re Bristol-Myers Squibb Securities Litigation,
312 F. Supp. 2d 549 (S.D.N.Y. 2004) ..........................................................................20

Bruce v. Martin,
No. 90 Civ. 1002 (RWS), 1992 WL 204395 (S.D.N.Y. Aug. 14, 1992)..........................28

Caiafa v. Sea Containers, Ltd.,
525 F. Supp. 2d 398 (S.D.N.Y. 2007) .....................................................................13, 18

Caiafa v. Sea Containers Ltd.,
    331 F. App'x 14, (2d Cir. 2009)..................................................................................18

Campo v. Sears Holdings Corp.,
    635 F. Supp. 2d 323 (S.D.N.Y. 2009), ....................................................................17

In re Ceridian Corp. Securities Litigation,
    542 F.3d 240 (8th Cir. 2008) ..............................................................................22, 34

In re Citigroup Auction Rate Securities Litigation,
    No. 08 Civ. 3095 (LTS) (FM), 2009 WL 2914370 (S.D.N.Y. Sept. 11, 2009) .................9

In re Citigroup Inc. Sec. Litigation,
    330 F. Supp. 2d 367 (S.D.N.Y. 2004) ................................................................13, 24

City of Brockton Retirement System v. Shaw Group, Inc.,
    540 F. Supp. 2d 464 (S.D.N.Y. 2008) ................................................................21, 22

City of Dearborn Heights Act 345 Police & Fire Retirement System v. Waters Corp.,
    No. 1:08-11889-JLT, 2010 WL 1221402 (D. Mass. Mar. 25, 2010) .................................22

Copeland v. Fortis,
    No. 08 Civ. 9060 (DC), 2010 WL 569865 (S.D.N.Y. Feb. 18, 2010)..............................10

Copland v. Grumet,
    88 F. Supp. 2d 326 (D.N.J. 1999).............................................................................30

Cornwell v. Credit Suisse Group,
    666 F. Supp. 2d 381 (S.D.N.Y. 2009) ........................................................................10

DeMarco v. Robertson Stephens Inc.,
    318 F. Supp. 2d 110 (S.D.N.Y. 2004) ........................................................................29

Denny v. Barber,
    576 F.2d 465 (2d Cir. 1978) ................................................................................1, 16

DiLeo v. Ernst & Young,
    901 F.2d 624 (7th Cir. 1990) ......................................................................1, 16, 37-38

In re Downey Securities Litigation,
    No. CV 08-3261-JFW (RZx), 2009 WL 736802 (C.D. Cal. Mar. 18, 2009) ....................17

In re Downey Securities Litigation,
    No. CV 08-3261- JFW, 2009 WL 2767670 (C.D. Cal. Aug. 21, 2009)....................passim.

Dresner v. Utility.com, Inc.,
    371 F. Supp. 2d 476 (S.D.N.Y. 2005) ...................................................27

Dura Pharmaceuticals, Inc. v. Broudo,
    544 U.S. 336 (2005) ...................................................................28

In re eSpeed, Inc. Securities Litigation,
    457 F. Supp. 2d 266 (S.D.N.Y. 2006) ................................................22

Ellington Management Group, LLC v. Ameriquest Mortgage Co.,
    No. 09 Civ 0416 (JSR), 2009 WL 3170102 (S.D.N.Y. Sept. 29, 2009) ...................16-17

In re European Aeronautic Defense & Space Corp. Securities Litigation,
    No. 08 Civ. 5389 (WHP), 2010 WL 1191888 (S.D.N.Y. Mar. 26, 2010)........................10

Fulton County Employees' Retirement Systems v. MGIC Investment Corp.,
    08-C-0458, 2010 WL 601364 (E.D. Wisc. Feb. 18, 2010) ...................................8, 15, 25

In re Gildan Activewear, Inc. Securities Litigation,
    636 F. Supp. 2d 261 (S.D.N.Y. 2009) ................................................35

In re Glenayre Technologies, Inc. Securities Litigation,
    No. 96 Civ. 8252 (HB), 1998 WL 915907 (S.D.N.Y. Dec. 30, 1998) ...............................20

In re Global Crossing, Ltd. Securities Litigation,
    No. 02 Civ. 910 (GEL), 2005 WL 2990646 (S.D.N.Y. Nov. 7, 2005) .................31, 33, 34

Gotlin v. Lederman,
    367 F. Supp. 2d 349 (E.D.N.Y. 2005) ................................................34

Harrison v. Rubenstein,
    No. 02 Civ. 9356 (DAB), 2007 WL 582955 (S.D.N.Y. Feb. 26, 2007)............................38

Higginbotham v. Baxter International Inc.,
    495 F.3d 753 (7th Cir. 2007) ..........................................................24

Indiana State District Council of Laborers & Hud Carriers
    Pension & Welfare Fund v. Omnicare, Inc.,
    583 F.3d 935 (6th Cir. 2009) ..........................................................19

Irvine v. ImClone System, Inc.,
    No. 02 Civ. 109 (RO), 2003 WL 21297285 (S.D.N.Y. June 4, 2003) ........................27-28

Jackson National Life Insurance Co. v. Merrill Lynch & Co.,
    32 F.3d 697 (2d Cir. 1994) ..........................................................30

Kalnit v. Eichler,
   264 F.3d 131 (2d Cir. 2001) ............................................................................................ 37

In re Keyspan Corp. Securities Litigation,
   383 F. Supp. 2d 358 (E.D.N.Y. 2003) ........................................................................ 33, 34

Lentell v. Merrill Lynch & Co.,
   396 F.3d 161 (2d Cir. 2005) ........................................................................................ 28, 29

Lipsky v. Commonwealth United Corp.,
   551 F.2d 887 (2d Cir. 1976) .............................................................................................. 34

In re Livent, Inc. Securities Litigation,
   78 F. Supp. 2d 194 (S.D.N.Y. 1999) ................................................................................. 38

Log On America, Inc. v. Promethean Asset Management L.L.C.,
   223 F. Supp. 2d 435 (S.D.N.Y. 2001) ............................................................................... 31

Malin v. XL Capital Ltd.,
   499 F. Supp. 2d 117 (D. Conn. 2007) ......................................................................... 17, 20

In re Merrill Lynch & Co., Inc. Research Reports Securities Litigation,
   218 F.R.D. 76 (S.D.N.Y. 2003) ......................................................................................... 34

Metropolitan Life Insurance Co. v. Robertson-Ceco Corp.,
   84 F.3d 560 (2d Cir. 1996) ................................................................................................ 39

Metzler Investment GMBH v. Corinthian Colleges, Inc.,
   540 F.3d 1049 (9th Cir. 2008) ........................................................................................... 32

Morrison v. National Australia Bank Ltd.,
   547 F.3d 167 (2d Cir. 2008) ........................................................................................... 9, 10

In re Nature's Sunshine Products Securities Litigation,
   486 F. Supp. 2d 1301 (D. Utah 2007) ............................................................................... 36

New York State Teachers' Retirement System v. Fremont General Corp.,
   No. 2:07-cv-5756 (FMC-FFMX), 2009 WL 3112574 (C.D. Cal. Sept. 25, 2009) ....... 8, 25

New York State Teachers' Retirement System v. Fremont General Corp.,
   No. 2:07-cv-5756 (FMC-FFMX) (C.D. Cal. Mar. 29, 2010) ............................................ 24

In re Nokia Oyj (Nokia Corp.) Securities Litigation,
   423 F. Supp. 2d 364 (S.D.N.Y. 2006) ............................................................................... 18

Novak v. Kasaks,
    216 F.3d 300 (2d Cir. 2000) ................................................................. 11

Northrop Grumman Overseas Services Corp. v. Banco Wiese Sudameris,
    No. 03 Civ. 1681(LAP), 2004 WL 2199547 (S.D.N.Y. Sept. 29, 2004) ......................... 39

O'Connor & Associates v. Dean Witter Reynolds, Inc.,
    559 F. Supp. 800 (S.D.N.Y. 1983) ......................................................... 30

In re Optionable Securities Litigation,
    577 F. Supp. 2d 681 (S.D.N.Y. 2008) ...................................................... 22

In re PMI Group, Inc. Securities Litigation,
    C 08-1406 (SI), 2009 WL 1916934 (N.D. Cal. July 1, 2009) ......................... 8, 15

In re PXRE Group, Ltd., Sec. Litigation,
    600 F. Supp. 2d 510 (S.D.N.Y. 2009), ..................................................... 17

In re Par Pharmaceuticals, Inc. Securities Litigation,
    733 F. Supp. 668 (S.D.N.Y. 1990) ......................................................... 38

Parks v. Fairfax Financial Holding Ltd.,
    No. 06 CV 2820 (GBD), 2010 WL 1372537 (S.D.N.Y. Mar. 29, 2010) ......................... 10

In re Parmalat Securities Litigation,
    376 F. Supp. 2d 472 (S.D.N.Y. 2005) ...................................................... 39

Pittleman v. Impac Mortgage Holdings, Inc.,
    No. SACV 07-0970 (AG), 2009 WL 648983 (C.D. Cal. Mar. 9, 2009) ......................... 8-9

Plumbers & Steamfitters Local 773 Pension Fund v.
Canadian Imperial Bank of Commerce,
    No. 08 Civ. 8143(WHP), 2010 WL 961596 (S.D.N.Y. Mar. 17, 2010) .................... passim.

In re Radian Securities Litigation,
    612 F. Supp. 2d 594 (E.D. Pa. 2009) ...................................................... 8, 15

In re Refco, Inc. Securities Litigation,
    503 F. Supp. 2d 611 (S.D.N.Y. 2007) .................................................. 27, 30

In re Rhodia SA Securities Litigation,
    531 F. Supp. 2d 527 (S.D.N.Y. 2007) ...................................................... 28

Rombach v. Chang,
    355 F.3d 164 (2d Cir. 2004) ................................................................. 18

Santa Fe Industrial, Inc. v. Green,
    430 U.S. 462 (1977) ............................................................................... 13

SEC v. Downe,
    969 F. Supp. 149 (S.D.N.Y. 1997) .........................................................36

SEC v. Gonzalez de Castilla,
    184 F. Supp. 2d 365 (S.D.N.Y. 2002) .............................................32, 33

SEC v. Hoover,
    903 F. Supp. 1135 (S.D. Tex. 1995).......................................................32

SEC v. Truong,
    98 F. Supp. 2d 1086 (N.D. Cal. 2000).....................................................32

In re Security Capital Assurance Securities Litigation,
    07 Civ. 11086 (DAB), 2010 WL 1372688 (S.D.N.Y. Mar. 31, 2010) ...........8, 15

Sedona Corp. v. Ladenburg Thalmann & Co.,
    No. 03 CIV 3120 (LTS) (THK), 2006 WL 2034663 (S.D.N.Y. July 19, 2006) ..............39

Shields v. Citytrust Bancorp, Inc.,
    25 F.3d 1124 (2d Cir. 1994) .............................................................16, 37

In re Silicon Graphics Inc. Sec. Litigation,
    183 F.3d 970 (9th Cir. 1999) ..................................................................36

South Cherry St., LLC v. Hennessee Group LLC,
    573 F.3d 98 (2d Cir. 2009) ...............................................................17, 38

Steinberg v. Ericsson LM Tel. Co.,
    No. 07 CV 9615 (RPP), 2008 WL 5170640 (S.D.N.Y. Dec. 10, 2008)...........16

Stevelman v. Alias Research Inc.,
    174 F.3d 79 (2d Cir. 1999) ......................................................................16

Stevens v. InPhonic, Inc.,
    662 F. Supp. 2d 105 (D.D.C. 2009)..........................................................35

In re Take-Two Interactive Sec. Litigation,
    551 F. Supp. 2d 247 (S.D.N.Y. 2008) ......................................................30

Teamsters Local 445 Freight Division Pension Fund v. Dynex Capital, Inc.,
    531 F.3d 190 (2d Cir. 2008) ....................................................................11

Tellabs, Inc. v. Makor Issues & Rights, Ltd.,
    551 U.S. 308 (2007) ..................................................................................................... 11, 12, 35

Virginia Bankshares v. Sandberg,
    501 U.S. 1083 (1991) ............................................................................................................ 26

Wachovia Corp. v. Citigroup, Inc.,
    634 F. Supp. 2d 445 (S.D.N.Y. 2009) .............................................................................. 6

Wilson v. Comtech Telecomms. Corp.,
    648 F.2d 88 (2d Cir. 1981) ............................................................................................ 29, 30

Yu v. State Street Corp.,
    No. 08-8235 (RJH), 2010 WL 668645 (S.D.N.Y. Feb. 25, 2010) ............................... 9, 16

## STATUTES

15 U.S.C. § 78j(b)..................................................................................................................passim.

15 U.S.C. § 78t(a) .................................................................................................................... 38

15 U.S.C. § 78t-1(a) ............................................................................................................ 29, 30

15 U.S.C. § 78u-4 ............................................................................................................... 23, 27

## RULES

Fed. R. Civ. P. 8(a) .................................................................................................................. 23

Fed. R. Civ. P. 9(b) .................................................................................................................. 23

## PRELIMINARY STATEMENT

Like most other financial institutions, Société Générale ("SG" or the "Company"), one of France's oldest banks, was negatively affected by the global credit crisis that began in the third quarter of 2007.  In addition to the losses brought on by the crisis, SG also disclosed, within days of its discovery, that a rogue trader far removed from SG's senior management had engaged in unauthorized trades causing billions of Euros in losses.  Plaintiffs' Second Amended and Consolidated Complaint ("SAC" or "Complaint") seeks to weave together these isolated, unrelated events to allege a deliberate two and a half year fraud.

Seizing on the opportunity presented by the financial crisis, plaintiffs' firms predictably have brought a wave of securities fraud litigation in the wake of dramatic declines in the price of the stock of publicly traded companies.  This current wave of cases typically asserts that write downs of certain subprime-related securitized investments (e.g., collateralized debt obligations ("CDOs") and residential mortgage backed securities ("RMBS")) should have been taken earlier or in a greater amount.  Plaintiffs here are following the same playbook.  They allege that SG's 2007 third quarter write down of €230 million should have been greater – and should have been taken earlier – because SG later announced an additional write down of approximately €2 billion on its CDO and RMBS investments.  (SAC ¶ 184.)  Just last month, Judge Pauley rejected the same notion advanced by the same Plaintiffs' counsel:

> Because the securities laws do not allow fraud by hindsight claims, after-the-fact "allegations that statements in one report should have been made in earlier reports do not make out a claim of securities fraud." Acito [v. IMCERA Group, Inc.], 47 F.3d 47, 53 (2d Cir. 1995); Denny v. Barber, 576 F.2d 465, 470 (2d Cir. 1978). "If all that is involved is a dispute about the timing of the writeoff . . . we do not have fraud; we may not even have negligence." DiLeo v. Ernst & Young, 901 F.2d 624, 627 (7th Cir. 1990).

<u>Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of Commerce</u>, No. 08 Civ. 8143(WHP), 2010 WL 961596, at *12 (S.D.N.Y. Mar. 17, 2010) (hereinafter "<u>CIBC</u>").

The Complaint also purports to assert securities law claims resulting from the unauthorized trading activities of a relatively low-level trader in Paris. Specifically, SG announced in January 2008 that it had incurred €4.9 billion in losses resulting from the unwinding of concealed, unauthorized derivatives trades by Jérôme Kerviel. It is undisputed that SG immediately unwound these trades upon their discovery and launched an internal investigation. Tellingly, Plaintiffs do not – and cannot – allege that any of the Individual Defendants allegedly responsible for any purported misstatements were aware of Kerviel's rogue trading. On the contrary, the investigative reports described in the Complaint confirm that there was no such knowledge, and that Kerviel actively concealed his activities from his superiors and deliberately circumvented SG's control structure.

For these and other reasons discussed below, the Complaint should be dismissed with prejudice.

## BACKGROUND

### A.  <u>Société Générale</u>

SG is a French company, incorporated under French law, and headquartered in Paris. Founded in 1864, it is one of the oldest banks in France and one of the largest European financial institutions. SG's common stock is traded on the Euronext Paris stock exchange and is alleged to trade "in an efficient market." (SAC ¶ 41.) A far less significant number of SG American Depositary Receipts ("ADRs") trade on an "over-the-counter market in New York." <u>Id.</u>

SG appropriately disclosed that its business involved substantial risks inherent to the financial services industry, including risks that allegedly materialized during the proposed 30-month class period ("Class Period"). SG extensively described these risks, including market risk,

see SG, 2007 Registration Document (Mar. 6, 2007) [hereinafter 2007 Reg. Doc.] at 136 (Ex. 1)
(referenced in (SAC ¶¶ 143 – 147)), and risks related to the credit crisis.  See SG, Second Update
to the 2007 Registration Document at 33 (Aug. 31, 2007) ("The extension of the crisis affecting
the US subprime market to other credit markets at the beginning of August has generated
liquidity pressures in many markets.") (Ex. 2).[1]

### B.    The Individual Defendants

Defendant Daniel Bouton, a French citizen residing in France, was "Chairman and Chief
Executive Officer of the Company" during the putative Class Period.  (SAC ¶ 44.)  Defendant
Philippe Citerne and Didier Alix, both French citizens residing in France, were SG's co-CEOs
during parts of the putative Class Period.  (SAC ¶¶ 55, 57.)  Defendant Jean-Pierre Mustier, also
a French citizen, was the CEO of SG's corporate and investment banking division ("SGCIB")
based in Paris.  (SAC ¶ 48.)  Defendant Robert A. Day, an American citizen residing in Los
Angeles, is an outside director of SG and the founder and Chairman of Trust Company of the
West ("TCW"), which SG acquired in 2001.  (SAC ¶ 53.)  Mr. Day is not alleged to have been an
officer of SG or have any responsibility for any SG disclosures.

### C.    The Subprime Mortgage Collapse and SG's
Disclosure of CDO and RMBS Write Downs

Subprime-related securitized financial products (e.g., CDOs and RMBS) – as opposed to
subprime mortgages – come in different shapes and sizes and involve different levels of risk.
(SAC ¶ 114-116.)  The lowest rated tranches cease to be paid earliest when there are defaults on
the underlying subprime mortgages, and for that risk they are paid the highest interest rates.  The
highest rated tranches are paid as long as all of the tranches below them are not wiped out, and
for that reduced risk they are paid the lowest interest rates.  The highest rated tranches received

---

[1] "Ex. ___" refers to documents attached to the accompanying Declaration of Scott D. Musoff.

AAA ratings by the rating agencies, and the highest rated portions of the AAA tranches – the tranches held by SG – were denominated AAA super senior tranches. (SAC ¶¶ 113-114.)[2] To provide another layer of protection, some of these tranches were also insured by "monoline" insurance companies that themselves often carried AAA ratings until late in the subprime mortgage crisis. See, e.g., In re Ambac Fin. Group Sec. Litig., No. 08 Civ. 411 (NRB), 2010 WL 727227, at *10 (S.D.N.Y. Feb. 22, 2010) ("On January 18, 2008, Ambac's credit rating was downgraded by Fitch, making Ambac the first bond insurer to lose its AAA rating.").

On September 10, 2007, SG voluntarily pre-announced estimated CDO and RMBS write downs for the 2007 third quarter. (SAC ¶ 399.) Based on an estimated cumulative industry loss of $200 billion on subprime mortgage loans, SG estimated it would have approximately €200 million in CDO and RMBS write downs for the third quarter ending September 30, 2007. (Id.)

On November 7, 2007, SG issued its Third Quarter and Nine Month Results for 2007. The release contained a table – conspicuously omitted from the Complaint – that (1) showed that almost all of SG's positions were in AAA super senior tranches of CDOs and more modest amounts of AAA and AA RMBS, (2) disclosed that SG held none of the riskier junior tranches of CDOs or mezzanine tranches of RMBS, (3) announced a write down of €230 million on these positions resulting from "modeling based on a forward-looking scenario of an approximately USD 200bn cumulated loss for the whole industry in the US residential mortgage sector and applied to each CDO on the basis of specific characteristics," and (4) explained that the write down relied on an assumption that there was a 30% probability of default compared to a then-

---

[2] "When the credit agency provided that designation to the senior tranche of a mortgage-backed security, it was a judgment that the junior tranches were large enough to absorb so much of the losses of the underlying mortgages that the probability of default for the senior tranche was generally as low as it would be for a triple A-rated corporate security." Remarks of John C. Dugan, Comptroller of the Currency, before the Global Association of Risk Professionals, at 3 (Feb. 27, 2008), http://www.occ.treas.gov/ftp/release/2008-22a.pdf (Ex. 3).

current delinquency rate of less than 15%, and a 49% loss upon default.  SG, <u>Third Quarter and 9 Month 2007 Results</u> at 57 (Nov. 7, 2007) (Ex. 4).[3]

      The earnings release also advised investors that the presentation involved "forecasts" that are "based on a series of assumptions, both general and specific," that "there is a risk these projections will not be met," "future results are liable to be affected by a number of factors and may therefore differ from current estimates," and readers "should take into account elements of uncertainty and risk when basing their investment decisions on information provided in this presentation."  (<u>Id.</u> at 2.)  On an earnings call for the third quarter, Mr. Mustier confirmed that SG's primary exposure was to higher-rated tranches of CDOs but said that the parameters of SG's write down "could be potentially wider."  (SAC ¶ 169.)

      Following the close of the third quarter, the subprime mortgage market continued to deteriorate.  As a result, on January 24, 2008, SG announced additional write downs of €2.05 billion related to its risk on mortgages and monoline insurers.  These write downs reflected the "worsening of the US residential mortgage crisis," were consistent with the "valuation levels of the ABX indices where they exist," and had "been reviewed by the Group's auditors."  Press Release, SG, at 2 (Jan. 24, 2008) (Ex. 6) (referenced in (SAC ¶ 184)).

      After SG's January 2008 write down and the end of the putative Class Period, the subprime crisis grew into a global financial meltdown.  "By the end of September 2008, the nation had witnessed the collapse and bailout of an unprecedented number of banks and other financial institutions: Freddie Mac and Fannie Mae, Lehman Brothers, Merrill Lynch, American

---

[3]  The $200 billion assumption was conservative at the time.  <u>See</u> Speech to the Federal Reserve Bank of Philadelphia, William C. Dudley, Executive Vice President, Federal Reserve Bank of New York, http://www.newyorkfed.org/newsevents/speeches/2007/dud071017.html (Oct. 17, 2007) ("Even if subprime delinquency rates keep climbing to unprecedented levels, it seems likely that total losses will be roughly in a range of $100-200 billion.") (Ex. 5).

International Group ("AIG"), and Washington Mutual." <u>Wachovia Corp. v. Citigroup, Inc.</u>, 634

F. Supp. 2d 445, 448 (S.D.N.Y. 2009). "At the end of 2008, the entire financial system was on

life support, the housing market had collapsed, consumers and businesses were at the edge of

panic, and the nightmare of a depression seemed like a real possibility."[4]  As of March 2010,

total financial institution credit-related write downs since January 2007 were $1.75 trillion, of

which only three-tenths of one percent occurred prior to the 2007 third quarter (when SG took its

first write down), and most of which occurred in and after 2008.  Writedowns and Credit Losses

vs. Capital Raised, Bloomberg (last update March 26, 2010) (Ex. 8).

### D.  <u>Rogue Trader Jérôme Kerviel Defrauds SG</u>

It is undisputed that SG's management was not made aware of the Kerviel losses until

Friday, January 18, 2008 (SAC ¶ 431(c)), that its Board met on January 20 (SAC ¶ 431(e)), and

that it began unwinding Kerviel's open positions the next business day.  (SAC ¶ 17.)  On January

24, SG announced that only days before it had "uncovered a fraud, exceptional in its size and

nature."  The press release stated:  "one trader, responsible for plain vanilla futures hedging on

European equity market indices, had taken massive fraudulent directional positions in 2007 and

2008 beyond his limited authority," and that "aided by his in-depth knowledge of the control

procedures resulting from his former employment in the middle-office, he managed to conceal

these positions through a scheme of elaborate fictitious transactions."  (SAC ¶ 184.)  SG

disclosed that it had promptly closed out the positions at a loss of €4.9 billion.  <u>Id.</u>

The Complaint contains a chart that shows where the trader at issue – Jérôme Kerviel –

fell within the hierarchy of SG.  (SAC ¶ 64.)  He was part of the "Delta One" group, and he

---

[4]  Presentation to Town Hall Los Angeles, Janet L. Yellen, President and CEO, Federal Reserve
Bank of San Francisco, Mar. 23, 2010, http://www.frbsf.org/news/speeches/2010/
janet_yellen0323.html (Ex. 7).

reported to someone, who reported to someone else, who reported into another area, that reported into yet someone else, that reported into yet another area, that reported into one of the Individual Defendants (Mustier) that was added in the Second Amended Complaint. Kerviel was therefore at least six levels removed from any of the Individual Defendants.

Following this disclosure of rogue trading losses, the French Finance Minister (SAC ¶¶ 252-253), the French Banking Commission (SAC ¶¶ 255-263), SG's own General Inspection Department (SAC ¶¶ 271-278) and a Special Committee of SG's Board of Directors (SAC ¶¶ 279-280) commenced investigations into the unauthorized trading. In addition, PricewaterhouseCoopers conducted a review of the remedial steps undertaken by SG. (SAC ¶ 281.) Each one of these investigations concluded, in hindsight, that control deficiencies had contributed to the failure to detect Kerviel's unauthorized trading. Yet Plaintiffs do not and cannot allege that any of these reports even remotely suggested that the Individual Defendants (or anyone else involved in the Company's disclosures) had been aware of Kerviel's unauthorized trading until the discovery of the trading days before the January 24, 2008 announcement. Indeed, the Complaint acknowledges precisely the opposite. (SAC ¶ 261) (Banking Commission concluded that control lapses were not known by management).

**E.    The Complaint**

After Defendants' motions to dismiss the First Amended and Consolidated Complaint ("FAC") were fully briefed, this case was reassigned to this Court from Judge Lynch. On January 8, 2010, Plaintiffs filed the Second Amended Complaint in an attempt to cure the fatal defects that Defendants had identified in the briefing on the initial motions to dismiss. As in the prior complaint, Plaintiffs appear to allege that beginning as early as August 1, 2005, and continuing through January 25, 2008, Defendants should have taken earlier, larger write downs on SG's AAA-rated super senior holdings. Plaintiffs' assertion is startling given that they do not

point to a single financial institution in the world that took write downs on these types of

positions before the third quarter of 2007, when SG itself began to write down these positions.

Plaintiffs also allege that SG should have pejoratively characterized the Company's risk controls,

and Plaintiffs allege without factual support that Defendants knew or must have known they

were misleading investors as to both matters.

**ARGUMENT**

**THE COMPLAINT SHOULD BE DISMISSED WITH PREJUDICE**

In recent months, a number of federal courts around the country have dismissed

subprime-related securities class actions that – with the exception of the rogue trading aspect of

the Complaint – make allegations substantially similar to those here.[5]  In every case, plaintiffs'

---

[5] See In re Sec. Capital Assurance Sec. Litig., 07 Civ. 11086 (DAB), 2010 WL 1372688, at *26 (S.D.N.Y. Mar. 31, 2010) (refusing to draw inference of scienter from alleged awareness "of the housing market crisis"); CIBC, 2010 WL 961596, at *11 ("CIBC, like so many other institutions, could not have been expected to anticipate the crisis with the accuracy Plaintiff enjoys in hindsight."); Fulton County Employees' Ret. Sys. v. MGIC Inv. Corp., 08-C-0458, 2010 WL 601364, at *12 (E.D. Wisc. Feb. 18, 2010) ("[O]ne can reasonably infer that the severe delinquencies and other problems in the 2005 and 2006 books took MGIC and its executives by surprise in the third quarter of 2007, and that therefore defendants did not intend to deceive the market when, between late 2006 and mid-2007, they informed investors that the 2005 and 2006 books were not experiencing unusual problems.") (hereinafter "MGIC"); N.Y. State Teachers' Ret. Sys. v. Fremont Gen. Corp., No. 2:07-cv-5756 (FMC-FFMX), 2009 WL 3112574, at *11 (C.D. Cal. Sept. 25, 2009) (allegations by 42 confidential witnesses regarding company's subprime exposures "point to evidence of serious mismanagement, [but] they are not sufficient to substantiate Plaintiff's allegations of falsity or scienter"); In re Downey Sec. Litig., No. CV 08-3261-JFW, 2009 WL 2767670, at *5 (C.D. Cal. Aug. 21, 2009) (dismissing complaint that demonstrated "only that Downey kept its reserves relatively constant during the fourth quarter of 2006 and the first quarter of 2007 before increasing its reserves commencing in the third quarter of 2007" and finding that confidential witness statements failed to demonstrate that defendants knew their public statements were false); In re PMI Group, Inc. Sec. Litig., C 08-1406 (SI), 2009 WL 1916934, at *8 (N.D. Cal. July 1, 2009) (dismissing complaint where confidential witness statements regarding subprime losses fell "short of alleging particular facts showing that the defendants were aware that the statements were false or misleading when made"); In re Radian Sec. Litig., 612 F. Supp. 2d 594, 618 (E.D. Pa. 2009) ("Although these allegations, if true, might be sufficient to establish declining conditions in the subprime market . . . , they are not particularized evidence that the defendants knew or must have known that their statements and omissions presented a danger of misleading buyers or sellers."); Pittleman v. Impac Mortgage

8

failure to plead concrete facts creating a strong inference of scienter was fatal to their claims. That is the case here as well. In addition, the Complaint here has yet another fundamental flaw: it asserts claims that have no place in an American court nor any statutory basis under federal securities law because they involve a French company, several Individual Defendants who are citizens of and reside in France, securities that trade on a French exchange, disclosures that were made in France and culpability that would have to be shown with regard to executives in France.

## I.   SECTION 10(b) DOES NOT COVER CLAIMS BY INVESTORS PURCHASING SG SHARES ON A FOREIGN EXCHANGE

The implied private right of action under Section 10(b) does not cover shares of a foreign issuer traded on a foreign exchange, either under the Second Circuit's subject matter jurisdiction analysis in Morrison v. National Australia Bank Ltd., 547 F.3d 167 (2d Cir. 2008), cert. granted 130 S. Ct. 783 (Nov. 30, 2009), or simply as an interpretation of the reach of Section 10(b) as is currently before the Supreme Court.[6] The Second Circuit in Morrison held U.S. courts lack

---

Holdings, Inc., No. SACV 07-0970 (AG), 2009 WL 648983, at *3 (C.D. Cal. Mar. 9, 2009) (dismissing complaint where confidential witness statements as to underwriting standards are "vague accusations and conjecture"); In re 2007 Novastar Fin. Inc. Sec. Litig., No. 07-0139-CV-W-ODS, 2008 WL 2354367, at *4 (W.D. Mo. June 4, 2008) (dismissing complaint where "[p]laintiff's Complaint reads more like a cautionary tale from a treatise on business management than a charge of knowing misstatements or concealments" and observing that bad decisions "may constitute a claim for mismanagement – but they do not constitute fraud"), aff'd, 579 F.3d 878 (8th Cir. 2009). See also In re Citigroup Auction Rate Sec. Litig., No. 08 Civ. 3095 (LTS) (FM), 2009 WL 2914370, at *6 (S.D.N.Y. Sept. 11, 2009) ("Market conditions-specifically the 'subprime crisis'. . . give rise to an opposing and compelling inference that [d]efendants only engaged in bad (in hindsight) business judgments . . . and did not engage in the alleged conduct with an intent to deceive investors."). Even some non-scienter claims have been dismissed. E.g., Yu v. State Street Corp., No. 08-8235 (RJH), 2010 WL 668645, at *9 (S.D.N.Y. Feb. 25, 2010) (dismissing Section 11 and 12(a)(2) claims because "though the complaint states that troubles in the subprime mortgage market . . . began emerging before the write downs occurred, the Complaint does not contain allegations showing that market events diminished the value of any [of] the Fund's holdings in a way that should have been, but was not, reflected under the 'fair value' methods.").

[6] Oral argument was held in Morrison on March 29, 2010, and a decision is expected by June 2010. Based on oral argument, the expectation is a restriction on claims such as those here over

subject matter jurisdiction over securities claims by foreign plaintiffs who purchase shares of foreign companies on foreign exchanges (or "f-cubed" plaintiffs). Id. at 176.

Here, as in Morrison, "[e]nsuring the accuracy of [financial] statements . . . is much more central to the responsibilities of [Defendants'] corporate headquarters, which issued the statements, than to those of [U.S. subsidiaries], which did not." Morrison, 547 F.3d at 176.[7] Plaintiffs do not and cannot allege any U.S. connection to the alleged Kerviel conduct. Even as to the CDO and RMBS allegations, the Complaint makes clear that the relevant conduct occurred far from the U.S. Specifically, Plaintiffs assert that the plan for the CDO and RMBS business "was developed by SG's senior executives in Paris," that "SG Paris implemented its TGV initiative" (SAC ¶ 391), that VaR and P&L reports were sent to Paris on a daily basis (SAC ¶¶ 74, 238, 311, 392), that SG Paris had a "checks and balances system to monitor the reports that came in from New York" (SAC ¶ 396), and that when the market began deteriorating in mid 2007, it was SG Paris that "implemented several 'significant initiatives' in an attempt to remedy the valuation issues with its RMBS and CDO portfolio." (SAC ¶ 397.)[8] Tellingly, Plaintiffs

---

foreign companies traded on foreign exchanges. Moreover, the parties before the Supreme Court agree that this analysis is not a subject matter test, but rather an application of Section 10(b). Either way, the result is the same: claims by purchasers of SG stock on a foreign exchange have no place in this Court. But even before the Supreme Court rules, this Court has the discretion to apply Morrison, as Judges Chin, Pauley and Daniels have recently done. See Parks v. Fairfax Fin. Holding Ltd., No. 06 CV 2820 (GBD), 2010 WL 1372537, at *4 (S.D.N.Y. Mar. 29, 2010) (dismissing f-cubed case following Morrison); In re European Aeronautic Def. & Space Corp. Sec. Litig., No. 08 Civ. 5389 (WHP), 2010 WL 1191888, at *7 (S.D.N.Y. Mar. 26, 2010); Copeland v. Fortis, No. 08 Civ. 9060 (DC), 2010 WL 569865, at *5-6 (S.D.N.Y. Feb. 18, 2010).

[7] The effects test "has no bearing in an action involving the claims of foreign purchasers of a foreign company's securities on foreign exchanges." In re Alstom SA Sec. Litig., 406 F. Supp. 2d 346, 369 (S.D.N.Y. 2005).

[8] Two courts in this District applying Morrison have declined to find subject matter jurisdiction for precisely the sort of activity alleged here. See Copeland, 2010 WL 569865, at *5-6 (no subject matter jurisdiction where public disclosures relating to US RMBS and CDO valuations performed in New York were made abroad); Cornwell v. Credit Suisse Group, 666 F. Supp. 2d 381, 390 (S.D.N.Y. 2009) (same).

removed the allegation found in the First Amended and Consolidated Complaint that risk

analysis functions were transferred to Paris in "mid-2007." Docket Entry 59 (FAC ¶¶ 206, 211).

## II. PLAINTIFFS HAVE FAILED TO STATE A CLAIM UNDER SECTION 10(b) OF THE EXCHANGE ACT OR SEC RULE 10b-5

### A. Plaintiffs Have Failed to Sufficiently Plead Scienter

#### 1. Standard of Review

The standards for pleading fraud under Section 10(b) – including the requirement set

forth in Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308 (2007), to plead non-

conclusory facts creating an inference of scienter that is cogent and at least as compelling as any

opposing inference one could draw from the facts alleged – are well established in this Circuit

and are neatly summarized in Judge Pauley's recent decision in CIBC dismissing substantially

similar allegations. CIBC, 2010 WL 961596, at *7-8. Since Tellabs, the Second Circuit has

emphasized that "'[w]here plaintiffs contend defendants had access to contrary facts, they must

specifically identify the reports or statements containing this information.'" Teamsters Local 445

Freight Div. Pension Fund v. Dynex Capital, Inc., 531 F.3d 190, 196 (2d Cir. 2008) (alteration in

original) (quoting Novak v. Kasaks, 216 F.3d 300, 309 (2d Cir. 2000)). Further, with regard to

corporate scienter, a plaintiff must plead non-conclusory facts demonstrating that "an agent of

the corporation committed a culpable act with the requisite scienter, and that the act (and

accompanying mental state) are attributable to the corporation." Id. at 195.

#### 2. Plaintiffs' Rogue Trading Allegations Do Not Create a Strong Inference of Scienter

Plaintiffs devote 115 paragraphs to their "Defendants' Scienter" allegations. (SAC

¶¶ 203-318.) With regard to their rogue trading allegations, Plaintiffs point to alleged second-

hand statements by unnamed and unidentified "former and current employees" that "risk taking

was embraced" in the derivatives operations (SAC ¶ 203); Kerviel's wholly and transparently

self-serving assertions – made by a person awaiting criminal trial whose every attempt to implicate SG has been rebuffed by French authorities and who is viewed as an unreliable witness – that unidentified "superiors" allegedly knew of his unauthorized trades (SAC ¶ 204-209); so-called "red flags" that unidentified "management" ignored (SAC ¶ 208); entirely generalized descriptions of two Bank of France letters stating that certain risk procedures were "wanting" for "certain financial derivatives" – a large sector of the Company's business and not necessarily the Delta One desk – and making recommendations for improvement (SAC ¶ 214); statements by former employees who left the Company before the putative Class Period began (SAC ¶ 223); statements by an "international business lawyer in Paris" (SAC ¶ 224) with no involvement with SG or any Kerviel inquiry; SG's restatement to reflect the impact of Kerviel's unauthorized trades in prior periods (SAC ¶ 282); after-the-fact reports by regulators and SG (SAC ¶¶ 252-263, 271-281) – many of which do not mention <u>any</u> of the Individual Defendants – and various changes in senior personnel following the losses.  (SAC ¶¶ 300-307.)

Totally lacking, however, are any of the nonconclusory facts required by <u>Tellabs</u>: particularized facts suggesting knowledge of the rogue trader's activities by Messrs. Bouton, Mustier, Citerne, Alix, or any other senior officials responsible for SG's public statements, or by outside director Day.  Indeed, Plaintiffs themselves note that Kerviel was a "junior trader" (SAC ¶ 63) no less than six levels of supervision removed from senior executives.  (SAC ¶ 64.)  And some of the very reports that Plaintiffs cite conclude that lapses in internal controls "were not known by management" (SAC ¶ 261) and that even Kerviel's "hierarchy . . . never had any knowledge of either the size of the incriminated positions or the mechanisms used to conceal them."  SG, General Inspection Dept., <u>Mission Green: Summary Report</u> (May 20, 2008) at 6 (Ex. 9) (referenced in (SAC ¶¶ 271-278)).  In the absence of alleged facts showing that senior

executives knew or must have known that their representations were false – and, indeed, false throughout a three-year Class Period going back to August of 2005 -- the inference of scienter is non-existent, and certainly far from compelling.  Moreover, the absence of scienter is fatal not only to the claims of scienter against the Individual Defendants, but also, under <u>Dynex</u>, to the claims against the Company.[9]

### 3. Plaintiffs' Subprime Allegations Do Not Create a Strong Inference of Scienter

Plaintiffs' allegations of scienter with regard to the timing and size of the CDO and RMBS write downs are based overwhelmingly on so-called confidential witnesses who were lower-level employees based in New York rather than Paris and were far removed from the Individual Defendants.  These confidential witnesses are alleged to support the propositions that (1) at some point during the proposed Class Period, "Defendants" had "knowledge regarding problems in the subprime mortgage market" (SAC ¶ 227), (2) CDOs became less liquid by mid-2007, and (3) in the absence of market transactions, SG had to develop models to price the securities, which was difficult given the complexity of the instruments and the fact there were no longer trading prices.  (<u>E.g.</u> SAC ¶ 229.)  But even taken together, and ignoring internal inconsistencies, the statements attributed to these confidential witnesses cannot sufficiently

---

[9]  Plaintiffs in reality allege nothing more than mismanagement, what the French Banking Commission characterized as "shortcomings" (SAC ¶ 24), "deficiencies" and "lapses" (SAC ¶ 261), which is not actionable as a securities fraud.  <u>See</u> <u>Santa Fe Indus., Inc. v. Green</u>, 430 U.S. 462, 477 (1977) (mismanagement is not "within the scope of [Section] 10(b)"); <u>Caiafa v. Sea Containers, Ltd.</u>, 525 F. Supp. 2d 398, 411-13 (S.D.N.Y. 2007) (allegations of mismanagement not actionable under Section 10(b)); <u>In re Citigroup Inc. Sec. Litig.</u>, 330 F. Supp. 2d 367, 375 (S.D.N.Y. 2004) ("such allegations of mismanagement . . . are insufficient to support a securities fraud claim under section 10(b)."), <u>aff'd sub nom.</u> <u>Albert Fadem Trust v. Citigroup, Inc.</u>, 165 F. App'x. 928 (2d Cir. 2006).

allege scienter, as none alleges that the Individual Defendants at any time knew information

contrary to their public statements.[10]

Indeed the Complaint suffers from at least one glaring and fatal omission: Plaintiffs do

not point to any facts showing that any Individual Defendant knew that AAA-rated super senior

positions had declined significantly in value before the third quarter of 2007, much less as of

August 2005 when the putative Class Period begins. Indeed, Plaintiffs acknowledge that CDOs

and RMBS involve many different tranches providing "different risk and return for different

investors" – ranging from unrated tranches carrying the most direct exposure to losses on the

---

[10] CW1, who is not alleged to have had any contact with anyone more senior than her immediate supervisor (the Director of "FICC Analytics"), alleged that by "mid-2007" trading of CDO products and RMBS "declined," causing the assets "to effectively become illiquid" (SAC ¶ 229), and that as they became illiquid by mid-2007, SG had to value these positions based on models rather than trades (because there were no trades) (SAC ¶ 230), and that these models did not rely on the "ABX Index," which was an index not of SG's positions but of "the cost of buying and selling 'insurance'" for RMBS products." (SAC ¶ 232.)

CW2, an "IT Director" who reported to Sergio Leifert (erroneously called SG's "Chief Investment Officer" (SAC ¶ 233)), and who (like all of the other confidential witnesses) does not purport to have had any contact with any of the Individual Defendants or to have had any awareness of what information was provided to them, stated that the IT budget was cut between March 2007 and the summer of 2007 and it was "widely known" that these cuts were based "at least in part" on the collapse of the "United States residential mortgage market." (SAC ¶ 234.) CW2 also said that by the second quarter of 2007, he could tell from his position as an "IT Director" that CDOs had become "virtually illiquid" (SAC ¶ 236), and that the lack of liquidity caused the IT department to work around the clock in an attempt to obtain a "proper valuation" for the CDOs and that "participants" discussed that the models were not "working." (SAC ¶ 237.)

CW3, who did not even join SG until July 2007, stated that her department, which handled commercial and not residential mortgage backed securities (SAC ¶ 75), was disbanded "due to the credit crunch." (SAC ¶¶ 75, 241.) CW4 left SG in April 2006, yet purported to have knowledge regarding "problems" with SG's CDO and RMBS valuations. (SAC ¶¶ 77, 80.) CW5, who was employed by SG only from July 2006 to January 2007 as a "vice president" (SAC ¶ 81), stated that in 2006 investors had "greater difficulty" finding investors to buy the "risky equity tranches" of CDOs (SAC ¶ 243), and, in contradiction to CW1, it was "common knowledge" that "by the end of 2006" the assets had become illiquid. (SAC ¶ 245.) CW5 stated that "sales staff" received inventory reports showing that turnover for CDOs "decreased dramatically" in 2006. (SAC ¶ 246.) Finally, CW6, a "senior operations specialist," recalled that things were "not going well" with securitized subprime loans "as early as mid-2007." (SAC ¶¶ 249, 250.)

underlying subprime mortgages to AAA super senior tranches (owned by SG) carrying the least

risk.  (SAC ¶¶ 114-116.)  Plaintiffs (and the confidential witnesses on whom they rely) then

ignore this distinction altogether and make no showing at all that any of the Individual

Defendants received any information showing that the failure to write down AAA super senior

tranches before the third quarter was incorrect, let alone fraudulent.  In the absence of such a

showing, similar complaints have routinely been dismissed.  See, e.g., In re Sec. Capital, 2010

WL 1372688, at **24-27 (dismissing complaint alleging company should have devalued CDO

investments in late 2006 or early 2007); CIBC, 2010 WL 961596, at *4, *12 (dismissing

complaint alleging failure to write down RMBS or CDO positions prior to Q3 2007, when

company disclosed that majority of exposure was on AAA rated securities); In re Downey, 2009

WL 2767670, at *5 (dismissing complaint where facts did not demonstrate that anything other

than changing conditions at company and in market dictated increases in reserves prior to Q3

2007); In re PMI, 2009 WL 1916934, at *8 (dismissing complaint in which plaintiff alleged that

defendants should have written investment down to zero by Q3 2007 rather than Q1 2008); In re

Radian, 612 F. Supp. 2d at 618 (dismissing complaint where facts did not show that failure to

report impairment prior to Q3 2007 was an extreme departure from range of business treatments

permitted under GAAP).[11]  Indeed, similar allegations were recently dismissed in the context of

Sections 11 and 12(a)(2) of the Securities Act, which, unlike the claims here, do not even require

---

[11]  In MGIC, 2010 WL 601364, the facts showed that beginning in the fourth quarter of 2006,
MGIC began to experience a rise in delinquencies among loans in its 2005 and 2006 books, and
that these delinquencies began to grow to problematic levels in the first and second quarters of
2007.  But plaintiffs failed to show that MGIC realized the severity of the problem until the third
quarter.  The court dismissed the complaint, stating:  "Based on this synopsis, one can reasonably
infer that the severe delinquencies and other problems in the 2005 and 2006 books took MGIC
and its executives by surprise in the third quarter of 2007, and that therefore defendants did not
intend to deceive the market when, between late 2006 and mid-2007, they informed investors
that the 2005 and 2006 books were not experiencing unusual problems."  Id. at *12.

proof of scienter. See Yu, 2010 WL 668645, at *9 (dismissing '33 Act complaint where Fund's

net asset value began to drop only in August 2007 as Fund began to write down mortgage-related

securities).

Of course, the mere fact that SG took write downs beginning in the 2007 third quarter –

like others with super-senior positions – does not mean SG committed a fraud by not taking its

write downs earlier. See, e.g., CIBC, 2010 WL 961596, at *12 ("'If all that is involved is a

dispute about the timing of the writeoff . . . we do not have fraud; we may not even have

negligence.'" (quoting DiLeo, 901 F.2d at 627)).  Courts in this Circuit consistently reject such

pleading of fraud by hindsight, especially when the market continues to change.[12]

Here, not a single confidential witness makes a particularized allegation that Messrs.

Bouton, Mustier, Citerne, Alix, or any senior SG executives responsible for the issuance of SG's

public statements (or Mr. Day, an outside director) knew that those statements were false, much

less had contrary information about the value of SG's CDOs or RMBS or the need to take earlier

or greater write downs.[13]  Indeed, no confidential witness is alleged to have had any direct

---

[12]  See, e.g., Stevelman v. Alias Research Inc., 174 F.3d 79, 84 (2d Cir. 1999) ("'Mere allegations that statements in one report should have been made in earlier reports do not make out a claim of securities fraud.'" (quoting Acito v. IMCERA Group, Inc., 47 F.3d 47, 53 (2d Cir. 1995))); Shields v. Citytrust Bancorp, Inc., 25 F.3d 1124, 1129 (2d Cir. 1994) (affirming dismissal of complaint brought in the wake of late-1980s commercial real estate collapse as "fraud by hindsight"); Denny v. Barber, 576 F.2d 465, 470 (2d Cir. 1978) (affirming dismissal of complaint brought during economic downturn of 1970s as "fraud by hindsight"); see also CIBC, 2010 WL 961596, at *11 ("CIBC, like so many other institutions, could not have been expected to anticipate the crisis with the accuracy Plaintiff enjoys in hindsight. . . .").

[13]  See CIBC, 2010 WL 961596, at *9 (dismissing subprime complaint where "[p]laintiffs should, but do not, provide specific instances in which defendants received information that was contrary to their public declarations"); Steinberg v. Ericsson LM Tel. Co., No. 07 CV 9615 (RPP), 2008 WL 5170640, at *13 (S.D.N.Y. Dec. 10, 2008) (plaintiffs failed to allege scienter where complaint did not identify any reports seen by executive defendants, or conversations in which they were provided information, that was inconsistent with public statements), aff'd sub nom. Furher v. Ericsson LM Tel. Co., No. 09-0134-cv, 2009 WL 3228895 (2d Cir. Oct. 8, 2009) (summary order); Ellington Mgmt. Group, LLC v. Ameriquest Mortgage Co., No. 09 Civ. 0416

communication with any of the Individual Defendants, or any of SG's officers in Paris,

particularly those making the alleged misstatements at issue (or with Mr. Day).[14] Thus, such

statements do not create a strong inference of scienter.

Tellingly, Plaintiffs do not point to a single other financial institution that broke out for

separate disclosure, or marked down, AAA-rated super senior positions before the third quarter

of 2007, perhaps because less than three-tenths of one percent of all credit-related write downs

between 2007 and 2010 occurred prior to the third quarter of 2007 (see Ex. 8), or because it was

not until October 2007 that the rating agencies began to downgrade super senior tranches.[15] See

---

(JSR), 2009 WL 3170102, at *3 (S.D.N.Y. Sept. 29, 2009) (granting defendants' motion to dismiss plaintiffs' Section 10(b) claims where plaintiffs failed to put forth "concrete allegations that senior management knew of, but actively ignored [] purported violations," but rather merely alleged only "indirect, hypothetical allegations," regarding deficiencies in mortgages underlying purchased securities, an approach to pleading recklessness rejected by the Second Circuit (citing S. Cherry St., LLC v. Hennessee Group LLC, 573 F.3d 98 (2d Cir. 2009)).

[14] See Campo v. Sears Holdings Corp., 635 F. Supp. 2d 323, 335-36 (S.D.N.Y. 2009) (rejecting scienter allegations dependent, in part, on the assertions of confidential witnesses because none of the confidential witnesses was alleged to have had contact with any of the individual defendants), aff'd, 2010 WL 1292329 (2d Cir. Apr. 6, 2010); In re PXRE Group, Ltd., Sec. Litig., 600 F. Supp. 2d 510, 537 (S.D.N.Y. 2009) (rejecting confidential witness allegation, where witness had no firsthand knowledge as to whether concerns over risk modeling were brought to the attention of individual defendants), aff'd sub nom. Condra v. PXRE Group Ltd., No. 09-1370-cv, 2009 WL 4893719 (2d Cir. Dec. 21, 2009); accord Malin v. XL Capital Ltd., 499 F. Supp. 2d 117, 141 (D. Conn. 2007); aff'd, 312 F. App'x 400 (2d Cir. 2009); see also In re Downey Sec. Litig., No. CV 08-3261-JFW (RZx), 2009 WL 736802, at *13 (C.D. Cal. Mar. 18, 2009) (rejecting confidential witness allegations about subprime lender's reserves that were not based on conversations with individual defendants).

[15] Plaintiffs do not allege that the mere fact that SG owned TCW would make any senior officials aware of any adverse facts regarding the value of the particular CDOs to which it was exposed. Crucially, there is no allegation that TCW possessed information about the value of SG's particular CDOs – regardless of whether that information was, or could have been, passed on to senior SG management – as opposed to general market information about subprime mortgages. Finally, while Plaintiffs allege that SG should have taken an earlier, greater write down because of the supposed riskiness of its hedges with monoline insurers (SAC ¶ 352), they do not allege how SG would have known that these insurers, who had no relation to SG, became a risky counterparty before SG took its 2007 year-end write down. See CIBC, 2010 WL 961596, at *13 (allegation that earlier, greater write down was necessary because of monoline risk on hedged CDOs was "particularly tenuous because they rest on the notion that Defendants failed to

Jian Hu, <u>Structured Finance CDO Ratings Surveillance Brief: September 2007</u>, Moody's

Investors Servs., Oct. 23, 2007, at 2 (as of September 30, 2007, only "0.6% of all Aaa [] CDO

tranches outstanding, or 0.2% by outstanding balance" had been downgraded in 2007) (Ex. 10).

Yet, well before those actions, SG had actually pre-announced write downs on its super senior

positions – an action at odds with an effort to conceal losses.[16]  As Judge Pauley stated, if a

defendant "chose an incremental measured response" to the global financial crisis by pre-

announcing estimated losses and taking multiple write downs over time, it does not create a

cogent inference of scienter.  <u>CIBC</u>, 2010 WL 961596, at *11.

      Moreover, as the Second Circuit held in affirming this Court's dismissal of a securities

fraud complaint premised on a supposedly inadequate, untimely write down, "plaintiffs' cursory

allegations that defendants failed to record accurately on the company's balance sheet the value

of certain assets and other alleged departures from [GAAP] establish neither defendants' motive

and opportunity nor strong circumstantial evidence of conscious behavior or recklessness."

<u>Caiafa v. Sea Containers Ltd.</u>, 331 F. App'x 14, 16 (2d Cir. 2009) (summary order).  Here, as in

<u>Caiafa</u>, the Complaint contains "no allegations that there were any internal reports that suggested

that the failure to take an impairment charge earlier was an incorrect application of accounting

principles" and "rose to the level of fraud." <u>Caiafa</u>, 525 F. Supp. 2d at 413 (citations omitted);

<u>see also</u> <u>CIBC</u>, 2010 WL 961596, at *13 ("The allegations regarding CIBC's write downs

---

disclose internal financial information of a company <u>other than CIBC</u>" as plaintiffs failed to
allege "that Defendants knew of, had access to, or could collect information that ACA Financial
was on the verge of bankruptcy" (alteration in original)).

[16] <u>See</u> <u>Rombach v. Chang</u>, 355 F.3d 164, 176 (2d Cir. 2004) ("[T]he allegation that defendants
behaved recklessly is weakened by their disclosure of certain financial problems prior to the
deadline to file its [sic] financial statements."); <u>see also</u> <u>In re Nokia Oyj (Nokia Corp.) Sec. Litig.</u>,
423 F. Supp. 2d 364, 407 (S.D.N.Y. 2006) (disclosure of poor sales ten days before financial
statement filing deadline undercut inference that defendants knowingly concealed problems).

amount to fundamental disagreements with Defendants' business judgments in a tumultuous economic downturn – claims that are not actionable under Section 10(b) and Rule 10b-5.").[17]

    4.    Plaintiffs Have Failed to Allege Scienter Based on Motive and Opportunity

Plaintiffs have failed to meet their burden of raising a cogent and equally compelling inference of intentional fraud by their allegations of insider stock sales. Plaintiffs fail to provide factual support or sources for many of the (at times erroneously) alleged trades In addition, given the 30-month putative Class Period and SG's quarterly reporting cycle, Plaintiffs could pick virtually any sales over a two-and-a-half-year period and allege that such sales constituted insider trading based on their theory that nearly <u>every</u> statement Defendants made over a 30-month period was false or misleading. Of course, since it is well known that senior executives are compensated largely in stock and often liquidate very significant portions of such shares for tax and other reasons multiple times throughout the year, Plaintiffs' approach would make almost any sales by a senior executive allegedly improper.

Even beyond this deficiency, Plaintiffs' stock sale and insider trading allegations fail for the following reasons:

<u>First</u>, the changes to the Individual Defendants' SG stock holdings during the putative Class Period are inconsistent with fraudulent intent. Both Messrs. Bouton and Citerne actually <u>increased their holdings</u>, which weakens any inference of scienter.[18]

---

[17]  The lack of a restatement or qualified audit opinion as to its CDOs or RMBS undercuts any inference that SG failed to properly account for the value of these investments prior to taking its write downs. <u>See</u> <u>Ind. State Dist. Council of Laborers & Hud Carriers Pension & Welfare Fund v. Omnicare, Inc.</u>, 583 F.3d 935, 945 (6th Cir. 2009).

[18]  <u>See</u> <u>Avon Pension Fund v. GlaxoSmithKline PLC</u>, 343 F. App'x 671, 673 (2d Cir. 2009) (summary order). <u>See also</u> SG, <u>2006 Registration Document</u> at 54 (Mar. 9, 2006) (Mr. Bouton: 98,500 shares; Mr. Citerne: 25,897 shares) (Ex. 11) (referenced in (SAC ¶¶ 130-132)); 2007 Reg. Doc., <u>supra</u>, at 58 (Mr. Bouton: 120,000 shares; Mr. Citerne: 43,124 shares) (Ex. 1); SG, <u>2008</u>

<u>Second</u>, Plaintiffs do not allege the percentage of stock the Individual Defendants sold during the putative Class Period compared to prior years.[19] Thus, there is no basis to infer that the amount of their purported stock sales during the putative Class Period was unusual in amount. Similarly, Plaintiffs fail to differentiate between sales of stock and options exercises, often using the two interchangeably. (<u>See, e.g.</u>, SAC ¶ 437.) There can be no inference of improper intent as to options exercises. <u>See In re Bristol-Myers Squibb Sec. Litig.</u>, 312 F. Supp. 2d 549, 561 (S.D.N.Y. 2004) (declining to infer improper motive from exercise of stock options).

<u>Third</u>, because Plaintiffs rely on such a long putative Class Period during which any sales would have constituted insider trading under their theory, Plaintiffs do not show that the timing of the sales coincided with any of the allegedly false comments, "such that the [c]ourt could infer that the Individual Defendants sought to reap the immediate benefit a falsely positive statement would have on the market." <u>In re Bausch & Lomb, Inc. Sec. Litig.</u>, 592 F. Supp. 2d 323, 344 (W.D.N.Y. 2008). Where the bulk of the alleged misrepresentations occur after the defendants sold stock, "the theory of insider selling as a motive for misrepresentations is effectively negated." <u>In re AstraZeneca Sec. Litig.</u>, 559 F. Supp. 2d 453, 469 (S.D.N.Y. 2008) (disregarding insider trading motive theory for alleged misrepresentations because over a year period, at least

---

<u>Registration Document</u> at 64 (Mar. 3, 2008) [hereinafter <u>2008 Reg. Doc.</u>] (referenced in (SAC ¶¶ 364, 430)) (Mr. Bouton: 127,500 shares; Mr. Citerne: 43,321 shares) (Ex. 12). Mr. Alix, who only became a senior officer in September 2006, had almost identical share holdings in 2007 and 2008. <u>Compare</u> 2007 Reg. Doc., <u>supra</u>, at 68 (5,030 shares) (Ex. 1) <u>with</u> 2008 Reg. Doc., <u>supra</u>, at 73 (5,037 shares) (Ex. 12). Plaintiffs make no allegations as to Mr. Mustier's or Mr. Day's prior holdings.

[19] In assessing whether a defendant's trading activity is "unusual and suspicious," courts look at the percentage of stock sold versus the insider's total stock holdings, not absolute percentages of amounts sold, as Plaintiffs allege here. <u>See Malin</u>, 499 F. Supp. 2d at 151-52; <u>In re Glenayre Techs., Inc. Sec. Litig.</u>, No. 96 Civ. 8252 (HB), 1998 WL 915907, at *3-4 (S.D.N.Y. Dec. 30, 1998) (no inference of scienter where defendant engaged in comparable cumulative sales both inside and outside of alleged class period), <u>aff'd sub nom.</u> <u>Kwalbrun v. Glenayre Techs., Inc.</u>, 201 F.3d 431 (2d Cir. 1999).

fifteen alleged misrepresentations were made, but out of four defendants, only two defendants made one sale each), aff'd sub nom. State Univ. Ret. Sys. v. AstraZeneca PLC, No. 08-3185-cv, 2009 WL 1796534 (2d Cir. June 25, 2009); see also City of Brockton Ret. Sys. v. Shaw Group, Inc., 540 F. Supp. 2d 464, 475 (S.D.N.Y. 2008) (ten week gap between stock sales and corrective disclosure undercut inference of scienter); In re Bausch & Lomb, 592 F. Supp. 2d at 344-45 (where defendants stopped selling shares more than two months before corrective disclosure, "[s]uch timing does not suggest that the Individual Defendants meant to realize profits immediately prior to an expected and dramatic fall in the stock's price").

Here, no insider Individual Defendant is alleged to have sold a single share after SG supposedly misrepresented that its subprime exposure was "marginal" (see, e.g., SAC ¶ 167), and throughout the remainder of the putative Class Period, while SG supposedly continued to make false statements regarding its subprime exposure. Indeed, the last alleged sale by any insider Individual Defendant is five months before the end of the putative Class Period. Thus, there is nothing "opportunistic" (id. ¶ 283) about the timing of any alleged sales. See CIBC, 2010 WL 961596, at *9 (that "the Defendants did not sell their stock just prior to a price drop" was "a fact suggesting the absence of any nefarious motives").

As to Mr. Mustier, Plaintiffs' allegations, based on conduct that purportedly occurred in 2007, are implausible, vague and do not create an inference that the information he purportedly knew was not ultimately disclosed accurately and in a timely fashion. For instance, despite supposedly knowing that SG's CDO and RMBS investments were overvalued and its monoline hedges were not creditworthy for months, if not years before his August 2007 trades, Mr. Mustier is alleged to have waited until August 2007, months after SG's share price hit its Class Period high but months before SG's next financial disclosure, to sell his shares. Any inference of

21

fraud based on the timing of his sales is further weakened because the source Plaintiffs rely on,

(see SAC ¶ 268), makes clear that Mr. Mustier is alleged to have told his broker to "liquidate

everything," not just his SG holdings (which represented a small portion of his portfolio), based

on what he perceived were recent movements in U.S. Treasuries. See Nicolas Cori, Scandale: la

Société Générale rempile, Libération.fr, August 7, 2009 (Ex. 13) (referenced in (SAC ¶ 268)).

Since the article does not describe a fraud, but rather reports an ongoing investigation, Plaintiffs

cannot infer one. See In re Ceridian Corp. Sec. Litig., 542 F.3d 240, 248-49 (8th Cir. 2008) (no

inference of scienter from ongoing investigation, even when it led to executive resignation); see

also In re Optionable Sec. Litig., 577 F. Supp. 2d 681, 690 (S.D.N.Y. 2008) (no fraud can be

inferred from newspaper articles that do not describe a fraud).

    Moreover, while Plaintiffs attempt to shock the court by alleging Mr. Mustier sold 50%

of his SG common stock in one day (a figure that is devoid of any context), and similarly that

Defendants Bouton, Citerne and Alix sold 65%, 81% and 81% respectively (e.g., SAC ¶¶ 21-23),

despite having increased their total holdings, Plaintiffs do not allege they considered exercisable

options in these Defendants' total holdings, or if they did, that these percentages would have been

significantly lower. See City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Waters

Corp., No. 1:08-11889-JLT, 2010 WL 1221402, at *12 (D. Mass. Mar. 25, 2010) ("this court

thinks that it would be remiss to disregard defendants' options . . . in determining the quality of

any inference"); In re eSpeed, Inc. Sec. Litig., 457 F. Supp. 2d 266, 290-91 (S.D.N.Y. 2006)

(considering exercisable options in determining percentage of stock sold).

    Finally, Mr. Mustier is alleged to have made his sales within two weeks of SG's release

of its Q2 2007 financial statements, raising an inference that these sales were made in a trading

window. See Shaw Group, 540 F. Supp. 2d at 475 (no suspicious timing where sales made in

trading window). Other Defendants are similarly alleged to have made trades after the release of financial information. (Compare, e.g., SAC ¶ 139 (alleging SG announced 2006 financial results on Feb. 14, 2007) with SAC ¶ 481 (alleging Mr. Bouton sold shares on Feb. 15, 2007)).

**B. Plaintiffs Have Failed to Plead Actionable Misrepresentations or Omissions**

        1.      Plaintiffs' "Puzzle Pleading" is Insufficient
                  Under Applicable Pleading Standards

Apart from all the pleading deficiencies detailed above, Plaintiffs' "puzzle pleading" (e.g., SAC ¶ 152) is impermissible under Fed. R. Civ. P. 8(a) and 9(b), as well as the PSLRA. Consider the following:

- Plaintiffs purported "false statements" consist of a laundry list of public filings between August 1, 2005 and January 24, 2008 (SAC ¶¶ 122-182);

- Plaintiffs rely extensively on lengthy block quotes with sentences bolded without explanation (SAC ¶¶ 122-126, 130, 131, 135, 139, 140, 141, 143, 144, 145, 146, 150, 151, 152, 156, 158, 160, 161, 167, 169, 176, 177, 188);

- Plaintiffs use the most generalized explanations of why all of the statements over a 30-month period were collectively misleading (SAC ¶¶ 142, 155, 168); and

- With respect to each alleged representation over the 30-month period, Plaintiffs fail to connect any alleged facts showing why any public statement was false when made.

In In re Downey, the court dismissed a subprime securities class action precisely because, as here, plaintiff had

    (1) with respect to each alleged misrepresentation, failed to connect the particularized facts demonstrating that the statement was false or misleading when made; (2) with respect to each of the Individual Defendants, failed to connect the particularized facts demonstrating that each Individual Defendant knew, or was deliberately reckless in not knowing, that a particular statement was false or misleading when made; (3) pled lengthy block quotes with sentences bolded and highlighted, without any explanation as to why any of the sentences were bolded and highlighted or what the bolded and highlighted material means or represents; (4) pled confidential witness statements without connecting those statements to the alleged misrepresentations; (5) added allegations seemingly meant to explain why earlier statements were false without specifying to which particular statements the allegations pertain; and (6) attributed alleged misconduct to all "defendants" without providing particularized facts demonstrating the involvement of any of the Individual Defendants.

In re Downey, 2009 WL 2767670, at *3; accord In re Alcatel Sec. Litig., 382 F. Supp. 2d 513,

534 (S.D.N.Y. 2005) (dismissing complaint where plaintiffs listed "lengthy quotations from

various releases by [Defendants] . . . [followed by] a similar (in most cases identical) laundry list

of 'specific' reasons why the statements are allegedly false"); N.Y State Teachers' Ret. Sys. v.

Fremont Gen. Corp., No. 2:07-cv-5756 (FMC-FFMX) (C.D. Cal. Mar. 29, 2010) (continued

"puzzle pleading" failed to make sufficient allegations pertaining to each defendant's knowledge).

      With regard to the alleged rogue trading fraud, most of the alleged misrepresentations in

SG's public statements simply consist of general descriptions of SG's controls or non-pejorative

characterizations of those controls going back to 2005.  (E.g., SAC ¶¶ 122-124).  To be sure, it

turned out in retrospect that there was a breakdown in controls in the Delta One area, which led

to significant losses when the rogue trader's positions were discovered and unwound in January

2008.  That breakdown, however, by no means suggests that SG's public statements about its

internal controls were false, or that the Individual Defendants knew that they were false when

made.  The claims should be dismissed even though "by definition, all frauds [perpetrated on

institutions] demonstrate the 'inadequacy' of existing controls, just as all bank robberies

demonstrate the failure of bank security and all burglaries demonstrate the failure of locks and

alarm systems."  Higginbotham v. Baxter Int'l Inc., 495 F.3d 753, 760 (7th Cir. 2007).

      Moreover, SG is a group of companies with hundreds of businesses, which allegedly

operated in over 80 countries and employed nearly 135,000 people.  (SAC ¶ 40.)  General

statements about its controls are not rendered false by a previously undiscovered breakdown in a

single discrete area of a company's business, no matter how significant the consequences of that

breakdown might be.  See In re Citigroup, Inc. Sec. Litig., 330 F. Supp. 2d 367, 379 (S.D.N.Y.

2004) (allegations that "Citigroup extended increasingly more credit to an 'unstable borrower'

[Enron]" did not show falsity of statements regarding Citigroup's risk management procedures as a whole (alteration in original) (citation omitted)); In re Novastar, 2008 WL 2354367, at *3 (even weakened underwriting standards do not mean that "controls or standards were not 'strong' or 'effective' as described in the Company's public statements").

With regard to the CDO and RMBS write downs, Plaintiffs provide no explanation at all for how statements from August 2005 on could have been false or misleading with regard to subprime exposure.  Plaintiffs seem to quarrel with statements late in the putative Class Period allegedly indicating that CDOs represented 1% of the CIB division's revenue, and that subprime exposure was, in SG's opinion, "low" or "negligible" or "under control," as well as SG not separately itemizing its CDO or RMBS exposures prior to the third quarter of 2007.  Plaintiffs, however, point to (i) no facts contradicting the 1% representation in the context of revenue; (ii) no facts contradicting the opinion that, at the time SG expressed its opinion, Defendants believed the Company's investments in AAA rated super senior tranches involved anything beyond a low risk of loss from the deterioration in the subprime mortgage market, and (iii) no facts suggesting that Defendants had previously chosen to break out CDO or RMBS exposures before the third quarter of 2007, but had changed course and decided not to when they realized that the exposures were growing.  See MGIC, 2010 WL 601364, at *10 (no duty to disaggregate subprime exposure prior to third quarter of 2007).[20]

---

[20] Moreover, statements like "low" and "under control" are too vague to be material under the federal securities laws, especially when considered relative to other banks.  E.g., Fremont, 2009 WL 3112574, at *9 (statements that "we tend to play at the upper end of that spectrum," that the company "seeks to mitigate its exposure to credit risk through underwriting standards that strive to ensure appropriate loan to collateral valuations;" and that the company "seeks to minimize credit exposure through loan underwriting that is focused upon appropriate loan to collateral valuations and cash flow coverages" are too vague to be material); In re Downey, 2009 WL 2767670, at *5 (statements regarding "'strong' capital position" too vague to be material).  Indeed, while SG was hurt by the credit crisis, it was not hurt nearly as badly as many other major

Similarly, Plaintiffs' allegations as to false statements regarding SG's Value at Risk ("VaR") calculations are wholly insufficient. (See, e.g., SAC ¶ 151). As Judge Pauley recognized in CIBC, VaR calculations are opinions, based on a prediction of future risk. CIBC, 2010 WL 961596, at *11. (See also SAC ¶ 108 (VaR is the "measure of market risk based on estimated likelihood of losses.")). To allege that a statement of opinion is false, Plaintiffs "must allege 'with particularity' 'provable facts' to demonstrate that the statement of opinion is both objectively and subjectively false." Bond Opportunity Fund v. Unilab Corp., No. 99 Civ. 11074 (JSM), 2003 WL 21058251, at *5 (S.D.N.Y. May 9, 2003) (quoting Va. Bankshares v. Sandberg, 501 U.S. 1083, 1093-98 (1991)), aff'd, 87 F. App'x 772 (2d Cir. 2004). In CIBC, the court rejected plaintiffs' attempt to "engraft a conscious intent to mislead onto the erroneous quantitative prediction – the VaR." CIBC, 2010 WL 961596, at *21. "Even assuming the VaR metric was neither forward-looking nor accompanied by appropriate cautionary language, Plaintiff cannot show the VaR calculations were both objectively and subjectively false." Id.

## 2.    Plaintiffs' "Group Pleading" Allegations are Insufficient

Aside from Plaintiffs' failure to meet basic pleading requirements, Plaintiffs impermissibly attribute all of the allegedly false statements to all Defendants rather than providing particularized facts demonstrating the involvement of any of the Individual Defendants. (E.g., SAC ¶¶ 226, 272, 298, 322, 330, 399, 422).

Indeed, Messrs. Citerne, Alix and Day are not alleged anywhere in the entire Complaint to have made a single false statement. Rather, by mere "virtue of their positions" (SAC ¶ 87),

---

financial institutions. As of the end of 2008, SG's credit-related write downs placed it 23rd on the list of banks that had taken significant credit-related losses as a result of the subprime meltdown – and the size of its loss was roughly one seventh the size of the average loss for each of the top ten banks. See Rodney Yap & Dave Pierson, Banks' Subprime Market-Related Losses Top $815 Billion," Bloomberg.com, http://www.bloomberg.com/apps/news?pid= newsarchive&sid=aQBNVIONOiAc (Feb. 9, 2009) (Ex. 14).

Plaintiffs simply assume that "Individual Defendants participated in drafting, producing, reviewing and/or disseminating the materially false and misleading information." (Id. ¶ 89.) But under the heightened pleading requirements of Rule 9(b) and the PSLRA, Plaintiffs cannot invoke the "group pleading" doctrine as to Messrs. Citerne, Alix and Day nor can they improperly "clump defendants together in vague allegations." In re Refco, Inc. Sec. Litig., 503 F. Supp. 2d 611, 641 (S.D.N.Y. 2007) (internal quotation marks omitted); Dresner v. Utility.com, Inc., 371 F. Supp. 2d 476, 494 (S.D.N.Y. 2005) ("conclusory, vague allegations" cannot support the application of the group pleading doctrine).

Plaintiffs' attempts to group plead Mr. Day – a non-executive outside director residing in California – are particularly deficient. The Complaint's 489 paragraphs nowhere allege that Mr. Day made, authorized, approved, or was otherwise involved in the dissemination of any statement concerning SG, much less any of the supposed misstatements or omissions, or other fraud.[21] Plaintiffs do not allege that Mr. Day signed or certified any public disclosures or AMF filings, or that he issued any public statements to the press on behalf of SG. The Complaint simply defines Mr. Day as an "Individual Defendant" (SAC ¶ 19), and then attributes knowledge, authority, actions, and statements to him as part of the group of "Individual Defendants." (See, e.g., SAC ¶¶ 23, 87–92, 143, 283, 297 – 299 & n.8, 309 – 11, 415, 416, 418 – 426, 432, 451, 481, 482, 485). The only factual allegation about Mr. Day's purported role at SG is merely that he is the chairman of SG's subsidiary TCW and an SG director (see SAC ¶¶ 20, 53-54, 286, 312, 358), and not that he is involved in the day-to-day management of the Company. Applying the group pleading doctrine to Mr. Day is therefore inappropriate. See Irvine v. ImClone Sys., Inc., No. 02

---

[21] Notably, Mr. Day is not mentioned in any of the reports cited by Plaintiffs that were issued in the wake of SG's January 2008 losses. (See SAC ¶¶252-263, 271-281).

Civ. 109 (RO), 2003 WL 21297285, at *2 (S.D.N.Y. June 4, 2003); Bruce v. Martin, No. 90 Civ.

1002 (RWS), 1992 WL 204395, at *6 (S.D.N.Y. Aug. 14, 1992).

### C.  Plaintiffs Fail to Plead Loss Causation

The Supreme Court requires that in a stock drop case plaintiffs plead not merely that they

bought at an allegedly inflated price, but that there was a subsequent corrective disclosure that

provides a basis for determining the losses directly attributable to the allegedly fraudulent

disclosures on which plaintiffs purport to have relied.  Dura Pharms., Inc. v. Broudo, 544 U.S.

336, 346 (2005).  The Second Circuit, even before Dura, has applied these principles of loss

causation.  See Lentell v. Merrill Lynch & Co., 396 F.3d 161, 175 n.4 (2d Cir. 2005) (disclosure

was not corrective because it did not reveal falsity of prior statements).

Attempting to satisfy their burden of pleading loss causation, Plaintiffs allege that SG

issued a purportedly corrective disclosure on January 24, 2008.  (SAC ¶ 457.)  However, that

announcement timely disclosed a €4.9 billion trading loss caused by Kerviel.  Plaintiffs do not

and cannot allege the Kerviel announcement caused a decline in SG's stock price due to any

purported revelation of internal control weaknesses, as opposed to the Company's actual €4.9

billion loss.  In re Rhodia SA Sec. Litig., 531 F. Supp. 2d 527, 545 (S.D.N.Y. 2007) ("disclosure

of financial losses generally – even if those financial losses are a result of the specifically

concealed fact – is not sufficient" to allege loss causation).[22]  Had Kerviel's trades resulted in a

profit, it cannot be said that SG's stock price still would have declined.

The Complaint is less coherent as to a corrective disclosure regarding the CDO or RMBS

losses.  Plaintiffs themselves suggest no basis at all for determining what portion, if any, of the

so-called corrective disclosure price drop is attributable to the losses on the CDO or RMBS

---

[22]  See also In re Avista Sec. Litig., 415 F. Supp. 2d 1214, 1220-21 (E.D. Wash. 2005) (no loss causation where "corrective disclosure" did not mention issuer's risk management policies).

positions. It is possible that the market anticipated the losses would have been greater, about the same, or less than the losses that were disclosed; and it is possible that the market was relieved going forward that the losses had been taken and would not affect future results, or was concerned going forward that there would be more losses to come and they would affect future results. Indeed, Plaintiffs tacitly concede that €1.3 billion of SG's loss was purportedly built into a 16% decline in SG's share price between January 18 and 21, days before the alleged corrective disclosure. (SAC ¶ 461.) In the absence of Plaintiffs pointing to any basis for disaggregating the impact of the so-called corrective disclosure (SAC ¶¶ 95, 308), it is impossible to tell if <u>any</u> of the post-disclosure market loss related to SG's CDO or RMBS exposure as opposed to Kerviel, or either of these factors as opposed to overall market declines related to the credit crisis. <u>See</u> <u>Lentell</u>, 396 F.3d at 174, 177 (considering "marketwide phenomena" as an intervening event; requiring plaintiffs to apportion losses to different sources in pleading loss causation).

## III.    PLAINTIFFS HAVE FAILED TO STATE A CLAIM AGAINST THE INDIVIDUAL DEFENDANTS FOR INSIDER TRADING

### A.    Plaintiffs' Second Claim for Relief Must be Dismissed in its Entirety

Plaintiffs purport to bring a separate cause of action against all of the Individual Defendants for violating Section 10(b) by engaging in supposed insider trading. (SAC ¶¶ 480-482.) However, since its enactment in 1988, it is Section 20A which "creates a private right of action to enforce the existing prohibition on insider trading under §10(b) caselaw." <u>DeMarco v. Robertson Stephens Inc.</u>, 318 F. Supp. 2d 110, 126 (S.D.N.Y. 2004).[23]

---

[23] Plaintiffs' plead their Second Claim for Relief against all Individual Defendants, but plead their Fourth Claim for Relief, a violation of Section 20A, only against Messrs. Bouton, Mustier and Day. In any event, even if an implied private right of action for insider trading under Section 10(b) (without § 20A) still exists, Plaintiffs have similarly failed to state such a claim for the same reasons discussed below including the failure to allege any contemporaneous trading involving Messrs. Citerne or Alix. <u>See</u> <u>Wilson v. Comtech Telecomms. Corp.</u>, 648 F.2d 88, 94–95 (2d Cir. 1981).

**B.  Plaintiffs Have Failed to State a Claim for Insider Trading**

Plaintiffs purport to bring a Section 20A claim against Individual Defendants Bouton, Day and Mustier. To state a claim under Section 20A, Plaintiffs must allege a predicate insider trading violation and a contemporaneous purchase and sale by Plaintiffs. See Jackson Nat'l Life Ins. Co. v. Merrill Lynch & Co., 32 F.3d 697, 703 (2d Cir. 1994), Wilson, 648 F.2d at 94–95; In re Refco, 503 F. Supp. 2d at 665. Plaintiffs meet neither element of a Section 20A claim.

1.    Plaintiffs Lack Standing as to Many of the Purported Insider Sales

Even if Plaintiffs had sufficiently alleged that Messrs. Bouton, Mustier or Day traded on the basis of material nonpublic information, and they have not, Plaintiffs do not have standing to bring a claim for most of the eleven purchases alleged to have been made in violation of Section 20A, because the purportedly contemporaneous purchases by a plaintiff must be made soon after a defendant sold rather than before to violate Section 20A. See In re Take-Two Interactive Sec. Litig., 551 F. Supp. 2d 247, 311 n.51 (S.D.N.Y. 2008) ("These defendants, however, may not be held liable for purchases Lead Plaintiffs carried out before the alleged insider trading in question."); O'Connor & Assoc. v. Dean Witter Reynolds, Inc., 559 F. Supp. 800, 803 (S.D.N.Y. 1983) ("[L]iability does not extend to those who traded prior to the defendant's breach of his duty to 'disclose or abstain' – that is, prior to the date of the defendant's trades.").

Here, as to Messrs. Bouton and Mustier, all of the contemporaneous purchases alleged by Plaintiffs occurred before or significantly after the alleged insider sales by these defendants. See, e.g., Copland v. Grumet, 88 F. Supp. 2d 326, 338 (D.N.J. 1999) (plaintiff's purchase two days after defendant's sale was not contemporaneous). As to Mr. Day, Plaintiffs only allege contemporaneous trades as to six of his sales. And for two of these sales – those on January 11, 2007 – the allegedly contemporaneous purchase occurred two days before Mr. Day's two alleged sales. These trades are not contemporaneous. See O'Connor & Assoc., 559 F. Supp. at 803.

2.    Plaintiffs Have Not Sufficiently Alleged Predicate Insider Trading Claims
       Against Messrs. Bouton, Mustier or Day

(a)    Plaintiffs do not Sufficiently Allege That Messrs. Bouton or
        Mustier Traded on the Basis of Material Nonpublic Information

Plaintiffs have failed to allege a predicate insider trading violation by Messrs. Bouton or

Mustier. As discussed above, Plaintiffs have failed to sufficiently allege any of the Individual

Defendants knew facts contrary to SG's public statements about its internal controls or its CDO

and RMBS exposure, and thus have not established the necessary strong inference that Messrs.

Bouton or Mustier traded while in possession of nonpublic information. Moreover, Plaintiffs'

lengthy putative Class Period involving numerous disclosures further undermines any inference

that Messrs. Bouton or Mustier possessed material inside information that was not disclosed to

the public at the time of their alleged trades. (Compare, e.g., SAC ¶ 158 (alleging disclosure on

August 2, 2007) with SAC ¶ 488 (alleging Mustier traded on August 21, 2007)).

(b)    The Complaint Does Not Give Rise to a Strong Inference of
        Scienter on the Insider Trading Claims Alleged Against Mr. Day

(i)    The Complaint Does Not Sufficiently Allege How
        and When Mr. Day Received Nonpublic
        Material Information

A plaintiff alleging insider trading must allege facts that "support a strong inference" both

that (1) the defendant "had access to inside information about [the company's] true financial

status" and (2) the defendant "was in receipt of such information when he sold his shares." See

In re Global Crossing, Ltd. Sec. Litig., No. 02 Civ. 910 (GEL), 2005 WL 2990646, at *10

(S.D.N.Y. Nov. 7, 2005) (internal quotation marks omitted). A complaint must allege "adequate

specifics regarding the circumstances surrounding Defendants' possession of non-public

information: e.g., among other things, what non-public information [was given to] Defendants,

when the information was given, etc." Log On Am., Inc. v. Promethean Asset Mgmt. L.L.C.,

31

223 F. Supp. 2d 435, 447 (S.D.N.Y. 2001). Moreover, "[s]uspicious trading by itself cannot suffice to warrant an inference" that the defendant possessed insider information, because such an inference would "relieve the [plaintiff of] its burden to identify the information, prove its materiality, and prove possession and use[.]" SEC v. Gonzalez de Castilla, 184 F. Supp. 2d 365, 378 (S.D.N.Y. 2002) (quoting SEC v. Truong, 98 F. Supp. 2d 1086 (N.D. Cal. 2000)).

In the Complaint's section entitled "Defendant Day's Insider Trading" (SAC ¶¶ 427-434), Plaintiffs allege that Mr. Day's twelve trades between April 2006 and January 18, 2008 were based on two pieces of nonpublic material information: (1) advance knowledge of SG's "exposure to massive unhedged, directional trades by Kerviel" (the "Kerviel losses"); and (2) advance knowledge of "imminent massive writedowns related to its subprime exposure" (the "CDO and RMBS write downs"). (SAC ¶ 430.) But this information could not have existed before January 2008. (E.g. SAC ¶ 16 (alleging that imminent CDO and RMBS write downs became expected "between January 18 and 21, [2008]"); SAC ¶ 344 (alleging that SG had announced much smaller CDO and RMBS write downs as of November 2007); SAC ¶ 431(c) (alleging that SG became aware of the Kerviel losses on January 18, 2008)). Thus, the seven sales Mr. Day made before 2008 cannot be "on the basis of" such information – one cannot possibly possess or trade on the basis of information that does not yet exist. SEC v. Hoover, 903 F. Supp. 1135, 1143 (S.D. Tex. 1995) ("[L]iability for insider trading can be based only on material, nonpublic information known at the time of the trade, not on information learned later."); see also Metzler Inv. GMBH v. Corinthian Colls., Inc., 540 F.3d 1049, 1069 (9th Cir. 2008); Gonzalez de Castilla, 184 F. Supp. 2d at 379.

As to Mr. Day's five trades in January 2008, the Complaint fails to adequately allege insider trading. No facts are alleged to show that Mr. Day purportedly knew about the Kerviel

losses and the CDO and RMBS write downs at the time of these trades. (See SAC ¶ 430).

Instead, the Complaint only asserts that SG's "management," not Mr. Day, became aware of the

Kerviel trading exposure on January 18, 2008. (See SAC ¶¶ 288 & n.7, 431(c)).

In an attempt to cover up this blatant deficiency, the Complaint alleges, without any

supporting factual detail, the conclusion that Mr. Day must have possessed material nonpublic

information based on his job titles alone. (See SAC ¶¶ 20, 286, 312, 358, 412, 427, 430). Such

an inference is not only unreasonable and unwarranted, but is flat wrong as a matter of law. See

In re Keyspan Corp. Sec. Litig., 383 F. Supp. 2d 358, 387 (E.D.N.Y. 2003) (collecting cases).

Nor does it help Plaintiffs' cause to point to the timing of Mr. Day's January 2008 trades in an

attempt to create a strong inference that Mr. Day possessed this information. To the contrary,

courts have made it clear that conclusory allegations about job titles and fortuitous timing are not

sufficient in combination to support a strong inference that a party, like Mr. Day, was in

possession of nonpublic material information at the time of the disputed trades. See In re Global

Crossing, 2005 WL 2990646, at *9; see also Gonzalez de Castilla, 184 F. Supp. 2d at 378.

> (ii)    The False Allegations Regarding Civil and Criminal
> Investigation are Entitled to No Weight

Plaintiffs also falsely allege that Mr. Day is currently under investigation by the SEC and

the Department of Justice. (SAC ¶¶ 27, 251, 269–70, 289, 434.) They further pile on legally

irrelevant hearsay from old newspaper articles making similar claims. (SAC ¶¶ 188(e), (g),

189.)[24] Plaintiffs' false accusations would be actionable if made outside of a legal pleading.

---

[24] The Complaint neglects to mention that the quoted Reuters wire service article that was
reprinted in the Globe and Mail (SAC ¶189), was not discussing Robert A. Day specifically. See
Randall Mikkelsen & Rachelle Younglai, CORRECTED-UPDATE 3 – US probes stock sales of
Socgen director-WSJ, Reuters.com, February 4, 2008 (Ex. 15). The false articles discussing the
putative SEC and DOJ investigations were published in the days following the disclosure of the
Kerviel trading two years ago, with no more recent reporting in the press.

They place Mr. Day in the position of being unable to prove a negative for the purposes of a

motion to dismiss, even though certain facts are indisputably true: no grand jury subpoenas for

documents or testimony have been issued by the DOJ, nor has the SEC issued any formal order,

taken any testimony, or subpoenaed any documents. Yet Plaintiffs constantly repeat these false

allegations, leaving a false cloud over Mr. Day, who has a forty-year history of compliance with

U.S. securities laws. Moreover, regardless of their falsity, such allegations of investigation are,

as a matter of law, entitled to "no weight" in determining whether plaintiffs adequately plead

scienter. See In re Ceridian, 542 F.3d at 248-49 (noting that plaintiffs are not permitted to rely

on pleadings from another lawsuit in pleading the extent of a defendant's knowledge).[25]

> (c)    The Allegations Regarding the Timing of the Trades and Mr. Day's
>        Titles do not Give Rise to a Strong Inference of Scienter on the
>        Insider Trading Claims

As discussed above, the timing of the insider Individual Defendants' trades does not

create a cogent and compelling inference of fraud. As to Mr. Day, the Complaint also relies

almost entirely on the timing of his trades and his job titles as a SG director and Chairman of

TCW to allege scienter for the insider trading claims. As noted, nothing about Mr. Day's

position as an outside director of SG and the nonexecutive Chairman of an SG subsidiary itself

gives rise to an inference of scienter. See Keyspan, 383 F. Supp. 2d at 387; In re Global

---

[25] As a matter of law, allegations regarding "litigations and administrative proceedings that did
not result in an adjudication on the merits or legal or permissible findings of fact" are per se
"immaterial" under Rule 12(f) of the Federal Rules of Civil Procedure. See In re Merrill Lynch
& Co., Inc. Research Reports Sec. Litig., 218 F.R.D. 76, 78 (S.D.N.Y. 2003); see also Lipsky v.
Commw. United Corp., 551 F.2d 887, 893 (2d Cir. 1976); Gotlin v. Lederman, 367 F. Supp. 2d
349, 363–64 (E.D.N.Y. 2005). The Complaint does not and cannot plead that any of these
putative "investigations" has resulted in an adjudication or formal finding of fact. Nor does the
oft-repeated allegation that Messrs. Day and Mustier have been investigated or charged by the
AMF (SAC ¶¶ 26, 29, 48, 52, 54, 188(g), 251, 264–68, 289, 292, 304, 445, 447) allege such a
result. Because these allegations are legally immaterial to the proceedings, they should be
stricken from the Complaint and cannot be the basis for any inference against any defendant.

Crossing, 2005 WL 2990646, at *9. Plaintiffs also seek an inference of scienter from the fact that Mr. Day sold about €140 million in SG common stock on the Euronext Paris Exchange in the weeks prior to the January 24, 2008 disclosure of the Kerviel losses and the CDO and RMBS write downs. (SAC ¶¶ 415, 427, 430.) But when viewed in context of all of the other facts, as they must be under Tellabs, 551 U.S. at 321-22, an inference of scienter is neither cogent, nor more reasonable than other inferences that can be drawn.

First, Mr. Day retained almost half of his SG stock even after the Kerviel losses and CDO and RMBS write downs were disclosed.[26] Based on the allegations in the Complaint, Mr. Day suffered a single-day loss of €5.35 million on January 24, 2008, and disclosure-related losses of over €13 million[27] to the value of shares that he continued to hold after January 24, 2008.[28] Second, by late 2007 as discussed above, it was widely known in the open market that banks exposed to U.S. residential mortgage market – as SG had publicly disclosed it was (Ex. 4 at 57) – faced market risks and a rapidly souring economic climate. Indeed, by the time of Mr. Day's January 2008 sales, SG's share price was 40 percent lower than its May 2007 peak. (SAC ¶428 (chart of share prices); see also SAC ¶183 (noting that several analysts predicted that SG would take substantial write downs related to CDO exposure, prior to their public disclosure by the company)). This alone dispels the notion that Mr. Day possessed inside information at the time

---

[26] See SAC ¶¶ 430 (Mr. Day sold 49.44 percent of his SG holdings in January 2008).

[27] The Complaint alleges that Mr. Day sold 1.6 million shares in January 2008, which represented 49.44 percent of his holdings. This puts his holdings prior to the sales at about 3,236,246 shares, which means that Mr. Day retained 1,636,246 on January 24 – the day on which the Complaint alleges that the revelation of the Kerviel losses and the CDO and RMBS write downs led to a single-day price decline of €3.27 per share (see SAC ¶ 185), and a soon-to-follow "collapse" of another €4.76. (SAC ¶ 431(b).)

[28] See In re Gildan Activewear, Inc. Sec. Litig., 636 F. Supp. 2d 261, 270 (S.D.N.Y. 2009); Stevens v. InPhonic, Inc., 662 F. Supp. 2d 105, 123 (D.D.C. 2009) (defendant's continued possession of a majority of his shares was enough to defeat a strong inference of scienter).

of his sales. Had Mr. Day made the 2006 and 2007 trades based on inside information, as alleged in the Complaint, there is no logical reason for him to have waited until January 2008 to sell over 1.5 million shares. The fact that Mr. Day sold the shares in January 2008 after a significant price drop refutes any reasonable inference that he possessed inside information at the time of his sales. Third, as a result of SG's $1.3 billion all-stock acquisition of TCW, which had been founded by Mr. Day (SAC ¶ 53), Mr. Day's personal holdings were highly over-concentrated in SG shares.[29] As of September 2007, the value of Mr. Day's SG shares made up more than 30 percent of his net worth. Fourth, even in the face of declining value, by delaying the sale until January 2008, Mr. Day incurred a substantial tax benefit by deferring the capital gains incurred from the sales of SG stock. Notably, attributing the timing of the trades to tax strategy is consistent with the trading pattern plead in the Complaint. As shown in the Complaint, Mr. Day's prior significant sales were also made at the beginning of the tax year. (SAC ¶ 415) (alleging over €27 million in sales in the first two weeks of 2007). Fifth, as the Complaint acknowledges, at the time Mr. Day engaged in the January trades, he was under an obligation to report them to the AMF (SAC ¶ 416), which he promptly did. Moreover, Mr. Day sold his shares during a window that was specifically opened for trading by SG. (See SAC ¶ 431(d).) There are simply no allegations that Mr. Day made any attempt whatsoever to disguise or cover up his trades.[30]

---

[29] See In re Silicon Graphics Inc. Sec. Litig., 183 F.3d 970, 987–88 (9th Cir. 1999) (rejecting an inference of scienter when a defendant sold over 75.3 percent of stock holdings during the class period, because the defendant was liquidating holdings that he had received as the result of a buyout of his former company).

[30] Cf. In re Nature's Sunshine Prods. Sec. Litig., 486 F. Supp. 2d 1301, 1310 (D. Utah 2007) ("Evidence that a defendant has taken steps to cover-up a misdeed is strong proof of scienter."); SEC v. Downe, 969 F. Supp. 149, 153 (S.D.N.Y. 1997) ("[A]ttempts to conceal . . . purchases from the SEC support[ ] an inference that [the defendant] was in possession of inside information when he made these trades.").

Ignoring these facts, Plaintiffs ask the Court – based on the thin gruel of Mr. Day's titles and the timing of the trades alone – to infer that Mr. Day (1) was aware of the impending disclosure of the Kerviel losses and the CDO and RMBS write downs, and (2) decided to commit insider trading by selling €140 million in SG common stock in his own name on the open Paris Bourse in the days and weeks prior to the disclosure. Plaintiffs seek this inference in the face of the certainty that Mr. Day's public sales would garner scrutiny. Further, Plaintiffs ignore the critical fact that Mr. Day retained nearly half of his SG holdings, on which he suffered personal losses far greater than those of any plaintiff in this case. In essence, Plaintiffs ask the Court to infer that Mr. Day – who had amassed $1.6 billion from forty years of ethical investing – made a decision that would be spectacularly irrational from an economic perspective and risk his entire reputation. Cf. Shields, 25 F.3d at 1130 ("In looking for a sufficient allegation of motive, we assume that the defendant is acting in his or her informed economic self-interest.").

The facts, however, support the far more compelling inference of innocence and nonfraudulent intent of Mr. Day. After several months of SG's shares steadily declining in value, Mr. Day made the rational decision to diversify his portfolio away from an underperforming asset in an increasingly risky business sector (banking) in which he was overly concentrated due to SG's all-stock acquisition of his former company. Mr. Day then made the reasoned decision to sell at a time when there were advantageous tax consequences. This is true as to all of the Individual Defendants. "Where plaintiff's view of the facts defies economic reason, . . . [it] does not yield a reasonable inference of fraudulent intent." Kalnit v. Eichler, 264 F.3d 131, 140-41 (2d Cir. 2001) (internal quotation marks omitted). It is true that "[p]eople sometimes act irrationally, but indulging ready inferences of irrationality would too easily allow the inference that ordinary business reverses are fraud." DiLeo, 901 F. 2d at 629. Thus, "[o]ne who believes

that another has behaved irrationally has to make a strong case." Id. Taking these rules into

account, along with the Court's "judicial experience and common sense," the inference of

scienter that Plaintiffs seek to draw is neither "cogent" nor "strong." S. Cherry St., 573 F.3d at

110 (citation omitted). It is certainly not anywhere close to being "at least as compelling as any

opposing inference of nonfraudulent intent" by Mr. Day. Id.

## IV.    PLAINTIFFS FAIL TO ALLEGE A VIOLATION OF SECTION 20(a)

As discussed above, Plaintiffs have failed to allege a primary violation of Section 10(b)

against any of the Individual Defendants, and accordingly, Plaintiffs' Section 20(a) claims must

fail too. See Boguslavsky v. Kaplan, 159 F.3d 715, 720 (2d Cir. 1998).

The Section 20(a) claim against Mr. Day fails for the additional reason that the

Complaint contains no adequate factual allegations that he exercised any control over SG. See

Harrison v. Rubenstein, No. 02 Civ. 9356 (DAB), 2007 WL 582955, at *19 (S.D.N.Y. Feb. 26,

2007); see also In re Livent, Inc. Sec. Litig., 78 F. Supp. 2d 194, 221 (S.D.N.Y. 1999) ("Actual

control is essential to control person liability."). Here, no such facts are alleged that could

possibly support such an inference that Mr. Day had power or influence over any "controlled

person." (See SAC ¶¶ 87–92, 484, 485). "[T]he law is settled that a person's status as a director

does not alone amount to the requisite power to control." In re Par Pharm., Inc. Sec. Litig., 733 F.

Supp. 668, 679 (S.D.N.Y. 1990) (citing cases).

## V.    THIS COURT LACKS PERSONAL JURISDICTION
##       OVER DEFENDANTS CITERNE AND ALIX

The Court need not reach the issue of personal jurisdiction over Messrs. Citerne and Alix

if Defendants' Motion to Dismiss is otherwise granted. In any event, such jurisdiction is lacking

here. Personal jurisdiction does not exist solely on the basis of being an officer, director or

supposed control person of a company with a U.S. presence. See, e.g., In re Alstom, 406 F. Supp.

2d at 399 ("[Defendant]'s status as a Board Member in itself, even if he in some respect oversaw [the alleged fraud] . . . is too tenuous a connection" to establish jurisdiction); see also Sedona Corp. v. Ladenburg Thalmann & Co., No. 03 CIV 3120 (LTS) (THK), 2006 WL 2034663, at *9 (S.D.N.Y. July 19, 2006) ("'If an individual is sued in his individual capacity, but only had contact with [the forum] as an officer of a corporation acting within the scope of his employment, that individual is not subject to personal jurisdiction.'") (alteration in original) (citation omitted)); In re Parmalat Sec. Litig., 376 F. Supp. 2d 472, 474, 516-17 (S.D.N.Y. 2005) (status as control person insufficient for personal jurisdiction).

Vaguely alleging that Messrs. Citerne and Alix were involved in the distribution of false and misleading reports and statements to investors as a result of their positions in the company (SAC ¶¶ 88-91) is also insufficient to infer personal jurisdiction. In re AstraZeneca, 559 F. Supp. 2d at 467. Further, the exercise of personal jurisdiction over Messrs. Citerne and Alix would offend due process because of their lack of contacts with the U.S. Courts must give "significant weight" to the "unique burdens" placed "upon one who must defend oneself in a foreign legal system." Northrop Grumman Overseas Serv. Corp. v. Banco Wiese Sudameris, No. 03 Civ. 1681(LAP), 2004 WL 2199547, at *16 (S.D.N.Y. Sept. 29, 2004) (internal quotation marks omitted) (citation omitted). Plaintiffs do not argue that Messrs. Citerne or Alix's role with regard to the facts at issue bears any causal nexus to the U.S., nor that they have any contacts, ties, or relations to this forum, so it would not comport with "traditional notions of fair play and substantial justice" to exercise personal jurisdiction over them. Metro. Life Ins. Co. v. Robertson-Ceco Corp., 84 F.3d 560, 568 (2d Cir. 1996). (See generally Declaration of Gerard Gardella ¶¶ 5, 6) (Docket Entry 66).

39

## CONCLUSION

For the foregoing reasons, the Complaint should be dismissed with prejudice.

Dated: New York, New York
      April 15, 2010


Respectfully submitted,


_____/s/ Scott D. Musoff_____          _Mark Holscher_

Scott D. Musoff                     Mark Holscher
(scott.musoff@skadden.com)      (mark.holscher@kirkland.com)
George A. Zimmerman           KIRKLAND & ELLIS LLP
(george.zimmerman@skadden.com)   333 S. Hope Street
Bryan Levine                       Los Angeles, California 90071
(bryan.levine@skadden.com)        (213) 680 8400
SKADDEN, ARPS, SLATE,
   MEAGHER & FLOM LLP
Four Times Square              Joseph Serino, Jr.
New York, New York 10036      (joseph.serino@kirkland.com)
(212) 735-3000                  KIRKLAND & ELLIS LLP
                              601 Lexington Avenue
                              New York, New York 10022
Attorneys for Defendants         (212) 446 4800
Société Générale, Daniel Bouton, Philippe
Citerne, Didier Alix and Jean-Pierre Mustier   Attorneys for Defendant Robert A. Day